

# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

**FILED**

FUJIFILM CORPORATION,



Movant,

NOV 1 4 2007

11-14-07

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

— v. —

HOSIDEN AMERICA CORPORATION,

Respondent.

**SUBPOENA IN A CIVIL CASE**

07cv6458
JUDGE MAROVICH
MAG. JUDGE SCHENKIER

## DECLARATION OF IAN G. DIBERNARDO IN SUPPORT OF MOTION TO ENFORCE RULE 45 SUBPOENA AGAINST NON-PARTY HOSIDEN AMERICA CORPORATION

IAN G. DIBERNARDO, declares, under penalty of perjury, as follows:

1.        I am a partner with the firm of Stroock & Stroock & Lavan LLP, having offices at 180 Maiden Lane, New York, New York 10038 and represent Movant FUJIFILM Corporation ("Fuji"). I am an attorney at law admitted to practice before the courts of the State of New York.

2.        Annexed as Exhibit A is a true and correct copy of a Subpoena Duces Tecum served on Hosiden America Corporation in connection with Honeywell International Inc., et al., v Apple Computer, Inc., et al. (C.A. No. 04-1338 (consolidated)), (the "Underlying Case") a case currently pending in the United State District Court For the District of Delaware. I am admitted to practice in that case. Fuji is one of the defendants in that case which arises out of a claim of infringement of U.S. Patent No. 5,280,371 (issued January 18, 1994) based on the incorporation of liquid crystal display ("LCD") modules incorporated in Fuji digital still cameras sold in the United States.

3.      Annexed as Exhibit B is a true and correct copy of a Dun & Bradstreet Report for Hosiden Corporation.

4.      Annexed as Exhibit C is a true and correct copy of a Dun & Bradstreet Report for Hosiden America Corporation.

5.      Annexed as Exhibit D is a true and correct copy of an Affidavit of Special Process Server that shows that the subpoena attached hereto as Exhibit A was served on Hosiden America on October 1, 2007.

6.      Annexed as Exhibit E is a true and correct copy of a letter from Jason Metnick, counsel for Hosiden America, to myself dated October 15, 2007.

7.      Annexed as Exhibit F is a true and correct copy of U.S. Patent No. 5,280,371, entitled Directional Diffuser for Liquid Crystal Display which issued on January 18, 1994.

8.      Annexed as Exhibit G is a true and correct copy of a Document Request dated July 19, 2006 wherein Fuji requested Honeywell to produce documents related to its involvement with Hosiden Corporation; however, Honeywell did not produce all relevant documents. In the Underlying Case, Fuji has asserted the defense of laches based upon *inter alia* prejudice arising out of the destruction of the requested documents.

9.      Annexed as Exhibit H is a true and correct copy of a letter from Jason Metnick, counsel for Hosiden America, to myself dated September 25, 2007.

10.     Annexed as Exhibit I is a true and correct copy of an email from Jason Metnick, counsel for Hosiden America Corporation, to myself dated October 31, 2007.

11.     Annexed as Exhibit J is a true and correct copy of an email from Jason Metnick, counsel for Hosiden America Corporation, to myself dated November 2, 2007.

12.     Annexed as Exhibit K is a true and correct copy of an email from myself to Jason Metnick, counsel for Hosiden America, dated October 29, 2007.

13.     I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001, Title 18 of the United States Code.

By: _____

Ian G. DiBernardo

Dated: _____

# **Exhibit A**

# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

HONEYWELL INTERNATIONAL INC. and
HONEYWELL INTELLECTUAL PROPERTIES,
INC.

Plaintiffs,

- v. -

APPLE COMPUTER, INC., et al.,

Defendants.

## SUBPOENA IN A CIVIL CASE

PENDING IN THE U.S. DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

CASE NUMBER: 04-1338 (***)
(Consolidated)

- - - - - - - - - - - - - - - - - - - - - - - -

To:    Hosiden America Corporation
       120 East State Parkway
       Schaumburg, Illinois 60173

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF TESTIMONY | DATE AND TIME |
|---|---|
| | |

☐ YOU ARE COMMANDED to produce a witness having personal knowledge of the matters set forth in Attachment B of the attached Notice of Deposition to appear at the place, date and time specified below to testify at the taking of a deposition in the above case.

| PLACE:   TO BE DETERMINED | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the documents or objects listed in Attachment A attached hereto, at the place, date, and time specified below.

| PLACE: Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038 | DATE AND TIME October 29, 2007 |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this proceeding case that is subpoenaed for the taking of a deposition shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify, Fed.R.Civ.P. 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE Attorney for Defendant FUJIFILM Corporation | DATE September 28, 2007 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Ian G. DiBernardo, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038-4982 (212) 806-5400

SSL-DOCS1 1847000v1

## PROOF OF SERVICE

| SERVED | DATE | PLACE |
|---|---|---|
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

### Rule 45, Fed.R.Civ.P., Parts (C) & (D)

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance;

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed and or regularly transacts business

in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applied, or

(iv)  subject a person to undue burden.

(B)  If a subpoena

(i)  require disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

SSL-DOCS1 1847000v1

## ATTACHMENT A

## DEFINITIONS

As used in this Subpoena the terms listed below are defined as follows:

1.      "'371 patent" shall mean United States Letters Patent No. 5,280,371 entitled "Directional Diffuser for a Liquid Crystal Display," (copy attached) and the application therefor, and all parent applications, continuation, continuation-in-part, divisionals and other related applications, all reexaminations and reissues, and the patent family thereof.

2.      "3M" shall mean the 3M Company and all of its divisions, departments, subsidiaries (whether direct or indirect), parents, affiliates, acquisitions, predecessors and entities controlled by any of them, whether domestic or foreign, and their respective present or former officers, directors, employees, owners, attorneys and agents, as well as consultants and any other persons acting or purporting to act on behalf of each such entity or person.

3.      The words "and", "and/or", and "or" shall each be deemed to refer to both their conjunctive and disjunctive meanings. The words "all" and "any" shall mean "each and every" as well as "any one". The masculine gender shall be deemed to include the feminine and the neuter where appropriate, the singular, the plural, and vice versa. The terms "person" or "persons" mean any natural person, corporation, partnership, association, organization, or group of natural persons, including but not limited to any employee, officer, director, consultant, independent contractor, agent, attorney or representative of any of them.

4.      "Contract" shall mean all contracts, agreements, instruments, conditional sales contracts, letters of intent, memoranda of understanding, licenses, commitments or other

1



arrangements, and any other documents setting forth terms or conditions, or otherwise governing the relationship between parties, together with all modifications and amendments thereto.

5.     The words "document" or "documents" shall be used in their broadest sense and shall include, but are not limited to, any tangible thing capable of storing information, including but not limited to the following items, whether printed, typed or recorded or reproduced by hand or electronically, magnetically, optically or in any graphic manner of any kind or nature however produced or reproduced, whether sent or received or neither, whether within the actual or constructive possession, custody, or control of any agent, employee, consultant, or any other person acting or purporting to act on behalf of you or Hosiden, including drafts and copies bearing notations or marks not found on the original, and includes, but is not limited to:

a. all letters or other forms of correspondence or communication, including envelopes, notes, telefaxes, telegrams, cables, electronic mail messages, telex messages, and telephone messages (including reports, notes, notations and memoranda of or relating to any telephone conversations or conferences or personal interviews);

b. all memoranda, laboratory notebooks, research reports, speeches, reports, financial statements or reports, appraisals, estimates, sales proposals, RFQ or RFP responses, notes, transcripts, tabulations, ledgers, studies, analyses, evaluations, projections, work papers of any type, corporate records or copies thereof, lists, comparisons, questionnaires, surveys, charts, graphs, maps, diagrams, summaries, tables, indexes, extracts, statistical records, compilations, reports and/or summaries of investigations, testing or analyses, marginal notations, all desk calendars, appointment books and diaries;

c. all books, manuscripts (whether submitted for publication or not), press releases, magazines, newspapers, booklets, brochures, sales support materials, training materials, pamphlets, circulars, bulletins, notices, speeches, instructions, manuals, and articles;

d. all minutes, transcripts, notes, presentation material, and memoranda of meetings;

e. all photographs, drawings, microfilms, tapes or other recordings, punch cards, magnetic tapes, magnetic disks, optical or magneto-optical disks, print-outs, and other data compilations from which information can be obtained, and any other information recorded in or on any medium whatsoever; and

       f.   all contracts, agreements, understandings, letters of intent, proposals, memoranda of understanding, representations and warranties.

6.     The term "Honeywell" shall refer to Honeywell International, Inc. and Honeywell Intellectual Properties Inc., and all divisions, departments, subsidiaries (whether direct or indirect), parents, affiliates, acquisitions, predecessors and entities controlled by any of them, whether domestic or foreign, including but not limited to, Honeywell Inc., and their respective present or former officers, directors, employees, owners, attorneys and agents, as well as consultants and any other persons acting or purporting to act on behalf of each such entity or person.

7.     "Hosiden" refers to Hosiden Corporation and all of its divisions, business units, departments, subsidiaries (whether direct or indirect), parents, affiliates, divisions, business units, subsidiaries, acquisitions, predecessors and entities controlled by any of them, whether domestic or foreign, including but not limited to Hosiden America Corporation, and their respective present or former officers, directors, employees, owners, attorneys and agents, as well as consultants and any other persons acting or purporting to act on behalf of each such entity or person.

8.     "JAE" shall mean Japan Aviation Electronics and all of its divisions, departments, subsidiaries (whether direct or indirect), parents, affiliates, acquisitions, predecessors and entities controlled by any of them, whether domestic or foreign, and their respective present or former officers, directors, employees, owners, attorneys and agents, as well as consultants and any other persons acting or purporting to act on behalf of each such entity or person.

9.    "LCD Module" shall mean a liquid crystal display for incorporation into another product or any assembly for use in a liquid crystal display, including but not limited to, a backlight and liquid crystal panel.

10.    The terms "person" or "persons" mean any natural person, corporation, partnership, association, organization, or group of natural persons, including but not limited to any employee, officer, director, consultant, independent contractor, agent, attorney or representative of any of them.

11.    Unless otherwise specified herein, "relates to" and "refers to", and forms thereof, shall be used interchangeably to mean concerning, comprising, involving, directed to, created by, sent to, received by, copied to, responsible for, or in any way logically or factually connected to the subject of the request.

12.    "SID" shall mean the Society for Information Display.

13.    The terms "thing" and "things" refer to any material object, such as samples, prototypes, packaging samples, models, illustrations of physical and chemical phenomena, and photographs, montages, movies or videotapes of physical objects, and electronic representations of any of the above.

14.    The terms "you" or "your" refer to Hosiden America Corporation and all of its divisions, business units, departments, subsidiaries (whether direct or indirect), affiliates, divisions, subsidiaries, acquisitions, predecessors and entities controlled by any of them, whether domestic or foreign, and their respective present or former officers, directors, employees,

owners, attorneys and agents, as well as consultants and any other persons acting or purporting to act on behalf of each such entity or person.

## INSTRUCTIONS

1. These requests shall apply to all documents and things in your possession, custody or control at the present time or coming into your possession, custody or control, including, but not limited to, documents and things in Hosiden's possession, custody or control. If you know of the existence, past or present, of any document or thing requested below, but are unable to produce such document or thing because it is not presently in your possession, custody, or control, you shall so state and shall identify such document or thing, and the person who now has or lost his possession, custody or control of the document or thing.

2. All documents that respond, in whole or in part, to any request are to be produced in their entirety, without abbreviation or expurgation, including all attachments or other matters affixed thereto.

3. If no documents are responsive to a particular request, you are to state that no responsive documents exist.

4. All documents shall be produced either in order of Request or in the manner that they are kept in the usual course of business. Whenever a document or group of documents is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, a copy of the label or other means of identification of such cover or other container shall be attached to the document.

5. If any document requested has existed, but has been lost, destroyed, or is no longer within your possession, custody or control, identify those documents and describe the

document, its author(s), the recipients(s) or addressee(s), the subject matter and content. Further, if the document has been destroyed, state with particularity the date and circumstances surrounding the reasons for its destruction, and identify the last known custodian of the document and each person who has knowledge of the contents, loss or destruction of any such document.

6.    In the event that any document identified in these Requests is subject to any claim of privilege (including work product), you shall furnish a list identifying each such document by:

    a.    identifying the person who prepared or authored the document and, if applicable, the persons who sent the document or thing and to whom the document (including copies) or thing was sent and the dates on which the document or thing was prepared and transmitted, identifying persons who prepared, sent and/or received the document or thing as required in the accompanying Definitions;

    b.    describing the nature of the document or thing (e.g., letter, inter-office memorandum, telegram, notes, etc.) and, to the extent possible, the subject matter thereof;

    c.    identifying any and all attachments or enclosures appurtenant to such documents;

    d.    stating briefly the nature of the privilege asserted; and

    e.    producing any non-privileged portions, attachments or enclosures to any such privileged document, and identifying the portion(s) of the document to which privilege is claimed.

7.    If, subsequent to the date you produce documents responsive to these requests you discover or receive documents that are responsive to any request herein, promptly produce all such additional documents to the full extent required by the Federal Rules of Civil Procedure and the Local Rules of the District Court.

8.    Each document is to be produced along with all drafts and copies having annotations different from those on other copies, without abbreviation or redaction.

9.      In the event any document identified in these Requests is deemed confidential by you or Hosiden, it shall be produced in accordance with the annexed Stipulated Protective Order in this case and the confidentiality thereof will be provided the protection of the Order pursuant to paragraph 20 thereof.

## DOCUMENTS AND THINGS TO BE PRODUCED

1.      All documents relating or referring to the design, development, testing, manufacturing, marketing, sale, purchase or supply of liquid crystal displays, LCD Modules or components thereof, whether final products or prototypes, by, for or on behalf of Honeywell, including, but not limited to, all documents provided by or on behalf of Honeywell, The Boeing Company or JAE to Hosiden and all documents provided by or on behalf of Hosiden to Honeywell, The Boeing Company or JAE relating or referring to liquid crystal displays, LCD Modules or components thereof between January 1, 1988 and December 31, 1994.

2.      All proposals, requirements, documents, specifications, requests for quotations and requests for proposals, and all responses thereto, from Honeywell to Hosiden, or vice versa, relating or referring to liquid crystal displays, LCD Modules or components thereof issued or outstanding between January 1, 1988 and December 31, 1994, and all documents relating or referring thereto.

3.      All Contracts relating or referring to Hosiden's relationship with Honeywell at any time between January 1, 1988 and January 18, 1994, including, but not limited to, all Contracts relating or referring to licenses of technology, know-how, intellectual property (including patents and patent applications) and/or inventions and/or to nondisclosure or

confidentiality obligations between Hosiden and Honeywell in force at any time between January 1, 1988 and January 18, 1994.

4.    All products, samples, prototypes, models, and demonstrations provided to or by Honeywell between January 1, 1988 and December 31, 1994 related to avionic displays, liquid crystal displays, LCD Modules or components thereof, including, but not limited to, those referred to by Honeywell as Display Units, numbers 8, 9 and 10 (DU #8, 9 and 10), and all documents relating or referring thereto.

5.    All products, samples, prototypes, models and demonstrations of avionic displays, liquid crystal displays, LCD Modules or components thereof furnished by Hosiden to another person on behalf of Honeywell, including but not limited to, Honeywell itself, the Boeing Company and JAE, or provided to Hosiden by or on behalf of Honeywell between January 1, 1988 and December 31, 1994, and all documents relating or referring thereto.

6.    All documents relating or referring to work done for The Boeing Company, whether performed directly or indirectly through Honeywell and/or JAE including, but not limited to, all documents relating to liquid crystal displays, LCD Modules or components thereof, for use in the Boeing 777, 767, 7J7, and 767X airplanes.

7.    All documents, including but not limited to, agendas, meeting minutes and meeting notes, relating or referring to meetings of Honeywell, JAE and/or The Boeing Company, whether or not attended by Hosiden, relating to liquid crystal displays, LCD modules or components thereof.

8.      All documents relating or referring to Hosiden's interaction, collaboration, supplying of materials or services to or other relationship with any person, including but not limited to JAE, on behalf of or in connection with providing materials or services to Honeywell.

9.      Organizational charts or other documents for any division, group or department of Hosiden that worked or collaborated with Honeywell or any of the inventors of the '371 patent and/or to which Honeywell provided information or designs between January 1, 1988 and January 18, 1994, from which the identification of the employees or consultants of Hosiden who actively participated with Honeywell in connection with the design, development, testing, manufacture, marketing, sale, purchase or supply of liquid crystal displays, LCD Modules or components thereof can be made.

10.      All documents relating or referring to the '371 patent or the subject matter thereof and Hosiden's interest in acquiring, and Honeywell's offering of, rights under the '371 patent, including but not limited to, all communications between Hosiden and Honeywell regarding the '371 patent (including but not limited to Hosiden letter HDO050, dated August 7, 1992 and correspondence to or from Mr. Yasohiro Ugai of Hosiden), valuations of the '371 patent and prior art to the '371 patent.

11.      All communications between Hosiden and any of the inventors of the '371 patent namely, Richard I. McCartney, Jr., Daniel D. Syroid, and Karen E. Jachimowicz.

12.      All documents referring or relating to the existence, reduction or avoidance of moiré interference, use of one or more lenticular, prismatic or other lens arrays (including, but not limited to, Optical Lighting Film (OLF) or Brightness Enhancing Film (BEF) offered by 3M or similar product) in an LCD Module or backlight for a liquid crystal display on or before

December 31, 1998, or rotation of a periodic structure to avoid or reduce moiré interference on or before December 31, 1998.

13.    All documents referring or relating to meetings, conferences, papers or publications of the SID between January 1988 and October 2004.

14.    All documents relating or referring to the existence, non-existence or destruction, including the timing of any such destruction, of any document or thing responsive to these Requests, including but not limited to, Hosiden document retention and document destruction policies in effect from January 1994.



# United States Patent [19]

## McCartney, Jr. et al.

US005280371A

[11] **Patent Number:** **5,280,371**

[45] **Date of Patent:** **Jan. 18, 1994**

[54] **DIRECTIONAL DIFFUSER FOR A LIQUID CRYSTAL DISPLAY**

[75] Inventors: **Richard I. McCartney, Jr.,** Scottsdale; **Daniel D. Syroid,** Glendale; **Karen E. Jachimowicz,** Goodyear, all of Ariz.

[73] Assignee: **Honeywell Inc., Minneapolis, Minn.**

[21] Appl. No.: **911,547**

[22] Filed: **Jul. 9, 1992**

[51] Int. Cl.$^5$ ............................................. G02F 1/133
[52] U.S. Cl. ............................. 359/40; 359/69
[58] Field of Search ..................... 359/69, 40, 41

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,416,515 | 11/1983 | Fumada et al. | 359/69 |
| 5,052,783 | 10/1991 | Hamada | 359/41 |
| 5,101,279 | 3/1992 | Kuramatsu et al. | 359/40 |
| 5,128,783 | 7/1992 | Abileah et al. | 359/40 |
| 5,161,041 | 11/1992 | Abileah et al. | 359/40 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0068400 | 10/1977 | Japan | 359/69 |
| 2-14822 | 8/1990 | Japan | 359/69 |

### OTHER PUBLICATIONS

IBM Corp., "Polarized backlight for liquid crystal display", IBM Technical Disclosure Bulletin, vol. 33, No. 1B, Jun. 1990, pp. 143–144.

*Primary Examiner*—William L. Sikes
*Assistant Examiner*—Huy Mai
*Attorney, Agent, or Firm*—Dale E. Jepsen; A. Medved

[57] **ABSTRACT**

A display apparatus including a light source, a liquid crystal panel, and one or more directional diffuser lens arrays disposed therebetween provides a tailored variation of luminance with viewing angle, a uniform variation of luminance with viewing angle within a first predetermined range of viewing angles and a concentration of light energy within a second predetermined range of viewing angles.

**3 Claims, 11 Drawing Sheets**









*Fig.2*



Fig.3



$$\Theta_V = \text{VERTICAL VIEW ANGLE}$$

## Fig. 4A



$$\Theta_H = \text{HORIZONTAL VIEW ANGLE}$$

## Fig. 4B



*Fig. 5*



*Fig.6*



*Fig. 7*



$\Theta_V =$ VERTICAL VIEW ANGLE

*Fig. 10*

**U.S. Patent**          Jan. 18, 1994          Sheet 8 of 11          5,280,371



*Fig. 8*



*Fig. 9*



Fig.11

Case 1:07-cv-06458    Document 7    Filed 11/14/2007    Page 28 of 159



Fig.12

5,280,371

1

# DIRECTIONAL DIFFUSER FOR A LIQUID CRYSTAL DISPLAY

## BACKGROUND OF THE INVENTION

This invention relates in general to flat panel liquid crystal displays and, more particularly, to a liquid crystal display (LCD) having a directional diffuser to provide a tailored variation of luminance with viewing angle.

There are commercially available liquid crystal displays for use in various applications, including for example aircraft cockpit displays. However, a typical characteristic of the liquid crystal panel used therein is a wide variation of the light transmission of the liquid crystal panel with viewing angle. This results in gray-scale errors and off-state errors with viewing angle. That is to say, the brightness of certain areas of the display when viewed at angles above or below a vertical viewing angle normal to the display surface, may be substantially different than the brightness of those areas when viewed at an angle normal to the display surface. This variation of brightness or luminance with viewing angle is generally undesirable and particularly undesirable in those cases where the information being displayed on the liquid crystal display is critical to an operation such as controlling or navigating an aircraft.

In addition, a typical diffuser used to provide a light source for backlighting a typical liquid crystal display ordinarily provides a constant luminance with viewing angle and therefore provides the same amount of energy for any given viewing angle of the display. In certain applications, such as for example an aircraft cockpit, the typical vertical viewing angle is fixed within a relatively narrow range and it would therefore be desirable to concentrate a higher percentage of the energy from the light source within a particular range of viewing angles.

It would therefore be desirable to provide a directional diffuser for use with a liquid crystal display to provide a tailored variation of luminance with viewing angle while also providing a concentration of the light energy from the light source within a predetermined range of viewing angles.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a directional diffuser element for a liquid crystal display to provide a tailored variation of luminance with viewing angle.

It is a further object of the present invention to provide a liquid crystal display having less variation of intermediate gray-level luminance with viewing angle.

It is still further an object of the present invention to provide a liquid crystal display combining the above features to provide a higher concentration of light energy, and therefore increased luminance, within a particular range of viewing angles thereby providing a more efficient use of light energy available from a light source.

The foregoing and other objects are achieved in the present invention wherein there is provided a liquid crystal display apparatus comprising a light source, a liquid crystal planar array of pixels for creating an image by controlling the amount of light allowed to pass through each of the pixels, and one or more directional diffuser lens arrays disposed between the light source and the liquid crystal array for providing a tailored variation of luminance from the liquid crystal display as a function of vertical viewing angle.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above mentioned and other features and objects of the present invention and the manner of attaining them will become more apparent and the invention itself will be best understood by reference to the following description of alternative embodiments of the invention taken in conjunction with the accompanying drawings wherein:

FIG. 1 is an exploded view of a typical prior art backlit liquid crystal display;

FIG. 2 is an exploded view of the liquid crystal display of the present invention, having a directional diffuser lens array;

FIG. 3 illustrates a typical prior art LCD gray-level response showing the variation of luminance with vertical viewing angle;

FIGS. 4A and 4B show cross sectional side and top views of a typical assembly including the lens array of the present invention;

FIG. 5 illustrates the variation of luminance with viewing angle for a light source alone and a light source combined with a single lens array;

FIG. 6 illustrates the path of various light rays when striking the lens array at various angles;

FIG. 7 is a cross sectional view of a preferred embodiment of the present invention with two lens arrays;

FIG. 8 illustrates the variation of luminance with viewing angle for the dual lens array configuration;

FIG. 9 illustrates the variation of luminance with viewing angle for a triple lens array configuration;

FIG. 10 is a cross sectional view of a configuration utilizing a triangular shaped lens array;

FIG. 11 illustrates the variation of luminance with viewing angle for the triangular shaped lens array; and

FIG. 12 shows the angular rotation of the lens array with respect to the LCD matrix array to eliminate residual moire effects.

## DESCRIPTION OF A PREFERRED EMBODIMENT

Referring now to FIG. 1 there is shown a cross section of a typical prior art liquid crystal display apparatus including backlight array 25 comprising lamp 10, rear reflecting surface 15 and lambertian diffuser 20. The backlight array provides a source of light which impinges on liquid crystal panel 30 comprised of a number of individual liquid crystal elements which are alternately energized in order to form a desired pattern or image for viewing from the front of the liquid crystal display.

While this typical prior art liquid crystal panel may be adequate for certain applications where the normal viewing angle is more or less at an angle normal to the display surface, this display is not optimum for applications wherein the typical viewing angle is other than at an angle normal to the display surface. This prior art display exhibits a relatively wide variation of light transmission with viewing angle, especially the vertical viewing angle. As illustrated in FIG. 3 this variation also changes with the level of lumination for various gray-levels or intermediate intensities for a given display.

5,280,371

3

As can be seen in the curves of FIG. 3, the luminance emitted from the lower gray-levels of the LCD system increases significantly with increasing vertical viewing angle. This variation presents an undesirably large luminance increase with angle when the information being presented is low-level luminance information, such as for avionics applications including weather radar or attitude director indicator presentations. As a pilot viewing the display moves his vertical perspective, or his viewing angle, higher above a normal angle to the display (larger vertical viewing angles), he observes a low luminance field increase significantly in luminance, thereby causing confusion in interpretation of critical display information.

In addition, the lambertian diffuser of the typical prior art display, element 20 of FIG. 1, provides for a nearly equal luminance in all angular viewing directions. In most applications a 180° field of view in both horizonal and vertical directions is not required. It would therefore be more energy efficient if a substantial portion of the light energy could be redirected so as to be concentrated in the viewing angles of interest for a particular application.

The apparatus of the present invention includes the backlight array and liquid crystal of the prior art as shown in FIG. 1 with the addition of a lens array 40 inserted between the lambertian diffuser 20 of the prior art and liquid crystal display panel 30, as shown in FIG. 2. It was found that by inserting a directional diffuser consisting of a cylindrical lens array 40 between the lambertian diffuser and the liquid crystal panel that both of the desired effects could be accomplished. That is, the overall light energy is concentrated within a desired rang of viewing angles and the variation of luminance with viewing angle is tailored to offset that which is obtained through the liquid crystal display alone.

For example, FIG. 5 illustrates that with the insertion of lens array 40 as shown in FIGS. 4A and 4B, the overall luminance has increased approximately 20 percent within a range from −20° to +20° viewing angle and the desired decrease in luminance with increased vertical viewing angle is obtained between approximately +10° and +35° of vertical viewing angle. Curve 110 of FIG. 5 illustrates the variation of luminance with viewing angle for the lambertian light source only, in both the horizontal and vertical angles while curves 120 and 130 respectively represent a variation of luminance with vertical and horizontal viewing angles for the backlight including lens array 40.

The effect which results from the insertion of the cylindrical lens array is explained by reference to FIG. 6 wherein there are shown light rays from the lambertian (having uniform luminance with angle) source diffuser impinging on the lens array from various angles. An air gap must be present at the interface of the lambertian diffuser and the lens array. The normal 4 percent loss per surface due to fresnel reflections is not incurred, because the surface reflections are returned to the diffuser and reflected again.

Those rays that are normal to the source diffuser but less than the critical angle within the lens array are passed through the lens array materially unobstructed, except for a small amount of surface reflection. Rays which enter at oblique angles and are greater than the critical angle of the lens array undergo total internal reflection at the inside of the lens surface as illustrated by ray tracing 70. These rays are reflected with no loss due to the total internal reflection effect around the lens

4

periphery. They exit the rear of the lens array and return to the source diffuser where they undergo a secondary diffuse reflection from the source diffuser.

However, because the source diffuser is not totally reflective, some of the returned rays are transmitted through the diffuser and are then reflected from the backlight enclosure surface 15 of FIG. 4A. Some fraction of these rays are reflected internally to exit the diffuser again. These reflected rays again have a lambertian distribution at the surface of lambertian diffuser 20. It is apparent from this interaction between the lens array and the backlight that rays which impinge close to the normal tend to be intensified while those rays which impinge at oblique angles undergo total internal reflection and are returned to the diffuser and diminished somewhat from this statistical process.

However, the roll off or variation with vertical viewing angle for this single directional diffuser cylindrical lens array was not sufficient to offset the effects of the liquid crystal display, and there were significant moire patterns caused by the interference between the lens array and the display panel wherein the lens array contained 142 lenses per inch and the display panel matrix had a spatial frequency resolution of 172 dots or pixels per inch.

For the desired specific implementation it was discovered that the adverse interaction producing moire patterns could be eliminated by including a second lens array with a different number of lenses per inch. The combination of the dual lenses increased the desired reduction in luminance with increased viewing angle, and in addition reduced or eliminated the moire patterns with the selection of an appropriate pitch, or number of lenses per inch, for the two lenses in question.

As illustrated in FIG. 7, one of the lens arrays 42 was selected to have a relatively coarse pitch with respect to that of the liquid crystal display and the second lens array 44 was selected to have a relatively fine pitch with respect to that of liquid crystal display. FIG. 8 illustrates again the relatively flat response of the lambertian source diffuser alone curve 110, and the increased roll off with vertical viewing angle of curve 125 as well as the corresponding variation of luminance with horizonal viewing angle as illustrated by curve 135 for the dual lens array of FIG. 8.

In general it was discovered that the addition of additional lens arrays caused a steeper or more rapid variation of the change in luminance with vertical viewing angle, which was desirable, but the corresponding change in luminance with variations in horizonal viewing angle also became steeper, which was not desirable for the particular application in question. For the particular application in question the preferred embodiment included two lens arrays in series which provided the best tradeoff of decrease in luminance with variation of vertical viewing angle, while not adversely affecting the variation in luminance with horizontal viewing angle.

In addition, since moire effects result when both of the lens arrays have the same spatial frequency, the rear array 42 should have a coarse resolution or low spatial frequency while the front lens array 44 should have a fine resolution or high spatial frequency. The lens arrays and the panel spatial frequencies should be selected to avoid integral multiples of the other. Thus the fine lens array should be as high a spatial frequency as is practical and should be a non integral multiple of the panel frequency. According to these guidelines the fine

5,280,371

5

array frequency becomes approximately 2.5 times the display spatial frequency and the coarse array frequency should be approximately the fine array frequency divided by 3.5, 4.5, 5.5 or as required for the most convenient fabrication.

It was also discovered that the maximum increase in luminance was obtained using a triangular lens array having an included angle of 90° as illustrated in FIG. 10. This configuration resulted in a variation of luminance with vertical and horizonal viewing angles which was quite steep as illustrated by curves 160 and 170 of FIG. 11. Other lens array shapes may be selected as desired to obtain the required concentration of luminance and variation of luminance with vertical and horizonal viewing angle for a particular application.

Even though the spatial frequencies of the directional diffuser lens array and LCD panel have been selected to be greatly different and non-integer multiples, some visual banding effects or moire pattern effects may still be apparent to the viewer. This is especially true at off-axis viewing conditions. This residual moire can be removed by rotating the lens array 40 with the respect to the LCD array 30, as illustrated in FIG. 11. This rotation of the lens array by a few degrees (Typically 2 to 16 degrees) from the horizontal axis causes a small change in the effective spatial frequency difference of the two arrays and thereby eliminates the residual moire.

In addition to the angular redistribution of the light from the directional diffuser, the lens array also provides an additional diffusing effect, especially for any step variations in luminance that are parallel to (or nearly parallel to within a few degrees) the axis of the lens array. This allows the reduction of the thickness or optical density of the conventional diffuser while still achieving the same system luminance uniformity and masking of undesired spatial artifacts from the light source, but with higher luminance at the output.

While there have been described above the principals of invention in conjunction with several specific embodiments, it is to be clearly understood that these descriptions are made only by way of example and not as a limitation to the scope of the invention.

6

We claim:

1. A display apparatus comprising:

a light source;

a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and

first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel, wherein said liquid crystal panel comprises a plurality of pixels arranged in rows and columns, and wherein the number of rows of pixels per unit height, or pitch, of the liquid crystal panel is a first value; the number of lenslets per unit height, or pitch, of said first lens array is a second value which is less than said first value; and the number of lenslets per unit height, or pitch, of said second lens array is a third value which is greater than said first value.

2. A display apparatus in accordance with claim 1 wherein said third value is a non-integral multiple of said first value and is also a non-integral multiple of said second value.

3. A display apparatus comprising:

a light source;

a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and

first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel, wherein at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal panel in order to provide a slight misalignment between said lenslets and said liquid crystal panel.

* * * * *

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC. and HONEYWELL INTELLECTUAL PROPERTIES INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 04-1338-KAJ (Consolidated) |
| v. | ) ) | |
| APPLE COMPUTER, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |
| HONEYWELL INTERNATIONAL INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 04-1337-KAJ |
| AUDIOVOX CORPORATION, et al., | ) ) ) | |
| Defendants. | ) ) | |
| OPTREX AMERICA, INC., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 04-1536-KAJ |
| HONEYWELL INTERNATIONAL INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

## STIPULATED PROTECTIVE ORDER

Whereas pretrial discovery in this action will necessarily involve the disclosure of trade secrets or confidential research, development, product or commercial information by the undersigned parties and by other non-parties from whom discovery may be sought; and

Whereas the undersigned parties wish to establish rules and procedures governing the treatment of such information, and accordingly have conferred in good faith with respect to the terms of this Protective Order pursuant to Fed. R. Civ. P. 26(c);

IT IS HEREBY STIPULATED AND AGREED BY AND AMONG THE UNDERSIGNED PARTIES AS FOLLOWS:

## 1. Scope of Protection.

1.1    This Protective Order shall govern any record of information produced in this action and designated pursuant to ¶ 2 below, including all designated deposition testimony, all designated testimony taken at a hearing or other proceeding, interrogatory answers, documents and other discovery materials, whether produced informally or in response to interrogatories, requests for admissions, requests for production of documents, or other formal method of discovery.

1.2    This Protective Order shall also govern any designated record of information produced in this action pursuant to required disclosures under any federal procedural rule or any District of Delaware local rule, and any supplementary disclosures thereto.

1.3    This Protective Order shall apply to the undersigned parties and to any non-party from whom discovery may be sought and who produces confidential information (as defined below) (hereinafter, collectively, referred to as a "party" or the "parties").

## 2. Designation

2.1    Each party shall have the right to designate as confidential and subject to this Protective Order any information produced by it in this action which contains, reflects, or otherwise discloses confidential technical, business, or financial information

("CONFIDENTIAL information"). This designation shall be made by stamping or otherwise labeling each page or thing containing confidential information with the legend CONFIDENTIAL prior to its production or, if inadvertently produced without such legend, by furnishing written notice to the receiving party that the information shall be considered CONFIDENTIAL under this Protective Order. The parties will use reasonable care to avoid designating any documents or information CONFIDENTIAL that are generally available to the public.

2.2    Each party shall have the right to designate as restricted to review by those categories of individuals identified in ¶ 4.2 below and subject to this Protective Order any information produced in this action which contains, reflects, or otherwise discloses: (1) trade secrets; (2) research and development or other highly sensitive technical information; or (3) highly sensitive business-related financial information (collectively, "CONFIDENTIAL— ATTORNEYS' EYES ONLY information"). This designation shall be made by stamping or otherwise labeling each page or thing containing confidential information with the legend CONFIDENTIAL—ATTORNEYS' EYES ONLY prior to its production or, if inadvertently produced without such legend, by furnishing written notice to the receiving party that the information shall be considered CONFIDENTIAL—ATTORNEYS' EYES ONLY under this Protective Order. To the extent that material is marked CONFIDENTIAL—ATTORNEYS' EYES ONLY, such material shall be revealed to or used by limited categories of individuals, as provided for in ¶ 4.2 below, and shall not be communicated in any manner, either directly or indirectly, to any person or entity not permitted disclosure pursuant to this Protective Order. Any copies of such material, abstracts, summaries, or information derived therefrom, and any notes or other records regarding the contents thereof, shall also be deemed

CONFIDENTIAL—ATTORNEYS' EYES ONLY, and the same terms regarding confidentiality of these materials shall apply as apply to the originals. The parties will use reasonable care to avoid designating any documents or information CONFIDENTIAL—ATTORNEYS' EYES ONLY for which the designating party does not have a good faith belief that the documents or information satisfy the criteria set forth in this paragraph.

2.3     Each party shall have the right to designate as restricted to review by those categories of individuals identified in ¶ 4.3 below and subject to this Protective Order any information produced in this action which contains, reflects, or otherwise discloses confidential information that comprises or contains sensitive information which is deemed by the producing party as inappropriate for review by in house personnel of non-affiliated companies except as otherwise provided herein, including: (1) trade secrets; (2) research and development or other highly sensitive technical information; or (3) highly sensitive business-related financial information (collectively, "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY"). This designation shall be made by stamping or otherwise labeling each page or thing containing confidential information with the legend HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY prior to its production or, if inadvertently produced without such legend, by furnishing written notice to the receiving party that the information shall be considered HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY under this Protective Order. To the extent that material is marked HIGHLY CONFIDENTIAL—OUTSIDE COUNSELS' EYES ONLY, such material shall be revealed to or used by limited categories of individuals, as provided for in ¶ 4.3 below, and shall not be communicated in any manner, either directly or indirectly, to any person or entity not permitted disclosure pursuant to this Protective Order. Any copies of

such material, abstracts, summaries, or information derived therefrom, and any notes or other records regarding the contents thereof, shall also be deemed HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY, and the same terms regarding confidentiality of these materials shall apply as apply to the originals. Use of this highly restrictive designation is limited to information of the highest sensitivity. The parties will use reasonable care to avoid designating any documents or information HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY for which the designating party does not have a good faith belief that the documents or information satisfy the criteria set forth in this paragraph.

2.4    CONFIDENTIAL, CONFIDENTIAL— ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY information shall be used only for purposes directly related to this action, and for no other purpose whatsoever, except by consent of the producing party or by order of the Court.

2.5    To the extent that any party has, prior to the date that this Order is entered, produced to the other side materials that the producing party has marked with any confidentiality designation, all such materials shall be considered to have been designated under this Order as HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY unless otherwise agreed by the producing party.

## 3.    Limit On Use And Disclosure Of Designated Information.

3.1    Each party and all persons bound by the terms of this Protective Order shall use any information or document governed by this Protective Order only in connection with the prosecution or defense of this action, except by consent of the producing party or by order of the Court. No party or other person shall disclose or release to any person not authorized under this Protective Order any information or document governed by this Protective Order

for any purpose, or to any person authorized under this Protective Order for any other purpose.

3.2    It is, however, understood that counsel for a party may give advice and opinions to his or her client based on his or her evaluation of designated confidential information received by the party, provided that such rendering of advice and opinions shall not reveal the content of such information except by prior written agreement with counsel for the producing party.

3.3    The attorneys of record for the parties and other persons receiving documents or information governed by this Protective Order shall exercise reasonable care to ensure that said documents or information governed by this Protective Order are: (a) used only for the purposes specified herein; and (b) disclosed only to authorized persons.

4.    **Disclosures Of Confidential, Confidential—Attorney's Eyes Only, and Highly Confidential—Outside Attorneys' Eyes Only Material.**

4.1    Absent the consent of the producing party, documents or information designated CONFIDENTIAL shall be disclosed by the recipient thereof only to:

(a)    the outside counsel of record and their staffs who are actively involved in this action and such additional law firms that become law firms of record for a party after the effective date of this Protective Order.

(b)    the Court and Court personnel, as provided in ¶ 12 below;

(c)    consultants, experts, or translators and their staffs retained by a party or its attorneys for purposes of this action, who are agreed upon by the parties pursuant to ¶ 6 below, who are not employees or otherwise affiliated with any of the parties (except persons scheduled

6

to be deposed by a party pursuant to Fed. R. Civ. P. 30(b)(6)), and who first agree to be bound by the terms of this Protective Order;

      (d)     court reporters employed in connection with this action;

      (e)     outside copying and computer services necessary for document handling, and other litigation support personnel (e.g., graphic designers and animators); and

      (f)     up to four (4) in-house counsel, legal or intellectual property staff members regularly employed by a party or the party's related corporate affiliate and responsible for assisting such party in connection with this action (hereinafter collectively with in-house counsel "In-house Counsel") or other designated employees of a party or the party's related corporate affiliate and responsible for assisting such party in connection with this action, provided that each such individual must first agree to be bound by the terms of this Protective Order. If the receiving party has less than four (4) In-house Counsel, the receiving party may assign designated employees of the party or employees of the party's related corporate affiliate who are responsible for assisting the receiving party in this action and agree to be bound by the terms of this protective order, who shall be deemed to be In-house Counsel for the purposes of this Protective Order, to have access to CONFIDENTIAL—ATTORNEYS' EYES ONLY documents or information of the Honeywell parties, but not of the non-Honeywell parties, provided that the total number of actual and deemed In-house Counsel allowed access to CONFIDENTIAL—ATTORNEYS' EYES ONLY documents or information is not more than four (4).

      4.2     Absent the consent of the producing party, documents or information designated CONFIDENTIAL—ATTORNEYS' EYES ONLY may be disclosed by the recipient thereof only to those categories of individuals listed in ¶¶ 4.1(a) - 4.1(e) above

7

subject to the restrictions therein; provided, however, documents or information designated CONFIDENTIAL—ATTORNEYS' EYES ONLY by a non-Honeywell party may be disclosed by the Honeywell parties to their In-house Counsel, and documents or information designated CONFIDENTIAL-ATTORNEY'S EYES ONLY by the Honeywell parties may be disclosed by a non-Honeywell party to its actual and deemed In-house Counsel.

4.3     Absent the consent of the producing party, documents or information designated HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY may be disclosed by the recipient thereof only to those categories of individuals listed in ¶¶ 4.1(a) - 4.1(e) above subject to the restrictions therein.

5.     **Redaction.**

Counsel for a party producing documents may mask ("redact") material deemed exempt from discovery because it is protected from disclosure under the attorney-client privilege or work product immunity afforded by Fed. R. Civ. P. 26(b). However, any document from which material is masked on this ground must identify in the masked area that masking or redaction has occurred. The reason for any such masking must be stated on a log to be provided within a reasonable time after the production of the documents. Sufficient information regarding the masked material must be provided to the other party to enable it to evaluate the legitimacy of the asserted privilege or immunity. The parties reserve the right to pursue categories for redaction in addition to those identified above, by either consent of the parties or order of the Court, to be addressed on a case-by-case basis.



6.      **Disclosure to Independent Consultants, Translators, Designated Employees, In-House Counsel, and Experts.**

6.1     If any party desires to disclose information designated by a producing party as CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY to any consultant, expert, or translator pursuant to ¶ 4.1(c) above or to any In-house Counsel or designated employee pursuant to ¶4.1(f), to the extent permitted by ¶ 4.2, it must first identify in writing to the attorneys for the producing party each such consultant, expert, translator, In-house Counsel, or designated employee. The writing shall be a facsimile, an email, or a first class mailing with facsimile or email confirmation. The attorneys for the producing party shall have ten (10) business days from receipt of such facsimile or email to object to disclosure of such information to any of the consultant, expert, translator, In-house Counsel, or designated employee so identified.

6.2     The identification of an expert or consultant shall include the full name and professional address and/or affiliation of the proposed expert or consultant, an up-to-date curriculum vitae, and a listing of at least all other present and prior employments or consultancies of the expert or consultant in the field of LCD display technologies. Additional information shall be provided upon request if available. The identification of an In-house Counsel shall include the full name and professional address of the In-house Counsel, an indication of whether such In-house Counsel performs patent prosecution in his/her employment. The identification of a designated employee shall identify the full name, professional address, position and job description of the designated employee. The identification of a translator shall include the full name, professional address of the proposed translator, and a listing of other present and prior employments in this case. The parties shall

9

attempt to resolve any objections informally. If the objections cannot be resolved, the party

objecting to the disclosure of CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES

ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY

information to the expert, consultant, translator, In-house Counsel, or designated employee

may move the Court for an Order proscribing the disclosure. Failure by the objecting party to

move the Court for an Order within fifteen (15) days of its service of the original objection

will be deemed a waiver of its objections. On any motion challenging the disclosure of such

information to an expert, consultant, translator, In-house Counsel, or designated employee,

the burden of proof shall lie with the party objecting to the disclosure to establish that the

information should not be disclosed to the expert, consultant, translator, In-house Counsel, or

designated employee. In the event objections are made and not resolved informally, disclosure

of information to the expert, consultant, translator, In-house Counsel, or designated employee

shall not be made except by the Order of the Court (or to any limited extent upon which the

parties may agree).

## 7.    Agreement Of Confidentiality

In no event shall any information designated CONFIDENTIAL, CONFIDENTIAL—

ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS'

EYES ONLY be disclosed to any person authorized pursuant to ¶ 4 above, other than (a) the

Court and Court personnel, (b) the parties' attorneys identified in ¶ 4.1(a) and their authorized

secretarial and legal assistant staffs, (c) court reporters, and (d) outside copying and computer

services necessary for document handling, until such person has executed a written

Confidentiality Undertaking (in the form set forth in Exhibit A hereto) acknowledging and

agreeing to be bound by the terms of this Protective Order. Copies of such Confidentiality Undertakings shall be promptly served on the producing party.

**8.    Related Documents.**

Information designated CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY shall include: (a) all documents, copies, extracts, and complete or partial summaries prepared from or containing such information; (b) portions of deposition transcripts and exhibits thereto which contain or reflect the content of any such documents, copies, extracts, or summaries; (c) portions of briefs, memoranda or any papers filed with the Court and exhibits thereto which contain or reflect the content of any such documents, copies, extracts, or summaries; (d) deposition testimony designated in accordance with ¶ 9 below; and (e) testimony taken at a hearing or other proceeding that is designated in accordance with ¶ 10 below.

**9.    Designation of Deposition Transcripts.**

9.1    Deposition transcripts, or portions thereof, may be designated as subject to this Protective Order either (a) at the time of such deposition, in which case the transcript of the designated testimony shall be marked by the reporter with the appropriate legend (see ¶ 2 above) as the designating party may direct, or (b) within thirty (30) days following the receipt of the transcript of the deposition by providing written notice to the reporter and all counsel of record, in which case all counsel receiving such notice shall mark the copies or portions of the designated transcript in their possession or under their control as directed by the designating party.

9.2    All deposition transcripts not previously designated shall be deemed to be, and shall be treated as CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY until the

expiration of the period set forth in ¶ 9.1 above, and neither the transcript nor the content of the testimony shall be disclosed by a non-designating party to persons other than those persons named or approved according to ¶ 4 above.

9.3    The designating party shall have the right to exclude from a deposition, before the taking of testimony which the designating party designates CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY and subject to this Protective Order, all persons other than those persons previously qualified to receive such information pursuant to ¶ 4 above.

## 10.    Designation of Hearing Testimony or Argument.

With respect to testimony elicited during hearings and other proceedings, whenever counsel for any party deems that any question or line of questioning calls for the disclosure of CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY information, counsel may designate on the record at any time during the hearing that the disclosure is subject to confidentiality restrictions.  Whenever matter designated CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY is to be discussed in a hearing or other proceeding, any party claiming such confidentiality may ask the Court to have excluded from the hearing or other proceeding any person who is not entitled under this Order to receive information so designated.

## 11.    Disclosure To Author Or Recipient.

Notwithstanding any other provisions of this Order, nothing herein shall prohibit counsel or a party from disclosing a document containing information designated CONFIDENTIAL,

CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY to any person which the document clearly identifies as an author, addressee, or carbon copy recipient of such document, or to any current employee of the producing party who by their testimony indicates that they have access to the type of information sought to be disclosed.  During deposition or trial testimony, counsel may disclose documents produced by a party to current employees and officers of the producing party who by their testimony indicates that they have access to the type of information sought to be disclosed. Regardless of confidentiality designations made pursuant to this Protective Order, if a document or testimony makes reference to the actual or alleged conduct or statements of a person who is a potential witnesses, counsel may discuss such conduct or statements with such witness without revealing any portion of the document or testimony other than that which specifically refers to such conduct or statement, and such discussion shall not constitute disclosure in violation of this Protective Order.

### 12.    Designation of Documents Under Seal.

Any information designated CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY, if filed with the Court, shall be filed under seal and shall be made available only to the Court and to persons authorized by the terms of this Protective Order.  A party filing any paper which reflects, contains or includes any CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY information subject to this Protective Order shall file such paper in a sealed envelope, or other appropriately sealed container, which indicates the title of the action, the party filing the materials, the nature of the

materials filed, the appropriate legend (see ¶ 2 above), and a statement substantially in the following form:

> This envelope contains documents subject to a Protective
> Order of the Court. It should be opened only by the Court. Its
> contents should not be disclosed, revealed, or made public
> except by Order of the Court or written agreement of the
> parties.

### 13.    Confidentiality Of A Party's Own Documents.

No person may disclose, in public or private, any designated information of another party except as provided for in this Protective Order, but nothing herein shall affect the right of the designating party to disclose to its own officers, directors, employees, attorneys, consultants or experts, or to any other person, its own information. Such disclosure shall not waive the protections of this Protective Order and shall not entitle other parties or their attorneys to disclose such information in violation of it, unless by such disclosure of the designating party the information becomes public knowledge (see ¶ 16 below). Similarly, the Protective Order shall not preclude a party from showing its own information to its own officers, directors, employees, attorneys, consultants or experts, or to any other person, which information has been filed under seal by the opposing party.

### 14.    Other Protections.

14.1    No person shall use any CONFIDENTIAL, CONFIDENTIAL—
ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY information, or information derived therefrom, for purposes other than the prosecution or defense of this action, including without limitation, for purposes of preparing, filing or prosecuting any patent application, continuation or divisional patent application, reissue patent application, or request for re-examination.

14

14.2    Any party may mark any document or thing containing CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL— OUTSIDE ATTORNEYS' EYES ONLY information as an exhibit to a deposition, hearing, or other proceeding and examine any witness thereon qualified under the terms of this Protective Order to have access to such designated material. Any respective portion of a transcript of the deposition, hearing, or other proceeding discussing the exhibit shall have the same confidentiality designation as the exhibit. No separate notice is needed regarding the respective portion unless otherwise agreed upon at the deposition, hearing, or other proceeding.

### 15.    Challenge To Confidentiality.

15.1    This Protective Order shall not preclude any party from seeking and obtaining, on an appropriate showing, such additional protection with respect to the confidentiality of documents or other discovery materials as that party may consider appropriate. Nor shall any party be precluded from: (a) claiming that any matter designated hereunder is not entitled to the protections of the Protective Order; (b) applying to the Court for an Order permitting the disclosure of use of information or documents otherwise prohibited by this Protective Order; or (c) applying for a further Order modifying this Protective Order in any respect. No party shall be obligated to challenge the propriety of any designation, and failure to do so shall not preclude a subsequent challenge to the propriety of such designation.

15.2    On any motion challenging the designation of any information, the burden of proof shall lie with the producing party to establish that the information is, in fact, CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY information. If a party seeks

15

declassification or removal of particular items from a designation on the ground that such designation is not necessary to protect the interests of the party wishing the designated information, the following procedure shall be utilized:

        a.      the party seeking such declassification or removal shall give counsel of record for the other party written notice thereof specifying the designated information as to which such removal is sought and the reasons for the request; and

        b.      if, after conferring, the parties cannot reach agreement concerning the matter, then the party requesting the declassification or removal of particular items may file and serve a motion for a further Order of this Court directing that the designation shall be so removed.

### 16.    Prior Or Public Knowledge

This Protective Order shall not apply to information that, prior to disclosure, is public knowledge, and the restrictions contained in this Protective Order shall not apply to information that is, or after disclosure becomes, public knowledge other than by an act or omission of the party to whom such disclosure is made, or that is legitimately and independently acquired from a source not subject to this Protective Order.

### 17.    Limitation Of Protective Order.

This Protective Order is not intended to address discovery objections to produce, answer, or respond on the grounds of attorney-client privilege or work product doctrine, or to preclude any party from seeking further relief or protective orders from the Court as may be appropriate under the Federal Rules of Civil Procedure or other applicable rule.

### 18.    Other Proceedings.

By entering this Protective Order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or party subject to this Order who may be subject to a motion to disclose another party's CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY information pursuant to this Order shall promptly notify that party of the motion so that it may have an opportunity to appear and be heard on whether such information should be disclosed.

### 19.    Inadvertent Disclosure Of Work Product Or Privileged Information: Procedure And Waiver.

19.1    If the producing party at any time notified the non-producing party in writing that it has inadvertently produced documents and/or things that are protected from disclosure under attorney-client privilege, work-product immunity, and/or any other applicable privilege or immunity from disclosure, the non-producing party shall return or destroy all physical and electronic copies of such documents and/or things to the producing party within five (5) business days of receipt of such notice and shall not further disclose or use such items, or information learned exclusively therefrom, for any purpose until further order of the Court. Upon being notified by the producing party pursuant to this section, counsel for the non-producing party shall use his or her best efforts to retrieve all copies of the documents or things at issue.

19.2    The return of any discovery item to the producing party shall not in any way preclude the non-producing party from moving the Court for a ruling that: (a) the document or

thing was never privileged or otherwise immune from disclosure; and/or (b) that any applicable privilege or immunity has been waived.

19.3    Inadvertent or unintentional disclosure of information subject to any privilege or immunity during the course of this litigation without proper designation shall not be deemed a waiver of a claim that disclosed information is in fact subject to a privilege or immunity if so designated within ten (10) business days after the producing party actually learns of the inadvertent or unintentional disclosure.

**20.    Non-Party Material.**

The terms of this Protective Order, as well as the terms of any protective order that may be entered into between a discovering party and third party for the production of information to the discovering party, are applicable to CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY information provided by a non-party. Information provided by a non-party in connection with this action and designated CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY pursuant to the terms of this Protective Order shall be protected by the remedies and relief provided by this Protective Order.

**21.    Return Of Designated Information.**

Within thirty (30) days of final termination of this action, unless otherwise agreed to in writing by an attorney of record for the designating party, each party shall assemble and return, or certify destruction of, all materials including both physical and electronic copies containing information designated CONFIDENTIAL, CONFIDENTIAL—ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY, including all copies,

18

extracts and summaries thereof, to the party from whom the designated material was obtained, except that (a) any documents or copies which contain, constitute, or reflect attorney's work product or attorney-client privilege communications, and (b) archive copies of pleadings, motion papers, deposition transcripts, correspondence, and written discovery responses may be retained by counsel.

**22.    Waiver Or Termination Of Order.**

No part of the restrictions imposed by this Protective Order may be waived or terminated, except by written stipulation executed by counsel of record for each designating party, or by an Order of the Court. The restrictions provided for herein shall not terminate upon the conclusion of this action, but shall continue until further Order of the Court.

**23.    Modification Of Order; Prior Agreements.**

This Protective Order may be modified, and any matter related to it may be resolved, by written stipulation of the parties without further Order of the Court. To the extent the terms of this Protective Order conflict with Local Rule 26.2 or with any agreements between the parties regarding the confidentiality of particular documents or information entered into before the date of this Protective Order, the terms of this Protective Order shall govern, except as to those documents and information produced or disclosed prior to the entry of this Protective Order, which documents and information shall continue to be governed by the terms of such prior agreements or by the provisions of Local Rule 26.2, as applicable.

Dated this _____ day of September 2006.

MORRIS, NICHOLS, ARSHT & TUNNELL

FISH & RICHARDSON P.C.


By: /s/ Thomas C. Grimm
     Thomas C. Grimm
     Leslie A. Polizoti
     1201 N. Market Street
     P.O. Box 1347
     Wilmington, DE 19899-1347
     (302) 658-9200
     tgrimm@mnat.com
     lpolizoti@mnat.com

*Attorneys for Plaintiffs Honeywell International Inc. and Honeywell Intellectual Properties, Inc. in C.A. Nos. 04-1338 and 04-1536*

By: /s/ Thomas L. Halkowski
     Thomas L. Halkowski
     919 N. Market Street
     Suite 1100
     P.O. Box 1114
     Wilmington, DE 19899-1114
     (302) 652-5070
     halkowski@fr.com

*Attorneys for Casio Computer Co., Ltd.*


YOUNG CONAWAY STARGATT & TAYLOR LLP

RICHARDS LAYTON & FINGER


By: /s/ John W. Shaw
     John W. Shaw
     Monte T. Squire
     1000 West Street, 17th Floor
     Wilmington, DE 19899
     (302) 571-6600
     jshaw@ycst.com
     msquire@ycst.com

*Attorneys for Sony Corporation, Sony Corporation of America, ST Liquid Crystal Display and Quanta Display Inc.*

By: /s/ William J. Wade
     William J. Wade
     One Rodney Square
     P. O. Box 551
     Wilmington, DE 19899
     (302) 651-7700
     wade@rlf.com

*Attorneys for Arima Display Corporation*

YOUNG CONAWAY STARGATT &
TAYLOR LLP


By: /s/ Karen L. Pascale
    Karen L. Pascale
    The Brandywine Bldg.
    1000 West Street, 17th Floor
    Wilmington, DE 19899
    (302) 571-6600
    kpascale@ycst.com

*Attorneys for Optrex America, Inc.*


POTTER ANDERSON & CORROON LLP


By: /s/ Richard L. Horwitz
    Richard L. Horwitz
    David E. Moore
    Hercules Plaza
    P.O. Box 951
    Wilmington, DE 19899
    (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for BOE Hydis Technology Co., Ltd.,
Hitachi Displays, Ltd., Toppoly
Optoelectronics Corp., Koninklijke Philips
Electronics NV, Philips Electronics North
America Corp., Philips Consumer Electronics
North America, Wintek Corp., Wintek Electro-
Optics Corporation, Samsung SDI America,
Inc. and Samsung SDI Co., Ltd.*


POTTER ANDERSON & CORROON LLP


By: /s/ Philip A. Rovner
    Philip A. Rovner
    Hercules Plaza
    P. O. Box 951
    Wilmington, DE 19899
    (302) 984-6000
    provner@potteranderson.com

*Attorneys for Fuji Photo Film Co., Ltd. and
Fuji Photo Film U.S.A., Inc.*


BOUCHARD MARGULES &
FRIEDLANDER, P.A.


By: /s/ David Margules
    David Margules
    John M. Seaman
    222 Delaware Avenue, Suite 1400
    Wilmington, DE 19801
    (302) 573-3500
    dmargules@bmf-law.com
    jseaman@bmf-law.com

*Attorneys for Citizen Watch Co., Ltd. and
Citizen Displays Co., Ltd.*

SMITH KATZENSTEIN & FURLOW LLP        DUANE MORRIS LLP


By: /s/ Robert J. Katzenstein                    By: /s/ Gary William Lipkin
    Robert J. Katzenstein                         Gary William Lipkin
    Robert Karl Beste, III                        1100 N. Market Street
    800 Delaware Avenue, 7th Floor                Suite 1200
    P. O. Box 410                                 Wilmington, DE  19801
    Wilmington, DE  19899                         (302) 657-4903
    (302) 652-8400                                gwlipkin@duanemorris.com
    rkatzenstein@skfdelaware.com
    rkb@skfdelaware.com                      *Attorneys for Innolux Display Corporation*

*Attorneys for Seiko Epson Corporation and*
*Sanyo Epson Imaging Devices*

ASHBY & GEDDES


By: /s/ Steven J. Balick
    Steven J. Balick
    John G. Day
    222 Delaware Avenue
    P. O. Box 1150
    Wilmington, DE  19899
    (302) 654-1888
    sbalick@ashby-geddes.com
    jday@ashby-geddes.com

*Attorneys for Honeywell International Inc.*
*and Honeywell Intellectual Properties, Inc. in*
*C.A. 04-1337*


SO ORDERED:


Dated: Sept. 19, 2006

_____
United States District Court Judge

22

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| HONEYWELL INTERNATIONAL INC.; and HONEYWELL INTELLECTUAL PROPERTIES INC.; | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 04-1338 KAJ (Consolidated) |
| v. | ) ) | |
| APPLE COMPUTER, INC., et al. | ) ) | |
| Defendants. | ) ) ) | |

## CONFIDENTIALITY UNDERTAKING

I certify that I have read the Stipulated Protective Order entered in the above-referenced action and that I fully understand the terms of that Order. By signing below, I recognize that I am bound by the terms of that Order, and I agree to comply with those terms in all respects. I hereby consent to the personal jurisdiction of the United States District Court, District of Delaware, for any proceedings involving the enforcement of that Order, and I waive any venue objection with respect to any such proceedings.

Executed this _____ day of _____, 200_.

<br>

_____
Name

_____
Affiliation

_____
Business Address

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC. and HONEYWELL INTELLECTUAL PROPERTIES INC., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 04-1338-MBT |
| v. | ) ) | (Consolidated) |
| APPLE COMPUTER, INC., et al., | ) ) | |
| Defendants. | ) ) | |

## NOTICE OF SUBPOENA DIRECTED TO THE HOSIDEN AMERICA CORPORATION

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 45 of the Federal Rules

of Civil Procedure, Defendant FUJIFILM Corporation ("Fuji") is serving a subpoena on Hosiden

America Corporation, Schaumburg, Illinois, ("Hosiden America") in the form appended hereto.

Hosiden America is commanded to produce, on October 29, 2007, the documents described in

"Attachment A" to the subpoena.

Date: September ___, 2007

OF COUNSEL:

Lawrence Rosenthal
Matthew W. Siegal
Ian G. DiBernardo
Angie M. Hankins
Kevin C. Ecker
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038-4982
(212) 806-5400

POTTER ANDERSON & CORROON LLP

By: _____
    Philip A. Rovner (#3215)
    Hercules Plaza
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE 19899
    (302) 984-6000

Attorneys for Defendant
FUJIFILM Corporation.

# **Exhibit B**

Source: Public Records > Find a Business > Dun & Bradstreet > $ D&B Duns Market Identifiers (Global) [i]
Terms: 69-053-9184 (Edit Search | Suggest Terms for My Search)

☞Select for FOCUS™ or Delivery
☐

*Worldbase, 06/22/2006, HOSIDEN CORPORATION*

Copyright 2007 Dun & Bradstreet, Inc
Worldbase
RETURN

Check availability of a D&B Business Information Report (Credit Report)

June 22, 2006

HOSIDEN CORPORATION

1-4-33, KITAKYUHOJI
YAO, OSK 581-0071
JAPAN

**REGION:** AUSTRALIA/ASIA

**\* \* \* \* \* \* \* \* \* COMMUNICATIONS \* \* \* \* \* \* \* \* \***
**TELEPHONE:** 729931010
**FAX:** 729945101

**COUNTRY CODE:** 0081

**\* \* \* \* \* \* \* \* \* COMPANY IDENTIFIERS \* \* \* \* \* \* \* \* \* \***
**DUNS:** 69-053-9184

**\* \* \* \* \* \* \* \* \* COMPANY INFORMATION \* \* \* \* \* \* \* \* \* \***
**FOUNDED:** 1950
**LEGAL STATUS:** Corporation
**ORGANIZATION TYPE:** Parent

**EMPLOYEES TOTAL:** 11,032 - Actual

**COMPANY TYPE:** Imports & Exports; Public; Ultimate

**\* \* \* \* \* \* \* \* \* EXECUTIVES \* \* \* \* \* \* \* \* \***

CEO:                          KENJI FURUHASHI, PRESIDENT
EXECUTIVE VICE PRESIDENT:      HAREMI KITATANI

**\* \* \* \* \* \* \* \* \* DESCRIPTION \* \* \* \* \* \* \* \* \***
ELECTRONIC COMPONENTS, NEC, NSK

**\* \* \* \* \* \* \* \* \* MARKET AND INDUSTRY \* \* \* \* \* \* \* \* \* \***
**PRIMARY SIC:**
3679 - Mfg electronic components
**SECONDARY SIC:**
3663 - Mfg radio/tv communication equipment

**\* \* \* \* \* \* \* \* \* FINANCIALS \* \* \* \* \* \* \* \* \***
**FISCAL YEAR DATE:** March 1, 2005

**\* \* \* \* \* \* \* \* \* OTHER FINANCIALS \* \* \* \* \* \* \* \* \* \***

## FINANCIAL FIGURE DATE 03/01/2005

|  | US DOLLARS | Japanese Yen |
|---|---|---|
| ANNUAL SALES | $2,225,679,000 | 234,282,000,000 |
| NET WORTH | $606,708,000 | 63,864,000,000 |
| PROFIT | $38,123,500 | 4,013,000,000 |

**LOAD-DATE:** June 4, 2007

Source: <u>Public Records</u> > <u>Find a Business</u> > <u>Dun & Bradstreet</u> > $ **D&B Duns Market Identifiers (Global)** 
Terms: **69-053-9184** (<u>Edit Search</u> | <u>Suggest Terms for My Search</u>)
View: Full
Date/Time: Friday, September 7, 2007 - 12:17 PM EDT

LexisNexis®  <u>About LexisNexis</u> | <u>Terms & Conditions</u>
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

International Business Information Report: Hosiden Corporation



**Decide with Confidence**

● My Report Archive

⊠ E-mail Report  🖹 Print Report

# International Business Information Report: Hosiden Corporation

**Country Conditions can Impact Company Risk**

Now that you know about this business, stay on top of the latest
developments in its country with ... D&B COUNTRY RISK SERVICES       <u>Click here</u> to learn more

---

COPYRIGHT 2007 DUN & BRADSTREET INC. – PROVIDED UNDER CONTRACT
FOR THE EXCLUSIVE USE OF SUBSCRIBER 001-061306L.

                    ATTN: 208801-0921
D-U-N-S: 69-053-9184                          FULL REVISION
                    SEP 8 2007

HOSIDEN CORPORATION

|                      |           |
|----------------------|-----------|
| RATING               | 5A 2      |
| FINANCIAL STRESS CLASS | 1       |
| STARTED              | 1950      |
| SALES                | 312,781 ML |
| WORTH                | 80,936 ML |
| IMPORT               | YES       |
| EXPORT               | YES       |
| EMPLOYS              | 903       |
| HISTORY              | CLEAR     |
| CONDITION            | GOOD      |
| CONTROL YR           | 1950      |

1-4-33, KITAKYUHOJI
YAO
OSAKA 581-0071 JAPAN
TEL: 0729 931010
FAX: 0729 945101
URL: http://www.hosiden.co.jp
SIC: 3679-9900    3663-9906

MFR ELECTRONIC COMPONENTS AND MOBILE COMMUNICATION EQUIPMENT

CHIEF EXECUTIVE  KENJI FURUHASHI / PRESIDENT

CURRENCY :  All monetary amounts quoted in this report are
            shown in JAPANESE YEN unless otherwise stated.

NOTE :  Report has been partially updated to provide information on latest
changes of some report elements. If you have any questions about BIR contents,
please contact your local D&B office.

NARRATIVE SUMMARY
(7/07)

The subject is considered to be a large-sized company in the industry. The
business is well-established.

CURRENT INVESTIGATION
(7/07)

On July 10, 2007, management, who stated that he/she is an authorized
spokesperson for the corporation, reported that there had been no significant
changes since latest fiscal date. Rating and Condition in this report were

International Business Information Report: Hosiden Corporation

assigned based on financial statement in Mar 2007.

CONDITION
(7/07)

The overall financial condition as of the last fiscal closing  dated  31  Mar,
2007  is  considered to be Good, based upon relatively higher current ratio in
this industry.

SALES AND PROFIT TREND          (IN MILLIONS)
(7/07)

|  | Mar 2003 | Mar 2004 | Mar 2005 | Mar 2006 | Mar 2007 |
|---|---|---|---|---|---|
| SALES | 233,547 | 225,374 (-3.5%) | 248,984 (10.4%) | 217,990 (-12.4%) | 312,781 (43.4%) |
| ORDINARY PROFIT | 6,964 | 9,583 (37.6%) | 9,040 (-5.6%) | 6,489 (-28.2%) | 9,963 (53.5%) |
| NET PROFIT | 3,758 | 4,458 (18.6%) | 5,839 (30.9%) | 4,002 (-31.4%) | 3,035 (-24.1%) |

TREND ANALYSIS
(7/07)

   Sales for the  last  fiscal  year  were  up  due  to  increased  number  of
commodities  sold.  Profit  for  the  last fiscal year was down due to special
loss.

PROJECTION(S) FOR THE CURRENT TERM ENDING IN MAR 2008
(7/07)

Sales                326,000.000 million or even
Ordinary Profit      10,200.000 million or even
Net Profit           5,100.000 million or more than 10% higher

FINANCIAL STRESS SUMMARY

The Japan Financial Stress Model predicts the likelihood of  a  firm  ceasing
business  without  paying all creditors in full, or re-organizing or obtaining
relief from creditors over the next 12 months. Scores were calculated using  a
statistically valid model, created by analyzing TSR corporate data.

The  Financial  Stress  Class  of  1  for  this  company shows that during the
previous year, firms with this classification had a failure rate of 0.37%  (37
per  10,000),  which  is  lower  than  Japan database average of 0.61% (61 per
10,000).

Financial Stress Class:                          1
(Highest Risk: 5; Lowest Risk: 1)

Incidence of Financial Stress Among
Companies with this Classification:              0.37% (37 per 10,000)

Incidence of Financial Stress:
- Japan Database Average:                        0.61% (61 per 10,000)

International Business Information Report: Hosiden Corporation

Financial Stress Percentile:                        100
(Highest Risk: 1; Lowest Risk: 100)

Financial Stress Score:                             1783
(Highest Risk: 1016; Lowest Risk: 1947)

Key to Scores:

| Stress Class | % of Bus. within range | Fin. Stress Percentile | Fin. Stress Score | Incidence of Fin Stress |
|---|---|---|---|---|
| 1 | Top 80 % | 21 - 100 | 1363-1947 | 0.37 % |
| 2 | 11th - 20th | 11 - 20 | 1338-1362 | 0.93 % |
| 3 | 5th - 10th | 5 - 10 | 1308-1337 | 1.43 % |
| 4 | 2nd - 4th | 2 - 4 | 1264-1307 | 2.42 % |
| 5 | Lowest 1% | 1 | 1016-1263 | 5.82 % |

The Financial Stress Class for this company is based on the following factors:

- Net profit figure suggests potential lower risk of financial stress.

- (Net Worth minus Issued Capital) to Total Liabilities Ratio  suggests  lower
risk of financial stress.

- Indication of lower industry risk classification.

Notes:

- The Financial Stress Class indicates that this firm shares some of the same
business and financial characteristics of other  companies  with  this
classification. It does not mean the firm will necessarily experience
financial stress.

- The Incidence of Financial Stress shows the percentage of firms in  a  given
Class that discontinued operations over the past year with loss to creditors.

- The  Incidence  of Financial Stress - Japan Database Average represents the
average failure rate in Japan and is provided for comparative purposes.

- The Financial Stress Percentile reflects the relative ranking of  a  company
among all scorable companies in D&B's file.

- The  Financial  Stress  Score offers a more precise measure of the level of
risk than the Class and Percentile. It is  especially  helpful  to  customers
using a scorecard approach to determining overall business performance.

- All  Financial Stress Class, Percentile, Score and Incidence statistics are
based on latest analysis derived from D&B Japan database.

- Financial statements of banking, insurance and securities companies are  not
used for failure risk score calculation.

- Estimated  financial  statement  is  not  used  for  failure  risk  score
calculation.

FINANCIAL STRESS NORMS

                                         Percentile

Subject Company:                             100

Norms for companies in the same...

International Business Information Report: Hosiden Corporation                    Page 4 of 12

- Region (OSAKA):                          48

- Industry:                               59
(MFR ELECTRICAL EQUIPMENT)

- Employee Range (500+):                  91

- Years in Business Range (26+):          56

Key Comparisons

The subject company has a Financial Stress Percentile that shows:

- Lower risk than other companies in the same region.

- Lower risk than other companies in the same industry.

- Lower risk than other companies in the same employee size range.

- Lower risk than other companies with a comparable number of years
in business.


PAYMENTS
        (Amounts may be rounded to nearest figure in prescribed ranges)

| RPTD | PAYING RECORD | HIGH CREDIT | NOW OWES | PAST DUE | SELLING TERMS | LAST SALE WITHIN | UNIT |
|------|---------------|-------------|----------|----------|---------------|------------------|------|
| 3/07 | PPT | | 515 | 0 | NOTES | | MIL YEN |
| 3/07 | PPT | | 286 | 0 | NOTES | | MIL YEN |
| 3/07 | PPT | | 225 | 0 | NOTES | | MIL YEN |
| 3/07 | PPT | | 119 | 0 | NOTES | | MIL YEN |
| 3/07 | PPT | | 74 | 0 | NOTES | | MIL YEN |

*  Payment experiences reflect how bills are
   met in relation to the terms granted, etc.

FINANCE
(7/07)

COMPARATIVES

| | Mar 31, 2005 (in millions) | Mar 31, 2006 (in millions) | Mar 31, 2007 (in millions) |
|------------------|-------|-------|-------|
| CURRENT ASSETS | 121,196 | 122,121 | 145,478 |
| CURRENT LIABILITIES | 47,117 | 49,133 | 67,722 |
| WORKING CAPITAL | 74,079 | 72,988 | 77,756 |
| OTHER ASSETS | 24,250 | 28,848 | 32,473 |
| OTHER LIABILITIES | 18,926 | 19,696 | 29,293 |
| TANGIBLE NET WORTH | 79,403 | 82,140 | 80,936 |
| TOTAL LIABILITIES | 66,043 | 68,829 | 97,015 |
| TOTAL ASSETS | 146,139 | 151,648 | 178,537 |
| CASH & BANK | 26,866 | 40,678 | 22,907 |
| TRADE RECEIVABLE | 54,377 | 45,621 | 71,435 |
| INVENTORY | 19,610 | 25,302 | 39,158 |
| FIXED ASSETS | 17,145 | 17,538 | 19,263 |
| TRADE PAYABLE | 33,553 | 36,812 | 53,166 |

| | Mar 31, 2005 (in millions) | Mar 31, 2006 (in millions) | Mar 31, 2007 (in millions) |
|---|---|---|---|

International Business Information Report: Hosiden Corporation                    Page 5 of 12

| | | | |
|---|---|---|---|
| ANNUAL SALES | 248,984 | 217,990 | 312,781 |
| NET PROFIT | 5,839 | 4,002 | 3,035 |
| NON-OP. INCOME/EXP. | -178 | 2,019 | 930 |

KEY RATIOS

| | Mar 2005 | Mar 2006 | Mar 2007 |
|---|---|---|---|
| ORDINARY PROFIT/SALES (%) | 3.6 | 2.9 | 3.1 |
| NET PROFIT/SALES (%) | 2.3 | 1.8 | 0.9 |
| CURRENT RATIO (%) | 257.2 | 248.5 | 214.8 |
| QUICK RATIO (%) | 192.4 | 176.4 | 139.3 |
| COLLECTION PERIOD (MONTHS) | 2.6 | 2.5 | 2.7 |
| INVENTORY PERIOD (MONTHS) | 0.9 | 1.3 | 1.5 |
| PAYMENT PERIOD (MONTHS) | 1.6 | 2.0 | 2.0 |
| INVESTED CAPITAL RATIO (%) | 25.1 | 28.8 | 29.8 |
| NET WORTH/TOTAL ASSETS (%) | 54.3 | 54.1 | 45.3 |
| DEBT RATIO (%) | 83.1 | 83.7 | 119.8 |
| TOTAL ASSETS TURNOVER (TIMES) | 1.7 | 1.4 | 1.7 |

Consolidated Statement for year ending Mar 31, 2007 (in millions).

| | | | |
|---|---|---|---|
| Cash and Bank | 22,907 | Trade Creditors | 53,166 |
| Trade Receivables | 71,435 | Short-Term Borrowings | 4,649 |
| Inventories | 39,158 | Curr. Portion of Bonds/Br | 161 |
| Other Current Assets | 12,176 | Accrued Income Tax | 2,651 |
| Reserve for Doubtful A/C | -198 | Other Current Liabilities | 7,095 |
| TOTAL CURRENT ASSETS | 145,478 | TOTAL CURRENT LIABILITIES | 67,722 |

| | | | |
|---|---|---|---|
| Buildings & Structures | 4,743 | Bonds | 20,068 |
| Machinery & Equipment | 3,999 | Long-Term Loans | 108 |
| Land | 3,631 | Res.for Retire.Allowance | 9,030 |
| Construction in Progress | 397 | Other Non-Current Liab. | 87 |
| Other fixed assets | 6,493 | | |
| TOTAL FIXED ASSETS | 19,263 | TOTAL NON-CURRENT LIAB. | 29,293 |

| | |
|---|---|
| Intangible Assets | 586 |
| TOTAL INTANGIBLE ASSETS | 586 |

| | | | |
|---|---|---|---|
| Investment in Securities | 9,992 | | |
| Other Investments | 3,334 | | |
| Doubtful A/C | -116 | | |
| INVESTMENT & OTHER ASSETS | 13,210 | TOTAL LIABILITIES | 97,015 |

| | |
|---|---|
| Paid-in Capital | 13,660 |
| Capital Surplus | 19,597 |
| Earned Surplus | 52,389 |
| Treasury Stock at Cost | -5,595 |

International Business Information Report: Hosiden Corporation

|  |  |
|---|---|
| Valuation & transl. adj. | 1,466 |
| Subscr. rights to shares | 5 |
| TOTAL EQUITY | 81,522 |

| | | | |
|---|---|---|---|
| TOTAL ASSETS | 178,537 | EQUITY & LIABILITIES | 178,537 |

ACCUMULATED DEPRECIATION     48,149
CONTINGENT LIABILITIES           35
( In accordance with  customary trade practices,  a company may
  guarantee the indebtedness of certain other business entities,
  such as customers, suppliers, and unconsolidated subsidiaries
  and affiliates. )

Profit & Loss Statement for the period from Apr 1, 2006 to Mar  31,  2007  (in
millions):

| | | |
|---|---|---|
| Sales : | | 312,781 |
| Cost of Goods Sold : | | 290,688 |
| Gross Profit/Loss : | | 22,093 |
| Sell.,General & Adm. Exp. : | | 13,060 |
| Operating Profit/Loss : | | 9,033 |
| Non-Operating Income : | | 1,104 |
|    Int. & Dividends Income | 494 | |
|    Other Non-operating Inc. | 610 | |
| Non-Operating Expenses : | | 174 |
|    Int. & Discounts Paid | 129 | |
|    Other Non-operating Exp. | 45 | |
| Ordinary Profit/Loss : | | 9,963 |
| Special Income : | | 131 |
| Special Expenses : | | 3,415 |
| Profit/Loss Before Tax : | | 6,679 |
| Taxes : | | 3,644 |
|    Corporate Income Tax | 4,081 | |
|    Adjustment Accounts | -437 | |
| Net Profit/Loss : | | 3,035 |

The  above book financial statement and profit and loss statement were audited
by Deloitte Touche Tohmatsu, 4-13-23, Shibaura, Minato-ku, Tokyo.

The following key indicators are judged from financial ratios to be as
follows :

| | HIGH | (BETTER) ABOVE AVERAGE | <- ¦ -> AVERAGE | (WORSE) BELOW AVERAGE | LOW |
|---|---|---|---|---|---|
| PROFITABILITY: | | | Y | | |
| STABILITY    : | | | Y | | |
| EFFICIENCY   : | | Y | | | |

FINANCIAL PROFILE STATEMENT STATISTICS & ANALYSIS
-------------------------------------------------------

Research and analysis of all business corporations in Japan in relationship to

the industry financial statement profile(s) of similar type of business shows, on the whole, this company's latest financial condition is on the same level with the industry average.

This business entity's financial statement condition as compared to companies in the same industry in Japan shows its financial condition and ratios to be:

PROFITABILITY of the company can be judged by the ratio of Recurring Profit (the profit before deducting extraordinary income and expenses) to Sales. Recurring Profit/Sales Ratio of this business is 3.185% versus the industry average of 2.4% which is considered to be AVERAGE.

FINANCIAL STABILITY of the company can be measured by the ratio of Net Worth to Total Assets Ratio. Net Worth/Total Assets Ratio of this company is 45.333% versus industrial average of 42.4%, which considered to be AVERAGE.

EFFICIENCY of the daily operation is indicated by the Total Assets Turnover (Sales/Total Assets). The total assets Turnover of this business is 1.7 versus industry average of 1.0, which is considered to be ABOVE AVERAGE.

BANKING
(7/07)

The company maintains relationships with several banks in JAPAN, including the following:

Mizuho Bank Ltd.

Bank of Tokyo-Mitsubishi UFJ Ltd.

Sumitomo Mitsui Banking Corp.

HISTORY
(7/07)

Subject was established in Sep 1950.

Authorized capital: 150,000,000 shares. Paid-in capital 13,660,000,000 yen, no. of shares issued : 72,710,084, as of June 28 2007.
Subject is listed on the following exchange(s): Listed Tokyo 1st Section, Listed Osaka 1st Section.


Shareholders :

Japan Trustee Services Bank Ltd. (Trust Account)    11.1%
Hosiden Corporation (Treasury Stocks)    6.2%
Master Trust Bank of Japan Ltd. (Trust Account)    4.9%
Trust & Custody Services Bank Ltd. (Trust Account)    4.0%
Other individuals and corporations    73.8% (none owns more than 10%)

Total No. of Shareholders :  8890

Capital Trend :
| Initial Capital Investment | 0.200 million yen |
| Mar 31 1995 | 8,148.415 million yen |
| Mar 31 1999 | 8,698.000 million yen |
| May 1 2000 | 10,745.000 million yen |
| Mar 31 2001 | 13,660.000 million yen |

Name Changes :

From: Hosiden Electronics Co. Ltd.
To  : The current name                    in: Oct 1990

International Business Information Report: Hosiden Corporation

Address Changes :

From: Higashinari-ku
      Osaka, Osaka
To  : The current address                              in: Jul 1960

Key Events :

* Aug 1963
Listed on 2nd section of Osaka Securities Exchange.
* Sep 1980
Listed on 1st section of Osaka Securities Exchange.
* Dec 1992
Listed on 1st section of Tokyo Stock Exchange.
* Nov 1996
Merged with Hosiden Shoji Corp.(D-U-N-S: 69-057-9214).

PRINCIPALS
(7/07)

| | |
|---|---|
| Furuhashi; Kenji | President |
| Kitatani; Haremi | Executive Vice President |
| Shigeno; Yasuhiro | Man.Dir. |
| Ino; Eiichi | Man.Dir. |
| Honbo; Shinji | Director |
| Kashiwaya; Shigetoshi | Auditor |
| Nakanishi; Akira | Auditor |
| Takahashi; Kenichi | Auditor |

PRIMARY EXECUTIVES
(7/07)

KENJI FURUHASHI, President, born March 11 1955, son of founder, graduated from
Konan University (Business Administration) in 1977.

Business Background :

1977 Started with subject.
1987 Appointed Director
1990 Appointed Sr.Man.Dir.
1991 Appointed President

HAREMI  KITATANI,  Executive  Vice President, born November 13 1937, graduated
from a high school in 1956.

Business Background :

1956 Started with subject.
1984 Appointed Director
1990 Appointed Man.Dir.
1992 Appointed Sr.Man.Dir.
1997 Appointed Executive Vice President

OPERATIONS
(7/07)

Line of Products/Services

Manufacturing electronic components                    71.0%
and parts

International Business Information Report: Hosiden Corporation

| | |
|---|---|
| Manufacturing mobile communication equipment and parts | 18.0% |
| Manufacturing liquid crystal displays (lcd) | 8.0% |
| Manufacturing others | 3.0% |

Sales breakdown by region:

| | |
|---|---|
| Domestic | 68.0% |
| Overseas | 32.0% |

TERRITORY :   International.
Exporting to ASIA
            EUROPE
            OTHERS

MAJOR CUSTOMERS

D-U-N-S: 69-053-7477
NINTENDO CO., LTD.
11-1, HOKOTATECHO, KAMITOBA, MINAMI-KU
KYOTO
KYOTO 601-8116

D-U-N-S: 69-053-6925
SHARP CORPORATION
22-22, NAGAIKECHO, ABENO-KU
OSAKA
OSAKA 545-0013

Hosiden Europe GmbH

Hong Kong Hosiden Ltd.

PURCHASING

MAJOR SUPPLIERS

D-U-N-S: 69-053-7477
NINTENDO CO., LTD.
11-1, HOKOTATECHO, KAMITOBA, MINAMI-KU
KYOTO
KYOTO 601-8116

Hong Kong Hosiden Ltd.
Kowloon, Hong Kong

D-U-N-S: 69-121-9281
HOSIDEN KYUSHU CORP.
3024-38, NAKAYAMA, KURATEMACHI
KURATE-GUN
FUKUOKA 807-1312

D-U-N-S: 69-121-9299
HOSIDEN SEIKO CORPORATION
15-1, EMMYOCHO
KASHIWARA
OSAKA 582-0027

NUMBER OF EMPLOYEES :   12336   (Consolidated)
                        903   (Non-Consolidated)

LOCATION
(7/07)

Location area type: An industrial area

International Business Information Report: Hosiden Corporation

Ownership of premises: Owns

```
PLANT
1-4-33, Kitakyuhoji
Yao
OSAKA
LAND AREA           25,000 square meters


Isesaki
GUNMA
LAND AREA           26,000 square meters


BRANCH
Kohoku-ku
Yokohama
KANAGAWA
LAND AREA           4,000 square meters
```

SUBSIDIARY COMPANIES
(7/07)

| | Consolidated Subsidiary/Affiliate | Non-Consolidated |
|---|---|---|
| Total | 23 | 0 |

Total Subsidiaries: 23

Total number of consolidated subsidiaries includes those in which subject company owns 50% or less interest, because such company is still considered a subsidiary according to Japanese law.

However, the list of the major subsidiaries in this report is created based on the global Dun & Bradstreet rule which says that subsidiary is a company in which subject holds at least 50.1% interest.

MAJOR SUBSIDIARIES

```
D-U-N-S : 69-121-9257
HOSHIDEN NIIGATA K.K.
10-10, YOKAICHI
MURAKAMI
NIIGATA 958-0052
JAPAN
(consolidated)
TEL: 0254-567521
100.0% owned by subject.

D-U-N-S : 69-121-9281
HOSIDEN KYUSHU CORP.
3024-38, NAKAYAMA, KURATEMACHI
KURATE-GUN
FUKUOKA 807-1312
JAPAN
(consolidated)
TEL: 0949-422311
100.0% owned by subject.

Hosiden America Corp.
Illinois
UNITED STATES
```

International Business Information Report: Hosiden Corporation

(consolidated)
100.0% owned by subject.


Hosiden Singapore Ltd.
SINGAPORE
(consolidated)
100.0% owned by subject.


D-U-N-S : 69-121-9299
HOSIDEN SEIKO CORPORATION
15-1, EMMYOCHO
KASHIWARA
OSAKA 582-0027
JAPAN
(consolidated)
TEL: 072-9772781
100.0% owned by subject.


D-U-N-S : 69-121-9265
HOSIDEN WAKAYAMA K.K.
454-9, HABU, ARIDAGAWACHO
ARIDA-GUN
WAKAYAMA 643-0025
JAPAN
(consolidated)
TEL: 0737-526011
100.0% owned by subject.


D-U-N-S : 69-169-9763
HOSHIDEN SERVICE K.K.
1-123-1, KYOKOJI
YAO
OSAKA 581-0874
JAPAN
(consolidated)
TEL: 072-9438500
100.0% owned by subject.



AFFILIATED COMPANIES
(7/07)

Total                          1

MAJOR AFFILIATES

Hosiden Corp. Malaysia
MALAYSIA


( -00/    10/7/07)


This report, which is licensed under contract solely for use by D&B's customer
as one factor in its business decisions, contains information compiled from
sources D&B does not control and which, unless otherwise indicated in this
report, has not been verified. D&B does not assume any of user's business
risk; does not guarantee the accuracy, completeness, and timeliness of the
information; and shall not be liable in tort, contract or otherwise for any
loss, damage, and injury resulting from use of this information, even if
caused by D&B's negligence.

Copyright 2007 Dun & Bradstreet

International Business Information Report: Hosiden Corporation

All Rights Reserved

*** REPORT COMPLETE ***

FOREIGN BIR DISPLAY COMPLETE



| Company Reports | Basic Marketing Lookups | U.S. Public Records Search | Country Risk Services | ZapData |

Main Menu | DUNSRight™ | FAQs | Customer Assistance | Samples & Descriptions | Price Guide | About Privacy

© 2006 Dun & Bradstreet, Inc.
January 14, 2006 - GTO

# **<u>Exhibit C</u>**

Search - 5 Results - 69-053-9184

Source: Public Records > Find a Business > Dun & Bradstreet > § D&B Duns Market Identifiers Plus (US) ⓘ
Terms: **69-053-9184** (Edit Search | Suggest Terms for My Search)

☞Select for FOCUS™ or Delivery
⌐

*Worldbase, 02/19/2007, HOSIDEN AMERICA CORPORATION*

Copyright 2007 Dun & Bradstreet, Inc
Worldbase
RETURN

Check availability of a D&B Business Information Report (Credit Report)

February 19, 2007

HOSIDEN AMERICA CORPORATION

120 E STATE PKWY
SCHAUMBURG, IL 601735335
USA

**COUNTY:** COOK
**REGION:** NORTH AMERICA

* * * * * * * * * **COMMUNICATIONS** * * * * * * * * * *
**TELEPHONE:** 8478858870

**COUNTRY CODE:** 0001

* * * * * * * * * **COMPANY IDENTIFIERS** * * * * * * * * * *
**DUNS:** 08-981-3281

* * * * * * * * * **COMPANY INFORMATION** * * * * * * * * * *
**FOUNDED:** 1978
**LEGAL STATUS:** Corporation

**EMPLOYEES HERE:** 22 - Actual
**EMPLOYEES TOTAL:** 31 - Actual

* * * * * * * * * **CORPORATE STRUCTURE** * * * * * * * * * *

**GLOBAL ULTIMATE COMPANY:**
DUNS NUMBER: **69-053-9184**
COMPANY NAME: HOSIDEN CORPORATION
ADDRESS: 1-4-33, KITAKYUHOJIYAOOSAKA581-0071JAPAN

* * * * * * * * * **EXECUTIVES** * * * * * * * * * *

CEO:                          KENJI FURUHASHI, PRESIDENT
TREASURER:                    KATSUMI KASHIWAI
SECRETARY:                    COLIN HARA
MANAGING DIRECTOR:            TOMIO HARAKI

* * * * * * * * * **DESCRIPTION** * * * * * * * * * *
ELECTRICAL APPARATUS AND EQUIPMENT, NSK

Search - 5 Results - 69-053-9184                                          Page 2 of 2

**\* \* \* \* \* \* \* \* \* MARKET AND INDUSTRY \* \* \* \* \* \* \* \* \* \***
**PRIMARY SIC:**
5063 - Whol electrical equipment
**SECONDARY SIC:**
5065 - Whol electronic parts/equipment


**\* \* \* \* \* \* \* \* \* OTHER FINANCIALS \* \* \* \* \* \* \* \* \***

**FINANCIAL FIGURE DATE (not available)**

|  | **US DOLLARS** | |
|---|---|---|
| ANNUAL SALES | $6,500,000 | 6,500,000 |

**LOAD-DATE:** June 4, 2007


Source: Public Records > Find a Business > Dun & Bradstreet > § D&B Duns Market Identifiers Plus (US) ⓘ
Terms: 69-053-9184  (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Friday, September 7, 2007 - 12:10 PM EDT


● LexisNexis®  About LexisNexis  | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION



**Decide with Confidence**

## Comprehensive Report

To save report(s) to your PC, click here for instructions.

📄 Print this Report

Copyright 2007 Dun & Bradstreet - Provided under contract for the exclusive use of subscriber 001061306L

ATTN: 208801-0921

Report Printed: SEP 07 2007

# Overview

**BUSINESS SUMMARY**

**HOSIDEN AMERICA CORPORATION**
   (FOREIGN PARENT IS HOSIDEN CORPORATION, OSAKA, JAPAN)
**120 E State Pkwy**
**Schaumburg, IL 60173**

**D&B D-U-N-S Number:**    08-981-3281

This is a **headquarters (subsidiary)** location. Branch(es) or division(s) exist.

| | |
|---|---|
| **Telephone:** | 847 885-8870 |
| **Fax:** | 847 885-0063 |
| **Chief executive:** | KENJI FURUHASHI, PRESIDENT |
| **Year started:** | 1978 |
| **Employs:** | 31 (22 here) |
| **History:** | CLEAR |
| **SIC:** | 5063 5065 |
| **Line of business:** | Whol electrical equipment, whol electronic parts/equipment |



**D&B's Credit Limit Recommendation**
How much credit should you extend?
▸ Learn More                          ▸ View Now

**Payment Trends Profile**
Payment trends and industry benchmarks
                          ▸ Jump to Payment Trends

**Credit Score Class:** **1**

Low risk of severe payment delinquency over next 12 months



**Financial Stress Class:** **1**

Low risk of severe financial stress over the next 12 months



**12-Month D&B PAYDEX®:** **80**

When weighted by dollar amount, payments to suppliers average generally within terms.

| | |
|---|---|
| **D&B Rating:** | **1R2** |
| **Number of employees:** | 1R is **10 or more** employees. |
| **Composite credit appraisal:** | 2 is **good.** |



**EXECUTIVE SUMMARY**

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION                    Page 2 of 14

The **Financial Stress Class of 1** for this company shows that firms with this classification had a failure rate of 1.2% (120 per 10,000), which is lower than the average of businesses in D&B's database.

The **Credit Score class of 1** for this company shows that 2.0% of firms with this classification paid one or more bills severely delinquent, which is lower than the average of businesses in D&B's database.

| Predictive Scores | This Business | Comments |
|---|---|---|
| Financial Stress Class | 1 | Failure Rate lower than the average of businesses in D&B's database |
| Financial Stress Score | 1492 | Highest Risk: 1,001; Lowest Risk: 1,875 |
| Credit Score Class | 1 | Probability of Severely Delinquent Payment is lower than the average of businesses in D&B's database |
| Credit Score | 610 | Highest Risk: 101; Lowest Risk: 670 |
| **Other Key Indicators** | | |
| PAYDEX Scores | generally within terms | Pays more promptly than the average for its industry of 6 days beyond terms |
| Industry Median | 6 days beyond terms | |
| Present management control | 29 years | |
| UCC Filings | UCC filing(s) are reported for this business | |
| Public Filings | No record of open Suit(s), Lien(s), or Judgment(s) in the D&B database | |
| History | is clear | |

**CREDIT CAPACITY SUMMARY**

**D&B Rating:**                    **1R2**
    **Number of employees:**    1R indicates **10 or more** employees.
    **Composite credit appraisal:** 2 is good.

The 1R and 2R ratings categories reflect company size based on the total number of employees for the business. They are assigned to business files that do not contain a current financial statement. In 1R and 2R Ratings, the 2, 3, or 4 creditworthiness indicator is based on analysis by D&B of public filings, trade payments, business age and other important factors. 2 is the highest Composite Credit Appraisal a company not supplying D&B with current financial information can receive. For more information, see the D&B Rating Key.

| # of Employees Total: | 31 (22 here) | **Payment Activity:** (based on 32 experiences) | |
|---|---|---|---|
| | | **Average High Credit:** | $2,858 |
| | | **Highest Credit:** | $35,000 |
| | | **Total Highest Credit:** | $85,400 |

**Jump to:**

Overview    |    Payments    |    Public Filings    |    History & Operations    |    Banking & Finance

# Scores ☑ D&B *EXCLUSIVE*

**FINANCIAL STRESS SUMMARY**

The Financial Stress Summary Model predicts the likelihood of a firm ceasing business without paying all creditors in full, or reorganization or obtaining relief from creditors under state/federal law over the next 12 months. Scores were calculated using a statistically valid model derived from D&B's extensive data files.

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION

Page 3 of 14

**Financial Stress Class: 1**

High     Moderate     Low

Low risk of severe financial stress, such as a bankruptcy, over the next 12 months.

**Incidence of Financial Stress**

Among Businesses with this Class:        1.20% (120 per 10,000)
Average of Businesses in D&B's Database: 2.60% (260 per 10,000)

**Financial Stress National Percentile: 95** (Highest Risk: 1; Lowest Risk: 100)

**Financial Stress Score: 1492** (Highest Risk: 1,001; Lowest Risk: 1,875)

The Financial Stress Score of this business is based on the following factors:

- No record of open suit(s), lien(s), or judgment(s) in the D&B files.
- Control age or date entered in D&B files indicates lower risk.
- 1% of trade dollars indicate slow payment(s) are present.

**Notes:**

- The Financial Stress Class indicates that this firm shares some of the same business and financial characteristics of other companies with this classification. It does not mean the firm will necessarily experience financial stress.
- The Incidence of Financial Stress shows the percentage of firms in a given Class that discontinued operations with loss to creditors. The Average Incidence of Financial Stress is based on businesses in D&B's database and is provided for comparative purposes.
- The Financial Stress National Percentile reflects the relative ranking of a company among all scorable companies in D&B's file.
- The Financial Stress Score offers a more precise measure of the level of risk than the Class and Percentile. It is especially helpful to customers using a scorecard approach to determining overall business performance.
- All Financial Stress Class, Percentile, Score and Incidence statistics are based on sample data from 2004.



| Norms | National % |
|---|---|
| This Business | 95 |
| Region:<br>EAST NORTH CENTRAL | 49 |
| Industry:<br>WHOLESALE | 58 |
| Employee Range:<br>20-99 | 80 |
| Years In Business:<br>26+ | 74 |

This business has a Financial Stress Percentile that shows:

- Lower risk than other companies in the same region.
- Lower risk than other companies in the same industry.
- Lower risk than other companies in the same employee size range.
- Lower risk than other companies with a comparable number of years in business.

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION

**CREDIT SCORE CLASS SUMMARY**

The Credit Score Class predicts the likelihood of a firm paying in a severely delinquent manner (90+ Days Past Terms) over the next twelve months. It was calculated using statistically valid models and the most recent payment information in D&B's files.

**Credit Score Class: 1**

High        Moderate        Low

5     4     3     2     1

Low risk of severe payment delinquency over next 12 months.

**Incidence of Delinquent Payment**

Among Companies with this Class:                    2.00%
Average Compared to Businesses in D&B's Database: 20.10%

**Credit Score Percentile: 100** (Highest Risk: 1; Lowest Risk: 100)

**Credit Score: 610** (Highest Risk: 101; Lowest Risk: 670)

The Credit Score of this business is based on the following factors:

- No record of open suit(s), lien(s), or judgment(s) in the D&B files.

**Notes:**

- The Credit Score Class indicates that this firm shares some of the same business and payment characteristics of other companies with this classification. It does not mean the firm will necessarily experience delinquency.
- The Incidence of Delinquent Payment is the percentage of companies with this classification that were reported 90 days past due or more by creditors. The calculation of this value is based on an inquiry weighted sample.
- The Percentile ranks this firm relative to other businesses. For example, a firm in the 80th percentile has a lower risk of paying in a severely delinquent manner than 79% of all scorable companies in D&B's files.
- The Credit Score offers a more precise measure of the level of risk than the Class and Percentile. It is especially helpful to customers using a scorecard approach to determining overall business performance.
- All Credit Class, Percentile, Score and Incidence statistics are based on sample data from 2004.



| Norms | National % |
|---|---|
| This Business | 100 |
| Region: EAST NORTH CENTRAL | 50 |
| Industry: WHOLESALE | 60 |
| Employee Range: 20-99 | 69 |
| Years in Business: 26+ | 79 |

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION

This business has a Credit Score Percentile that shows:

- Lower risk than other companies in the same region.
- Lower risk than other companies in the same industry.
- Lower risk than other companies in the same employee size range.
- Lower risk than other companies with a comparable number of years in business.

**Jump to:**

Overview    |    Scores    |    Public Filings    |    History & Operations    |    Banking & Finance

# Payments ☑ D&B EXCLUSIVE

**PAYMENT TRENDS**

| | |
|---|---|
| **Total Payment Experiences in D&B's File:** | 32 |
| **Payments Within Terms:** (not dollar weighted) | 98% |
| **Total Placed For Collection:** | 0 |
| **Average Highest Credit:** | $2,858 |
| **Largest High Credit:** | $35,000 |
| **Highest Now Owing:** | $10,000 |
| **Highest Past Due:** | $0 |

| | | |
|---|---|---|
| **Current PAYDEX is:** | 80 | equal to generally within terms |
| **Industry Median is:** | 76 | equal to 6 days beyond terms |
| **Payment Trend currently is:** | ⬌ | unchanged, compared to payments three months ago |

Indications of slowness can be the result of dispute over merchandise, skipped invoices, etc. Accounts are sometimes placed for collection even though the existence or amount of the debt is disputed.

**PAYDEX Scores**

Shows the D&B PAYDEX scores as calculated on the most recent 3 months and 12 months of payment experiences.

The D&B PAYDEX is a unique, dollar weighted indicator of payment performance based on up to payment experiences as reported to D&B by trade references. A detailed explanation of how to read and interpret PAYDEX scores can be found at the end of this report.



**3-Month D&B PAYDEX: 80**
When weighted by dollar amount, payments to suppliers average within terms.

Based on payments collected over last 3 months.



**12-Month D&B PAYDEX: 80**
When weighted by dollar amount, payments to suppliers average generally within terms.

Based on payments collected over last 12 months.

**PAYDEX Yearly Trend**

**12 Month PAYDEX Scores Comparison to Industry**

| | 10/06 | 11/06 | 12/06 | 1/07 | 2/07 | 3/07 | 4/07 | 5/07 | 6/07 | 7/07 | 8/07 | 9/07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| This Business | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 |
| **Industry Quartiles** | | | | | | | | | | | | |
| Upper | | | 79 | | | 79 | | | 79 | | | 79 |

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION

| | | | | |
|---|---|---|---|---|
| Median | 76 | 76 | 76 | 76 |
| Lower | 70 | 70 | 69 | 70 |

Shows the trend In D&B PAYDEX scoring over the past 12 months.



**Last 12 Months**

Based on payments collected over the last 12 months.

- Current PAYDEX for this Business is 80, or equal to generally within terms
- The 12-month high is **80**, or equal to generally within terms
- The 12-month low is **80**, or equal to generally within terms

**PAYDEX Comparison to Industry**

Shows PAYDEX scores of this Business compared to the Primary Industry from each of the last four quarters. The Primary Industry is Whol electrical equipment, whol electronic parts/equipment, based on SIC code 5063.

**Quarterly PAYDEX Scores Comparison to Industry**

Previous Year

| | 9/05 | 12/05 | 3/06 | 6/06 |
|---|---|---|---|---|
| **This Business** | UN | 80 | 80 | 80 |
| **Industry Quartiles** | | | | |
| Upper | 79 | 79 | 79 | 79 |
| Median | 76 | 76 | 76 | 76 |
| Lower | 70 | 70 | 70 | 70 |

Current Year

| | 9/06 | 12/06 | 3/07 | 6/07 |
|---|---|---|---|---|
| **This Business** | 80 | 80 | 80 | 80 |
| **Industry Quartiles** | | | | |
| Upper | 79 | 79 | 79 | 79 |
| Median | 76 | 76 | 76 | 76 |
| Lower | 70 | 70 | 70 | 69 |



D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION

### Last 12 Months

Based on payments collected over the last 4 quarters.

| Score Comparison Key: | ▷ This Business | ▲ Industry upper quartile |
| --- | --- | --- |
| | | 🏛 Industry median |
| | | ▼ Industry lower quartile |

- Current **PAYDEX** for this Business is **80**, or equal to generally within terms
- The present industry **median score** is **76**, or equal to 6 days beyond terms.

- Industry upper quartile represents the performance of the payers in the 75th percentile
- Industry lower quartile represents the performance of the payers in the 25th percentile

### Payment Habits

For all payment experiences within a given amount of credit extended, shows the percent that this Business paid within terms. Provides number of experiences used to calculate the percentage, and the total dollar value of the credit extended.



| $ Credit Extended | % of Payments Within Terms | # Payment Experiences | $ Total Dollar Amount |
| --- | --- | --- | --- |
| Over 100,000 | 0% | 0 | $0 |
| 50,000-100,000 | 0% | 0 | $0 |
| 15,000-49,999 | | 1 | $35,000 |
| 5,000-14,999 | | 4 | $32,500 |
| 1,000-4,999 | | 9 | $10,500 |
| Under 1,000 | | 18 | $4,900 |

Based on payments collected over the last 12 months.

Payment experiences reflect how bills are met in relation to the terms granted. In some instances, payment beyond terms can be the result of disputes over merchandise, skipped invoices, etc.

### PAYMENT SUMMARY

The Payment Summary section reflects payment information in D&B's file as of the date of this report.

There are 32 payment experiences in D&B's file for the most recent 12 months, with 21 experiences reported during the last three month period.

Below is an overview of the company's dollar-weighted payments, segmented by its suppliers' primary industries:

| | Total Rcv'd (#) | Total Dollar Amts ($) | Largest High Credit ($) | Within Terms (%) | Days Slow <31 (%) | 31-60 | 61-90 | 90> |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Top industries:** | | | | | | | | |
| Nonclassified | 7 | 15,250 | 10,000 | 100 | 0 | 0 | 0 | 0 |
| Telephone communictns | 4 | 22,750 | 10,000 | 100 | 0 | 0 | 0 | 0 |
| Radiotelephone commun | 3 | 3,350 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Misc business service | 2 | 200 | 100 | 100 | 0 | 0 | 0 | 0 |

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Misc business credit | 2 | 100 | 0 | 100 | 0 | 0 | 0 | 0 |
| Ret-direct selling | 1 | 35,000 | 35,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg computers | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Data processing svcs | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Short-trm busn credit | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Misc general gov't | 1 | 750 | 750 | 100 | 0 | 0 | 0 | 0 |
| Electric services | 1 | 250 | 250 | 0 | 100 | 0 | 0 | 0 |
| Whol service paper | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Help supply service | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Whol office supplies | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Whol electrical equip | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Whol durable goods | 1 | 50 | 50 | 100 | 0 | 0 | 0 | 0 |
| Misc publishing | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Security systems svcs | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Other payment categories:** | | | | | | | | |
| Cash experiences | 0 | 0 | 0 | | | | | |
| Payment record unknown | 1 | 2,500 | 2,500 | | | | | |
| Unfavorable comments | 0 | 0 | 0 | | | | | |
| **Placed for collections:** | | | | | | | | |
| With D&B | 0 | 0 | 0 | | | | | |
| Other | 0 | N/A | 0 | | | | | |
| Total in D&B's file | 32 | | 35,000 | | | | | |

The highest **Now Owes** on file is $10,000 The highest **Past Due** on file is $0

Accounts are sometimes placed for collection even though the existence or amount of the debt is disputed. Indications of slowness can be result of dispute over merchandise, skipped invoices, etc.

**PAYMENT DETAILS**

**Detailed payment history**

| Date Reported (mm/yy) | Paying Record | High Credit ($) | Now Owes ($) | Past Due ($) | Selling Terms | Last Sale Within (months) |
|---|---|---|---|---|---|---|
| 08/07 | Ppt | | 50 | 0 | | |
| | Ppt | | 50 | 0 | | 1 mo |
| | Ppt | 5,000 | 2,500 | 0 | | 1 mo |
| | Slow 15 | 250 | 0 | 0 | | 4-5 mos |
| 07/07 | Ppt | 35,000 | 1,000 | 0 | N30 | 1 mo |
| | Ppt | 10,000 | 10,000 | 0 | | 1 mo |
| | Ppt | 10,000 | 0 | 0 | | 6-12 mos |
| | Ppt | 7,500 | 5,000 | 0 | | 1 mo |
| | Ppt | 2,500 | 2,500 | 0 | | 1 mo |
| | Ppt | 2,500 | 2,500 | 0 | | 1 mo |
| | Ppt | 1,000 | 1,000 | 0 | | 1 mo |
| | Ppt | 1,000 | 500 | 0 | | 1 mo |
| | Ppt | 1,000 | 0 | 0 | | 1 mo |
| | Ppt | 750 | 500 | 0 | | 1 mo |
| | Ppt | 250 | 0 | 0 | | 1 mo |
| | Ppt | 250 | 250 | 0 | | 1 mo |
| | Ppt | 250 | 100 | 0 | | 1 mo |
| | Ppt | 100 | 0 | 0 | N30 | 1 mo |
| | Ppt | 100 | 100 | 0 | | 1 mo |
| | Ppt | 100 | 100 | 0 | | 1 mo |

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION                    Page 9 of 14

| | | | | | | |
|---|---|---|---|---|---|---|
| | Ppt | 0 | 0 | 0 | | 1 mo |
| 05/07 | Ppt | 0 | 0 | 0 | | 1 mo |
| 04/07 | Ppt | 250 | 0 | 0 | | 6-12 mos |
| 02/07 | Ppt | 2,500 | 1,000 | 0 | | 1 mo |
| 12/06 | (025) | 2,500 | 0 | 0 | | 6-12 mos |
| 10/06 | Ppt | 100 | 0 | 0 | | 6-12 mos |
| 07/06 | Ppt | 100 | 50 | 0 | N30 | 1 mo |
| | (028) | 750 | | | | 1 mo |
| | Satisfactory. | | | | | |
| 05/06 | Ppt | 250 | 0 | 0 | N10 | 6-12 mos |
| 04/06 | Ppt | 750 | 750 | 0 | | 1 mo |
| | Ppt | 500 | 0 | 0 | | 6-12 mos |
| | Ppt | 50 | 0 | 0 | | 6-12 mos |

Payment experiences reflect how bills are met in relation to the terms granted. In some instances payment beyond terms can be the result of disputes over merchandise, skipped invoices etc.

Each experience shown is from a separate supplier. Updated trade experiences replace those previously reported.

**Jump to:**

Overview    |    Scores    |    Payments    |    History & Operations    |    Banking & Finance

# Public Filings

**PUBLIC FILINGS**

The following data includes both open and closed filings found in D&B's database on the subject company.

| Record Type | # of Records | Most Recent Filing Date |
|---|---|---|
| Bankruptcy Proceedings | 0 | - |
| Judgments | 0 | - |
| Liens | 0 | - |
| Suits | 0 | - |
| UCC's | 3 | 11/29/2001 |

The following Public Filing data is for information purposes only and is not the official record. Certified copies can only be obtained from the official source.

**UCC FILINGS**

| | |
|---|---|
| Collateral: | Leased Equipment and proceeds |
| Type: | Original |
| Sec. party: | FIRST SIERRA FINANCIAL, INC, HOUSTON, TX |
| Debtor: | HOSIDEN AMERICA CORPORATION |
| Filing number: | 004468228 |
| Filed with: | SECRETARY OF STATE/UCC DIVISION, SPRINGFIELD, IL |
| Date filed: | 11/29/2001 |
| Latest Info Received: | 12/07/2001 |

| | |
|---|---|
| Collateral: | Leased Equipment and proceeds |
| Type: | Original |
| Sec. party: | FIRST SIERRA FINANCIAL INC, HOUSTON, TX |
| Debtor: | HOSIDEN AMERICA CORP |
| Filing number: | 004358354 |
| Filed with: | SECRETARY OF STATE/UCC DIVISION, SPRINGFIELD, IL |
| Date filed: | 03/22/2001 |
| Latest Info Received: | 04/19/2001 |

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION

Page 10 of 14

| | |
|---|---|
| **Collateral:** | Leased Equipment and proceeds |
| **Type:** | Original |
| **Sec. party:** | SIERRACITIES.COM, HOUSTON |
| **Debtor:** | HOSIDEN AMERICA CORP |
| **Filing number:** | 004223810 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, SPRINGFIELD, IL |
| **Date filed:** | 06/08/2000 |
| **Latest Info Received:** | 06/18/2000 |

The public record items contained in this report may have been paid, terminated, vacated or released prior to the date this report was printed.

**GOVERNMENT ACTIVITY**

**Activity summary**

| | |
|---|---|
| Borrower (Dir/Guar): | NO |
| Administrative debt: | NO |
| Contractor: | NO |
| Grantee: | NO |
| Party excluded from federal program(s): | NO |

**Possible candidate for socio-economic program consideration**

| | |
|---|---|
| Labor surplus area: | YES (2007) |
| Small Business: | N/A |
| 8(A) firm: | N/A |

The details provided in the Government Activity section are as reported to Dun & Bradstreet by the federal government and other sources.

Jump to:

Overview    |    Scores    |    Payments    |    Public Filings    |    Banking & Finance

# History & Operations

**HISTORY**

The following Information was reported **05/23/2007**:

**Officer(s):**    KENJI FURUHASHI, PRESIDENT
TOMIO HARAKI, MANAGING DIRECTOR
KATSUMI KASHIWAI, TREASURER
COLIN HARA, SECRETARY

**DIRECTOR(S):**    THE OFFICER(S)

Incorporated in the state of Illinois on January 1, 1978.

Business started 1978 by parent company. 100% of capital stock is owned by parent company.

KENJI FURUHASHI. Antecedents are undetermined.

TOMIO HARAKI. 1998-Present active here.

KATSUMI KASHIWAI. Antecedents are undetermined.

COLIN HARA, not active here. Antecedents are undetermined.

**CORPORATE FAMILY**

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION

For more details on the Corporate Family, use D&B's Global Family Linkage product.

**Parent:**
Select business below to buy a Business Information Report.

☐ Hosiden Corporation                Yao, Japan                  DUNS # 69-053-9184

**Branches (US):**
Select companies below to buy Business Information Report(s).

☐ Hosiden America Corporation        Cupertino, CA              DUNS # 80-588-1513
☐ Hosiden America Corporation        San Diego, CA              DUNS # 96-087-6720
☐ Hosiden America Corporation        Chicago, IL                DUNS # 62-058-9606
☐ Hosiden America Corporation        Novi, MI                   DUNS # 61-077-7752

**Affiliates (International):** *(Affiliated companies share the same parent company as this business.)*
Select companies below to buy Business Information Report(s).

☐ Chang Won Hosiden Electronics Co., Ltd.   CHANGWON, KOREA, REPUBLIC OF   DUNS # 68-783-3921
☐ Hong Kong Hosiden Limited                 SAN PO KONG, HONG KONG         DUNS # 68-640-8725
☐ HOSIDEN K.K.                              MYOZAI-GUN, JAPAN              DUNS # 69-121-9273
☐ HOSIDEN NIIGATA K.K.                      MURAKAMI, JAPAN                DUNS # 69-121-9257
☐ HOSIDEN SERVICE K.K.                      YAO, JAPAN                     DUNS # 69-169-9763
☐ Hosiden (Shenzhen) Co., Ltd.             SHENZHEN, CHINA                DUNS # 54-493-8637
☐ HOSIDEN ELECTRONICS (MALAYSIA) SDN BHD   BANDAR BARU BANGI, MALAYSIA    DUNS # 65-221-2879
☐ Hosiden Electronics (Shanghai) Co., Ltd. SHANGHAI, CHINA                DUNS # 54-488-7532
☐ Hosiden Europe GmbH                       DÜSSELDORF, GERMANY            DUNS # 32-562-0219
☐ HOSIDEN F.D.CORPORATION                   ECHI-GUN, JAPAN                DUNS # 69-121-9307
☐ HOSIDEN KYUSHU CORP.                      KURATE-GUN, JAPAN              DUNS # 69-121-9281
☐ Hosiden México, S.A de C.V.              TIJUANA, MEXICO                DUNS # 81-241-9687
☐ HOSIDEN PLASTICS CO.,LTD.                 ECHI-GUN, JAPAN                DUNS # 70-511-5129
☐ HOSIDEN SEIKO CORPORATION                 KASHIWARA, JAPAN               DUNS # 69-121-9299
☐ HOSIDEN SINGAPORE PTE LTD                 SINGAPORE, SINGAPORE           DUNS # 59-515-9740
☐ HOSIDEN WAKAYAMA K.K.                     ARIDA-GUN, JAPAN               DUNS # 69-121-9265
☐ Korea Hosiden Electronics Co., Ltd.       MASAN, KOREA, REPUBLIC OF      DUNS # 68-783-3913
☐ Qingdao Hosiden Electronics Co.,Ltd.      QINGDAO, CHINA                 DUNS # 65-452-5831
☐ SATOLEX CORPORATION                       OSAKA, JAPAN                   DUNS # 69-121-9323
☐ TAIWAN HOSIDEN CO., LTD.                  Taipei City, TAIWAN            DUNS # 65-614-6016

**BUSINESS REGISTRATION**

CORPORATE AND BUSINESS REGISTRATIONS REPORTED BY THE SECRETARY OF STATE OR OTHER OFFICIAL SOURCE AS OF SEP 05 2007:

**Registered Name:**        HOSIDEN AMERICA CORPORATION

**Business type:**          DOMESTIC              **Common stock**
                            CORPORATION          Authorized shares:     25,000

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION

| | | | |
|---|---|---|---|
| **Corporation type:** | PROFIT | **Par value:** | $100.0000 |
| **Date incorporated:** | JAN 23 1978 | | |
| **State of Incorporation:** | ILLINOIS | | |
| **Filing date:** | JAN 23 1978 | | |
| **Registration ID:** | 51358058 | | |
| **Federal ID:** | 362952242 | | |
| **Duration:** | PERPETUAL | | |
| **Status:** | GOOD STANDING | | |

**Where filed:**      SECRETARY OF STATE/CORPORATIONS DIVISION, SPRINGFIELD, IL

**Registered agent:**   MASARU FUNAI, 203 NORTH LASALLE ST #2500, CHICAGO, IL, 606011262
Agent appointed: NOV 10 2003

**Principals:**      KENJI FURUHASHI HYOGO JAPAN, PRESIDENT
COLIN HARA 203 N LASALLE ST #2500 CHICAGO 60601-1262, SECRETARY

## OPERATIONS

05/23/2007

**Description:** Foreign parent is Hosiden Corporation, Osaka, Japan, DUNS number is 69-053-9184, started in 1952, which operates as a manufacturer of electronic components. Reference is made to that report for background information on the parent and its management. The parent company owns 100% of capital stock of the business. Intercompany relations were reported by management to consist of merchandise transactions.

As noted, subject is a subsidiary of Hosiden Corporation, DUNS number 69-053-9184, and reference is made to that report for background information on the parent company and its management.

Wholesales electrical apparatus, wiring and construction materials (50%). Wholesales electronic parts and equipment (50%).

Has 250 account(s). Terms are Net 30 days. Sells to computer, automotive, telecommunications and consumer products industries. Territory : International.

Nonseasonal.

**Employees:** 31 which includes officer(s). 22 employed here.

**Facilities:** Owns 11,000 sq. ft. in a one story concrete block building.

**Location:** Central business section on main street.

**Branches:** Maintains branch locations at 28970 Cabot Dr-Novi MI; 1601 S De Anza Blvd Ste 215, Cupertino, CA; 9785 Marconi Dr Ste P-San Diego CA.

## SIC & NAICS

**SIC:**
Based on information in our file, D&B has assigned this company an extended 8-digit SIC. D&B's use of 8-digit SICs enables us to be more specific to a company's operations than if we use the standard 4-digit code.

The 4-digit SIC numbers link to the description on the Occupational Safety & Health Administration (OSHA) Web site. Links open in a new browser window.

| | |
|---|---|
| 50630000 | Electrical apparatus and equipment |
| 50650000 | Electronic parts and equipment, nec |

**NAICS:**

| | |
|---|---|
| 423610 | Electrical Apparatus and Equipment, Wiring Supplies and Related Equipment Merchant Wholesalers |
| 423690 | Other Electronic Parts and Equipment Merchant Wholesalers |

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION

**Jump to:**

Overview    |    Scores    |    Payments    |    Public Filings    |    History & Operations

# Banking & Finance

**BANKING**

**BANK:**    Fuji Bank, 225 W Wacker Dr, Chicago, IL

**KEY BUSINESS RATIOS**

D&B has been unable to obtain sufficient financial information from this company to calculate business ratios. Our check of additional outside sources also found no information available on its financial performance. To help you in this instance, ratios for other firms in the same industry are provided below to support your analysis of this business.

**Based on this number of establishments:**  32

### Industry Norms based on 32 establishments

| | This Business | Industry Median | Industry Quartile |
|---|---|---|---|
| **Profitability** | | | |
| **Return on Sales** | UN | 3.7 | UN |
| **Return on Net Worth** | UN | 16.0 | UN |
| **Short-Term Solvency** | | | |
| **Current Ratio** | UN | 3.0 | UN |
| **Quick Ratio** | UN | 1.3 | UN |
| **Efficiency** | | | |
| **Assets Sales** | UN | 35.6 | UN |
| **Sales / Net Working Capital** | UN | 4.9 | UN |
| **Utilization** | | | |
| **Total Liabs / Net Worth** | UN | 70.2 | UN |

UN = Unavailable

**FINANCE**

**02/19/2007**

On FEB 19 2007 Tomio Haraki, Managing Director, deferred financial information.

**CUSTOMER SERVICE**

If you have questions about this report, please call our Customer Resource Center at 1.800.234.3867 from anywhere within the U.S. If you are outside the U.S. contact your local D&B office.

#### *** Additional Decision Support Available ***

Additional D&B products, monitoring services and specialized investigations are available to help you evaluate this company or its industry. Call Dun & Bradstreet's Customer Resource Center at 1.800.234.3867 from anywhere within the U.S. or visit our website at www.dnb.com.

D&B Comprehensive Report: HOSIDEN AMERICA CORPORATION

Copyright 2007 Dun & Bradstreet - Provided under contract for the exclusive use of subscriber 001061306L

# **<u>Exhibit D</u>**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### CASE NO. 04-1338
## AFFIDAVIT OF SPECIAL PROCESS SERVER

**Philip Alkhoury**, being first duly sworn on oath deposes and says that he served process in the above mentioned cause.
That he served the within:

(   ) Summons & Complaint
(   ) Citation to Discover Assets
(   ) Rule to Show Cause
( **X** ) Subpoena
(   ) Other:

1.     (   ) By leaving a copy with the named party, ------- personally on -------.

2.     (   ) On the within named party, -------, by leaving a copy with -------, -------, who states that they are a member of the household on -------, and informed that person of the contents thereof, and that further he mailed a copy of same in a sealed envelope with postage prepaid addressed to the party on -------.

3.     ( **X** ) On the within party, **Hosiden America Corporation** by leaving a copy with **Christina Gonzalez, Inventory Coordinator and Authorized Person**, on **October 1, 2007**, and informed that person of the contents thereof.

4.     ( **X** ) That the sex, race and approximate age of the person with whom he left the documents were as follows:

SEX: **Female**       RACE: **Hispanic**       APPROXIMATE AGE: **25-30**

5.     ( **X** ) That the place where and the time of day when the documents were served were as follows:

PLACE: **120 E State Parkway, Schaumburg, IL 60173**
TIME OF DAY: **2:40 PM**

6.     (   ) That he was unable to serve the within named party ------- located at -------- for the reason: -------

Signed and Sworn to before me
This **2nd** day of **October 2007**.

OFFICIAL SEAL
KELLY L DENT
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 09/02/99

Philip Alkhoury
Special Process Server
IT'S YOUR SERVE, INC.
Private Detective No. 117-000885

# **<u>Exhibit E</u>**

MasudaFunai

CHICAGO  LOS ANGELES  SCHAUMBURG

# FAX

| | | | |
|---|---|---|---|
| **To:** | Strook & Strook & Lavan LLP | **From:** | Jason M. Metnick |
| **Attn:** | Ian G. DiBernardo | **Phone:** | (312) 245-7500 |
| **Fax:** | (212) 806-7867 | **# of Pages:** | 2 (including cover) |
| **Phone:** | | **Date:** | October 15, 2007 |
| **Re:** | Honeywell International, Inc. et al. v. Apple Computer et al.: Subpoena served upon Hosiden America Corporation | | |

**Comments**

The information contained in the attached transmission may be attorney-client privileged, confidential, exempt from disclosure under applicable law and intended only for the use of the person(s) or firm(s) named above. If the reader of this message is not an intended recipient, or an employee of or agent responsible for delivery to an intended recipient, you are hereby notified that any dissemination, distribution or copying of the attached transmission is strictly prohibited. If you have received this transmission in error, please immediately notify us by telephone and return the original transmission to us at the above address via the U.S. Postal Service. All postal fees so incurred will be reimbursed. Thank you.

**MasudaFunai**

CHICAGO   LOS ANGELES   SCHAUMBURG

Jason M. Metnick
Attorney at Law
jmetnick@masudafunai.com
tel 312.245.7500
fax 312.245.7467

October 15, 2007

*Via Fax:* (212) 806-7867

Strook & Strook & Lavan LLP
180 Maiden Lane
New York, NY
10038

Attn:   Ian G. DiBernardo

Re:     Honeywell International, Inc. et al. v. Apple Computer et al.: Subpoena served upon Hosiden
        America Corporation

Dear Mr. DiBernardo:

Hosiden America Corporation ("Hosiden America") objects to producing any and all of the categories of
documents listed in Attachment A to the above-referenced subpoena (the "Subpoena"). Hosiden America
objects to the categories of requested documents listed in Attachment A, as well as all "Instructions" to the
Subpoena, because they are unduly broad, overly burdensome, and are insufficiently limited in time and in
scope. In sum, the Subpoena unreasonably requests nearly every document, product, and electronic
communication that passed through Hosiden America from 1988 through 1994.

Hosiden America further objects to the requested documents and things to be produced because the
relevance of such documents and items is not sufficiently justified given the significant burden imposed upon
Hosiden America in responding to the Subpoena. Moreover, the requested documents and items listed in
Attachment A includes trade secrets and other confidential research and commercial information of Hosiden
America.

We further note and object to the Subpoena on the basis that the Subpoena is apparently being served upon
Hosiden America because a prior attempt to serve Hosiden America's parent corporation, Hosiden
Corporation, was unsuccessful. Consequently, the Subpoena is inherently suspect and appears to be a
speculative inquiry into the business of Hosiden America.

Hosiden America reserves its rights to assert further objections to the Subpoena, which will be asserted if a
court determines that Hosiden America must respond to the Subpoena.

If you have any questions regarding the contents of this letter, please contact me

Very truly yours,

Jason M. Metnick

cc:     Hosiden America Corporation
        Colin Hara, Esq.
        Rein F. Krammer, Esq.

N:\SYS02\2MA\LETTERS\0260 - October 15 2007.doc

MASUDA, FUNAI, EIFERT & MITCHELL, LTD
200 North LaSalle Street Suite 2500 Chicago Illinois 60601-1252 Tel 312 245 7500 Fax 312 245 7467 www.masudafunai.com

# **Exhibit F**

# United States Patent [19]

## McCartney, Jr. et al.

US005280371A

[11] Patent Number: **5,280,371**

[45] Date of Patent: **Jan. 18, 1994**

[54] **DIRECTIONAL DIFFUSER FOR A LIQUID CRYSTAL DISPLAY**

[75] Inventors: Richard I. McCartney, Jr., Scottsdale; Daniel D. Syroid, Glendale; Karen E. Jachimowicz, Goodyear, all of Ariz.

[73] Assignee: Honeywell Inc., Minneapolis, Minn.

[21] Appl. No.: 911,547

[22] Filed: Jul. 9, 1992

[51] Int. Cl.⁵ ............................................ G02F 1/133
[52] U.S. Cl. ............................................ 359/40; 359/69
[58] Field of Search ............................ 359/69, 40, 41

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,416,515 | 11/1983 | Fumada et al. | 359/69 |
| 5,052,783 | 10/1991 | Hamada | 359/41 |
| 5,101,279 | 3/1992 | Kurematsu et al. | 359/40 |
| 5,128,783 | 7/1992 | Abileah et al. | 359/40 |
| 5,161,041 | 11/1992 | Abileah et al. | 359/40 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0068400 | 10/1977 | Japan | 359/69 |
| 2-14822 | 8/1990 | Japan | 359/69 |

### OTHER PUBLICATIONS

IBM Corp., "Polarized backlight for liquid crystal display", IBM Technical Disclosure Bulletin, vol. 33, No. 1B, Jun. 1990, pp. 143–144.

Primary Examiner—William L. Sikes
Assistant Examiner—Huy Mai
Attorney, Agent, or Firm—Dale E. Jepsen; A. Medved

[57] **ABSTRACT**

A display apparatus including a light source, a liquid crystal panel, and one or more directional diffuser lens arrays disposed therebetween provides a tailored variation of luminance with viewing angle, a uniform variation of luminance with viewing angle within a first predetermined range of viewing angles and a concentration of light energy within a second predetermined range of viewing angles.

**3 Claims, 11 Drawing Sheets**



Case 1:07-cv-06458    Document 7    Filed 11/14/2007    Page 95 of 159



Fig.1
PRIOR ART





Fig.2



Fig.3



*Fig. 4A*



*Fig. 4B*

Case 1:07-cv-06458     Document 7     Filed 11/14/2007     Page 99 of 159



Fig. 5



*Fig.6*



*Fig.7*



$\Theta_V$ = VERTICAL VIEW ANGLE

*Fig.10*



Fig. 8

Case 1:07-cv-06488    Document 7    Filed 11/14/2007    Page 103 of 159



*Fig.9*



Fig. 11

Case 1:07-cv-06458    Document 7    Filed 11/14/2007    Page 105 of 159



θ ~ 2° TO 16°

Fig.12

5,280,371

**1**

# DIRECTIONAL DIFFUSER FOR A LIQUID CRYSTAL DISPLAY

## BACKGROUND OF THE INVENTION

This invention relates in general to flat panel liquid crystal displays and, more particularly, to a liquid crystal display (LCD) having a directional diffuser to provide a tailored variation of luminance with viewing angle.

There are commercially available liquid crystal displays for use in various applications, including for example aircraft cockpit displays. However, a typical characteristic of the liquid crystal panel used therein is a wide variation of the light transmission of the liquid crystal panel with viewing angle, especially the vertical viewing angle. This results in gray-scale errors and off-state errors with viewing angle. That is to say, the brightness of certain areas of the display when viewed at angles above or below a vertical viewing angle normal to the display surface, may be substantially different than the brightness of those areas when viewed at an angle normal to the display surface. This variation of brightness or luminance with viewing angle is generally undesirable and particularly undesirable in those cases where the information being displayed on the liquid crystal display is critical to an operation such as controlling or navigating an aircraft.

In addition, a typical diffuser used to provide a light source for backlighting a typical liquid crystal display ordinarily provides a constant luminance with viewing angle and therefore provides the same amount of energy for any given viewing angle of the display. In certain applications, such as for example an aircraft cockpit, the typical vertical viewing angle is fixed within a relatively narrow range and it would therefore be desirable to concentrate a higher percentage of the energy from the light source within a particular range of viewing angles.

It would therefore be desirable to provide a directional diffuser for use with a liquid crystal display to provide a tailored variation of luminance with viewing angle while also providing a concentration of the light energy from the light source within a predetermined range of viewing angles.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a directional diffuser element for a liquid crystal display to provide a tailored variation of luminance with viewing angle.

It is a further object of the present invention to provide a liquid crystal display having less variation of intermediate gray-level luminance with viewing angle.

It is still further an object of the present invention to provide a liquid crystal display combining the above features to provide a higher concentration of light energy, and therefore increased luminance, within a particular range of viewing angles thereby providing a more efficient use of light energy available from a light source.

The foregoing and other objects are achieved in the present invention wherein there is provided a liquid crystal display apparatus comprising a light source, a liquid crystal planar array of pixels for creating an image by controlling the amount of light allowed to pass through each of the pixels, and one or more directional diffuser lens arrays disposed between the light

**2**

source and the liquid crystal array for providing a tailored variation of luminance from the liquid crystal display as a function of vertical viewing angle.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above mentioned and other features and objects of the present invention and the manner of attaining them will become more apparent and the invention itself will be best understood by reference to the following description of alternative embodiments of the invention taken in conjunction with the accompanying drawings wherein:

FIG. 1 is an exploded view of a typical prior art backlit liquid crystal display;

FIG. 2 is an exploded view of the liquid crystal display of the present invention, having a directional diffuser lens array;

FIG. 3 illustrates a typical prior art LCD gray-level response showing the variation of luminance with vertical viewing angle;

FIGS. 4A and 4B show cross sectional side and top views of a typical assembly including the lens array of the present invention;

FIG. 5 illustrates the variation of luminance with viewing angle for a light source alone and a light source combined with a single lens array;

FIG. 6 illustrates the path of various light rays when striking the lens array at various angles;

FIG. 7 is a cross sectional view of a preferred embodiment of the present invention with two lens arrays;

FIG. 8 illustrates the variation of luminance with viewing angle for the dual lens array configuration;

FIG. 9 illustrates the variation of luminance with viewing angle for a triple lens array configuration;

FIG. 10 is a cross sectional view of a configuration utilizing a triangular shaped lens array;

FIG. 11 illustrates the variation of luminance with viewing angle for the triangular shaped lens array; and

FIG. 12 shows the angular rotation of the lens array with respect to the LCD matrix array to eliminate residual moire effects.

## DESCRIPTION OF A PREFERRED EMBODIMENT

Referring now to FIG. 1 there is shown a cross section of a typical prior art liquid crystal display apparatus including backlight array 25 comprising lamp 10, rear reflecting surface 15 and lambertian diffuser 20. The backlight array provides a source of light which impinges on liquid crystal panel 30 comprised of a number of individual liquid crystal elements which are alternately energized in order to form a desired pattern or image for viewing from the front of the liquid crystal display.

While this typical prior art liquid crystal panel may be adequate for certain applications where the normal viewing angle is more or less at an angle normal to the display surface, this display is not optimum for applications wherein the typical viewing angle is other than at an angle normal to the display surface. This prior art display exhibits a relatively wide variation of light transmission with viewing angle, especially the vertical viewing angle. As illustrated in FIG. 3 this variation also changes with the level of lumination for various gray-levels or intermediate intensities for a given display.

5,280,371

3

As can be seen in the curves of FIG. 3, the luminance emitted from the lower gray-levels of the LCD system increases significantly with increasing vertical viewing angle. This variation presents an undesirably large luminance increase with angle when the information being presented is low-level luminance information, such as for avionics applications including weather radar or attitude director indicator presentations. As a pilot viewing the display moves his vertical perspective, or his viewing angle, higher above a normal angle to the display (larger vertical viewing angles), he observes a low luminance field increase significantly in luminance, thereby causing confusion in interpretation of critical display information.

In addition, the lambertian diffuser of the typical prior art display, element 20 of FIG. 1, provides for a nearly equal luminance in all angular viewing directions. In most applications a 180° field of view in both horizontal and vertical directions is not required. It would therefore be more energy efficient if a substantial portion of the light energy could be redirected so as to be concentrated in the viewing angles of interest for a particular application.

The apparatus of the present invention includes the backlight array and liquid crystal of the prior art as shown in FIG. 1 with the addition of a lens array 40 inserted between the lambertian diffuser 20 of the prior art and liquid crystal display panel 30, as shown in FIG. 2. It was found that by inserting a directional diffuser consisting of a cylindrical lens array 40 between the 30 lambertian diffuser and the liquid crystal panel that both of the desired effects could be accomplished. That is, the overall light energy is concentrated within a desired rang of viewing angles and the variation of luminance with viewing angle is tailored to offset that which is 35 obtained through the liquid crystal display alone.

For example, FIG. 5 illustrates that with the insertion of lens array 40 as shown in FIGS. 4A and 4B, the overall luminance has increased approximately 20 percent within a range from −20° to +20° viewing angle and the desired decrease in luminance with increased vertical viewing angle is obtained between approximately +10° and +35° of vertical viewing angle. Curve 110 of FIG. 5 illustrates the variation of luminance with viewing angle for the lambertian light source only, in both the horizontal and vertical angles while curves 120 and 130 respectively represent a variation of luminance with vertical and horizontal viewing angles for the backlight including lens array 40.

The effect which results from the insertion of the cylindrical lens array is explained by reference to FIG. 6 wherein there are shown light rays from the lambertian (having uniform luminance with angle) source diffuser impinging on the lens array from various angles. An air gap must be present at the interface of the lambertian diffuser and the lens array. The normal 4 percent loss per surface due to fresnel reflections is not incurred, because the surface reflections are returned to the diffuser and reflected again.

Those rays that are normal to the source diffuser but less than the critical angle within the lens array are passed through the lens array materially unobstructed, except for a small amount of surface reflection. Rays which enter at oblique angles and are greater than the critical angle of the lens array undergo total internal reflection at the inside of the lens surface as illustrated by ray tracing 70. These rays are reflected with no loss due to the total internal reflection effect around the lens

4

periphery. They exit the rear of the lens array and return to the source diffuser where they undergo a secondary diffuse reflection from the source diffuser.

However, because the source diffuser is not totally reflective, some of the returned rays are transmitted through the diffuser and are then reflected from the backlight enclosure surface 15 of FIG. 4A. Some fraction of these rays are reflected internally to exit the diffuser again. These reflected rays again have a lambertian distribution at the surface of lambertian diffuser 20. It is apparent from this interaction between the lens array and the backlight that rays which impinge close to the normal tend to be intensified while those rays which impinge at oblique angles undergo total internal reflection and are returned to the diffuser and diminished somewhat from this statistical process.

However, the roll off or variation with vertical viewing angle for this single directional diffuser cylindrical lens array was not sufficient to offset the effects of the liquid crystal display, and there were significant moire patterns caused by the interference between the lens array and the display panel wherein the lens array contained 142 lenses per inch and the display panel matrix had a spatial frequency resolution of 172 dots or pixels per inch.

For the desired specific implementation it was discovered that the adverse interaction producing moire patterns could be eliminated by including a second lens array with a different number of lenses per inch. The combination of the dual lenses increased the desired reduction in luminance with increased viewing angle, and in addition reduced or eliminated the moire patterns with the selection of an appropriate pitch, or number of lenses per inch, for the two lenses in question.

As illustrated in FIG. 7, one of the lens arrays 42 was selected to have a relatively coarse pitch with respect to that of the liquid crystal display and the second lens array 44 was selected to have a relatively fine pitch with respect to that of liquid crystal display. FIG. 8 illustrates again the relatively flat response of the lambertian source diffuser alone curve 110, and the increased roll off with vertical viewing angle of curve 125 as well as the corresponding variation of luminance with horizontal viewing angle as illustrated by curve 135 for the dual lens array of FIG. 8.

In general it was discovered that the addition of additional lens arrays caused a steeper or more rapid variation of the change in luminance with vertical viewing angle, which was desirable, but the corresponding change in luminance with variations in horizontal viewing angle also became steeper, which was not desirable for the particular application in question. For the particular application in question the preferred embodiment included two lens arrays in series which provided the best tradeoff of decrease in luminance with variation of vertical viewing angle, while not adversely affecting the variation in luminance with horizontal viewing angle.

In addition, since moire effects result when both of the lens arrays have the same spatial frequency, the rear array 42 should have a coarse resolution or low spatial frequency while the front lens array 44 should have a fine resolution or high spatial frequency. The lens arrays and the panel spatial frequencies should be selected to avoid integral multiples of the other. Thus the fine lens array should be as high a spatial frequency as is practical and should be a non integral multiple of the panel frequency. According to these guidelines the fine

5,280,371

5

array frequency becomes approximately 2.5 times the display spatial frequency and the coarse array frequency should be approximately the fine array frequency divided by 3.5, 4.5, 5.5 or as required for the most convenient fabrication.

It was also discovered that the maximum increase in luminance was obtained using a triangular lens array having an included angle of 90° as illustrated in FIG. 10. This configuration resulted in a variation of luminance with vertical and horizonal viewing angles which was quite steep as illustrated by curves 160 and 170 of FIG. 11. Other lens array shapes may be selected as desired to obtain the required concentration of luminance and variation of luminance with vertical and horizonal viewing angle for a particular application.

Even though the spatial frequencies of the directional diffuser lens array and LCD panel have been selected to be greatly different and non-integer multiples, some visual banding effects or moire pattern effects may still be apparent to the viewer. This is especially true at off-axis viewing conditions. This residual moire can be removed by rotating the lens array 40 with the respect to the LCD array 30, as illustrated in FIG. 12. This rotation of the lens array by a few degrees (Typically 2 to 16 degrees) from the horizontal axis causes a small change in the effective spatial frequency difference of the two arrays and thereby eliminates the residual moire.

In addition to the angular redistribution of the light from the directional diffuser, the lens array also provides an additional diffusing effect, especially for any step variations in luminance that are parallel to (or nearly parallel to within a few degrees) the axis of the lens array. This allows the reduction of the thickness or optical density of the conventional diffuser while still achieving the same system luminance uniformity and masking of undesired spatial artifacts from the light source, but with higher luminance at the output.

While there have been described above the principals of invention in conjunction with several specific embodiments, it is to be clearly understood that these descriptions are made only by way of example and not as a limitation to the scope of the invention.

6

We claim:

1. A display apparatus comprising:

a light source;

a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and

first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel, wherein said liquid crystal panel comprises a plurality of pixels arranged in rows and columns, and wherein the number of rows of pixels per unit height, or pitch, of the liquid crystal panel is a first value; the number of lenslets per unit height, or pitch, of said first lens array is a second value which is less than said first value; and the number of lenslets per unit height, or pitch, of said second lens array is a third value which is greater than said first value.

2. A display apparatus in accordance with claim 1 wherein said third value is a non-integral multiple of said first value and is also a non-integral multiple of said second value.

3. A display apparatus comprising:

a light source;

a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and

first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel, wherein at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal panel in order to provide a slight misalignment between said lenslets and said liquid crystal panel.

* * * * *

# **Exhibit G**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HONEYWELL INTERNATIONAL INC.; and
HONEYWELL INTELLECTUAL PROPERTIES
INC.;

          Plaintiffs,

          v.

APPLE COMPUTER, INC., *et al.*

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

C. A. No. 04-1338-KAJ
C.A. No. 04-1337-KAJ
C.A. No. 04-1536-KAJ
C.A. No. 05-874-KAJ

## DEFENDANT FUJI PHOTO FILM CO., LTD.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFFS HONEYWELL INTERNATIONAL, INC. AND HONEYWELL INTELLECTUAL PROPERTIES INC.

Pursuant to Rules 26 and 34 of the Federal Rules of Procedure, Defendant Fuji Photo

Film Co., Ltd. ("Fuji") requests that Plaintiffs Honeywell International, Inc. and Honeywell

Intellectual Properties, Inc. (collectively "Honeywell") produce for inspection and copying each

of the documents and tangible items described below at the offices of Stroock & Stroock &

Lavan LLP, 180 Maiden Lane, New York, New York 10038-4982 or at such place as may be

mutually agreed on within the time specified by the Court.

## DOCUMENT REQUESTS

A. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these Requests for

Production of Documents and Things are deemed to be continuing and Plaintiffs Honeywell are

required to reasonably supplement these responses upon receipt or discovery of additional

information or documents pertinent to any of the propounded Requests.



B.  The Definitions and Instructions that appear in the accompanying First Set of Interrogatories to Plaintiffs Honeywell are incorporated herein by reference as though fully set forth.

## INSTRUCTIONS

A.  These requests shall apply to all documents and things in your possession, custody or control at the present time or coming into your possession, custody or control.  If you know of the existence, past or present, of any document or thing requested below, but are unable to produce such document or thing because it is not presently in your possession, custody, or control, you shall so state and shall identify such document or thing, and the person who now has or lost his possession, custody or control of the document or thing.

B.  All documents that respond, in whole or in part, to any request are to be produced in their entirety, without abbreviation or expurgation, including all attachments or other matters affixed thereto.

C.  If no documents are responsive to a particular request, you are to state that no responsive documents exist.

D.  All documents shall be produced either in order of Request or in the manner that they are kept in the usual course of business.  Whenever a document or group of documents is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, a copy of the label or other means of identification of such cover or other container shall be attached to the document.

E.  If any document requested has existed, but has been lost, destroyed, or is no longer within your possession, custody or control, identify those documents and describe the document,

2

its author(s), the recipients(s) or addressee(s), the subject matter and content. Further, if the document has been destroyed, state with particularity the date and circumstances surrounding the reasons for its destruction, and identify the last known custodian of the document and each person who has knowledge of the contents, loss or destruction of any such document.

      F. In the event that any document identified in these Requests is subject to any claim of privilege (including work product), Plaintiffs shall furnish a list identifying each such document by:

      (1) identifying the person who prepared or authored the document and, if applicable, the persons who sent the document and to whom the document was sent (including copies) and the dates on which the document was prepared and transmitted, identifying persons who prepared, sent and/or received the document as required in the accompanying Definitions;

      (2) describing the nature of the document (e.g., letter, inter-office memorandum, telegram, notes, etc.) and, to the extent possible, the subject matter thereof;

      (3) identifying any and all attachments or enclosures appurtenant to such documents;

      (4) stating briefly the nature of the privilege asserted; and

      (5) producing any non-privileged portions, attachments or enclosures to any such privileged document, and identifying the portion(s) of the document to which privilege is claimed.

      G. If, subsequent to the date you produce documents responsive to these requests you discover or receive documents that are responsive to any request herein, promptly produce all

3

such additional documents to the full extent required by the Federal Rules of Civil Procedure and the Local Rules of the District Court.

H. Each document is to be produced along with all drafts and copies having annotations different from those on other copies, without abbreviation or redaction.

I. If Honeywell refuses to produce any documents by reason of a confidentiality agreement with a third party or a Government secrecy designation, so state and identify each such Agreement and Government classification order and produce a copy of the confidentiality agreement and/or order upon which Honeywell relies.

## REQUESTS FOR PRODUCTION

1. All documents reviewed, consulted or referred to in any way by any person in preparing the answers to Fuji Photo Film Co., Ltd.'s First Set Of Interrogatories To Plaintiffs Honeywell International, Inc. and Honeywell Intellectual Properties Inc.

2. All documents and things that you produce or make available for inspection to any party in the present litigation, Honeywell Intl. Inc., et al. v. Apple Computer, Inc., et al., C.A. No. 04-1338-KAJ (D. Del. 2004), Honeywell Intl. Inc., et al. v. Audiovox Communications Corp. et al., C.A. No. 04-1337-KAJ (D. Del. 2004), Honeywell Intl. Inc., et al. v. Citizen Watch Co. Ltd. et al., C.A. No. 05-874-KAJ (D. Del. 2005), and/or Optrex America, Inc. v. Honeywell Intl. Inc., et al., C.A. No. 04-1536-KAJ (D. Del. 2004), including all privilege logs.

3. All documents that you receive from Third Parties in connection with this litigation.

4. All Answers to Interrogatories propounded by any entity named in the above referenced cases.

5.  All documents relating to or concerning Honeywell's policy and/or practice of enforcing its patents.

6.  The documents sufficient to determine the time between the issuance of any patent owned by Honeywell which Honeywell has licensed or made the subject of a suit and the initiation of an infringement suit involving that patent and/or the entry of a decision covering that patent.

7.  All documents referring or relating to Honeywell's decision to initiate this lawsuit against Fuji and Fuji USA.

8.  All documents that Honeywell contends, if it so contends, provided notice of the '371 patent to Fuji.

9.  All documents that Honeywell contends, if it so contends, provided an indication, warning or notice that Honeywell intended to assert the '371 patent against any entity or individual.

10. All documents relating to Honeywell's first notice or knowledge that any Fuji digital still camera contained a liquid crystal display.

11. All documents relating to Honeywell's contentions, if it so contends, that any delay between the issuance of the '371 patent and the filing of the Complaints in CA No. 04-1357 and 04-1338 was reasonable and/or justified.

12. All documents relating to Honeywell's knowledge and/or analysis of the alleged infringement of the '371 patent by Fuji.

13. All documents supporting, evidencing, contradicting, and/or relating to Honeywell's claim that Fuji's alleged infringement of the '371 patent was willful.

14. All documents that support, rebut, refer or relate to Honeywell's contention that Fuji infringes, willfully infringes, contributes to the infringement of, or induces infringement, of any claim of the '371 patent.

15. All documents which support, rebut or concern Honeywell's claims for damages including documents sufficient to identify the methods by which Honeywell hopes to calculate damages and the amount of damages Honeywell is seeking from Fuji.

16. All documents which support, rebut or concern Honeywell's claims that this case is "exceptional" pursuant to 35 U.S.C. §285.

17. All documents which support, rebut or concern Honeywell's claims that Honeywell is entitled to an injunction against Fuji.

18. All documents produced by any party to the litigation which identifies Fuji as a supplier of LCD modules to entities other than its subsidiaries or in connection with a repair program of digital still cameras made or sold by or on behalf of Fuji.

19. All documents that refer or relate to ownership of the '371 patent including but not limited to any assignments of the rights to the '371 patent.

20. All documents that refer, relate to or constitute licenses granted to practice the '371 patent.

21. All documents that refer or relate to Honeywell's dealings with Japan Aviation Electronics Ltd. ("JAE") from 1986 to date to the extent they relate to the general relationship between the entities and/or products which include or consist of LCD modules or components thereof.

6

22. All documents exchanged between JAE and Honeywell referring or to relating to any LCD module or part thereof which would be covered by a claim of the '371 patent if such LCD module were made, sold or offered for sale in the United States after the issuance of the '371 patent.

23. The drawing furnished by or on behalf of a Named Inventor and/or Honeywell to JAE in 1990 which Honeywell claims constituted a reduction to practice of the alleged inventions of the '371 patent and all documents referring or relating to such drawing.

24. Documents which show the structure of all LCD modules or components thereof developed in whole or in part and/or sold or offered for sale by JAE or to for Honeywell, developed in whole or in part and/or offered for sale by Honeywell for or to JAE and/or developed and/or sold or offered for sale jointly by Honeywell and JAE, and which shows the date of creation and/or transfer of a copy of each such document.

25. Documents which show the structure of all LCD modules or components thereof developed in whole or in part and/or sold or offered for sale by Hosiden Corporation of Japan ("Hosiden") for Honeywell, developed in whole or in part and/or offered for sale by Honeywell for Hosiden and/or developed jointly and/or sold or offered for sale by Honeywell and Hosiden, and which shows the date of creation and/or transfer of a copy of each such document.

26. Documents which show the structure of all LCD modules or components thereof which, from 1986 to 1996, were developed in whole or in part and/or sold or offered for sale by OIS Optical Imaging Systems ("OIS") for Honeywell, developed in whole or in part and/or offered for sale by Honeywell for OIS, and/or developed jointly by Honeywell and OIS, and which show the dates of creation and/or transfer of a copy of each such document.

7

27. Documents which show the structure of all LCD modules or components thereof, lens arrays and/or diffusers from 1986 to 1996, which were developed in whole or in part by Minnesota Mining and Manufacturing Company ("3M") for Honeywell and/or sold to Honeywell by 3M, developed in whole or in part and/or sold or offered for sale by Honeywell to 3M, and/or developed jointly by Honeywell and 3M and which show the dates of creation and/or transfer of a copy of each such document.

28. Documents which show the structure of all LCD modules or components thereof which, from 1986 to 1996, were developed in whole or in part and/or sold or offered for sale by Compaq Computer Company ("Compaq") for Honeywell, developed in whole or in part and/or sold or offered for sale by Honeywell for Compaq and/or developed jointly by Honeywell and Compaq, and which shows the dates of creation and/or transfer of a copy of each such document.

29. Documents which show the structure of all LCD modules or components thereof which, from 1986 to 1996, were developed in whole or in part and/or sold or offered for sale by Bendix Corporation ("Bendix") for Honeywell, Allied Signal, Allied Corporation and/or Allied-Signal (collectively referred to as "Honeywell" for this Document Request), developed in whole or in part and/or sold or offered for sale by Honeywell for Bendix and/or developed jointly by Honeywell and Bendix, and which shows the dates of creation and/or transfer of a copy of each such document.

30. Documents which show the structure of all LCD modules developed (in whole or in part), sold and/or offered for sale by, in behalf of, or with Honeywell in connection with bids, proposals, contracts and/or sub-contracts relating to each of the following projects:

   a.   TCAS;

   b.   cockpit displays for the F-16 aircraft;

8

    c.  cockpit displays for the F-22 aircraft;

    d.  cockpit displays for the C-130 aircraft;

    e.  cockpit displays for the Boeing 777 aircraft

31. Documents which show the structure of all LCD modules developed (in whole or in part), sold and/or offered for sale by, in behalf of or with Honeywell in connection with a cockpit display and not produced in response to a foregoing document request.

32. Documents which show the date, location and nature of participation by Honeywell of every air show at which a product consisting of or including an LCD module was shown by Honeywell and/or another entity from 1986 to 1996.

33. All documents referring or relating to any experiments developmental or supply efforts and/or projects of Honeywell relating to projection televisions or components thereof started prior to January 1994.

34. All documents referring or relating to any experiments and/or projects of Honeywell relating to moiré interference started prior to January 1994.

35. All documents which describe, support or contradict the continuous diligence on the part of the named inventors and any prosecuting attorneys to obtain patent protection for the subject matter of the '371 patent from the claimed date of reduction to practice of the alleged inventions of the '371 patent and until the filing of the application of the '371 patent.

9

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Lawrence Rosenthal
Matthew W. Siegal
Angie M. Hankins
Kevin C. Ecker
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY  10038
(212) 806-5400

Dated: July 19, 2006

741930

By: _Philip A. Rovner/pmw_
   Philip A. Rovner (#3215)
   Hercules Plaza
   P.O. Box 951
   Wilmington, DE  19899-0951
   (302) 984-6000
   provner@potteranderson.com

*Attorneys for Defendants*
*Fuji Photo Film Co., Ltd. and*
*Fuji Photo Film U.S.A., Inc.*



# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, hereby certify that, on July 19, 2006, true and correct copies of the within document were served on the following counsel of record, at the addresses and in the manner indicated:

### BY HAND DELIVERY

Thomas C. Grimm, Esq.
Leslie A. Polizoti, Esq.
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
tgrimm@mnat.com
lpolizoti@mnat.com

Thomas L. Halkowski, Esq.
Fish & Richardson P.C.
919 N. Market Street
Suite 1100
P.O. Box 1114
Wilmington, DE 19899
halkowski@fr.com

William J. Wade, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
wade@rlf.com

### BY HAND DELIVERY

Frederick L. Cottrell, III, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Cottrell@rlf.com

Richard L. Horwitz, Esq.
David E. Moore, Esq.
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

John W. Shaw, Esq.
Young, Conaway, Stargatt & Taylor LLP
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com

Adam Wyatt Poff, Esq.
Young, Conaway, Stargatt & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 3981
Wilmington, D E 19899-0391
apoff@ycst.com

Arthur G. Connolly, III, Esq.
Brian M. Gottesman, Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building – 8th Floor
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899-2207
Ac3@cblh.com

Robert J. Katzenstein, Esq.
800 Delaware Avenue, 7th Fl.
P.O. Box 410
Wilmington, DE 19899
rkatzenstein@skfdelaware.com

William J. Marsden, Jr., Esq.
Fish & Richardson, P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE 19899-1114
marsden@fr.com

Paul A. Bradley, Esq.
McCarter & English, LLP
919 N. Market Street
Suite 1800
P.O. Box 111
Wilmington, DE 19899
pbradley@mccarter.com

Francis DiGiovanni, Esq.
James M. Olsen, Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building – 8th Fl.
1007 N. Orange Street
Wilmington, DE 19899-2207
fdigiovanni@cblh.com

Amy Evans, Esq.
Cross & Simon, LLC
913 N. Market Street, Suite 1001
Wilmington, DE 19899-1380
aevans@crosslaw.com

Karen L. Pascale, Esq.
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Bldg., 17th Fl.
1000 West Street
Wilmington, DE 19801
kpascale@ycst.com

Monte Terrell Squire, Esq.
Young, Conaway, Stargatt & Taylor
The Brnadywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
msquire@ycst.com

Steven J. Balick, Esq.
John G. Day, Esq.
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
sbalick@ashby-geddes.com
jday@ashby-geddes.com

Matthew Neiderman, Esq.
Duane Morris LLP
1100 N. Market Street
Suite 1200
Wilmington, DE 19801
mneiderman@duanemorris.com

David J. Margules, Esq.
John M. Seaman, Esq.
Bouchard Margules & Friedlander, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
dmargules@bmf-law.com
jseaman@bmf-law.com


_Philip A. Rovner / men_
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
E-mail: provner@potteranderson.com

726238

# **<u>Exhibit H</u>**

# FAX

**MasudaFunai**

CHICAGO LOS ANGELES SCHAUMBURG

**Recipient 1**

**To:** Strook & Strook & Lavan LLP

**Attn:** Mr. Ian G. DiBernardo

**Fax:** (212) 806-7867

**Phone:**

**From:** Jason M. Metnick

**Phone:** 312-245-7441

**# of Pages:** 3 (including cover)

**Date:** September 24, 2007

**Re:** Honeywell International, Inc. et al. v. Apple Computer et al: Subpoena served upon Hosiden America Corporation

**Comments:**

☐ Original will follow by: _____

☐ For your review

☒ Original will not follow

☐ Please respond

The information contained in the attached transmission may be attorney-client privileged, confidential, exempt from disclosure under applicable law and intended only for the use of the person(s) or firm(s) named above. If the reader of this message is not an intended recipient, or an employee of or agent responsible for delivery to an intended recipient, you are hereby notified that any dissemination, distribution or copying of the attached transmission is strictly prohibited. If you have received this transmission in error, please immediately notify us by telephone and return the original transmission to us at the above address via the U.S. Postal Service. All postal fees so incurred will be reimbursed. Thank you.

MASUDA, FUNAI, EIFERT & MITCHELL, LTD.

203 North LaSalle Street Suite 2500 Chicago Illinois 60601-1262 TEL +312 245.7500 FAX +312 245.7467 www.masudafunai.com

Jason M. Melnick
Attorney at Law
jmelnick@masudafunai.com
tel 312.245.7500
fax 312.245.7467

September 24, 2007

*Via Fax:*    (212) 806-7867

Strook & Strook & Lavan LLP
180 Maiden Lane
New York, NY
10038

Attn:  Ian G. DiBernardo

Re:  Honeywell International, Inc. et al. v. Apple Computer et al.: Subpoena served upon Hosiden
America Corporation

Dear Mr. DiBernardo:

As we discussed earlier this month, Hosiden America Corporation ("Hosiden America") objects to producing any and all of the categories of documents listed in Attachment A to the above-referenced subpoena, because the subpoena was erroneously served on Hosiden America as a proxy for service upon Hosiden Corporation.

As you are aware, Hosiden Corporation is the Japanese parent corporation of Hosiden America. Hosiden America does not maintain control over Hosiden Corporation's documents, nor is there closely coordinated management between Hosiden Corporation and Hosiden America.

Hosiden America further objects to the subpoena for failure to comply with the service requirements provided by Rule 45(b)(1) of the Federal Rules of Civil Procedure. The subpoena names Hosiden Corporation as the intended recipient and the documents requested are apparently sought from Hosiden Corporation, yet the subpoena was served upon Hosiden America. Consequently, Hosiden America was erroneously served, instead of the intended recipient, Hosiden Corporation.

Hosiden America objects to the categories of requested documents listed in Attachment A, because they are overly broad, unduly burdensome, insufficiently limited in time and in scope, and are not within the reasonable control of Hosiden America. Hosiden America reserves its rights to assert further objections to the categories of documents requested in Attachment A, which will be asserted if a court determines that Hosiden America must respond to the subpoena improperly served upon it.

MASUDA, FUNAI, EIFERT & MITCHELL, LTD.
203 North LaSalle Street Suite 2500 Chicago Illinois 60601-1262 TEL 312.245.7500 FAX 312.245.7467 www.masudafunai.com

Mr. Ian G. DiBernado
September 24, 2007
Page 2

If you have any questions regarding the contents of this letter, please contact me

Very truly yours,

Jason M. Melnick

cc:     Hosiden America Corporation
        Colin Hara, Esq.
        Rein F. Krammer, Esq.

JMf:
N:\SYS02\2665\LETTERS\0240 - September 24 2007.doc

MasudaFunai

# **Exhibit I**

-----Original Message-----
From: Jason Metnick [mailto:JMetnick@masudafunai.com]
Sent: Wednesday, October 31, 2007 6:10 PM
To: DiBernardo, Ian G.
Cc: Mann, Jeffrey M.
Subject: RE: Hosiden subpoena


Dear Ian -

Hosiden America retains all of its files for only 7 years.  In addition, Hosiden America
reported that it has not independently retained any contracts between Hosiden Corporation
and Honeywell.  Consequently, Hosiden America does not have the documents that you are
seeking, which are from the years 1988-1992.

Regards,

Jason Metnick

Masuda Funai
203 North LaSalle Street, Suite 2500
Chicago, Illinois 60601-1262
Tel:  312.245.7441
Fax:  312.245.7467
jmetnick@masudafunai.com
www.masudafunai.com

The preceding E-mail message and/or attachment(s) contains information that may be
confidential, may be protected by the attorney/client or other applicable privileges, and
may constitute non-public information.
If you are not an intended recipient of this message, please notify the sender at (312)
245-7500 or by return e-mail and destroy all copies in your possession. Unauthorized use,
dissemination, distribution, or reproduction of this message is strictly prohibited and
may be unlawful.
Thank you.
CIRCULAR 230 DISCLOSURE: In compliance with Circular 230, Masuda, Funai, Eifert &
Mitchell, Ltd. informs you that, if any advice concerning one or more U.S. federal tax
issues is contained in this communication (including any attachments), such advice is not
intended or written to be used, and cannot be used, for the purpose of (I) avoiding
penalties under the internal revenue code or (II) promoting, marketing, or recommending to
another party any transaction or matter addressed herein.

# **Exhibit J**

----- Original Message -----
From: Jason Metnick <JMetnick@masudafunai.com>
To: DiBernardo, Ian G.
Cc: Mann, Jeffrey M.; Colin Hara <CHara@masudafunai.com>
Sent: Fri Nov 02 18:14:59 2007
Subject: RE: Hosiden subpoena

Dear Ian -

Hosiden America does not control Hosiden Corporation or have access to the files for
Hosiden Corporation.

I reviewed the cases you sent to me, which specifically cite to Federal Rule 34 - which
applies to discovery issued to party opponents.  As you know, subpoenas are issued to
third parties pursuant to the guidelines provided by Rule 45 of the Federal Rules of Civil
Procedure.
Consequently, the standard is not the same as under Rule 34.

Nevertheless, as I have previously mentioned, the requested documents (if they exist) are
not within Hosiden America's control; Hosiden America does not exercise any control over
Hosiden Corporation, and Hosiden America has no connection to the transactions that are
allegedly at issue.  It appears that you are assuming that if Hosiden Corporation has any
degree of control over Hosiden America, then Hosiden America has a similar degree of
control over Hosiden Corporation.  Without a doubt, Hosiden America does not control
Hosiden Corporation.

Moreover, even if a court were to rule that Hosiden America controls a minor aspect of
Hosiden Corporation (which to my knowledge, it does not),the requests for these documents
are unduly broad and overly burdensome in  scope, and the relevance of the requested
documents is not sufficiently justified for Hosiden America to go to Japan to attempt to
retrieve these files from a corporation who it does not control.
Thus, the subpoena subjects Hosiden America to undue burden in many ways.

I note that you could simply serve Hosiden Corporation in Japan with a subpoena, but for
whatever reason have elected not to take that option.
Hosiden America stands by its objections to producing Hosiden Corporation's documents for
the foregoing reasons, as well as the reasons stated in my prior correspondence with you.

Regards,

Jason Metnick


Masuda Funai
203 North LaSalle Street, Suite 2500
Chicago, Illinois 60601-1262
Tel:  312.245.7441
Fax:  312.245.7467
jmetnick@masudafunai.com
www.masudafunai.com

The preceding E-mail message and/or attachment(s) contains information that may be
confidential, may be protected by the attorney/client or other applicable privileges, and
may constitute non-public information.

1

If you are not an intended recipient of this message, please notify the sender at (312) 245-7500 or by return e-mail and destroy all copies in your possession. Unauthorized use, dissemination, distribution, or reproduction of this message is strictly prohibited and may be unlawful.
Thank you.
CIRCULAR 230 DISCLOSURE: In compliance with Circular 230, Masuda, Funai, Eifert & Mitchell, Ltd. informs you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (I) avoiding penalties under the internal revenue code or (II) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

-----Original Message-----
From: DiBernardo, Ian G. [mailto:idibernardo@stroock.com]
Sent: Thursday, November 01, 2007 5:45 PM
To: Jason Metnick
Cc: Mann, Jeffrey M.
Subject: RE: Hosiden subpoena

Jason,
Thank you for your email and for checking Hosiden America files.

However, you have not addressed the issue of whether Hosiden America will obtain documents in Hosiden Corporation's files. We had discussed this issue and, in a prior email, provided you with some relevant case law and a D&B report. Will Hosiden America obtain responsive documents from Hosiden Corporation?

Very truly yours,

Ian G. DiBernardo
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
T: 212-806-5867
F: 212-806-6006
idibernardo@stroock.com
www.stroock.com

-----Original Message-----
From: Jason Metnick [mailto:JMetnick@masudafunai.com]
Sent: Wednesday, October 31, 2007 6:10 PM
To: DiBernardo, Ian G.
Cc: Mann, Jeffrey M.
Subject: RE: Hosiden subpoena

Dear Ian -

Hosiden America retains all of its files for only 7 years.  In addition, Hosiden America reported that it has not independently retained any contracts between Hosiden Corporation and Honeywell.  Consequently, Hosiden America does not have the documents that you are seeking, which are from the years 1988-1992.

Regards,

Jason Metnick

Masuda Funai
203 North LaSalle Street, Suite 2500
Chicago, Illinois 60601-1262
Tel:  312.245.7441
Fax:  312.245.7467
jmetnick@masudafunai.com
www.masudafunai.com

2



The preceding E-mail message and/or attachment(s) contains information that may be confidential, may be protected by the attorney/client or other applicable privileges, and may constitute non-public information.
If you are not an intended recipient of this message, please notify the sender at (312) 245-7500 or by return e-mail and destroy all copies in your possession. Unauthorized use, dissemination, distribution, or reproduction of this message is strictly prohibited and may be unlawful.
Thank you.
CIRCULAR 230 DISCLOSURE: In compliance with Circular 230, Masuda, Funai, Eifert & Mitchell, Ltd. informs you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (I) avoiding penalties under the internal revenue code or (II) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

==========================================================================================
============================================================================
IRS Circular 230 Disclosure:   To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that any tax advice contained in this communication (including any attachment that does not explicitly state otherwise) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.
==========================================================================================
==========================================================================

# **<u>Exhibit K</u>**

| | |
|---|---|
| **From:** | DiBernardo, Ian G. |
| **Sent:** | Monday, October 29, 2007 12:35 PM |
| **To:** | jmetnick@masudafunai.com |
| **Cc:** | Mann, Jeffrey M. |
| **Subject:** | Hosiden subpoena |

**Attachments:**    Westlaw_Document_11_54_52_6996.doc; 480_F__Supp__1138.doc; Westlaw_Document_
12_59_49_4236.doc; Scan001.PDF; Scan001.PDF

    

Westlaw_Docu  480_F__Supp_  Westlaw_Docu  Scan001.PDF  Scan001.PDF
t_11_54_52_691138.doc (75 KB_12_59_49_42   (43 KB)      (45 KB)

Jason,

Further to our discussion Friday, attached are three cases in the 7th circuit in which a US subsidiary was required to produce documents of its foreign parent. These cases support Hosiden America producing documents of Hosiden Corporation.

In short, Hosiden America has adequate control over Hosiden Corporation's documents at least because Hosiden Corporation owns 100% of Hosiden America and there is an interlocking management structure in both entities (as shown by the attached D&B report and information from Hosiden's website showing that Mr. Furuhashi is the CEO/President of both entities). Hosiden Corporation has sufficient control over Hosiden America. Furthermore, Hosiden has a connection to the underlying action: in the underlying action, Honeywell is asserting a patent that arose out of work on a project for which Hosiden was a subcontractor. Given the relationship between Hosiden America and Hosiden Corporation, Hosiden America has "control" over the Hosiden Corporation documents.

We also understand from our discussion that you are checking for agreements responsive to our document requests that are in Hosiden America's possession. Furthermore, in response to your refusal to produce other documents (even in light of our willingness to further limit the scope of our requests), we asked, and understand that you agreed, that you would inquire as to an index or other log of archived documents with the goal of our identifying relevant documents.

We look forward to coming to an amicable resolution of this matter this week.

Very truly yours,

Ian G. DiBernardo
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
T: 212-806-5867
F: 212-806-6006
idibernardo@stroock.com
www.stroock.com



Not Reported in F.Supp.

Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027

(Cite as: 1993 WL 580831 (E.D.Wis.))

Page 1

---

United States District Court, E.D. Wisconsin.

Malcolm D. FLAVEL, individually and on behalf of all other persons similarly situated, Representative Plaintiff,

and

Robert F. Cnare, James R. Conradt, Major Coxhill, Robert K. Elbel, Malcolm D. Flavel, Russell H. Graf, Robert L. Isferding, Robert E. Jones, Chalasani C. Rayan, Richard Spoonamore and Ronald J. Weiss, Plaintiffs,

and

Equal Employment Opportunity Commission, Plaintiff-Intervenor,

v.

SVEDALA INDUSTRIES, INC., f/k/a Boliden Allis, Inc.; Svedala, Inc.; Allis Mineral Systems; and Mineral Processing Systems, Inc.; Defendants.

No. 92-C-1095.

Dec. 13, 1993.

Stephen Snyder, Laurie A Knocke, Winthrop & Weinstine, P.A., St. Paul, MN, for plaintiffs.

Brian C. Tyndall, Lloyd B. Zimmerman, U.S. E.E.O.C., Milwaukee, WI, for plaintiff-intervenor.

David Loeffler, Marty R. Howard, Krukowski & Costello, S.C., Milwaukee, WI, for defendants.

MEMORANDUM AND ORDER

WARREN, Senior District Judge.

*1 Before the Court is the plaintiffs' Motion to Compel the Discovery of Documents Within the Physical Possession of Svedala Industry, A.B. and/or Svedala International in the above-captioned matter. For the following reasons, this motion is granted.

I. FACTUAL AND PROCEDURAL BACKGROUND

On January 1, 1988, Boliden AB, a Swedish company owned by Trelleborg AB, another Swedish company, assumed ownership of several units of

Allis-Chalmers Corp., a U.S. company, including its crushing and screening production facility in Appleton, Wisconsin, and its "pyroprocessing" and grinding mill production facility in Milwaukee, Wisconsin. (Plaintiff's July 2, 1993 Letter Brief at 2-3.) These units, along with related businesses owned or controlled by Boliden AB, were renamed Boliden-Allis, Inc., and were included in the company's newly-formed "Minerals Processing Business Area" in 1989. Id. at 3. In January, 1990, Trelleborg AB changed the company's corporate structure, (1) transforming the "Minerals Processing Business Area" into Svedala Industry AB ("SIAB"), a Swedish company; (2) renaming Boliden-Allis' remaining operations "Allis Mineral Systems," which became a wholly-owned business unit of SIAB; (3) forming Svedala Industries ("Svedala"), a U.S. company, as a "special unit" of SIAB, and (4) creating Svedala, Inc. ("SI"), a U.S. company, as a holding company for Svedala Industries. Id. at 6. Svedala International ("MINCO") [FN1], a Swedish company formerly known as MINCO International, is also a subsidiary of SIAB. Id. at 1-2.

Malcolm D. Flavel was hired by Allis-Chalmers in 1961 as a factory representative, and was promoted to the level of Consultant-Comminution Systems in 1983. (Complaint ¶ 17.) On October 17, 1990, at the age of 54, Mr. Flavel was terminated from employment at the Appleton plant. Id. at ¶ 18-19. Robert E. Jones was hired by Allis-Chalmers in 1955 as an Application Specialist, and was promoted to the level of Senior Project Application Engineer in 1979. Id. at ¶ 21. On May 31, 1991, at the age of 60, Mr. Jones resigned from employment at the Appleton plant. Id. at ¶ 23-24. Mr. Flavel and Mr. Jones both filed timely complaints with the Equal Employment Opportunity Commission ("EEOC"), alleging that Svedala discriminated against them on the basis of age. Id. at ¶ 11-12. On September 30, 1992, the EEOC issued a Letter of Violation, finding (1) that Svedala "discriminated against [Mr. Flavel] and a class of protected age group employees on the basis of age with respect to evaluations, terms and conditions of employment, demotion, and termination;" and (2) that Mr. Jones "was subjected

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027
(Cite as: 1993 WL 580831 (E.D.Wis.))

to harassment by his manager with considerable frequency, that [Mr. Jones] complained to others about this, and that others complained to the manager about his abusive behavior; [that] younger co-workers were not harassed with the same degree and frequency, [and that witnesses observed] connections between the manager's behavior towards his employees and the employee's age, [with] preference being extended to younger staff members." *Id.* at ¶ 14, 22.

*2 On October 16, 1992, the plaintiffs brought the above-captioned matter as a representative action, claiming violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.*, and seeking declaratory relief and damages under state common law; thus far, eleven (11) private plaintiffs have joined this suit. [FN2] After an extension was granted by the Court, the defendants filed an Answer on November 25, 1992, which was amended on December 4, 1992. On July 13, 1993, this Court issued an Order allowing the EEOC to intervene as a plaintiff in this action.

Regrettably, discovery in this case has been punctuated by numerous disputes, requiring several dispositive rulings by this Court. In the instant motion, which was originally brought on February 22, 1993, the plaintiffs seek from the defendants the production of documents which are held by foreign entities SIAB and MINCO. At a June 21, 1993 hearing resolving other discovery disputes, which was memorialized in a July 22, 1993 Order, we directed the parties to submit to the Court letter briefs regarding the instant motion. The plaintiffs submitted their letter brief on July 2, 1993, with an addendum on September 10, 1993; the defendants submitted their letter brief on July 9, 1993, with an addendum on July 12, 1993.

## II. DISCUSSION
### A. PARTIES' ARGUMENTS

The plaintiffs argue that, at all times subsequent to the Allis-Chalmers buyout, Swedish managers at SIAB and its predecessors maintained "direct and primary management authority over [the] U.S. businesses." (Plaintiffs' July 2, 1993 Letter Brief at 3-4.) They emphasize that these managers "were, and continue to be, actively involved in making decisions directly affecting the operations and personnel in the Appleton and Milwaukee facilities ... [including] directly participating in key hiring and employment decisions for the U.S. operations ...

reviewing the performance of U.S. employees of Svedala ... [and making] decisions concerning the restructuring or reorganization of the Appleton and Milwaukee businesses." *Id.* at 4-5, 7. The plaintiffs note that "two of the three board members for [Svedala and SI] are Swedish officers of the parent company [SIAB] ... [while] only one member of the board of Svedala and SI is an American," and that MINCO, who employed one of the plaintiffs at the time of his termination, circulated a "blatantly ageist notice of a job opening" at the Appleton facility. *Id.* at 6-7. The plaintiffs argue that such facts prove that Svedala and SI have the requisite "control" pursuant to Rule 34(a) over the requested documents held by SIAB and MINCO because (1) a "close corporate relationship" exists between the foreign parents and American subsidiaries because they have close managerial connections, interlocking management structures, and the parent company has a significant ownership share of the subsidiary; or (2) the "consolidated enterprise" or "integrated enterprise" doctrine under Title VII and the ADEA is met because the foreign parents and American subsidiaries share an interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control. *Id.* at 8-12.

*3 The defendants, in turn, claim that, because SIAB and MINCO are not named as defendants in this suit, Svedala and SI "are obliged to produce documents now sitting in Sweden only if all the corporations are *alter egos* under the corporate model enacted into law in Section 4(h)(3)(A) through (D) of the ADEA," which requires that corporations share (1) an interrelation of operations; (2) common management, (3) centralized control of labor relations; *and* (4) common ownership or financial control. (Defendants' July 9, 1993 Letter Brief at 3-5.) While acknowledging that this provision only governs liability under the ADEA, and not discovery, the defendants argue that it creates a " 'substantive right' within the meaning of 28 U.S.C. § 2072(b), which cannot be abridged or modified through the application of any of the discovery rules." *Id.* at 5. They argue that "the American and Swedish corporations are not *alter egos* however, because [Svedala] and [SI] pursue 'labor relations' or employment policies without any 'centralized' direction or control from [SIAB] or [MINCO] ... the managements of the Swedish and American companies are not 'common' ... and the production and sales operations of the American and Swedish companies are largely independent of one another

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027
(Cite as: 1993 WL 580831 (E.D.Wis.))

and not integrated in a continuous flow. *Id.* at 5-6. Specifically, "at the level of employment relevant to this litigation--managers below the level of facility General Manager and professional/technical support staff--the employment decisions of Svedala are not central[ly] controlled from Sweden." (Defendants' July 12, 1993 Addendum to Letter Brief at 2.) Thus, the defendants claim that the companies "have totally different senior management ... [and] Svedala runs its own employment regime independent of any direction from SIAB, except a broad directive to conform to U.S. law." (Defendants' July 9, 1993 Letter Brief at 8-10.)

### B. *LEGAL STANDARD*

Document production in discovery is governed by Rule 34(a), which reads as follows:
> "Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents, ... or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) *and which are in the possession, custody or control of the party upon whom the request is served* ..."

By using the word "or," Rule 34(a) makes a clear distinction among the meanings of "possession," "custody," and "control." In determining whether or not a party exercises "control," courts ask whether a party has a legal right to obtain the documents requested upon demand; actual physical possession is not required. *Burton Mechanical Contractors, Inc., v. Foreman,* 148 F.R.D. 230, 236 (N.D.Ind.1992); *Henderson v. Zurn Indus., Inc.,* 131 F.R.D. 560, 567 (S.D.Ind.1990) (*citing Searock v. Stripling,* 736 F.2d 650, 653 (11th Cir.1984)); *In re Folding Carton Antitrust Litigation,* 76 F.R.D. 420, 423 (N.D.Ill.1977). The party seeking document production bears the burden of establishing the opposing party's control over such documents. *Burton,* 148 F.R.D. at 236.

*4 The plaintiffs properly note that, in determining whether a U.S.- domestic corporation must produce documents in possession of a foreign parent or affiliate, courts have focused on whether the U.S. corporation has the requisite degree of control over the documents sought. *See, e.g., Afros S.P.A. v. Krauss-Maffei Corp.,* 113 F.R.D. 127, 129 (D.Del.1986); *In re Uranium Antitrust Litigation,* 480 F.Supp. 1138, 1145-53 (N.D.Ill.1979). In deciding whether a subsidiary has "control" over

documents held by its parent corporation, courts focus on the closeness of the relationship between the entities. *See, e.g., Johnson v. Cloos Int'l., Inc.,* 1990 WL 106560, at *1- 2 (N.D.Ill.1990); *Afros,* 113 F.R.D. at 129-31; *Cooper Indus., Inc. v. British Aerospace, Inc.,* 102 F.R.D. 918, 919 (S.D.N.Y.1984). If the requisite degree of closeness is found, domestic corporations may be required to produce documents in the possession of foreign parents or affiliates, even though the latter are not subject to the personal jurisdiction of the court. *Cloos,* 1990 WL 106560, at 1-2; *Afros,* 113 F.R.D. at 131; *In re Uranium,* 480 F.Supp. at 1145-53.

### C. *ANALYSIS*

In their letter brief, the defendants mistakingly assume that the "*alter ego*" doctrine [FN3] embodied in Section 4(h)(3) of the ADEA dictates resolution of the "control" issue under Rule 34(a). Section 4(h)(3), however, is a *liability* provision, and it is clear that a party may exercise the requisite degree of "control" over documents held by a related entity under the discovery rules without exhibiting the degree of interrelationship necessary to project liability upon such entity pursuant to the ADEA. The degree of relationship between a domestic subsidiary and a foreign parent required to subject the latter to liability under the ADEA is certainly greater than that needed to subject the latter to document production through the former. This does not, as the defendants assert, violate 28 U.S.C. § 2072(b), [FN4] because the "substantive right" created under Sections 4(h)(1-3) of the ADEA, the inclusion or exclusion of liability for SIAB and MINCO, [FN5] is not implicated simply because such entities may be required to produce documents through Svedala and SI pursuant to Rule 34(a). A domestic subsidiary, then, may be required to produce documents held by a foreign parent, even though that parent is not covered by the provisions of the ADEA, so long as that subsidiary "controls" such documents as defined under Rule 34(a). [FN6]

The Court is satisfied that the defendants so "control" the requested documents held by SIAB and, derivatively, MINCO. As previously noted, in spirit with the current policy of permissive discovery, a party is generally considered to have "control" over documents under Rule 34(a) if it can likely obtain such documents upon demand. Thus, under the Rule 34(a) control analysis employed in *Afros S.P.A.* and its progeny, a sufficiently close corporate relationship exists between a domestic subsidiary and a foreign

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027
(Cite as: 1993 WL 580831 (E.D.Wis.))

parent to compel the former to produce documents held by the latter if their degree of interrelation is evidenced by (1) adequate ownership share in the subsidiary by the parent;    (2)    interlocking management structures;    (3) sufficient control exercised by the foreign parent over the subsidiary's directors, officers, and employees;    and/or (4) a "connection    to    the    transaction"    at    issue. Consideration of such factors promotes the policies underlying Rule 34(a) and ensures that a corporation cannot "hide" incriminating documents overseas; and, because none of these factors acts as an exclusive test, each factor need not be satisfied to prove the existence of Rule 34(a) "control."

*5 Nobody disputes that SIAB owns 100% of Svedala through its holding company, SI. Nor can it be seriously disputed that SIAB has traditionally maintained interlocking management structures with SI and Svedala. As noted by the plaintiffs, and as indicated in the defendants' exhibits, Thomas Older, the President, CEO, and Board member of SIAB, and Jan Knutsson, an Executive Vice President of SIAB, are currently acting as two of the three directors of Svedala, and Mr. Knutsson is also the Manager of Allis Mineral Systems. In addition, Mr. Older and Sven Ek, another Executive Vice President of SIAB, are currently acting as two of the three directors of SI. Clearly, this degree of interrelationship between directors of domestic subsidiaries and officers of a foreign parent sufficiently demonstrates the requisite "corporate closeness" required under this branch of the Rule 34(a) control analysis. In light of this, the defendants argument that SIAB lacks "interlocking management" with SI and Svedala simply because they do not share common directors or common officers is clearly disingenuous.

It also appears that SIAB exercised the requisite degree of control over the management of Svedala and SI regarding employment policies and decisions to justify the plaintiffs' document production request. The defendants concede that officers of SIAB "have the final say" on "key management personnel" decisions, including performance reviews, down to the level of General Managers of operating facilities. The plaintiffs, in turn, charge that several of these handpicked managers "had an active role" in at least several of their terminations, and "set the tone" for employment practices throughout Svedala and SI. This Court is satisfied that SIAB exhibited sufficient control over the hiring and review of upper and mid-level managers to bring the requested documents within the control of SI and Svedala pursuant to Rule

34(a). The plaintiffs have demonstrated that the motives behind employment decisions by SI and Svedala may be exhibited in documents held by SIAB, and have shown that, given the corporations' close relationship, such documents are available to the domestic corporations upon request. In addition, as previously noted, it is clear that our decision has no bearing on the *liability* of SIAB or MINCO for any allegedly unlawful acts; [FN7] therefore, the defendants' concerns as to our flaunting conventional notions of unlimited liability through incorporation are unwarranted. As a result, SI and Svedala will be required to produce the documents requested by the plaintiff which are held by SIAB pursuant to Rule 34(a).

Finally, because MINCO falls within the penumbra of the domestic subsidiaries' "close relationship" with SIAB, documents held by it are also discoverable by the plaintiffs. As previously noted, MINCO is a foreign, wholly-owned subsidiary of SIAB; and because, *inter alia*, MINCO's manager, Peter Kohle, is an Executive Vice President of SIAB, it appears that    these    corporations    have    interlocking management. In addition, the defendants have not challenged the plaintiff's assertion that MINCO directly employed at least one of the plaintiffs. Finally, based on the letter briefs submitted by the parties, the Court reasonably intimates that SIAB manages the operations of MINCO in the same manner as it does SI and Svedala; thus, SIAB clearly controls documents held by MINCO as defined under Rule 34(a). As a result, such documents, if relevant, are discoverable by the plaintiffs through Rule 34(a) as accessible through SIAB. [FN8]

### III. *SUMMARY*

*6 For the foregoing reasons, the Court hereby ORDERS that the plaintiffs' motion to compel documents in the above-referenced matter be GRANTED.

SO ORDERED.

> FN1. For the sake of clarity, Svedala International will be referred to by its previous name, MINCO.

> FN2. On February 25, 1993, the Court signed a stipulated order that consolidated *Weiss v. Boliden-Allis, Inc.,* Case No. 91-C-493, with the instant case. Normally, pursuant to Local Rule 4.03, "[i]f the motion is granted, the judge to whom the lowest

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027
(Cite as: 1993 WL 580831 (E.D.Wis.))

numbered case is assigned shall handle all future proceedings covered by the consolidation order. When two or more cases are consolidated, all documents relevant to the purposes for which consolidation was granted will thenceforth be docketed only on the docket sheet for the lowest numbered of the consolidated cases." In this case, however, while the cases were consolidated into the lower-numbered case on the docket sheet, they were consolidated into the higher-numbered case in the court file. Because both cases were originally assigned to this Court, this oversight has not caused any significant administrative difficulties; it did, however, precipitate a filing error which resulted in a significant delay in processing the instant motion. To eliminate any further confusion, the Court hereby requests that, despite Local Rule 4.03, the parties use the higher-case number, 91-C-1095, in the caption of any subsequent filings in this case.

FN3. In their letter brief, the plaintiffs term this the "consolidated enterprise" or "integrated enterprise" liability doctrine under the ADEA.

FN4. 28 U.S.C. § 2072(b) reads as follows: "Such rules [the Federal Rules of Civil Procedure] shall not abridge, enlarge or modify any substantive right."

FN5. Clearly, Section 4(h)(3) of the ADEA does not grant the defendants any substantive right to be free from the rules of discovery.

FN6. The Court expresses no opinion as to whether SIAB or MINCO are sufficiently interrelated with SI and Svedala to implicate the liability provisions of the ADEA.

FN7. See supra pages 9-10.

FN8. The Court notes, however, that documents held by MINCO are generally less likely to be relevant to the instant matter than those held by SIAB, a more proximate relative to the plaintiffs than MINCO.

Empl. Prac. Dec. P 43,027

END OF DOCUMENT

Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

Page 1

LEXSEE 480 F. SUPP. 1138

100260

**In re Uranium Antitrust Litigation; Westinghouse Electric Corp. v. Rio Algom Limited, et al.; In re Tennessee Valley Authority Uranium Antitrust Litigation .**

**Nos. 76 C 3830, 78 C 3233, 78 C 3243, 78 C 3280, MDL 342, MDL 342-A**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*480 F. Supp. 1138; 1979 U.S. Dist. LEXIS 8686; 29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124*

**November 7, 1979**

COUNSEL: [**1]

Donovan, Leisure, Newton & Irvine, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, Freeman, Rothe, Freeman & Salzman, Chicago, Ill., Westinghouse Electric Corp., Raymond Scannell, Pittsburgh, Pa., for Westinghouse.

Arter & Hadden, Cleveland, Ohio, Jeffrey Neal Cole, Winston & Strawn, Chicago, Ill., Simpson, Thacher & Bartlett, New York City, for Atlas.

Schiff, Hardin & Waite, Chicago, Ill., for Anaconda Co.

Peterson, Ross, Schloerb & Seidel, Chicago, Ill., Mudge, Rose, Guthrie & Alexander, New York City, for Denison Mines, Inc.

Cahill, Gordon & Reindel, New York City, Altheimer & Gray, Chicago, Ill., for Engelhard.

Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, Lord, Bissell & Brook, Chicago, Ill., for Federal Resources Corp.

McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., McDermott, Will & Emery, Chicago, Ill., for Homestake.

Chadwell, Kayser, Ruggles, McGee & Hastings, Chicago, Ill., for Kerr-McGee.

Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for Noranda.

Debevoise, Plimpton, Lyons & Gates, New York City, for Phelps & Western.

Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., Wildman, Harrold, Allen & Dixon, Chicago, Ill., [**2] for Pioneer.

McConnell & Campbell, Chicago, Ill., for Reserve.

O'Melveny & Myers, Los Angeles, Cal., Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for RTZ.

Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., Bigbee, Stephenson, Carpenter & Crout, Santa Fe, N. M., for United.

Mayer, Brown & Platt, Chicago, Ill., for Utah.

Jenner & Block, Chicago, Ill., for Rio.

Arnold & Porter, Washington, D. C., for Urangesellschaft.

Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, Karon, Morrison & Savikas, Chicago, Ill., for Uranerz.

Weil, Gotshal & Manges, New York City, for Uranex.

Keck, Cushman, Mahin & Cate, Chicago, Ill., Howrey & Simon, Washington, D. C., Latham & Watkins, Los Angeles, Cal., Davis, Graham & Stubbs, Denver, Colo., for Gulf.

Burditt & Calkins, Chicago, Ill., Overton, Lyman & Prince, Los Angeles, Cal., for Getty.

Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for British Government.

OPINION BY:

MARSHALL

OPINION:

[*1142]

MEMORANDUM DECISION n*

* We have delayed this ruling in the hope that the question here decided might be amicably

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

resolved among the parties to these actions and the foreign governments involved (particularly Canada and Australia). See, Letter of Latham & Watkins to the Prime Minister and Minister of Energy, Mines and Resources of Canada, dated September 12, 1979. But our hope has turned to despair. This litigation must proceed.

[**3]

On February 27, 1979, we entered Joint Pretrial Order No. 5 in an effort to narrow and ripen the issues surrounding the parties' discovery demands for documents located in foreign countries. We ordered that, by March 28, 1979, all parties should either comply with outstanding discovery demands for "foreign documents" or file restated objections to the production of such documents, including specific and particularized objections to demands for any such documents whose production was said to be forbidden by foreign law. The term "foreign documents" was defined to include all documents whose disclosure was in any way affected by foreign law.

The responses of the parties were varied. Plaintiffs Westinghouse Electric Corporation (Westinghouse) and the Tennessee Valley Authority (TVA) raised no foreign law objections and stated that they either had no foreign documents or were producing all of them. Of the twenty non-defaulting active defendants in the Westinghouse action, six apparently have no foreign documents not previously produced, since they neither produced documents nor stated objections. n1 Two other defendants, Kerr-McGee Corporation and the Anaconda Company, appear to have [**4] now produced all responsive foreign documents. Two more defendants, Western Nuclear, Inc. and Phelps Dodge Corporation, were seemingly able to comply with all material document demands. They invoked Australian nondisclosure legislation but frankly summarized the contents of the three Australian documents in such a manner as to convince Westinghouse that it does not need the documents. Ten other defendants have raised foreign law objections and have withheld foreign documents. Those defendants are Rio Algom Corporation (Rio U.S.), Engelhard Minerals and Chemicals Corporation (Engelhard), Denison Mines, Ltd. (Denison Canada), Denison Mines, Inc. (Denison U.S.), Gulf Oil Corporation (Gulf), Gulf Minerals Canada Limited (GMCL), Getty Oil Company (Getty), Utah International, Inc. (Utah), Noranda Mines, Ltd. (Noranda), and Federal Resources Corporation (Federal). In the three TVA actions, in which eight of the thirteen named defendants have appeared, seven of the active defendants have invoked foreign nondisclosure laws as a bar to production. n2 Only one of those defendants, Uranerz Canada [*1143] Ltd. (Uranerz), is not a defendant in the Westinghouse action.

n1. The six are Rio Tinto Zinc Corporation of America, Homestake Mining Company, Atlas Corporation, Reserve Oil and Minerals Corporation, United Nuclear Corporation, and Pioneer Nuclear, Inc.

[**5]

n2. The eighth TVA defendant, Urangesellschaft mbH & Co., has raised no foreign law objections.

Westinghouse has moved for production orders pursuant to *Rule 37(a), F.R.Civ.P.*, against the ten non-producing defendants listed above, and TVA has similarly moved against the seven non-producing defendants in its case. The following table connects each defendant with the country whose foreign law is invoked as a bar to production. Defendants who are named in both the Westinghouse and TVA motions are identified by an asterisk (*):

TABLE

Five sets of foreign laws are involved. Three of those are regulations or statutes of Canada, Australia and South Africa which were enacted or modified during the period from 1976 to 1978 for the express purpose of frustrating the jurisdiction of the United States courts over the activities of the alleged international uranium cartel. Those laws generally prohibit the production of any document relating to uranium marketing activities from 1972 through 1975 and also prohibit communications that would result in the disclosure of the contents of such documents. [**6] The fourth statute is the Ontario Business Records Protection Act, which was enacted in Canada in 1947. That Act forbids the production of any business records requested by a foreign tribunal if a provincial court issues an order to that effect. Because no such order has been sought or issued to date, this Act has little or no applicability here. The final statutes are Articles 162 and 273 of the Swiss Penal Code, which prohibit the disclosure of a "business or manufacturing secret." Because a violation can be avoided if a person with a secrecy interest in some matter consents to its disclosure, and because Gulf and GMCL expect to secure all necessary consents within a short span of time, the Swiss statutes also have limited applicability here. All of these statutes impose criminal penalties for their violation, including fines and imprisonment.

In addition to plaintiffs' motions to compel, three of the defendants Getty, Gulf and Utah have filed motions to compel Westinghouse to produce documents located in Australia, Canada and South Africa. Because Westinghouse has raised no foreign law objections to the pro-

duction of those documents, these defendants' complaint is that Westinghouse's [**7] purportedly complete production of documents is in fact only a partial one. This contention rests mainly on inferences drawn from an affidavit by one of Westinghouse's attorneys, James E. Daniels.

The Daniels affidavit states that Westinghouse documents responsive to defendants' document requests are located in Canada, Australia and South Africa, that the nondisclosure laws of those countries have not deterred Westinghouse's compliance with those requests, and that, based upon his own knowledge and on consultation with others, Daniels is satisfied that copies of all responsive documents in those countries, together with any handwritten and margin notes, are now available for inspection at Westinghouse's Pittsburgh offices. Defendants claim these statements fail to meet the requirements of paragraph 5 of Joint Pretrial Order No. 5, which requires Westinghouse to specify "the procedures it followed in ascertaining that identical copies of such foreign documents, including handwritten notations, marginalia and attachments, have been produced from files maintained in the United States . . ." In addition, they contend that Westinghouse has ignored the additional requirement that a party [**8] must identify the foreign documents that were not produced if copies of those originals were not produced from its U.S. files or state the circumstances that prevent such identification. In essence, then, these defendants suspect that Westinghouse's U.S. files are less complete than [*1144] those in foreign countries, want more complete information to determine whether this is so, and then want access to any additional documents which are discovered.

Plaintiffs' and defendants' motions to compel thus rest on wholly different theories. With plaintiffs' motions, the main issue is whether defendants should be ordered to produce withheld documents despite the prohibitions of foreign nondisclosure laws. With defendants' motions, the main issue is whether Westinghouse has withheld foreign documents, and that question turns on the sufficiency of the Daniels affidavit. Assuming such documents have been withheld, Westinghouse seems to have raised no objection to their disclosure. Because plaintiffs' motions raise the more complex issues and occupy the bulk of the voluminous papers which have been submitted to us, we shall discuss them first.

The parties have offered differing views [**9] on the proper standards to be applied in deciding whether to issue a production order for documents located in a country which prohibits their removal or disclosure. Plaintiffs argue that Rule 37 requires a bifurcated two-step procedure for compelling production and imposing sanctions. They contend that the question of whether a discovery order should issue is solely a matter of American law; foreign nondisclosure laws are only relevant in deciding whether sanctions should be imposed for non-compliance. Defendants argue that we should instead use a balancing test to consider all circumstances, including foreign law, before entering an order compelling discovery. We take a middle course between these opposing positions, finding that a number of factors must be considered before issuing a production order, but that the inquiry is not as comprehensive as defendants suggest.

At the outset, we should identify the type of jurisdiction exercised by a court in issuing an order to produce foreign documents. In the field of foreign relations law, two types of jurisdiction have been defined. Prescriptive jurisdiction refers to the capacity of a state under international law to make a rule [**10] of law. It is exemplified by the enactment of the Federal Rules of Civil Procedure, e.g., Rule 37. Enforcement jurisdiction, on the other hand, refers to the capacity of a state under international law to enforce a rule of law. When a court enters an order compelling production of documents under Rule 37, it exercises its enforcement jurisdiction. Restatement, Second, Foreign Relations Law of the United States, § 6 (1965); Onkelinx, Conflict of International Jurisdiction: Ordering the Production of Documents in Violation of the Law of the Situs, *64 Nw.L.Rev. 487, 495 (1969).* The jurisdiction of American courts is unquestioned when they order their own nationals to produce documents located within this country. But jurisdiction is less certain when American courts order a defendant to produce documents located abroad, especially when the country in which the documents are situated prohibits their disclosure.

As a general rule, a court has the power to order a person subject to its jurisdiction to perform an act in another state. *Restatement, Second, Conflict of Laws, § 53 (1971).* There are two preconditions for the exercise of this power. First, the court must have personal [**11] jurisdiction over the person. Second, the person must have control over the documents. *United States v. First National City Bank, 396 F.2d 897, 900-01 (2d Cir. 1968); In Re Grand Jury Supoenas Duces Tecum Addressed to Canadian International Paper Co., 72 F. Supp. 1013 (S.D.N.Y.1947).* The location of the documents is irrelevant. *72 F. Supp. at 1020.*

On the issue of control, there are certain corollary principles which apply to multinational corporations. The test for determining whether an American court can order an American parent corporation to produce the documents of its foreign subsidiary was stated in *In Re Investigation of World Arrangements, 13 F.R.D. 280, 285 (D.D.C.1952):*

Case 1:07-cv-064●● Document 7 Filed 11/14/2007 Page 143 of 159

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

Page 4

(I)f a corporation has power, either directly or indirectly, through another corporation [*1145] or series of corporations, to elect a majority of the directors of another corporation, such corporation may be deemed a parent corporation and in control of the corporation whose directors it has the power to elect to office.

Thus, for example, if the parent owns more than 50% Of the foreign subsidiary's stock, it possesses the necessary control. W. Fugate, Foreign Commerce and the Antitrust [**12] Laws, 116 (2d ed. 1973).

The test is less clear in situations where an order is directed to the American subsidiary of a foreign corporation to produce documents from its head office located abroad. One court has held that a subpoena duces tecum was enforceable if it was served on the subsidiary's offices in the United States, even though the corporation's board of directors had passed a resolution prohibiting the removal of the requested records from Canada and even though all the board members were residents of Canada. In Re Grand Jury Subpoenas Duces Tecum, supra, 72 F. Supp. at 1020. The court's reasoning as to how the American officers had control over the withheld documents seems to rest on the theory that it was sufficient that the documents were in the possession of the corporation and that a subpoena had been served on some of its officers. See Onkelinx, Supra, 64 Nw.L.Rev. at 505-06. More helpful guidance can be drawn from Societe Internationale v. McGranery, 111 F. Supp. 435, 440-42 (D.D.C.1953), in which the court held that plaintiff, a Swiss corporation, had control over the papers of its Swiss-based bank, H. Sturzenegger & Cie. n3 The court attached significance [**13] to the fact that Sturzenegger was a director and officer of plaintiff and was "perhaps" a dominant personality in plaintiff's affairs. After an extensive examination of the corporate affiliations of the two partners, the court concluded that "(through) the interlocked web of corporate organization, management and finance there runs the thread of a fundamental identity of individuals in the pattern of control." 111 F. Supp. at 442. Thus, the issue of control is more a question of fact than of law, and it rests on a determination of whether the defendant has practical and actual managerial control over, or shares such control with, its affiliate, regardless of the formalities of corporate organization.

n3. The court's holding on the control issue was accepted both by the Court of Appeals, Societe Internationale v. Brownell, 96 U.S.App.D.C. 232, 236, 225 F.2d 532, 536 (D.C.Cir. 1955), and by the Supreme Court, Societe Internationale v.

Rogers, 357 U.S. 197, 204, 78 S. Ct. 1087, 2 L. Ed. 2d 1255 (1958).

Once personal [**14] jurisdiction over the person and control over the documents by the person are present, a United States court has power to order production of the documents. The existence of a conflicting foreign law which prohibits the disclosure of the requested documents does not prevent the exercise of this power. This proposition has been accepted by both the American Law Institute (Restatement, Second, Foreign Relations Law of the United States, § 39 n4), and by the Supreme Court, Societe Internationale v. Rogers, 357 U.S. 197, 78 S. Ct. 1087, 2 L. Ed. 2d 1255 (1958). However, American courts should not ignore the fact that such a law exists. When two states, both having jurisdiction, prescribe inconsistent conduct, American courts have developed certain rules of self-restraint governing the appropriate exercise of their power. United States v. First National City Bank, supra, 396 F.2d at 901. Because Societe Internationale dominates the field and sets forth the pertinent considerations to be weighed when such conflicts arise, we analyze it at length.

n4. Section 39(1) states:

A state having jurisdiction to prescribe or to enforce a rule of law is not precluded from exercising its jurisdiction solely because such exercise requires a person to engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct.

[**15]

The procedural context of the Societe case is intricate. A Swiss company brought a civil suit under the Trading with the Enemy Act to recover assets which the United States Government had seized during World War II as enemy-owned proper [*1146] ty. The American government challenged plaintiff's claim of ownership and also asserted that plaintiff itself was an "enemy" and hence was barred from recovery under the Act. To prove its defenses, the government moved for an order requiring plaintiff to produce documents held by its bank in Switzerland. The district court granted the motion. Plaintiff then sought to avoid production on the ground that disclosure of the bank records would violate Swiss penal laws and subject it to criminal sanctions. The defendant in turn moved to dismiss the complaint because of plaintiff's noncompliance with the production order.

The district court appointed a special master to consider plaintiff's claims. The master found that there was no evidence of collusion between plaintiff and the Swiss

Page 5

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

government to evade discovery, and that plaintiff had shown good faith in its efforts to secure waivers from the Swiss government and to comply with the [**16] order. The district court accepted these findings, but nevertheless dismissed the complaint with prejudice holding that plaintiff had control over the bank records, that the records "might prove to be a deciding factor in the outcome of this suit" *(111 F. Supp. at 443)*, that Swiss law did not provide an adequate excuse for noncompliance, and that the court in these circumstances had the power to dismiss the complaint. Although plaintiff was given a grace period to continue its efforts to secure waivers from the Swiss government, and although it produced more than 190,000 documents over the next three years, plaintiff ultimately failed to achieve full compliance. Consequently, the district court directed a final dismissal of the action. The Court of Appeals affirmed.

On certiorari, the Supreme Court affirmed the issuance of the production order, but reversed the dismissal of the action. It is the first half of the Court's holding that is of primary concern to us here.

In deciding that the production order was justified, the Court first accepted the district court's finding that, apart from the effect of Swiss law, the documents were within plaintiff's control and possession. [**17] It then discussed the question of whether Swiss law barred the conclusion that plaintiff had "control" of the documents within the meaning of the Federal Rules of Civil Procedure governing discovery orders. The Court decided that Swiss laws did not create an insuperable obstacle to issuance of a production order.

The Court identified three salient factors which influenced its decision. First, in enacting the statute which formed the basis for plaintiff's action, Congress had expressed a "deep concern" with reaching property held by corporations whose intricate financial structure disguised their ties to enemy interests. The Court stated that a failure to order the production of documents illuminating plaintiff's financial background would frustrate this Congressional policy. We infer that the Court would accept the obverse proposition that a court should generally order production to effectuate strong Congressional policies. In addition, because the Court gave no hint that the disclosure policies of the American statute should be balanced against the secrecy policies of the Swiss law, it appears that the only pertinent inquiry is the strength of the American interests. Second, [**18] the Court noted that the requested records were "vital" to a determination of the pivotal statutory inquiry, namely whether plaintiff was the captive of enemy interests. The Court thus suggested that the normal discovery standard of whether a document is relevant or is calculated to lead to the discovery of admissible evidence does not apply, and should be replaced by the higher standard of whether the

requested documents are crucial to the resolution of a key issue in the litigation. Third, in apparent reliance on plaintiff's status as a Swiss national invoking the prohibitions of its own country's penal laws, the Court stated that plaintiff was in a favorable position to secure a waiver of those laws from its government or to explore alternative procedures for achieving compliance. The opinion thus suggests that the greater the chances for flexibility in a country's application of its nondisclosure laws, the greater the likelihood that a production order [*1147] should issue. In conclusion, the Court stated that "United States courts should be free to require (persons such as plaintiff) . . . to make all such efforts (at compliance) to the maximum of their ability . . ." [**19] *357 U.S. at 205, 78 S. Ct. at 1092.*

In the next paragraph, however, the Court explicitly confined its ruling to the case before it, thus weakening the precedential value of its three-pronged analytical framework. The propriety of issuing a production order in other cases was said to depend not only on those three factors, but also on the "exigencies of particular litigation" and "the circumstances of a given case." *357 U.S. at 206, 78 S. Ct. at 1092.* These circumstances and exigencies were not defined with any particularity.

Although the Court by this language seemingly endorsed a completely open-ended approach for deciding future cases, the overall tenor of the opinion and several additional comments lead us to conclude that the Court envisioned some limits on its inquiry. First, in summarizing its holding that the district court properly issued the production order, the Court mentioned only two interests which were to be factored into the decisionmaking process: a) the requirements of the procedural rule authorizing production orders, and b) the policies underlying the law which formed the basis for the action. *357 U.S. at 206, 78 S. Ct. 1087.* The first of those interests encompasses [**20] the questions of defendant's control over the documents and plaintiff's need for them. The other is confined to the importance of the policies behind the American law. Second, the next section of the opinion contains language which reserves certain factors for consideration solely at the sanctions phase of the enforcement process. In that section, the Court explored the source of a federal court's power to dismiss a complaint because of noncompliance with a production order, and decided that it rested solely on *Rule 37, F.R.Civ.P.* The Court then found that a district court's Rule 37 power is invoked when a party "refuses to obey" such an order, and that refusal occurs whenever a party fails to comply with an order, regardless of its reasons for noncompliance. This analysis is followed by this sentence:

> Such reasons, and the willfulness or good faith of petitioner, can hardly affect the fact of noncompliance and are rele-

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

vant Only to the path which the District Court might follow in dealing with (a party's) failure to comply. *357 U.S. at 208, 78 S. Ct. at 1094.* (Emphasis supplied.)

Although this sentence does not explicitly remove defendant's reasons for noncompliance [**21] from consideration at the order-making stage of the proceedings, it impliedly has that effect, because we are told such reasons are relevant Only to the question of appropriate sanctions.

This conclusion is confirmed by the third section of the Societe opinion, in which the Court examined whether plaintiff's stated reasons for noncompliance were adequate to prevent dismissal of its complaint under Rule 37. The Court first determined that plaintiff "had in good faith made diligent efforts to execute the production order," then found that those efforts fell short of full compliance, and then analyzed the shortfall to see whether it was caused by plaintiff's "inability fostered neither by its own conduct nor by circumstances within its control."

In defining acceptable forms of inability, the Court discussed a number of issues that the parties in the present case have attempted to raise prematurely at the order-making stage. One such issue is whether defendants "deliberately courted legal impediments" in a foreign country to evade discovery, such as by requesting a foreign government to adopt a nondisclosure law and then shipping its records to that jurisdiction. Another is the severity [**22] of the sanctions imposed for violation of the nondisclosure law and the resulting hardship to defendants. In this vein, the Court noted that "fear of criminal prosecution constitutes a weighty excuse for nonproduction . . ." A further issue concerns the scope and applicability of the foreign laws, since a refusal to produce which rests on an overbroad and unjustified interpretation of [*1148] the foreign laws will not be honored here. On this question the Supreme Court stated that "the very fact of compliance by disclosure of banking records will itself constitute the initial violation of Swiss laws."

The wisdom of deferring consideration of these factors until the sanctions phase of the proceedings is clear. In the present case, each defendant seeks to differentiate itself from its co-defendants on the basis of a variety of factors, including the volume of the documents it is withholding, the extent of its culpability in securing passage of the foreign laws, its good faith in seeking to comply with document requests, the amount of hardship it might suffer by disclosure, and the breadth of its interpretation of foreign laws. Each defendant asks for sepa-

rate treatment and [**23] consideration. A decision to grant or withhold a production order under Rule 37(a) does not provide a means for tailoring relief to the individual circumstances of each defendant. On the other hand, Rule 37(b) is flexible and offers a variety of sanctions, if necessary, which the court may incorporate into such orders "as are just."

The Supreme Court in Societe recognized the validity of this approach. Although it found that the district court was unjustified in dismissing plaintiff's complaint, it remanded the case with instructions that the district court "possesse(d) wide discretion to proceed in whatever manner it deems most effective." That discretion included options to "explore plans looking towards fuller compliance," and even to "draw ( ) inferences unfavorable to (plaintiff) as to particular events." This language indicates that a production order is only the first step in the process of resolving discovery disputes, and that it should not be prematurely burdened by a comprehensive inquiry into all ramifications of the controversy.

To summarize the preceding discussion, we have concluded that we possess the power to enter an order against defendants under Rule 37(a) [**24] compelling them to produce documents located abroad if the particular defendant is within the personal jurisdiction of this court and has control over the requested documents. Societe teaches that the decision whether to exercise that power is a discretionary one which is informed by three main factors: 1) the importance of the policies underlying the United States statute which forms the basis for the plaintiffs' claims; 2) the importance of the requested documents in illuminating key elements of the claims; and 3) the degree of flexibility in the foreign nation's application of its nondisclosure laws. Relying on the Court's additional suggestion that each case must depend upon its particular facts, several defendants urge that we consider several other factors that we have not yet discussed. However, in the circumstances of this case, we find that these other factors are of limited or no utility.

Several defendants cite the Restatement, Second, Foreign Relations Law of the United States, § 40(a) or rely on broad notions of "international comity" for the proposition that we should balance the vital national interests of the United States and the foreign countries to determine [**25] which interests predominate. Aside from the fact that the judiciary has little expertise, or perhaps even authority, to evaluate the economic and social policies of a foreign country, such a balancing test is inherently unworkable in this case. The competing interests here display an irreconcilable conflict on precisely the same plane of national policy. Westinghouse seeks to enforce this nation's antitrust laws against an alleged international marketing arrangement among uranium producers, and to that end has sought documents

located in foreign countries where those producers conduct their business. In specific response to this and other related litigation in the American courts, three foreign governments have enacted nondisclosure legislation which is aimed at nullifying the impact of American antitrust legislation by prohibiting access to those same documents. It is simply impossible to judicially "balance" these totally contradictory and mutually negating actions.

All defendants rely on a line of Second Circuit cases which were decided after Societe and which suggest that a district court [*1149] should not order production if the order would cause a party to violate [**26] a foreign law. *First National City Bank v. Internal Revenue Service, 271 F.2d 616 (2d Cir. 1959); Ings v. Ferguson, 282 F.2d 149 (2d Cir. 1960); Application of Chase Manhattan Bank, 297 F.2d 611 (2d Cir. 1962)*. Plaintiffs rely in turn on a Tenth Circuit decision which takes a contrary view. *Arthur Andersen & Co. v. Finesilver, 546 F.2d 338 (10th Cir. 1976)*. We believe that the Tenth Circuit decision is more closely in harmony with the principles established in Societe.

Gulf and Uranerz urge that the production orders sought by plaintiffs are barred by the act of state doctrine because they would interfere with the conduct of our foreign relations by the Executive Branch. However, the act of state doctrine is not applicable here. That doctrine bars an American court from questioning the validity of the act of a foreign sovereign when that act is done within the sovereign's territory. *Underhill v. Hernandez, 168 U.S. 250, 252, 18 S. Ct. 83, 42 L. Ed. 456 (1897); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 416, 84 S. Ct. 923, 11 L. Ed. 2d 804 (1964)*. Plaintiffs have not challenged the validity of any of the foreign nondisclosure laws which are relied on by defendants. The [**27] issue is not whether those laws are valid, but rather, conceding their validity, whether they excuse defendants from complying with a production order.

Many defendants ask us to consider communications from foreign governments to the U. S. State Department which have protested the issuance of production orders by American courts in similar circumstances. We believe those communications are relevant to the decision whether to issue a production order only insofar as they indicate the degree of accommodation or adjustment which the foreign government may be willing to make in its nondisclosure laws. We reserve any further consideration of these communications to the hearing on sanctions, if that becomes necessary.

Finally we have on this question as we have on another question n5 been benefitted with statements amici curiae from the Governments of Canada, Australia, South Africa and Switzerland. By far the most extensive

of these is the Canadian statement which urges that we defer to the critical importance which Canada attaches to its national policies and regulations. But as we have earlier observed a balancing test is inherently unworkable in this case, and were it not we would [**28] be hard pressed not to accede to the strong national policy of this country to enforce vigorously its anti-trust laws.

n5. Here the amici appear in support of the non-defaulting defendants. On the question of the timing of the hearing to prove up damages on the default judgment, which is now before the Court of Appeals, the amici have supported the defaulting defendants.

There are two procedural hurdles we must clear before we reach the merits of the various motions to compel. The issues are ones of waiver and collateral estoppel.

TVA argues that Uranerz and Noranda have waived certain foreign law objections by failing to raise them in a timely manner. As to Uranerz, we previously ruled on January 29, 1979 that Uranerz, because of its delinquency in asserting objections, had waived all objections to production Except those objections based on the Canadian nondisclosure laws. We created this exception after learning that many other defendants had raised foreign law objections, that the issue was unusually [**29] sensitive and important, and that neither side had moved for a resolution of the issue. In those circumstances, we ruled that it would be unfair to deprive Uranerz of the opportunity to raise the foreign law objection.

Noranda's situation is somewhat different. Noranda initially objected to TVA's document requests on the basis of Canadian nondisclosure laws. However, when it later defined its foreign law objections in accordance with Pretrial Order No. 5, Noranda added a new objection based on Australian law. TVA challenges the Australian law objection as untimely, because it was not raised in response to the document requests and because the pretrial order did not expressly [*1150] authorize new objections. We think TVA's interpretation of the pretrial order is too narrow. The order was drafted in response to the delays and difficulties in document production which first surfaced in the Uranerz situation, and was specifically intended to provide the final deadline for particularized foreign law objections to all prior and pending document requests. All objections filed within the time limits of the order are proper.

Rio U.S., Noranda and Uranerz contend that plaintiffs [**30] are collaterally estopped from litigating their present motions because the Tenth Circuit decided the same issues adversely to them in *In Re Westinghouse*

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

Page 8

*Electric Corporation Uranium Contracts Proceedings, 563 F.2d 992 (10th Cir. 1977).* That case was a by-product of the related Virginia contracts litigation, where Westinghouse was sued for breach of its uranium contracts by thirteen utility companies, including TVA. In an effort to prove its defense that the real cause of its inability to perform was a price-fixing conspiracy among uranium producers, Westinghouse served a subpoena on Rio U.S., a non-party, in Utah. The subpoena directed Rio U.S. to produce certain business records. Rio U.S. raised the Canadian nondisclosure laws as a bar to production and moved to quash the subpoena. The district court denied the motion and entered a production order. After Rio U.S. failed to comply, it was adjudged in contempt and was fined $ 10,000 per day until it complied with the order. The Tenth Circuit reversed, holding that "(a)ll things considered, on the basis of the record before it, the district court in our view abused its discretion in adjudging Rio (U.S.) to be in contempt of court, [**31] and in imposing the severe sanction in connection therewith." *563 F.2d at 996.*

We do not believe that the court's decision constitutes an estoppel to plaintiffs' present motions. TVA never appeared in the Utah proceedings, and therefore never had a full and fair opportunity to litigate the issues. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 329, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971).* Its position as a party plaintiff in the Virginia litigation, in which it was Westinghouse's adversary, gave it no meaningful incentive to intervene in Westinghouse's efforts to secure discovery on Westinghouse's cartel-related defenses. Although Westinghouse did have a full opportunity to litigate the issues, those issues are not the same as those raised here. The only issue on appeal was the propriety of the sanctions imposed for noncompliance, not the validity of the production order. Therefore, that decision offers no conclusive guidance on the issue of whether a production order should issue here. Furthermore, the decision whether to impose sanctions rests on a variety of factors, and those factors have been restructured in this case by Rio U.S.'s [**32] status as a party rather than a witness, by the more crucial relevance of the requested documents to plaintiffs' antitrust claims, and by our opportunity to have a much more complete record on Westinghouse's charges of a collusive attempt to evade discovery and of overall bad faith. n6

n6. Of course, a more complete record is of no consequence for collateral estoppel purposes if Westinghouse could have developed the same facts against Rio U.S. in the earlier litigation. It appears, however, that some additional facts have only recently been made available (e.g. the grand

jury documents) or relate to subsequent events (e.g. later efforts to secure waivers from the foreign governments).

We now examine whether all defendants are within the personal jurisdiction of this court and have control over the requested documents, so that we possess the requisite power to issue an order under Rule 37(a) compelling production of their foreign documents. Only Noranda has raised an objection based on lack of In personam jurisdiction. [**33] Five defendants Engelhard, Noranda, Denison U.S., Rio U.S. and Uranerz deny that they control the requested documents.

Noranda has moved to dismiss both the Westinghouse and the TVA actions for lack of personal jurisdiction. Both motions have been deferred pending discovery. Noranda [*1151] argues that no production order can be entered until we rule upon the motions. We disagree, because even in the absence of such a ruling, we possess jurisdiction to determine our jurisdiction over the parties. In the exercise of that jurisdiction, we may compel discovery to aid our resolution of the personal jurisdiction issues.

Noranda admits that it has interposed foreign law objections to production of several documents which are directly relevant to its contacts with Illinois: 1) the content of a document regarding the seminar of the Atomic Industrial Forum in Oak Brook, Illinois in 1973, and 2) documents concerning contacts with two Illinois utilities. Noranda seeks to nullify the usefulness of these documents by making self-serving and uncorroborated assurances that they do not establish its contacts with this state. Plaintiffs are not required to accept these assurances, and [**34] are entitled to make their own inspection of the documents. *Societe Internationale v. McGranery, supra, 111 F. Supp. at 442.*

Noranda makes the alternative contention that we should limit discovery to those documents relevant to the jurisdictional issues. While we agree with this statement as a general principle, that principle offers little assistance where, as here, the jurisdictional and merits discovery is intertwined. Because the documents withheld pursuant to foreign law are peculiarly likely to impact on both areas, and because any segregation of documents will likely involve the unreviewable discretion of the party segregating and withholding them, we believe an order requiring full production is necessary.

To resolve the issue of whether four defendants control the requested documents, we must delve into the details of their corporate affiliations. Rio U.S. and Denison U.S. are the American subsidiaries of foreign parents, Engelhard is an American parent with foreign sub-

Page 9

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

sidiaries, and Noranda is a foreign parent with foreign and domestic subsidiaries.

Engelhard is a Delaware corporation with its principal place of business in New York City. Although it does not mine [**35] or produce uranium, it has acted as a sales representative for Nuclear Fuels Corporation of South Africa (Nufcor, a defaulting defendant) in promoting its sales of uranium in North America. In carrying out that function, Engelhard has been assisted by three wholly owned subsidiaries located in Australia and South Africa. Derby and Co. (South Africa) Pty., Ltd. is a South African corporation which is a wholly owned subsidiary of Derby and Co., Ltd. (London), which in turn is a wholly owned subsidiary of Engelhard. Derby-South Africa transmitted information between Nufcor's offices in South Africa and Engelhard's offices in the United States. Philipp Brothers (Australia) Pty., Ltd. is an Australian corporation which is a wholly owned subsidiary of Engelhard. Derby and Co. (Australia) Pty., Ltd. is an Australian corporation which is a wholly owned subsidiary of Derby-London. The Australian subsidiaries have aided Engelhard in its unsuccessful attempt to act as a sales representative for a newly-developing Australian mining company, Queensland Mines, which is also a defaulting defendant. Engelhard states that "it is possible that one or more of these subsidiaries may have within [**36] its possession, custody or control documents or information responsive to portions of (plaintiffs') document requests . . ." Engelhard has refused to produce those documents.

It is clear that Engelhard's total ownership of its Australian and South African subsidiaries gives it effective control over those corporations' documents. Engelhard's only argument to the contrary is that the normal inference of control is rebutted here because Engelhard has no legal right to direct the officers and employees of its foreign subsidiaries to violate the nondisclosure laws of their countries. The Supreme Court specifically rejected that argument in Societe, after it weighed the argument in light of the three factors we have identified above. *357 U.S. at 204-06, 78 S. Ct. 1087*. We reach the same conclusion, but postpone our analysis for a consolidated discussion of all defendants' arguments on this issue. See pp. 1154-1156 below.

[*1152] Noranda is a Canadian corporation with its principal place of business in Ontario. Noranda itself does not own uranium or uranium-producing properties and has not sold uranium. However, it owns 43.8% Of the common shares of Kerr-Addison Mines, Ltd., [**37] a Canadian corporation which has a wholly owned subsidiary called Agnew Lake Mines, Ltd., which in turn owns a 90% Interest in a uranium-producing mine in Ontario, Canada. Kerr-Addison's shares are publicly traded on the Toronto Stock Exchange and are owned by more than 11,000 shareholders. While a minority of the directors of Kerr-Addison are also officers of Noranda, Kerr-Addison keeps its own books and records and holds its own corporate meetings separate and apart from any other company. Noranda also has wholly owned subsidiaries that own uranium prospects located in Canada, Australia and the United States. One of these is Noranda Australia, Ltd., which has an interest in undeveloped uranium deposits in Australia. In addition, personnel of Noranda Sales Corporation, Ltd., a wholly owned Canadian subsidiary, have consulted with purchasers or prospective purchasers of uranium at various times in an effort to sell uranium to be produced in the future. These facts, as disclosed by affidavits in support of Noranda's motion to dismiss, reveal that Noranda has control over responsive documents of Noranda Australia and Noranda Sales, but not over those of Kerr-Addison.

The situation [**38] with Rio Algom Corporation (Rio U.S.) is much more complex than either Noranda or Engelhard. Rio U.S. is a Delaware corporation with its principal place of business in Moab, Utah, where it owns and operates a uranium mining and milling facility. Rio U.S. is the wholly owned subsidiary of Atlas Alloys, Inc., an Ohio corporation, which in turn is the wholly owned subsidiary of Rio Algom, Ltd. (Rio Canada), a Canadian corporation which mines and sells uranium produced from its Elliott Lake mine in Canada. Rio U.S. has appeared in this action and defended itself, but Rio Canada has defaulted.

Rio U.S. states that it has withheld no documents in its possession, custody and control, including documents from files located in Canada, on the ground that they are affected by foreign law. However, it has declined to produce certain other documents located in Canada because those documents are in the possession, custody and control of its parent once removed, Rio Canada, and because production of those documents would violate Canadian law. Westinghouse has sought to define an overlap or gray area of documents falling between these two statements. Westinghouse argues that Rio U.S. has unjustifiably [**39] refused to produce responsive documents concerning its uranium mining, marketing and exploration activities, because even though those documents are located in Canada in the files of Rio Canada's directors, officers and employees, those persons at all pertinent times acted in behalf of Rio U.S. and had responsibility for those uranium activities.

In support of this contention, Westinghouse has submitted extensive evidence that Rio U.S. and Rio Canada have operated as a single functional unit in all aspects of their uranium business. These two corporations have shared an interlocking structure of corporate directors, officers, and executive and administrative personnel who have managed the uranium-related activities of both

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

corporations. The intervening ownership interest of Atlas Alloys is wholly collateral to the managerial unity of the two companies. Numerous officers of Rio U.S. have held dual positions with Rio Canada, enabling them to perform identical uranium-related functions for each corporation. For example, George Albino, in his capacity as principal operating officer of both corporations from 1971 to 1977, exercised direct managerial control over the daily uranium operations [**40] of both companies. Nine of Rio U.S.'s current officers and directors have offices at the corporate headquarters of Rio Canada in Toronto, Ontario. In January, 1976, A. G. Lowell, who is a Rio Canada Vice-President, stated that "Rio Algom Corporation is wholly owned by Rio Algom Ltd., and all marketing matters related to [*1153] uranium and other mineral products are handled from our Toronto office." Other evidence demonstrates that Rio U.S. and Rio Canada have been treated as a single uranium business not only by themselves, but by other members of the uranium industry and by their ultimate parent, Rio Tinto Zinc Corporation, Ltd.

From the available evidence of coordinated uranium-related activities, we conclude that there is a strong likelihood that Rio U.S. is withholding responsive documents in the files of Rio Canada personnel who have had and/or continue to have responsibility for Rio U.S.'s mining and marketing of uranium. To defend this withholding, Rio U.S. relies on cases involving a corporation's liability for a related corporation's actions. However, there is a crucial distinction between ability to compel production of documents and liability for a subsidiary's [**41] acts. The latter may require Rio U.S. to actually control or manage Rio Canada's business, but the former does not. W. Fugate, Foreign Commerce and the Antitrust Laws, supra at 116. It is sufficient that Rio U.S. has, or once had, control over its directors, officers and employees who managed the uranium-related activities of Rio U.S. alone or of both corporations. Rio U.S. must produce all responsive documents held by those employees or former employees, even if those documents have found their way into Rio Canada files. The formalities separating the two corporations cannot be used as a screen to disguise the coordinated nature of their uranium enterprise.

A similar situation may exist with respect to defendant Denison Mines, Inc. (Denison U.S.), but Westinghouse has provided insufficient documentation for us to conclude that Denison U.S. controls withheld documents in the files of its parent defendant Denison Mines, Ltd. (Denison Canada). Denison Canada is a Canadian corporation with its principal place of business in Toronto and engages in the mining, milling and sale of uranium. Denison U.S. is a Delaware corporation with its principal place of business in Denver, Colorado [**42] and is a wholly owned subsidiary of Denison Canada. Denison U.S. is and has been engaged in exploration for uranium and other minerals in the United States. Answer, PP 17, 18. Both corporations have appeared in this action.

Like Rio U.S., Denison U.S. states that it has raised no objections based on foreign law and has produced all documents within its control. Indeed, Denison U.S. allowed plaintiffs to walk through their entire files and select documents without regard to relevancy standards, with the exception of documents covered by the attorney-client privilege or work product immunity. However, Denison U.S. has been silent on the question of whether some of its documents were generated in Canada and have been kept there. Westinghouse suggests that these documents have been and are now held by Denison Canada and that the close managerial connections between the two corporations justify the issuance of an order directing the production of all such documents reflecting management decisions of Denison U.S. But Westinghouse's exhibits on this issue (Nos. 61 and 62) are too scanty to support this inference. Consequently, Westinghouse's motion to compel Denison U.S. to produce [**43] documents from the files of its parent Denison Canada must be denied.

Uranerz raises a control issue of a completely different character. Its documents are located primarily in its corporate offices in Canada and West Germany, and Uranerz raises no control objections as to them. But an undisclosed volume of Uranerz documents is currently located in the offices of the Ministry of Energy, Mines and Resources of the Canadian government in Ottawa. Those documents were transferred in November, 1976, after the Canadian government directed Uranerz and other companies to deposit with the Ministry all documents covered by the Canadian nondisclosure laws which had been enacted in September of that year. When Uranerz's American counsel, Mr. Levitt, later asked the Ministry if he could review the documents, he was advised that no American counsel for any company has been permitted [*1154] to inspect any documents in the Ottawa depository. Levitt was informed that his request would not even be considered unless he could furnish a written opinion that he could not be compelled by any American court to disclose what he had seen. In his view, American law did not provide such an airtight [**44] safeguard against disclosure that he could give such assurances. Therefore Mr. Levitt abandoned his efforts to seek access to these documents. Because these documents are in the actual possession of government officials, and because those officials have demonstrated that access is strictly limited and is to be granted on a discretionary basis, we agree with Uranerz that it has no control over those documents. Compare Societe Internationale, supra, 357 U.S. at 204, 78 S. Ct. 1087.

Case 1:07-cv-06458    Document 7    Filed 11/14/2007    Page 150 of 159

Page 11

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

We have now determined that, with certain exceptions regarding Denison U.S. and Uranerz, we have the power to issue a production order under Rule 37(a) against the eleven resisting defendants that are the subjects of plaintiffs' motions. The remaining question is whether we should exercise our discretionary power to issue those orders, after weighing the three factors described earlier in this memorandum. We conclude that we should.

The first consideration is the strength of the Congressional policies underlying the statute which forms the basis for plaintiffs' action. Plaintiffs' complaint challenges activities by the defendants which, if true, would constitute massive violations of this nation's antitrust [**45] laws. "These laws have long been considered cornerstones of this nation's economic policies, have been vigorously enforced and the subject of frequent interpretation by our Supreme Court." *United States v. First National City Bank, 396 F.2d 897, 903 (2d Cir. 1968).* "They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Associates, Inc., 405 U.S. 596, 610, 92 S. Ct. 1126, 1135, 31 L. Ed. 2d 515 (1972).* More specifically, Congressional concern with the very practices at issue here, and with the antitrust implications of those practices, is evidenced by extensive subcommittee investigations into the alleged international uranium cartel. See Hearings Before the Subcommittee on Oversight and Investigation of the House Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess. (1977). Governmental concern with this issue achieved choate form when the Justice Department convened a grand jury which eventually charged Gulf with criminal antitrust violations arising out of the same transactions identified by Westinghouse. United States v. [**46] Gulf Oil Corp., Cr. No. 78-123 (W.D.Pa.1978). The existence of this public enforcement action does not supplant plaintiffs' private civil action. Indeed, Congress specifically intended to encourage civil antitrust actions by allowing private litigants to gain certain estoppel advantages from government antitrust actions. *Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 85 S. Ct. 1473, 14 L. Ed. 2d 405 (1965).* From these indicators, it is clear that the policies supporting an inquiry into corporate activities and structure are at least as weighty, and probably stronger, with the antitrust statutes here than they were with the Trading with the Enemy Act in Societe Internationale. See W. Fugate, Supra at 122.

The second consideration is whether the requested documents are crucial to the determination of a key issue in the litigation. Plaintiffs' showing on this factor is simply overwhelming. All of the discovery requests now at issue are directly relevant to a number of fundamental issues in the complaint, answers, affirmative defenses and counterclaims in this litigation. Plaintiffs seek vital information relating to, among other things, the time period [**47] when the alleged conspiracy of uranium producers was carrying out its activities, defendants' alleged efforts to conceal their conspiracy, the impact of that alleged conspiracy on United States interstate and foreign commerce, the defendants' defenses of sovereign compulsion, and information on uranium sales and market conditions. Plaintiffs have submitted voluminous exhibits [*1155] which give a sketchy picture strongly supporting their allegations in these areas but also suggesting that there are larger gaps in defendants' document production.

The strength of plaintiffs' need for these documents is perhaps best demonstrated by these facts. First, Gulf has admitted the "establishment of an international uranium cartel under which price controls and market allocations were established" for at least some sales of uranium. (Gulf Brief, p. 18). Second, the information which plaintiffs seek is of such exceptional significance that three foreign governments have sought to authorize defendants to withhold that information for the express purpose of frustrating United States judicial inquiries into the activities of this cartel. Third, ten defendants have withheld documents under [**48] their control which are said to be within the scope of the secrecy legislation. The inevitable inference is that the withheld information is likely to be the heart and soul of plaintiffs' case.

Several defendants counter that the unproduced documents are merely cumulative of presently available discovery (Gulf, pp. 56-57) or that their own examination of the documents has convinced them that they have little significance to the case (Federal, pp. 14-15). These arguments were persuasively rejected by the district court in the Societe Internationale litigation:

> Under the rules of United States Courts a party is not required to accept the assurance of opposing counsel as to what has been made available. He is entitled to draw his own conclusions on examination of the papers. *111 F. Supp. at 442.*

Other defendants argue that they are equally prejudiced by the nondisclosure laws, since they may be prevented from using exculpatory documents which are covered by those laws. (See, e.g. Noranda, pp. 24-25). However, the solution to this "problem" lies in the fullest possible disclosure, not in a mutual limitation on relevant information.

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

Finally, we recognize that, as one [**49] commentator has put it, "the heart of any American antitrust case is the discovery of business documents. Without them, there is virtually no case." Note, Discovery of Documents Located Abroad in U.S. Antitrust Litigation: Recent Developments in the Law Concerning the Foreign Illegality Excuse for Non-Production, *14 Va.J.Int'l. L. 747 (1974)*. That is especially true when plaintiffs allege an antitrust conspiracy which has taken deliberate and elaborate steps to cloak its activities. "If true, the nature of the activities must be ferreted out of dark and obscure corners." *Societe Internationale, supra, 111 F. Supp. at 443*. The documents at issue here are crucial to plaintiffs' proof.

The third consideration involves an appraisal of the chances for flexibility in a country's application of its nondisclosure laws. The degree of leniency in the application of the nondisclosure laws varies from country to country. South Africa has taken the most flexible position. It has allowed Westinghouse to inspect Utah's uranium-related documents in that country, and is currently considering a request from Engelhard to allow a similar inspection of its documents. Australia has rejected all past [**50] requests for a waiver of its regulations, but interprets its laws as authorizing the Attorney General to grant such waivers. The Attorney General is presently considering requests for waivers from Engelhard, Getty and Utah. Canada has taken a completely inflexible position. It has consistently rejected all requests for waivers, stating that its government officials have no authority to grant them. It has opposed Westinghouse's unsuccessful efforts to secure letters rogatory from a Canadian court for production of uranium-related documents. It has rejected all requests to modify or amend the regulations and has refused to give any assurances of nonprosecution for any violations. Canada has also sent numerous diplomatic notes to the U.S. State Department in which it has expressed a firm position that any disclosure of documents covered by its regulations would be inimical to its national interests. Canada's position has not been relaxed by its amicus submission.

[*1156] On balance, we have concluded the issuance of Rule 37(a) orders is required. The entry of such

orders may lead to a further narrowing of the defendants' foreign law objections. That process has already [**51] been evidenced by the increased disclosures which have occurred since Westinghouse filed the present motions. Even if some defendants subsequently conclude, as they now suggest, that they have already done everything within their powers to comply with such an order, we do not think an order at this time would be a futile gesture. The order will serve to declare Westinghouse's right to the discovery it seeks, thereby framing the competing interests of the United States and the foreign governments on a plane where the potential moderation of the exercise of their conflicting enforcement jurisdictions can be meaningfully considered. We do not seek to force any defendant to violate foreign law. But we do seek to make each defendant feel the full measure of each sovereign's conflicting commands, so that, in the words of Chief Judge Kaufman of the Second Circuit, it now

"must confront . . . the need to "surrender to one sovereign or the other the privileges received therefrom' or, alternatively a willingness to accept the consequences."

*United States v. First National City Bank, 396 F.2d 897, 905 (2d Cir. 1968)*.

Accordingly, plaintiffs' motions to compel Utah, Gulf, GMCL, [**52] Noranda, Denison Canada, Engelhard, Getty, Federal, and Rio U.S. to produce foreign documents are granted in their entirety and are granted in part and denied in part as to Uranerz and are denied as to Denison U.S. Defendants' alternative objections to production of foreign documents on grounds such as attorney-client privilege and overbroad definitions are reserved for ruling at such time as defendants announce their ability to comply with this order. Production hereunder to be made on or before January 2, 1980.

The motions of defendants Getty, Gulf and Utah to compel Westinghouse to comply with Pretrial Order No. 5 are granted in part and Westinghouse is directed to provide defendants with a list identifying the foreign documents which it has produced from its domestic files.



**H**

Japan Halon Co., Ltd. v. Great Lakes Chemical Corp.
N.D.Ind.,1993.

United States District Court,N.D. Indiana,Hammond
Division.
JAPAN HALON CO., LTD., Plaintiff,
v.
GREAT LAKES CHEMICAL CORPORATION and
Yuichi Iikubo, Defendants.
No. 4:90cv37AS.

May 28, 1993.

Defendants in action by Japanese company for
misappropriation of trade secrets filed motion to
compel discovery of unprivileged documents from
plaintiff's parent companies. The District Court,
Allen Sharp, Chief Judge, held that relationship
between parent corporations and plaintiff was
sufficiently close to justify enforcing discovery
request.

Motion granted.
West Headnotes

**[1] Federal Civil Procedure 170A**  **1574**

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(E) Discovery and Production of
Documents and Other Tangible Things
      170AX(E)2 Subject Matter in General
        170Ak1574 k. Existence, Possession,
Custody, Control and Location. Most Cited Cases
Plaintiff in action for misappropriation of trade
secrets had sufficiently close relationship with its
parent corporations to justify enforcing discovery
request as to documents in possession of parent
companies. Fed.Rules Civ.Proc.Rule 34, 28
U.S.C.A.

**[2] Federal Civil Procedure 170A**  **1312**

170A Federal Civil Procedure

170AX Depositions and Discovery
  170AX(C) Depositions of Parties and Others
Pending Action
    170AX(C)1 In General
      170Ak1312 k. Letters Rogatory from
Without the United States. Most Cited Cases
Defendants in action for misappropriation of trade
secrets brought by Japanese company would not be
required to pursue request for discovery of
documents in possession of plaintiff's parent
companies through letters rogatory procedures
prescribed by Japan's Reciprocal Judicial Assistance
Act through consular channels. Fed.Rules
Civ.Proc.Rule 34, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A**  **1551**

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(E) Discovery and Production of
Documents and Other Tangible Things
      170AX(E)1 In General
        170Ak1551 k. In General. Most Cited
Cases
Analysis of document production under Federal
Rules of Civil Procedure is subject to broad
approach, as rule is to be liberally, rather than
narrowly, construed. Fed.Rules Civ.Proc.Rule 34, 28
U.S.C.A.

**[4] Federal Civil Procedure 170A**  **1551**

170A Federal Civil Procedure
  170AX Depositions and Discovery
    170AX(E) Discovery and Production of
Documents and Other Tangible Things
      170AX(E)1 In General
        170Ak1551 k. In General. Most Cited
Cases
Japanese company which brought action for
misappropriation of trade secrets would not be
permitted to use Japanese practice of "secondment"
to prevent discovery of documents in possession of
its parent companies. Fed.Rules Civ.Proc.Rule 34,
28 U.S.C.A.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*626 John R. VanWinkle, Bingham Summers Welsh and Spilman, Indianapolis, IN, Matthew D. Powers, Jared Bobrow, Weil Gotshal and Manges, Menlo Park, CA, for Japan Halon Co., Ltd.

John C. Duffey, James V. McGlone, Stuart and Branigin, Lafayette, IN, for Great Lakes Chemical Corp.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

Japan Halon filed its complaint for misappropriation of trade secrets against Great Lakes in the Central District of California on February 22, 1990. Following a transfer of venue to the Northern District of Indiana, Great Lakes filed its answer and counterclaim. Japan Halon has amended its complaint to include Yuichi Iikubo as a defendant. Great Lakes has filed a motion to compel discovery of unprivileged documents from Onoda Cement and Tosoh, Japan Halon's parent companies.

### Analysis

[1] The issue before the court is whether Japan Halon has "possession, custody or control" over the documents in question. Fed.R.Civ.P. 34 delineates the scope of production of documents between parties.[FN1] In this *627 case, the defendants have requested that documents be produced, or at least their existence or nonexistence be confirmed, by nonparties, Onoda Cement and Tosoh. Rule 34 only applies to discovery between parties, but it "does not prevent discovery of the kind permitted by the rule against one who is not a party" (Charles A. Wright & Arthur R. Miller, 8 Federal Practice and Procedure § 2208 (1970). Great Lakes bases its argument for production on Japan Halon's alleged custody or control over documents in the possession of its parent companies, which would give the plaintiff the legal right to copies of documents. Japan Halon, however, has declared that it does not have the requisite control over the documents because "Japanese law makes clear that Japan Halon has no right to broadly demand internal documents from Onoda and Tosoh" (Memorandum of Japan Halon in Opposition to Great Lakes' Motion ["Japan Halon Memorandum"] at 2). Thus, Japan Halon has argued that international interpretation of its corporate structure and the Japanese discovery law result in the conclusion that its does not have the requisite control over documents in possession of its parent companies. In response to Japan Halon's declaration that Japanese law does not

permit compliance with Great Lakes' discovery request, the defendants have argued that "[h]aving chosen to bring its lawsuit in the U.S. federal courts, Japan Halon is required to conduct discovery within the letter and the spirit of the Federal Rules of Civil Procedure" (Defendant's Memorandum in Support of Motion to Compel Discovery ["Defendants' Memorandum"] at 3).

> FN1. (a) Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents ... which are in the possession, custody or control of the party upon whom the request is served ...Fed.R.Civ.P. 34(a).

[2] Conversely, Japan Halon has argued that the Federal Rules of Civil Procedure cannot be applied in this case until Great Lakes has pursued its discovery request through the "traditional letters rogatory procedures prescribed by Japan's Reciprocal Judicial Assistance Act" through consular channels (Japan Halon's Memorandum at 3). The defendants claim that this course of action would be futile, and that Rule 34 is applicable:

"It is generally understood that a Japanese court, acting as a commissioned or assigned judge as defined by the Code of Civil Procedure, cannot issue an order to produce documents or other tangible evidence in executing letters rogatory from a foreign court. Thus, the only assistance generally given by Japanese courts is the taking of testimony of witnesses, expert witnesses and the parties."

Defendants' Memorandum at 18, quoting 7 Kitagawa, Doing Business is Japan § 5.05[5][d] (M.B.1992 ed.) (emphasis added). This court finds that the defendants are not required to take the path of letters rogatory prior to filing their motion to compel discovery pursuant to Fed.R.Civ.P. 34. The court also agrees with the defendants that because Japan is not a signatory to the Hague Convention on Evidence, any analysis of case law on that point is rendered moot (Defendant's Reply in Support of Motion to Compel ["Defendant's Reply"] at 2).

[3] The analysis of document production under the Federal Rules of Civil Procedure is subject to a broad approach, as the "rule is to be liberally, rather than narrowly, construed, and its provisions have the force and effect of a statute" 8 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2202

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

155 F.R.D. 626
155 F.R.D. 626, 145 A.L.R. Fed. 749
(Cite as: 155 F.R.D. 626)

(1970). Great Lakes bases its discovery request on the relationship between Japan Halon and its parent corporations:

Defendants believe-and Japan Halon does not deny-that its "parent companies" namely Onoda Cement Co., Ltd. and Tosoh are in physical possession of documents which are 1) reasonably calculated to lead to the discovery of admissible evidence, and 2) responsive to one or more of the Defendants' requests for discovery.

Defendants' Memorandum in Support at 4. Further, Great Lakes argues that the close nature of the three corporate entities supports the conclusions that the documents are within the "possession, custody and control" *628 meaning of Fed.R.Civ.P. 34(a), even though they are in the possession of nonparties:"A party may be required to produce documents and things that he possesses even though they belong to a third person who is not a party to the action. And if a party has possession, custody or control, he must produce documents and things even though the documents and things are themselves beyond the jurisdiction of the court."

Defendants' Memorandum in Support at 4-5, quoting 8 Charles A. Wright & Arthur R. Miller, 8Federal Practice and Procedure § 2210 (1970).

The defendants also cite Afros S.P.A. v. Krauss-Maffei Corp., 113 F.R.D. 127, 129 (D.Del.1986), which defines control: "The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them." Afros S.P.A. based its analysis on the test applied in In Re Uranium Antitrust Litigation, 480 F.Supp. 1138 (N.D.Ill.1979), in which the court held that:

It is sufficient that Rio U.S. has, or once had, control over its directors, officers and employees who managed the uranium-related activities of Rio U.S. alone or of both corporations. Rio U.S. must produce all responsive documents held by those employees or former employees, even if those documents have found their way into Rio Canada files. The formalities separating the two corporations cannot be used as a screen to disguise the coordinated nature of their uranium enterprise.

In Re Uranium, 480 F.Supp. at 1153.

[4] The same analysis applies to this case. As an alternative to its position that Great Lakes should be forced to pursue international letters rogatory through consular routes with a dim chance of success, Japan Halon advances the argument that the Japanese practice of "secondment" should prevent discovery from its parent companies:

Japan Halon's board of directors includes four full-time directors and four part-time directors. See Haga Decl. § 5. The four full-time directors are charged with primary responsibility for conducting and directing the business activities of Japan Halon. Id. Each of these directors is seconded from Onoda or Tosoh and, during the period of the secondment, performs no duties or responsibilities for Tosoh or Onoda. Id. § § 6-7. The effect of these secondments is that each of Japan Halon's full-time directors is subject to the command and control of Japan Halon, not Tosoh or Onoda. This is because Tosoh and Onoda gave up their right to command and control the seconded employees during the period of the secondment. Bobrow Decl., Exh. C. Thus, Japan Halon's full-time directors do not "overlap" with Tosoh or Onoda because the full-time directors are subject only to the command and control of Japan Halon.

Secondment makes Japan Halon's board of directors structure completely distinguishable from the structure at issue in Afros S.P.A., the case relied on by Great Lakes.

Japan Halon Memorandum at 9. This hypertechnical argument is precisely the type that is considered obstructionist in violation of the letter and the spirit of Fed.R.Civ.P. 34. The defendants have cited, for five pages, deposition testimony that evidences extreme closeness of Japan Halon and its parent corporations (Defendants' Memorandum in Support at 7-12). Despite what its connection is called in Japan, the relationship between the parent corporations and Japan Halon is sufficiently close to justify enforcing a discovery request. In keeping with the test for control in In Re Uranium Antitrust litigation, 480 F.Supp. 1138, 1153, the term "secondment" "cannot be used as a screen to disguise the coordinated nature" of the companies, in an attempt to evade discovery relevant to the lawsuit brought by Japan Halon.

Japan Halon further advances the position that the parent companies do not stand to benefit from this lawsuit, although the two corporations hold all the stock in Japan Halon (Japan Halon Memorandum at 12-14). This court does not agree that because neither parent corporation owns a majority of the shares, neither will benefit. The court is also not convinced that because any award *629 would go to Japan Halon, its parent corporations would not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

benefit directly enough to warrant any production of documents on their behalf.

The tactics of some counsel in this case have the distinct odor of an effort to prolong the discovery disputes so as to undermine the trial date in this case. Such will not be tolerated and the trial date is firm. The Civil Justice Reform Act, 28 U.S.C. § 1471 et seq., and this district's plan thereunder places heavy burdens on the judges of this court to give prompt attention to civil cases.    This court has every intention of doing precisely what the Congress has demanded of the Federal trial judiciary and will tolerate no effort to improperly undermine same.

Counsel in this case must understand that it is the practice of this court to require during the period of discovery all witnesses including expert witnesses who are to be called at trial to be disclosed. Failure to disclose such witnesses so that they may be deposed during the discovery period will generally foreclose those witnesses testifying at trial.    This court also encourages the presentation of expert testimony on video tape deposition, understanding that a written transcript must accompany the same. Those depositions also must be completed during the open discovery period.

In terms of worldwide macroeconomics, it may well be argued that there are many characteristics of the current Japanese economy which are admirable and which should be adopted in this nation.   One may well argue, for example, that the excessive number of lawyers in the United States represent a drain on its economy.   Japan currently has very few lawyers in its society.   However, it is unlikely that the legal system in the United States in this regard is likely to change in any significant way in the immediate future given the social and political values of those who currently hold the levers of power in this nation. Whatever the faults of the legal system of the United States may be, and there are many, foreign corporations who do business in this nation must be bound by our laws and legal system.   It is not the primary responsibility of this court to bring about social and economic change in the nation.   It is the obligation of this court to fairly and evenhandedly enforce the laws of this nation to all concerned including, where appropriate, foreign corporations. This court does not conceive that it here has an obligation to wade deeply into Japanese domestic law and any invitation to do so is now most respectfully declined.   The corporate entities before this court are doing business in this nation and the jurisdictional basis of this court is based on that fact under 28

U.S.C. § 1332.   In fact, a Japanese corporation has invoked that jurisdiction of this court, and therefore is subject to the appropriate laws that apply here.

In looking through the elaborate discovery paper chase present in this record, there is every appearance that this plaintiff who chose to invoke the jurisdiction of the United States courts is engaged in a species of international hide and seek.   Such a game is unwise and can become very expensive under the sanction provisions of both Fed.R.Civ.P. 16 and Fed.R.Civ.P. 37, aside from any reference to Fed.R.Civ.P. 11. Further, the Supreme Court of the United States has now submitted to the Congress a far-reaching amendment to Fed.R.Civ.P. 26 which would greatly expand the scope of discovery.   It also provides for voluntary disclosures by parties and sanctions for failure to comply.   Under the Civil Justice Reform Act, 28 U.S.C. 1471 et seq., and the plans and orders thereunder this court has provided for expansive discovery in civil cases.   The direction of the law is clear and the rule is for expansive discovery and those who oppose same carry heavy burdens and risk heavy sanctions.   The new legal order requires a change in attitudes and practices born in an earlier era.   The opposition to discovery in this case smacks of an earlier now outdated mentality.

The defendants' motion to compel discovery is **GRANTED.   IT IS SO ORDERED.**

N.D.Ind.,1993.
Japan Halon Co., Ltd. v. Great Lakes Chemical Corp.
155 F.R.D. 626, 145 A.L.R. Fed. 749

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Profile



## Profile

(as of the end on June, 2007)

| Company Name | Hosiden Corporation |
|---|---|
| Address | Head Office<br>4-33, Kitakyuhoji 1-Chome, Yao-City, Osaka 581-0071, JAPAN<br>Phone +81-72-993-1010 |
| Business | 1.Manufacturing and selling of electronic, electrical appliances, related parts, and auto parts<br><br>2.Manufacturing and selling information telecommunications equipment, office machines, and medical equipment and related parts<br><br>3.All businesses which accompany former title |
| Established | September 14, 1950 |
| Capital | 13,660,279,000 yen<br>A total of 72,710,000 stocks (as of the end on June, 2007) have been issued. |
| Closing of Accounts | March 31 |
| Trademark | HOSIDEN |
| Board of Directors | President          Kenji Furuhashi<br>Vice-president      Haremi Kitatani<br>Managing director   Yasuhiro Shigeno<br>Managing director   Eiichi Ino<br>Director            Shinji Hombo<br>Full time Auditor   Shigetoshi Kashiwaya<br>Auditor             Akira Nakanishi<br>Auditor             Kenichi Takahashi |
| No. of Employees | 1,000 people (as of the end on June, 2007). |
| Stock Listings | Tokyo and Osaka Securities Exchange (Primary Market) |



Copyright(C)2007 Hosiden Corporation. All Rights Reserved.

Search - 5 Results - 69-053-9184

Source: <u>Public Records</u> > <u>Find a Business</u> > <u>Dun & Bradstreet</u> > <u>§ D&B Duns Market Identifiers Plus (US)</u> ⓘ
Terms: **69-053-9184** (Edit Search | Suggest Terms for My Search)

☞Select for FOCUS™ or Delivery
⌐

*Worldbase, 02/19/2007, HOSIDEN AMERICA CORPORATION*

Copyright 2007 Dun & Bradstreet, Inc
Worldbase
RETURN

Check availability of a D&B Business Information Report (Credit Report)

February 19, 2007

HOSIDEN AMERICA CORPORATION

120 E STATE PKWY
SCHAUMBURG, IL 601735335
USA

**COUNTY:** COOK
**REGION:** NORTH AMERICA

\* \* \* \* \* \* \* \* \* **COMMUNICATIONS** \* \* \* \* \* \* \* \* \* \*
**TELEPHONE:** 8478858870

**COUNTRY CODE:** 0001

\* \* \* \* \* \* \* \* \* **COMPANY IDENTIFIERS** \* \* \* \* \* \* \* \* \* \*
**DUNS:** 08-981-3281

\* \* \* \* \* \* \* \* \* **COMPANY INFORMATION** \* \* \* \* \* \* \* \* \* \*
**FOUNDED:** 1978
**LEGAL STATUS:** Corporation

**EMPLOYEES HERE:** 22 - Actual
**EMPLOYEES TOTAL:** 31 - Actual

\* \* \* \* \* \* \* \* \* **CORPORATE STRUCTURE** \* \* \* \* \* \* \* \* \* \*

**GLOBAL ULTIMATE COMPANY:**
DUNS NUMBER: **69-053-9184**
COMPANY NAME: HOSIDEN CORPORATION
ADDRESS: 1-4-33, KITAKYUHOJIYAOOSAKA581-0071JAPAN

\* \* \* \* \* \* \* \* \* **EXECUTIVES** \* \* \* \* \* \* \* \* \* \*

CEO:
TREASURER:                KENJI FURUHASHI, PRESIDENT
SECRETARY:                KATSUMI KASHIWAI
MANAGING DIRECTOR:        COLIN HARA
                          TOMIO HARAKI

\* \* \* \* \* \* \* \* \* **DESCRIPTION** \* \* \* \* \* \* \* \* \* \*
ELECTRICAL APPARATUS AND EQUIPMENT, NSK

Search - 5 Results - 69-053-9184

\* \* \* \* \* \* \* \* \* \* **MARKET AND INDUSTRY** \* \* \* \* \* \* \* \* \* \*
**PRIMARY SIC:**
5063 - Whol electrical equipment
**SECONDARY SIC:**
5065 - Whol electronic parts/equipment

\* \* \* \* \* \* \* \* \* \* **OTHER FINANCIALS** \* \* \* \* \* \* \* \* \* \*

**FINANCIAL FIGURE DATE (not available)**

| | US DOLLARS | |
|---|---|---|
| ANNUAL SALES | $6,500,000 | 6,500,000 |

**LOAD-DATE:** June 4, 2007

Source: Public Records > Find a Business > Dun & Bradstreet > $ D&B Duns Market Identifiers Plus (US) (i)
Terms: **69-053-9184**  (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Friday, September 7, 2007 - 12:10 PM EDT

**LexisNexis**

About LexisNexis  |  Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.