# **Exhibit F**

-----Original Message-----
From: Jason Metnick [mailto:JMetnick@masudafunai.com]
Sent: Wednesday, October 31, 2007 6:10 PM
To: DiBernardo, Ian G.
Cc: Mann, Jeffrey M.
Subject: RE: Hosiden subpoena


Dear Ian -

Hosiden America retains all of its files for only 7 years.  In addition, Hosiden America
reported that it has not independently retained any contracts between Hosiden Corporation
and Honeywell.  Consequently, Hosiden America does not have the documents that you are
seeking, which are from the years 1988-1992.

Regards,

Jason Metnick

Masuda Funai
203 North LaSalle Street, Suite 2500
Chicago, Illinois 60601-1262
Tel:  312.245.7441
Fax:  312.245.7467
jmetnick@masudafunai.com
www.masudafunai.com


The preceding E-mail message and/or attachment(s) contains information that may be
confidential, may be protected by the attorney/client or other applicable privileges, and
may constitute non-public information.
If you are not an intended recipient of this message, please notify the sender at (312)
245-7500 or by return e-mail and destroy all copies in your possession. Unauthorized use,
dissemination, distribution, or reproduction of this message is strictly prohibited and
may be unlawful.
Thank you.
CIRCULAR 230 DISCLOSURE: In compliance with Circular 230, Masuda, Funai, Eifert &
Mitchell, Ltd. informs you that, if any advice concerning one or more U.S. federal tax
issues is contained in this communication (including any attachments), such advice is not
intended or written to be used, and cannot be used, for the purpose of (I) avoiding
penalties under the internal revenue code or (II) promoting, marketing, or recommending to
another party any transaction or matter addressed herein.

# Exhibit G

----- Original Message -----
From: Jason Metnick <JMetnick@masudafunai.com>
To: DiBernardo, Ian G.
Cc: Mann, Jeffrey M.; Colin Hara <CHara@masudafunai.com>
Sent: Fri Nov 02 18:14:59 2007
Subject: RE: Hosiden subpoena

Dear Ian -

Hosiden America does not control Hosiden Corporation or have access to the files for
Hosiden Corporation.

I reviewed the cases you sent to me, which specifically cite to Federal Rule 34 - which
applies to discovery issued to party opponents.  As you know, subpoenas are issued to
third parties pursuant to the guidelines provided by Rule 45 of the Federal Rules of Civil
Procedure.
Consequently, the standard is not the same as under Rule 34.

Nevertheless, as I have previously mentioned, the requested documents (if they exist) are
not within Hosiden America's control; Hosiden America does not exercise any control over
Hosiden Corporation, and Hosiden America has no connection to the transactions that are
allegedly at issue.  It appears that you are assuming that if Hosiden Corporation has any
degree of control over Hosiden America, then Hosiden America has a similar degree of
control over Hosiden Corporation.  Without a doubt, Hosiden America does not control
Hosiden Corporation.

Moreover, even if a court were to rule that Hosiden America controls a minor aspect of
Hosiden Corporation (which to my knowledge, it does not),the requests for these documents
are unduly broad and overly burdensome in  scope, and the relevance of the requested
documents is not sufficiently justified for Hosiden America to go to Japan to attempt to
retrieve these files from a corporation who it does not control.
Thus, the subpoena subjects Hosiden America to undue burden in many ways.

I note that you could simply serve Hosiden Corporation in Japan with a subpoena, but for
whatever reason have elected not to take that option.
Hosiden America stands by its objections to producing Hosiden Corporation's documents for
the foregoing reasons, as well as the reasons stated in my prior correspondence with you.

Regards,

Jason Metnick


Masuda Funai
203 North LaSalle Street, Suite 2500
Chicago, Illinois 60601-1262
Tel:  312.245.7441
Fax:  312.245.7467
jmetnick@masudafunai.com
www.masudafunai.com

The preceding E-mail message and/or attachment(s) contains information that may be
confidential, may be protected by the attorney/client or other applicable privileges, and
may constitute non-public information.

1

If you are not an intended recipient of this message, please notify the sender at (312) 245-7500 or by return e-mail and destroy all copies in your possession. Unauthorized use, dissemination, distribution, or reproduction of this message is strictly prohibited and may be unlawful.
Thank you.
CIRCULAR 230 DISCLOSURE: In compliance with Circular 230, Masuda, Funai, Eifert & Mitchell, Ltd. informs you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (I) avoiding penalties under the internal revenue code or (II) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

-----Original Message-----
From: DiBernardo, Ian G. [mailto:idibernardo@stroock.com]
Sent: Thursday, November 01, 2007 5:45 PM
To: Jason Metnick
Cc: Mann, Jeffrey M.
Subject: RE: Hosiden subpoena

Jason,
Thank you for your email and for checking Hosiden America files.

However, you have not addressed the issue of whether Hosiden America will obtain documents in Hosiden Corporation's files. We had discussed this issue and, in a prior email, provided you with some relevant case law and a D&B report. Will Hosiden America obtain responsive documents from Hosiden Corporation?

Very truly yours,

Ian G. DiBernardo
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
T: 212-806-5867
F: 212-806-6006
idibernardo@stroock.com
www.stroock.com


-----Original Message-----
From: Jason Metnick [mailto:JMetnick@masudafunai.com]
Sent: Wednesday, October 31, 2007 6:10 PM
To: DiBernardo, Ian G.
Cc: Mann, Jeffrey M.
Subject: RE: Hosiden subpoena


Dear Ian -

Hosiden America retains all of its files for only 7 years.  In addition, Hosiden America reported that it has not independently retained any contracts between Hosiden Corporation and Honeywell.  Consequently, Hosiden America does not have the documents that you are seeking, which are from the years 1988-1992.

Regards,

Jason Metnick

Masuda Funai
203 North LaSalle Street, Suite 2500
Chicago, Illinois 60601-1262
Tel:  312.245.7441
Fax:  312.245.7467
jmetnick@masudafunai.com
www.masudafunai.com

The preceding E-mail message and/or attachment(s) contains information that may be confidential, may be protected by the attorney/client or other applicable privileges, and may constitute non-public information.

If you are not an intended recipient of this message, please notify the sender at (312) 245-7500 or by return e-mail and destroy all copies in your possession. Unauthorized use, dissemination, distribution, or reproduction of this message is strictly prohibited and may be unlawful.

Thank you.

CIRCULAR 230 DISCLOSURE: In compliance with Circular 230, Masuda, Funai, Eifert & Mitchell, Ltd. informs you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (I) avoiding penalties under the internal revenue code or (II) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

==========================================================================
================================================

IRS Circular 230 Disclosure:  To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that any tax advice contained in this communication (including any attachment that does not explicitly state otherwise) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

==========================================================================
================================================

3

# **Exhibit H**

**From:**        DiBernardo, Ian G.
**Sent:**        Monday, October 29, 2007 12:35 PM
**To:**          jmetnick@masudafunai.com
**Cc:**          Mann, Jeffrey M.
**Subject:**     Hosiden subpoena

**Attachments:**    Westlaw_Document_11_54_52_6996.doc; 480_F__Supp__1138.doc; Westlaw_Document_
                    12_59_49_4236.doc; Scan001.PDF; Scan001.PDF

    

Westlaw_Docu    480_F__Supp_    Westlaw_Docu    Scan001.PDF    Scan001.PDF
t_11_54_52_691138.doc (75 Kt_12_59_49_42    (43 KB)        (45 KB)

                                                        Jason,
Further to our discussion Friday, attached are three cases in the 7th circuit in which a
US subsidiary was required to produce documents of its foreign parent.  These cases
support Hosiden America producing documents of Hosiden Corporation.

In short, Hosiden America has adequate control over Hosiden Corporation's documents at
least because Hosiden Corporation owns 100% of Hosiden America and there is an
interlocking management structure in both entities (as shown by the attached D&B report
and information from Hosiden's website showing that Mr. Furuhashi is the CEO/President of
both entities). Hosiden Corporation has sufficient control over Hosiden America.
Furthermore, Hosiden has a connection to the underlying action: in the underlying action,
Honeywell is asserting a patent that arose out of work on a project for which Hosiden was
a subcontractor. Given the relationship between Hosiden America and Hosiden Corporation,
Hosiden America has "control" over the Hosiden Corporation documents.

We also understand from our discussion that you are checking for agreements responsive to
our document requests that are in Hosiden America's possession.  Furthermore, in response
to your refusal to produce other documents (even in light of our willingness to further
limit the scope of our requests), we asked, and understand that you agreed, that you would
inquire as to an index or other log of archived documents with the goal of our identifying
relevant documents.

We look forward to coming to an amicable resolution of this matter this week.

Very truly yours,

Ian G. DiBernardo
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
T: 212-806-5867
F: 212-806-6006
idibernardo@stroock.com
www.stroock.com

1



Not Reported in F.Supp.                                                                                      Page 1
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027
**(Cite as: 1993 WL 580831 (E.D.Wis.))**

**H**

United States District Court, E.D. Wisconsin.
Malcolm D. FLAVEL, individually and on behalf of all other persons similarly situated, Representative Plaintiff, and
Robert F. Cnare, James R. Conradt, Major Coxhill, Robert K. Elbel, Malcolm D. Flavel, Russell H. Graf, Robert L. Isferding, Robert E. Jones, Chalasani C. Rayan, Richard Spoonamore and Ronald J. Weiss, Plaintiffs, and
Equal Employment Opportunity Commission, Plaintiff-Intervenor,
v.
SVEDALA INDUSTRIES, INC., f/k/a Boliden Allis, Inc.; Svedala, Inc.; Allis Mineral Systems; and Mineral Processing Systems, Inc.; Defendants.
**No. 92-C-1095.**

Dec. 13, 1993.
Stephen Snyder, Laurie A Knocke, Winthrop & Weinstine, P.A., St. Paul, MN, for plaintiffs.

Brian C. Tyndall, Lloyd B. Zimmerman, U.S. E.E.O.C., Milwaukee, WI, for plaintiff-intervenor.

David Loeffler, Marty R. Howard, Krukowski & Costello, S.C., Milwaukee, WI, for defendants.

*MEMORANDUM AND ORDER*

WARREN, Senior District Judge.

*1 Before the Court is the plaintiffs' Motion to Compel the Discovery of Documents Within the Physical Possession of Svedala Industry, A.B. and/or Svedala International in the above-captioned matter. For the following reasons, this motion is granted.

I. *FACTUAL AND PROCEDURAL BACKGROUND*
On January 1, 1988, Boliden AB, a Swedish company owned by Trelleborg AB, another Swedish company, assumed ownership of several units of Allis-Chalmers Corp., a U.S. company, including its crushing and screening production facility in Appleton, Wisconsin, and its "pyroprocessing" and grinding mill production facility in Milwaukee, Wisconsin. (Plaintiff's July 2, 1993 Letter Brief at 2-3.) These units, along with related businesses owned or controlled by Boliden AB, were renamed Boliden-Allis, Inc., and were included in the company's newly-formed "Minerals Processing Business Area" in 1989. *Id.* at 3. In January, 1990, Trelleborg AB changed the company's corporate structure, (1) transforming the "Minerals Processing Business Area" into Svedala Industry AB ("SIAB"), a Swedish company; (2) renaming Boliden-Allis' remaining operations "Allis Mineral Systems," which became a wholly-owned business unit of SIAB; (3) forming Svedala Industries ("Svedala"), a U.S. company, as a "special unit" of SIAB, and (4) creating Svedala, Inc. ("SI"), a U.S. company, as a holding company for Svedala Industries. *Id.* at 6. Svedala International ("MINCO") [FN1] , a Swedish company formerly known as MINCO International, is also a subsidiary of SIAB. *Id.* at 1-2.

Malcolm D. Flavel was hired by Allis-Chalmers in 1961 as a factory representative, and was promoted to the level of Consultant-Comminution Systems in 1983. (Complaint ¶ 17.) On October 17, 1990, at the age of 54, Mr. Flavel was terminated from employment at the Appleton plant. *Id.* at ¶¶ 18-19. Robert E. Jones was hired by Allis-Chalmers in 1955 as an Application Specialist, and was promoted to the level of Senior Project Application Engineer in 1979. *Id.* at ¶ 21. On May 31, 1991, at the age of 60, Mr. Jones resigned from employment at the Appleton plant. *Id.* at ¶ 23-24. Mr. Flavel and Mr. Jones both filed timely complaints with the Equal Employment Opportunity Commission ("EEOC"), alleging that Svedala discriminated against them on the basis of age. *Id.* at ¶ 11-12. On September 30, 1992, the EEOC issued a Letter of Violation, finding (1) that Svedala "discriminated against [Mr. Flavel] and a class of protected age group employees on the basis of age with respect to evaluations, terms and conditions of employment, demotion, and termination;" and (2) that Mr. Jones "was subjected

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                  Page 2
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P
43,027
**(Cite as: 1993 WL 580831 (E.D.Wis.))**

to harassment by his manager with considerable frequency, that [Mr. Jones] complained to others about this, and that others complained to the manager about his abusive behavior;   [that] younger co-workers were not harassed with the same degree and frequency, [and that witnesses observed] connections between the manager's behavior towards his employees and the employee's age, [with] preference being extended to younger staff members." *Id.* at ¶ 14, 22.

*2 On October 16, 1992, the plaintiffs brought the above-captioned matter as a representative action, claiming violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.,* and seeking declaratory relief and damages under state common law;   thus far, eleven (11) private plaintiffs have joined this suit. [FN2] After an extension was granted by the Court, the defendants filed an Answer on November 25, 1992, which was amended on December 4, 1992.   On July 13, 1993, this Court issued an Order allowing the EEOC to intervene as a plaintiff in this action.

Regrettably, discovery in this case has been punctuated by numerous disputes, requiring several dispositive rulings by this Court.   In the instant motion, which was originally brought on February 22, 1993, the plaintiffs seek from the defendants the production of documents which are held by foreign entities SIAB and MINCO.   At a June 21, 1993 hearing resolving other discovery disputes, which was memorialized in a July 22, 1993 Order, we directed the parties to submit to the Court letter briefs regarding the instant motion.   The plaintiffs submitted their letter brief on July 2, 1993, with an addendum on September 10, 1993;   the defendants submitted their letter brief on July 9, 1993, with an addendum on July 12, 1993.

## II. *DISCUSSION*
### A. *PARTIES' ARGUMENTS*

The plaintiffs argue that, at all times subsequent to the Allis-Chalmers buyout, Swedish managers at SIAB and its predecessors maintained "direct and primary management authority over [the] U.S. businesses." (Plaintiffs' July 2, 1993 Letter Brief at 3-4.)   They emphasize that these managers "were, and continue to be, actively involved in making decisions directly affecting the operations and personnel in the Appleton and Milwaukee facilities ... [including] directly participating in key hiring and employment decisions for the U.S. operations ...

reviewing the performance of U.S. employees of Svedala ... [and making] decisions concerning the restructuring or reorganization of the Appleton and Milwaukee businesses." *Id.* at 4-5, 7.   The plaintiffs note that "two of the three board members for [Svedala and SI] are Swedish officers of the parent company [SIAB] ... [while] only one member of the board of Svedala and SI is an American," and that MINCO, who employed one of the plaintiffs at the time of his termination, circulated a "blatantly ageist notice of a job opening" at the Appleton facility. *Id.* at 6-7.   The plaintiffs argue that such facts prove that Svedala and SI have the requisite "control" pursuant to Rule 34(a) over the requested documents held by SIAB and MINCO because (1) a "close corporate relationship" exists between the foreign parents and American subsidiaries because they have close managerial connections, interlocking management structures, and the parent company has a significant ownership share of the subsidiary;   or (2) the "consolidated enterprise" or "integrated enterprise" doctrine under Title VII and the ADEA is met because the foreign parents and American subsidiaries share an interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control. *Id.* at 8-12.

*3 The defendants, in turn, claim that, because SIAB and MINCO are not named as defendants in this suit, Svedala and SI "are obliged to produce documents now sitting in Sweden only if all the corporations are *alter egos* under the corporate model enacted into law in Section 4(h)(3)(A) through (D) of the ADEA," which requires that corporations share (1) an interrelation of operations;   (2) common management, (3) centralized control of labor relations;   *and* (4) common ownership or financial control. (Defendants' July 9, 1993 Letter Brief at 3-5.)   While acknowledging that this provision only governs liability under the ADEA, and not discovery, the defendants argue that it creates a " 'substantive right' within the meaning of 28 U.S.C. § 2072(b), which cannot be abridged or modified through the application of any of the discovery rules." *Id.* at 5.   They argue that "the American and Swedish corporations are not *alter egos* however, because [Svedala] and [SI] pursue 'labor relations' or employment policies without any 'centralized' direction or control from [SIAB] or [MINCO] ... the managements of the Swedish and American companies are not 'common' ... and the production and sales operations of the American and Swedish companies are largely independent of one another

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                 Page 3
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P
43,027
**(Cite as: 1993 WL 580831 (E.D.Wis.))**

and not integrated in a continuous flow. *Id.* at 5-6.
Specifically, "at the level of employment relevant to
this litigation--managers below the level of facility
General Manager and professional/technical support
staff--the employment decisions of Svedala are not
central[ly] controlled from Sweden." (Defendants'
July 12, 1993 Addendum to Letter Brief at 2.) Thus,
the defendants claim that the companies "have totally
different senior management ... [and] Svedala runs its
own employment regime independent of any
direction from SIAB, except a broad directive to
conform to U.S. law." (Defendants' July 9, 1993
Letter Brief at 8-10.)

B. *LEGAL STANDARD*

Document production in discovery is governed by
Rule 34(a), which reads as follows:
  "Any party may serve on any other party a request
  (1) to produce and permit the party making the
  request, or someone acting on the requestor's
  behalf, to inspect and copy, any designated
  documents, ... or to inspect and copy, test, or
  sample any tangible things which constitute or
  contain matters within the scope of Rule 26(b) *and
  which are in the possession, custody or control of
  the party upon whom the request is served* ..."
By using the word "or," Rule 34(a) makes a clear
distinction among the meanings of "possession,"
"custody," and "control." In determining whether or
not a party exercises "control," courts ask whether a
party has a legal right to obtain the documents
requested upon demand; actual physical possession
is not required. *Burton Mechanical Contractors,
Inc., v. Foreman,* 148 F.R.D. 230, 236
(N.D.Ind.1992); *Henderson v. Zurn Indus., Inc.,* 131
F.R.D. 560, 567 (S.D.Ind.1990) (citing *Searock v.
Stripling,* 736 F.2d 650, 653 (11th Cir.1984)); *In re
Folding Carton Antitrust Litigation,* 76 F.R.D. 420,
423 (N.D.Ill.1977). The party seeking document
production bears the burden of establishing the
opposing party's control over such documents.
*Burton,* 148 F.R.D. at 236.

***4** The plaintiffs properly note that, in determining
whether a U.S.- domestic corporation must produce
documents in possession of a foreign parent or
affiliate, courts have focused on whether the U.S.
corporation has the requisite degree of control over
the documents sought. *See, e.g., Afros S.P.A. v.
Krauss-Maffei Corp.,* 113 F.R.D. 127, 129
(D.Del.1986); *In re Uranium Antitrust Litigation,*
480 F.Supp. 1138, 1145-53 (N.D.Ill.1979). In
deciding whether a subsidiary has "control" over

documents held by its parent corporation, courts
focus on the closeness of the relationship between the
entities. *See, e.g., Johnson v. Cloos Int'l., Inc.,* 1990
WL 106560, at *1- 2 (N.D.Ill.1990); *Afros,* 113
F.R.D. at 129-31; *Cooper Indus., Inc. v. British
Aerospace, Inc.,* 102 F.R.D. 918, 919
(S.D.N.Y.1984). If the requisite degree of closeness
is found, domestic corporations may be required to
produce documents in the possession of foreign
parents or affiliates, even though the latter are not
subject to the personal jurisdiction of the court.
*Cloos,* 1990 WL 106560, at 1-2; *Afros,* 113 F.R.D.
at 131; *In re Uranium,* 480 F.Supp. at 1145-53.

C. *ANALYSIS*

In their letter brief, the defendants mistakingly
assume that the "*alter ego* " doctrine   [FN3]
embodied in Section 4(h)(3) of the ADEA dictates
resolution of the "control" issue under Rule 34(a).
Section 4(h)(3), however, is a *liability* provision, and
it is clear that a party may exercise the requisite
degree of "control" over documents held by a related
entity under the discovery rules without exhibiting
the degree of interrelationship necessary to project
liability upon such entity pursuant to the ADEA.
The degree of relationship between a domestic
subsidiary and a foreign parent required to subject the
latter to liability under the ADEA is certainly greater
than that needed to subject the latter to document
production through the former. This does not, as the
defendants assert, violate 28 U.S.C. § 2072(b),
[FN4] because the "substantive right" created under
Sections 4(h)(1-3) of the ADEA, the inclusion or
exclusion of liability for SIAB and MINCO, [FN5] is
not implicated simply because such entities may be
required to produce documents through Svedala and
SI pursuant to Rule 34(a). A domestic subsidiary,
then, may be required to produce documents held by
a foreign parent, even though that parent is not
covered by the provisions of the ADEA, so long as
that subsidiary "controls" such documents as defined
under Rule 34(a). [FN6]

The Court is satisfied that the defendants so
"control" the requested documents held by SIAB and,
derivatively, MINCO. As previously noted, in spirit
with the current policy of permissive discovery, a
party is generally considered to have "control" over
documents under Rule 34(a) if it can likely obtain
such documents upon demand. Thus, under the Rule
34(a) control analysis employed in *Afros S.P.A.* and
its progeny, a sufficiently close corporate relationship
exists between a domestic subsidiary and a foreign

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027
**(Cite as: 1993 WL 580831 (E.D.Wis.))**

parent to compel the former to produce documents held by the latter if their degree of interrelation is evidenced by (1) adequate ownership share in the subsidiary by the parent; (2) interlocking management structures; (3) sufficient control exercised by the foreign parent over the subsidiary's directors, officers, and employees; and/or (4) a "connection to the transaction" at issue. Consideration of such factors promotes the policies underlying Rule 34(a) and ensures that a corporation cannot "hide" incriminating documents overseas; and, because none of these factors acts as an exclusive test, each factor need not be satisfied to prove the existence of Rule 34(a) "control."

*5 Nobody disputes that SIAB owns 100% of Svedala through its holding company, SI. Nor can it be seriously disputed that SIAB has traditionally maintained interlocking management structures with SI and Svedala. As noted by the plaintiffs, and as indicated in the defendants' exhibits, Thomas Older, the President, CEO, and Board member of SIAB, and Jan Knutsson, an Executive Vice President of SIAB, are currently acting as two of the three directors of Svedala, and Mr. Knutsson is also the Manager of Allis Mineral Systems. In addition, Mr. Older and Sven Ek, another Executive Vice President of SIAB, are currently acting as two of the three directors of SI. Clearly, this degree of interrelationship between directors of domestic subsidiaries and officers of a foreign parent sufficiently demonstrates the requisite "corporate closeness" required under this branch of the Rule 34(a) control analysis. In light of this, the defendants argument that SIAB lacks "interlocking management" with SI and Svedala simply because they do not share common directors or common officers is clearly disingenuous.

It also appears that SIAB exercised the requisite degree of control over the management of Svedala and SI regarding employment policies and decisions to justify the plaintiffs' document production request. The defendants concede that officers of SIAB "have the final say" on "key management personnel" decisions, including performance reviews, down to the level of General Managers of operating facilities. The plaintiffs, in turn, charge that several of these handpicked managers "had an active role" in at least several of their terminations, and "set the tone" for employment practices throughout Svedala and SI. This Court is satisfied that SIAB exhibited sufficient control over the hiring and review of upper and mid-level managers to bring the requested documents within the control of SI and Svedala pursuant to Rule

34(a). The plaintiffs have demonstrated that the motives behind employment decisions by SI and Svedala may be exhibited in documents held by SIAB, and have shown that, given the corporations' close relationship, such documents are available to the domestic corporations upon request. In addition, as previously noted, it is clear that our decision has no bearing on the *liability* of SIAB or MINCO for any allegedly unlawful acts; [FN7] therefore, the defendants' concerns as to our flaunting conventional notions of unlimited liability through incorporation are unwarranted. As a result, SI and Svedala will be required to produce the documents requested by the plaintiff which are held by SIAB pursuant to Rule 34(a).

Finally, because MINCO falls within the penumbra of the domestic subsidiaries' "close relationship" with SIAB, documents held by it are also discoverable by the plaintiffs. As previously noted, MINCO is a foreign, wholly-owned subsidiary of SIAB; and because, *inter alia,* MINCO's manager, Peter Kohle, is an Executive Vice President of SIAB, it appears that these corporations have interlocking management. In addition, the defendants have not challenged the plaintiff's assertion that MINCO directly employed at least one of the plaintiffs. Finally, based on the letter briefs submitted by the parties, the Court reasonably intimates that SIAB manages the operations of MINCO in the same manner as it does SI and Svedala; thus, SIAB clearly controls documents held by MINCO as defined under Rule 34(a). As a result, such documents, if relevant, are discoverable by the plaintiffs through Rule 34(a) as accessible through SIAB. [FN8]

### III. *SUMMARY*
*6 For the foregoing reasons, the Court hereby ORDERS that the plaintiffs' motion to compel documents in the above-referenced matter be GRANTED.

SO ORDERED.

> FN1. For the sake of clarity, Svedala International will be referred to by its previous name, MINCO.

> FN2. On February 25, 1993, the Court signed a stipulated order that consolidated *Weiss v. Boliden-Allis, Inc.,* Case No. 91-C-493, with the instant case. Normally, pursuant to Local Rule 4.03, "[i]f the motion is granted, the judge to whom the lowest

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                          Page 5
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027
**(Cite as: 1993 WL 580831 (E.D.Wis.))**

numbered case is assigned shall handle all future proceedings covered by the consolidation order. When two or more cases are consolidated, all documents relevant to the purposes for which consolidation was granted will thenceforth be docketed only on the docket sheet for the lowest numbered of the consolidated cases." In this case, however, while the cases were consolidated into the lower-numbered case on the docket sheet, they were consolidated into the higher-numbered case in the court file. Because both cases were originally assigned to this Court, this oversight has not caused any significant administrative difficulties; it did, however, precipitate a filing error which resulted in a significant delay in processing the instant motion. To eliminate any further confusion, the Court hereby requests that, despite Local Rule 4.03, the parties use the higher-case number, 91-C-1095, in the caption of any subsequent filings in this case.

FN3. In their letter brief, the plaintiffs term this the "consolidated enterprise" or "integrated enterprise" liability doctrine under the ADEA.

FN4. 28 U.S.C. § 2072(b) reads as follows: "Such rules [the Federal Rules of Civil Procedure] shall not abridge, enlarge or modify any substantive right."

FN5. Clearly, Section 4(h)(3) of the ADEA does not grant the defendants any substantive right to be free from the rules of discovery.

FN6. The Court expresses no opinion as to whether SIAB or MINCO are sufficiently interrelated with SI and Svedala to implicate the liability provisions of the ADEA.

FN7. *See supra* pages 9-10.

FN8. The Court notes, however, that documents held by MINCO are generally less likely to be relevant to the instant matter than those held by SIAB, a more proximate relative to the plaintiffs than MINCO.

Empl. Prac. Dec. P 43,027

END OF DOCUMENT

Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

Page 1

100260

LEXSEE 480 F. SUPP. 1138

**In re Uranium Antitrust Litigation; Westinghouse Electric Corp. v. Rio Algom Limited, et al.; In re Tennessee Valley Authority Uranium Antitrust Litigation .**

**Nos.  76 C 3830, 78 C 3233, 78 C 3243, 78 C 3280, MDL 342, MDL 342-A**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*480 F. Supp. 1138; 1979 U.S. Dist. LEXIS 8686; 29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124*

**November 7, 1979**

**COUNSEL:** [**1]

Donovan, Leisure, Newton & Irvine, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, Freeman, Rothe, Freeman & Salzman, Chicago, Ill., Westinghouse Electric Corp., Raymond Scannell, Pittsburgh, Pa., for Westinghouse.

Arter & Hadden, Cleveland, Ohio, Jeffrey Neal Cole, Winston & Strawn, Chicago, Ill., Simpson, Thacher & Bartlett, New York City, for Atlas.

Schiff, Hardin & Waite, Chicago, Ill., for Anaconda Co.

Peterson, Ross, Schloerb & Seidel, Chicago, Ill., Mudge, Rose, Guthrie & Alexander, New York City, for Denison Mines, Inc.

Cahill, Gordon & Reindel, New York City, Altheimer & Gray, Chicago, Ill., for Engelhard.

Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, Lord, Bissell & Brook, Chicago, Ill., for Federal Resources Corp.

McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., McDermott, Will & Emery, Chicago, Ill., for Homestake.

Chadwell, Kayser, Ruggles, McGee & Hastings, Chicago, Ill., for Kerr-McGee.

Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for Noranda.

Debevoise, Plimpton, Lyons & Gates, New York City, for Phelps & Western.

Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., Wildman, Harrold, Allen & Dixon, Chicago, Ill., [**2] for Pioneer.

McConnell & Campbell, Chicago, Ill., for Reserve.

O'Melveny & Myers, Los Angeles, Cal., Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for RTZ.

Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., Bigbee, Stephenson, Carpenter & Crout, Santa Fe, N. M., for United.

Mayer, Brown & Platt, Chicago, Ill., for Utah.

Jenner & Block, Chicago, Ill., for Rio.

Arnold & Porter, Washington, D. C., for Urangesellschaft.

Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, Karon, Morrison & Savikas, Chicago, Ill., for Uranerz.

Weil, Gotshal & Manges, New York City, for Uranex.

Keck, Cushman, Mahin & Cate, Chicago, Ill., Howrey & Simon, Washington, D. C., Latham & Watkins, Los Angeles, Cal., Davis, Graham & Stubbs, Denver, Colo., for Gulf.

Burditt & Calkins, Chicago, Ill., Overton, Lyman & Prince, Los Angeles, Cal., for Getty.

Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for British Government.

**OPINION BY:**

MARSHALL

**OPINION:**

[*1142]

MEMORANDUM DECISION n*

* We have delayed this ruling in the hope that the question here decided might be amicably

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

resolved among the parties to these actions and the foreign governments involved (particularly Canada and Australia). See, Letter of Latham & Watkins to the Prime Minister and Minister of Energy, Mines and Resources of Canada, dated September 12, 1979. But our hope has turned to despair. This litigation must proceed.

[**3]
On February 27, 1979, we entered Joint Pretrial Order No. 5 in an effort to narrow and ripen the issues surrounding the parties' discovery demands for documents located in foreign countries. We ordered that, by March 28, 1979, all parties should either comply with outstanding discovery demands for "foreign documents" or file restated objections to the production of such documents, including specific and particularized objections to demands for any such documents whose production was said to be forbidden by foreign law. The term "foreign documents" was defined to include all documents whose disclosure was in any way affected by foreign law.

The responses of the parties were varied. Plaintiffs Westinghouse Electric Corporation (Westinghouse) and the Tennessee Valley Authority (TVA) raised no foreign law objections and stated that they either had no foreign documents or were producing all of them. Of the twenty non-defaulting active defendants in the Westinghouse action, six apparently have no foreign documents not previously produced, since they neither produced documents nor stated objections. n1 Two other defendants, Kerr-McGee Corporation and the Anaconda Company, appear to have [**4] now produced all responsive foreign documents. Two more defendants, Western Nuclear, Inc. and Phelps Dodge Corporation, were seemingly able to comply with all material document demands. They invoked Australian nondisclosure legislation but frankly summarized the contents of the three Australian documents in such a manner as to convince Westinghouse that it does not need the documents. Ten other defendants have raised foreign law objections and have withheld foreign documents. Those defendants are Rio Algom Corporation (Rio U.S.), Engelhard Minerals and Chemicals Corporation (Engelhard), Denison Mines, Ltd. (Denison Canada), Denison Mines, Inc. (Denison U.S.), Gulf Oil Corporation (Gulf), Gulf Minerals Canada Limited (GMCL), Getty Oil Company (Getty), Utah International, Inc. (Utah), Noranda Mines, Ltd. (Noranda), and Federal Resources Corporation (Federal). In the three TVA actions, in which eight of the thirteen named defendants have appeared, seven of the active defendants have invoked foreign nondisclosure laws as a bar to production. n2 Only one of those defendants, Uranerz Canada [*1143] Ltd. (Uranerz), is not a defendant in the Westinghouse action.

n1. The six are Rio Tinto Zinc Corporation of America, Homestake Mining Company, Atlas Corporation, Reserve Oil and Minerals Corporation, United Nuclear Corporation, and Pioneer Nuclear, Inc.

[**5]

n2. The eighth TVA defendant, Urangesellschaft mbH & Co., has raised no foreign law objections.

Westinghouse has moved for production orders pursuant to *Rule 37(a), F.R.Civ.P.*, against the ten non-producing defendants listed above, and TVA has similarly moved against the seven non-producing defendants in its case. The following table connects each defendant with the country whose foreign law is invoked as a bar to production. Defendants who are named in both the Westinghouse and TVA motions are identified by an asterisk (*):

TABLE

Five sets of foreign laws are involved. Three of those are regulations or statutes of Canada, Australia and South Africa which were enacted or modified during the period from 1976 to 1978 for the express purpose of frustrating the jurisdiction of the United States courts over the activities of the alleged international uranium cartel. Those laws generally prohibit the production of any document relating to uranium marketing activities from 1972 through 1975 and also prohibit communications that would result in the disclosure of the contents of such documents. [**6] The fourth statute is the Ontario Business Records Protection Act, which was enacted in Canada in 1947. That Act forbids the production of any business records requested by a foreign tribunal if a provincial court issues an order to that effect. Because no such order has been sought or issued to date, this Act has little or no applicability here. The final statutes are Articles 162 and 273 of the Swiss Penal Code, which prohibit the disclosure of a "business or manufacturing secret." Because a violation can be avoided if a person with a secrecy interest in some matter consents to its disclosure, and because Gulf and GMCL expect to secure all necessary consents within a short span of time, the Swiss statutes also have limited applicability here. All of these statutes impose criminal penalties for their violation, including fines and imprisonment.

In addition to plaintiffs' motions to compel, three of the defendants Getty, Gulf and Utah have filed motions to compel Westinghouse to produce documents located in Australia, Canada and South Africa. Because Westinghouse has raised no foreign law objections to the pro-

Page 3

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

duction of those documents, these defendants' complaint is that Westinghouse's [**7] purportedly complete production of documents is in fact only a partial one. This contention rests mainly on inferences drawn from an affidavit by one of Westinghouse's attorneys, James E. Daniels.

The Daniels affidavit states that Westinghouse documents responsive to defendants' document requests are located in Canada, Australia and South Africa, that the nondisclosure laws of those countries have not deterred Westinghouse's compliance with those requests, and that, based upon his own knowledge and on consultation with others, Daniels is satisfied that copies of all responsive documents in those countries, together with any handwritten and margin notes, are now available for inspection at Westinghouse's Pittsburgh offices. Defendants claim these statements fail to meet the requirements of paragraph 5 of Joint Pretrial Order No. 5, which requires Westinghouse to specify "the procedures it followed in ascertaining that identical copies of such foreign documents, including handwritten notations, marginalia and attachments, have been produced from files maintained in the United States . . ." In addition, they contend that Westinghouse has ignored the additional requirement that a party [**8] must identify the foreign documents that were not produced if copies of those originals were produced from its U.S. files or state the circumstances that prevent such identification. In essence, then, these defendants suspect that Westinghouse's U.S. files are less complete than [*1144] those in foreign countries, want more complete information to determine whether this is so, and then want access to any additional documents which are discovered.

Plaintiffs' and defendants' motions to compel thus rest on wholly different theories. With plaintiffs' motions, the main issue is whether defendants should be ordered to produce withheld documents despite the prohibitions of foreign nondisclosure laws. With defendants' motions, the main issue is whether Westinghouse has withheld foreign documents, and that question turns on the sufficiency of the Daniels affidavit. Assuming such documents have been withheld, Westinghouse seems to have raised no objection to their disclosure. Because plaintiffs' motions raise the more complex issues and occupy the bulk of the voluminous papers which have been submitted to us, we shall discuss them first.

The parties have offered differing views [**9] on the proper standards to be applied in deciding whether to issue a production order for documents located in a country which prohibits their removal or disclosure. Plaintiffs argue that Rule 37 requires a bifurcated two-step procedure for compelling production and imposing sanctions. They contend that the question of whether a discovery

order should issue is solely a matter of American law; foreign nondisclosure laws are only relevant in deciding whether sanctions should be imposed for noncompliance. Defendants argue that we should instead use a balancing test to consider all circumstances, including foreign law, before entering an order compelling discovery. We take a middle course between these opposing positions, finding that a number of factors must be considered before issuing a production order, but that the inquiry is not as comprehensive as defendants suggest.

At the outset, we should identify the type of jurisdiction exercised by a court in issuing an order to produce foreign documents. In the field of foreign relations law, two types of jurisdiction have been defined. Prescriptive jurisdiction refers to the capacity of a state under international law to make a rule [**10] of law. It is exemplified by the enactment of the Federal Rules of Civil Procedure, e.g., Rule 37. Enforcement jurisdiction, on the other hand, refers to the capacity of a state under international law to enforce a rule of law. When a court enters an order compelling production of documents under Rule 37, it exercises its enforcement jurisdiction. Restatement, Second, Foreign Relations Law of the United States, § 6 (1965); Onkelinx, Conflict of International Jurisdiction: Ordering the Production of Documents in Violation of the Law of the Situs, *64 Nw.L.Rev. 487, 495 (1969)*. The jurisdiction of American courts is unquestioned when they order their own nationals to produce documents located within this country. But jurisdiction is less certain when American courts order a defendant to produce documents located abroad, especially when the country in which the documents are situated prohibits their disclosure.

As a general rule, a court has the power to order a person subject to its jurisdiction to perform an act in another state. *Restatement, Second, Conflict of Laws, § 53* (1971). There are two preconditions for the exercise of this power. First, the court must have personal [**11] jurisdiction over the person. Second, the person must have control over the documents. *United States v. First National City Bank, 396 F.2d 897, 900-01 (2d Cir. 1968); In Re Grand Jury Supoenas Duces Tecum Addressed to Canadian International Paper Co., 72 F. Supp. 1013 (S.D.N.Y.1947)*. The location of the documents is irrelevant. *72 F. Supp. at 1020*.

On the issue of control, there are certain corollary principles which apply to multinational corporations. The test for determining whether an American court can order an American parent corporation to produce the documents of its foreign subsidiary was stated in *In Re Investigation of World Arrangements, 13 F.R.D. 280, 285 (D.D.C.1952)*:

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

(I)f a corporation has power, either directly or indirectly, through another corporation [*1145] or series of corporations, to elect a majority of the directors of another corporation, such corporation may be deemed a parent corporation and in control of the corporation whose directors it has the power to elect to office.

Thus, for example, if the parent owns more than 50% Of the foreign subsidiary's stock, it possesses the necessary control. W. Fugate, Foreign Commerce and the Antitrust [**12] Laws, 116 (2d ed. 1973).

The test is less clear in situations where an order is directed to the American subsidiary of a foreign corporation to produce documents from its head office located abroad. One court has held that a subpoena duces tecum was enforceable if it was served on the subsidiary's offices in the United States, even though the corporation's board of directors had passed a resolution prohibiting the removal of the requested records from Canada and even though all the board members were residents of Canada. *In Re Grand Jury Subpoenas Duces Tecum, supra, 72 F. Supp. at 1020.* The court's reasoning as to how the American officers had control over the withheld documents seems to rest on the theory that it was sufficient that the documents were in the possession of the corporation and that a subpoena had been served on some of its officers. See *Onkelinx, Supra,* 64 Nw.L.Rev. at 505-06. More helpful guidance can be drawn from *Societe Internationale v. McGranery, 111 F. Supp. 435, 440-42 (D.D.C.1953),* in which the court held that plaintiff, a Swiss corporation, had control over the papers of its Swiss-based bank, H. Sturzenegger & Cie. n3 The court attached significance [**13] to the fact that Sturzenegger was a director and officer of plaintiff and was "perhaps" a dominant personality in plaintiff's affairs. After an extensive examination of the corporate affiliations of the two partners, the court concluded that "(through) the interlocked web of corporate organization, management and finance there runs the thread of a fundamental identity of individuals in the pattern of control." *111 F. Supp. at 442.* Thus, the issue of control is more a question of fact than of law, and it rests on a determination of whether the defendant has practical and actual managerial control over, or shares such control with, its affiliate, regardless of the formalities of corporate organization.

n3. The court's holding on the control issue was accepted both by the Court of *Appeals, Societe Internationale v. Brownell, 96 U.S.App.D.C. 232, 236, 225 F.2d 532, 536 (D.C.Cir. 1955),* and by the Supreme Court, *Societe Internationale v.*

*Rogers, 357 U.S. 197, 204, 78 S. Ct. 1087, 2 L. Ed. 2d 1255 (1958).*

Once personal [**14] jurisdiction over the person and control over the documents by the person are present, a United States court has power to order production of the documents. The existence of a conflicting foreign law which prohibits the disclosure of the requested documents does not prevent the exercise of this power. This proposition has been accepted by both the American Law Institute (Restatement, Second, Foreign Relations Law of the United States, § 39 n4), and by the Supreme Court, *Societe Internationale v. Rogers, 357 U.S. 197, 78 S. Ct. 1087, 2 L. Ed. 2d 1255 (1958).* However, American courts should not ignore the fact that such a law exists. When two states, both having jurisdiction, prescribe inconsistent conduct, American courts have developed certain rules of self-restraint governing the appropriate exercise of their power. *United States v. First National City Bank, supra, 396 F.2d at 901.* Because Societe Internationale dominates the field and sets forth the pertinent considerations to be weighed when such conflicts arise, we analyze it at length.

n4. Section 39(1) states:

A state having jurisdiction to prescribe or to enforce a rule of law is not precluded from exercising its jurisdiction solely because such exercise requires a person to engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct.

[**15]

The procedural context of the Societe case is intricate. A Swiss company brought a civil suit under the Trading with the Enemy Act to recover assets which the United States Government had seized during World War II as enemy-owned proper [*1146] ty. The American government challenged plaintiff's claim of ownership and also asserted that plaintiff itself was an "enemy" and hence was barred from recovery under the Act. To prove its defenses, the government moved for an order requiring plaintiff to produce documents held by its bank in Switzerland. The district court granted the motion. Plaintiff then sought to avoid production on the ground that disclosure of the bank records would violate Swiss penal laws and subject it to criminal sanctions. The defendant in turn moved to dismiss the complaint because of plaintiff's noncompliance with the production order.

The district court appointed a special master to consider plaintiff's claims. The master found that there was no evidence of collusion between plaintiff and the Swiss

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

government to evade discovery, and that plaintiff had shown good faith in its efforts to secure waivers from the Swiss government and to comply with the [**16] order. The district court accepted these findings, but nevertheless dismissed the complaint with prejudice holding that plaintiff had control over the bank records, that the records "might prove to be a deciding factor in the outcome of this suit" *(111 F. Supp. at 443),* that Swiss law did not provide an adequate excuse for noncompliance, and that the court in these circumstances had the power to dismiss the complaint. Although plaintiff was given a grace period to continue its efforts to secure waivers from the Swiss government, and although it produced more than 190,000 documents over the next three years, plaintiff ultimately failed to achieve full compliance. Consequently, the district court directed a final dismissal of the action. The Court of Appeals affirmed.

On certiorari, the Supreme Court affirmed the issuance of the production order, but reversed the dismissal of the action. It is the first half of the Court's holding that is of primary concern to us here.

In deciding that the production order was justified, the Court first accepted the district court's finding that, apart from the effect of Swiss law, the documents were within plaintiff's control and possession. [**17] It then discussed the question of whether Swiss law barred the conclusion that plaintiff had "control" of the documents within the meaning of the Federal Rules of Civil Procedure governing discovery orders. The Court decided that Swiss laws did not create an insuperable obstacle to issuance of a production order.

The Court identified three salient factors which influenced its decision. First, in enacting the statute which formed the basis for plaintiff's action, Congress had expressed a "deep concern" with reaching property held by corporations whose intricate financial structure disguised their ties to enemy interests. The Court stated that a failure to order the production of documents illuminating plaintiff's financial background would frustrate this Congressional policy. We infer that the Court would accept the obverse proposition that a court should generally order production to effectuate strong Congressional policies. In addition, because the Court gave no hint that the disclosure policies of the American statute should be balanced against the secrecy policies of the Swiss law, it appears that the only pertinent inquiry is the strength of the American interests. Second, [**18] the Court noted that the requested records were "vital" to a determination of the pivotal statutory inquiry, namely whether plaintiff was the captive of enemy interests. The Court thus suggested that the normal discovery standard of whether a document is relevant or is calculated to lead to the discovery of admissible evidence does not apply, and should be replaced by the higher standard of whether the

requested documents are crucial to the resolution of a key issue in the litigation. Third, in apparent reliance on plaintiff's status as a Swiss national invoking the prohibitions of its own country's penal laws, the Court stated that plaintiff was in a favorable position to secure a waiver of those laws from its government or to explore alternative procedures for achieving compliance. The opinion thus suggests that the greater the chances for flexibility in a country's application of its nondisclosure laws, the greater the likelihood that a production order [*1147] should issue. In conclusion, the Court stated that "United States courts should be free to require (persons such as plaintiff) . . . to make all such efforts (at compliance) to the maximum of their ability . . ." [**19] *357 U.S. at 205, 78 S. Ct. at 1092.*

In the next paragraph, however, the Court explicitly confined its ruling to the case before it, thus weakening the precedential value of its three-pronged analytical framework. The propriety of issuing a production order in other cases was said to depend not only on those three factors, but also on the "exigencies of particular litigation" and "the circumstances of a given case." *357 U.S. at 206, 78 S. Ct. at 1092.* These circumstances and exigencies were not defined with any particularity.

Although the Court by this language seemingly endorsed a completely open-ended approach for deciding future cases, the overall tenor of the opinion and several additional comments lead us to conclude that the Court envisioned some limits on its inquiry. First, in summarizing its holding that the district court properly issued the production order, the Court mentioned only two interests which were to be factored into the decisionmaking process: a) the requirements of the procedural rule authorizing production orders, and b) the policies underlying the law which formed the basis for the action. *357 U.S. at 206, 78 S. Ct. at 1087.* The first of those interests encompasses [**20] the questions of defendant's control over the documents and plaintiff's need for them. The other is confined to the importance of the policies behind the American law. Second, the next section of the opinion contains language which reserves certain factors for consideration solely at the sanctions phase of the enforcement process. In that section, the Court explored the source of a federal court's power to dismiss a complaint because of noncompliance with a production order, and decided that it rested solely on *Rule 37, F.R.Civ.P.* The Court then found that a district court's Rule 37 power is invoked when a party "refuses to obey" such an order, and that refusal occurs whenever a party fails to comply with an order, regardless of its reasons for noncompliance. This analysis is followed by this sentence:

> Such reasons, and the willfulness or
> good faith of petitioner, can hardly affect
> the fact of noncompliance and are rele-

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

vant Only to the path which the District Court might follow in dealing with (a party's) failure to comply. *357 U.S. at 208, 78 S. Ct. at 1094.* (Emphasis supplied.)

Although this sentence does not explicitly remove defendant's reasons for noncompliance [**21] from consideration at the order-making stage of the proceedings, it impliedly has that effect, because we are told such reasons are relevant Only to the question of appropriate sanctions.

This conclusion is confirmed by the third section of the Societe opinion, in which the Court examined whether plaintiff's stated reasons for noncompliance were adequate to prevent dismissal of its complaint under Rule 37. The Court first determined that plaintiff "had in good faith made diligent efforts to execute the production order," then found that those efforts fell short of full compliance, and then analyzed the shortfall to see whether it was caused by plaintiff's "inability fostered neither by its own conduct nor by circumstances within its control."

In defining acceptable forms of inability, the Court discussed a number of issues that the parties in the present case have attempted to raise prematurely at the order-making stage. One such issue is whether defendants "deliberately courted legal impediments" in a foreign country to evade discovery, such as by requesting a foreign government to adopt a nondisclosure law and then shipping its records to that jurisdiction. Another is the severity [**22] of the sanctions imposed for violation of the nondisclosure law and the resulting hardship to defendants. In this vein, the Court noted that "fear of criminal prosecution constitutes a weighty excuse for nonproduction . . ." A further issue concerns the scope and applicability of the foreign laws, since a refusal to produce which rests on an overbroad and unjustified interpretation of [*1148] the foreign laws will not be honored here. On this question the Supreme Court stated that "the very fact of compliance by disclosure of banking records will itself constitute the initial violation of Swiss laws."

The wisdom of deferring consideration of these factors until the sanctions phase of the proceedings is clear. In the present case, each defendant seeks to differentiate itself from its co-defendants on the basis of a variety of factors, including the volume of the documents it is withholding, the extent of its culpability in securing passage of the foreign laws, its good faith in seeking to comply with document requests, the amount of hardship it might suffer by disclosure, and the breadth of its interpretation of foreign laws. Each defendant asks for separate treatment and [**23] consideration. A decision to grant or withhold a production order under Rule 37(a) does not provide a means for tailoring relief to the individual circumstances of each defendant. On the other hand, Rule 37(b) is flexible and offers a variety of sanctions, if necessary, which the court may incorporate into such orders "as are just."

The Supreme Court in Societe recognized the validity of this approach. Although it found that the district court was unjustified in dismissing plaintiff's complaint, it remanded the case with instructions that the district court "possesse(d) wide discretion to proceed in whatever manner it deems most effective." That discretion included options to "explore plans looking towards fuller compliance," and even to "draw ( ) inferences unfavorable to (plaintiff) as to particular events." This language indicates that a production order is only the first step in the process of resolving discovery disputes, and that it should not be prematurely burdened by a comprehensive inquiry into all ramifications of the controversy.

To summarize the preceding discussion, we have concluded that we possess the power to enter an order against defendants under Rule 37(a) [**24] compelling them to produce documents located abroad if the particular defendant is within the personal jurisdiction of this court and has control over the requested documents. Societe teaches that the decision whether to exercise that power is a discretionary one which is informed by three main factors: 1) the importance of the policies underlying the United States statute which forms the basis for the plaintiff's claims; 2) the importance of the requested documents in illuminating key elements of the claims; and 3) the degree of flexibility in the foreign nation's application of its nondisclosure laws. Relying on the Court's additional suggestion that each case must depend upon its particular facts, several defendants urge that we consider several other factors that we have not yet discussed. However, in the circumstances of this case, we find that these other factors are of limited or no utility.

Several defendants cite the Restatement, Second, Foreign Relations Law of the United States, § 40(a) or rely on broad notions of "international comity" for the proposition that we should balance the vital national interests of the United States and the foreign countries to determine [**25] which interests predominate. Aside from the fact that the judiciary has little expertise, or perhaps even authority, to evaluate the economic and social policies of a foreign country, such a balancing test is inherently unworkable in this case. The competing interests here display an irreconcilable conflict on precisely the same plane of national policy. Westinghouse seeks to enforce this nation's antitrust laws against an alleged international marketing arrangement among uranium producers, and to that end has sought documents

Page 7

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

located in foreign countries where those producers conduct their business. In specific response to this and other related litigation in the American courts, three foreign governments have enacted nondisclosure legislation which is aimed at nullifying the impact of American antitrust legislation by prohibiting access to those same documents. It is simply impossible to judicially "balance" these totally contradictory and mutually negating actions.

All defendants rely on a line of Second Circuit cases which were decided after Societe and which suggest that a district court [*1149] should not order production if the order would cause a party to violate [**26] a foreign law. *First National City Bank v. Internal Revenue Service, 271 F.2d 616 (2d Cir. 1959); Ings v. Ferguson, 282 F.2d 149 (2d Cir. 1960); Application of Chase Manhattan Bank, 297 F.2d 611 (2d Cir. 1962).* Plaintiffs rely in turn on a Tenth Circuit decision which takes a contrary view. *Arthur Andersen & Co. v. Finesilver, 546 F.2d 338 (10th Cir. 1976).* We believe that the Tenth Circuit decision is more closely in harmony with the principles established in Societe.

Gulf and Uranerz urge that the production orders sought by plaintiffs are barred by the act of state doctrine because they would interfere with the conduct of our foreign relations by the Executive Branch. However, the act of state doctrine is not applicable here. That doctrine bars an American court from questioning the validity of the act of a foreign sovereign when that act is done within the sovereign's territory. *Underhill v. Hernandez, 168 U.S. 250, 252, 18 S. Ct. 83, 42 L. Ed. 456 (1897); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 416, 84 S. Ct. 923, 11 L. Ed. 2d 804 (1964).* Plaintiffs have not challenged the validity of any of the foreign nondisclosure laws which are relied on by defendants. The [**27] issue is not whether those laws are valid, but rather, conceding their validity, whether they excuse defendants from complying with a production order.

Many defendants ask us to consider communications from foreign governments to the U. S. State Department which have protested the issuance of production orders by American courts in similar circumstances. We believe those communications are relevant to the decision whether to issue a production order only insofar as they indicate the degree of accommodation or adjustment which the foreign government may be willing to make in its nondisclosure laws. We reserve any further consideration of these communications to the hearing on sanctions, if that becomes necessary.

Finally we have on this question as we have on another question n5 been benefitted with statements amici curiae from the Governments of Canada, Australia, South Africa and Switzerland. By far the most extensive of these is the Canadian statement which urges that we defer to the critical importance which Canada attaches to its national policies and regulations. But as we have earlier observed a balancing test is inherently unworkable in this case, and were it not we would [**28] be hard pressed not to accede to the strong national policy of this country to enforce vigorously its anti-trust laws.

n5. Here the amici appear in support of the non-defaulting defendants. On the question of the timing of the hearing to prove up damages on the default judgment, which is now before the Court of Appeals, the amici have supported the defaulting defendants.

There are two procedural hurdles we must clear before we reach the merits of the various motions to compel. The issues are ones of waiver and collateral estoppel.

TVA argues that Uranerz and Noranda have waived certain foreign law objections by failing to raise them in a timely manner. As to Uranerz, we previously ruled on January 29, 1979 that Uranerz, because of its delinquency in asserting objections, had waived all objections to production Except those objections based on the Canadian nondisclosure laws. We created this exception after learning that many other defendants had raised foreign law objections, that the issue was unusually [**29] sensitive and important, and that neither side had moved for a resolution of the issue. In those circumstances, we ruled that it would be unfair to deprive Uranerz of the opportunity to raise the foreign law objection.

Noranda's situation is somewhat different. Noranda initially objected to TVA's document requests on the basis of Canadian nondisclosure laws. However, when it later defined its foreign law objections in accordance with Pretrial Order No. 5, Noranda added a new objection based on Australian law. TVA challenges the Australian law objection as untimely, because it was not raised in response to the document requests and because the pretrial order did not expressly [*1150] authorize new objections. We think TVA's interpretation of the pretrial order is too narrow. The order was drafted in response to the delays and difficulties in document production which first surfaced in the Uranerz situation, and was specifically intended to provide the final deadline for particularized foreign law objections to all prior and pending document requests. All objections filed within the time limits of the order are proper.

Rio U.S., Noranda and Uranerz contend that plaintiffs [**30] are collaterally estopped from litigating their present motions because the Tenth Circuit decided the same issues adversely to them in *In Re Westinghouse*

Case 1:07-cv-06458    Document 22-4    Filed 12/04/2007    Page 21 of 40

Page 8

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

*Electric Corporation Uranium Contracts Proceedings, 563 F.2d 992 (10th Cir. 1977).* That case was a by-product of the related Virginia contracts litigation, where Westinghouse was sued for breach of its uranium contracts by thirteen utility companies, including TVA. In an effort to prove its defense that the real cause of its inability to perform was a price-fixing conspiracy among uranium producers, Westinghouse served a subpoena on Rio U.S., a non-party, in Utah. The subpoena directed Rio U.S. to produce certain business records. Rio U.S. raised the Canadian nondisclosure laws as a bar to production and moved to quash the subpoena. The district court denied the motion and entered a production order. After Rio U.S. failed to comply, it was adjudged in contempt and was fined $ 10,000 per day until it complied with the order. The Tenth Circuit reversed, holding that "(a)ll things considered, on the basis of the record before it, the district court in our view abused its discretion in adjudging Rio (U.S.) to be in contempt of court, [**31] and in imposing the severe sanction in connection therewith." *563 F.2d at 996.*

We do not believe that the court's decision constitutes an estoppel to plaintiffs' present motions. TVA never appeared in the Utah proceedings, and therefore never had a full and fair opportunity to litigate the issues. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 329, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971).* Its position as a party plaintiff in the Virginia litigation, in which it was Westinghouse's adversary, gave it no meaningful incentive to intervene in Westinghouse's efforts to secure discovery on Westinghouse's cartel-related defenses. Although Westinghouse did have a full opportunity to litigate the issues, those issues are not the same as those raised here. The only issue on appeal was the propriety of the sanctions imposed for noncompliance, not the validity of the production order. Therefore, that decision offers no conclusive guidance on the issue of whether a production order should issue here. Furthermore, the decision whether to impose sanctions rests on a variety of factors, and those factors have been restructured in this case by Rio U.S.'s [**32] status as a party rather than a witness, by the more crucial relevance of the requested documents to plaintiffs' antitrust claims, and by our opportunity to have a much more complete record on Westinghouse's charges of a collusive attempt to evade discovery and of overall bad faith. n6

n6. Of course, a more complete record is of no consequence for collateral estoppel purposes if Westinghouse could have developed the same facts against Rio U.S. in the earlier litigation. It appears, however, that some additional facts have only recently been made available (e.g. the grand

jury documents) or relate to subsequent events (e.g. later efforts to secure waivers from the foreign governments).

We now examine whether all defendants are within the personal jurisdiction of this court and have control over the requested documents, so that we possess the requisite power to issue an order under Rule 37(a) compelling production of their foreign documents. Only Noranda has raised an objection based on lack of In personam jurisdiction. [**33] Five defendants Engelhard, Noranda, Denison U.S., Rio U.S. and Uranerz deny that they control the requested documents.

Noranda has moved to dismiss both the Westinghouse and the TVA actions for lack of personal jurisdiction. Both motions have been deferred pending discovery. Noranda [*1151] argues that no production order can be entered until we rule upon the motions. We disagree, because even in the absence of such a ruling, we possess jurisdiction to determine our jurisdiction over the parties. In the exercise of that jurisdiction, we may compel discovery to aid our resolution of the personal jurisdiction issues.

Noranda admits that it has interposed foreign law objections to production of several documents which are directly relevant to its contacts with Illinois: 1) the content of a document regarding the seminar of the Atomic Industrial Forum in Oak Brook, Illinois in 1973, and 2) documents concerning contacts with two Illinois utilities. Noranda seeks to nullify the usefulness of these documents by making self-serving and uncorroborated assurances that they do not establish its contacts with this state. Plaintiffs are not required to accept these assurances, and [**34] are entitled to make their own inspection of the documents. *Societe Internationale v. McGranery, supra, 111 F. Supp. at 442.*

Noranda makes the alternative contention that we should limit discovery to those documents relevant to the jurisdictional issues. While we agree with this statement as a general principle, that principle offers little assistance where, as here, the jurisdictional and merits discovery is intertwined. Because the documents withheld pursuant to foreign law are peculiarly likely to impact on both areas, and because any segregation of documents will likely involve the unreviewable discretion of the party segregating and withholding them, we believe an order requiring full production is necessary.

To resolve the issue of whether four defendants control the requested documents, we must delve into the details of their corporate affiliations. Rio U.S. and Denison U.S. are the American subsidiaries of foreign parents, Engelhard is an American parent with foreign sub-

Page 9

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

sidiaries, and Noranda is a foreign parent with foreign and domestic subsidiaries.

Engelhard is a Delaware corporation with its principal place of business in New York City. Although it does not mine [**35] or produce uranium, it has acted as a sales representative for Nuclear Fuels Corporation of South Africa (Nufcor, a defaulting defendant) in promoting its sales of uranium in North America. In carrying out that function, Engelhard has been assisted by three wholly owned subsidiaries located in Australia and South Africa. Derby and Co. (South Africa) Pty., Ltd. is a South African corporation which is a wholly owned subsidiary of Derby and Co., Ltd. (London), which in turn is a wholly owned subsidiary of Engelhard. Derby-South Africa transmitted information between Nufcor's offices in South Africa and Engelhard's offices in the United States. Philipp Brothers (Australia) Pty., Ltd. is an Australian corporation which is a wholly owned subsidiary of Engelhard. Derby and Co. (Australia) Pty., Ltd. is an Australian corporation which is a wholly owned subsidiary of Derby-London. The Australian subsidiaries have aided Engelhard in its unsuccessful attempt to act as a sales representative for a newly-developing Australian mining company, Queensland Mines, which is also a defaulting defendant. Engelhard states that "it is possible that one or more of these subsidiaries may have within [**36] its possession, custody or control documents or information responsive to portions of (plaintiffs') document requests . . ." Engelhard has refused to produce those documents.

It is clear that Engelhard's total ownership of its Australian and South African subsidiaries gives it effective control over those corporations' documents. Engelhard's only argument to the contrary is that the normal inference of control is rebutted here because Engelhard has no legal right to direct the officers and employees of its foreign subsidiaries to violate the nondisclosure laws of their countries. The Supreme Court specifically rejected that argument in Societe, after it weighed the argument in light of the three factors we have identified above. *357 U.S. at 204-06, 78 S. Ct. 1087.* We reach the same conclusion, but postpone our analysis for a consolidated discussion of all defendants' arguments on this issue. See pp. 1154-1156 below.

[*1152] Noranda is a Canadian corporation with its principal place of business in Ontario. Noranda itself does not own uranium or uranium-producing properties and has not sold uranium. However, it owns 43.8% Of the common shares of Kerr-Addison Mines, Ltd., [**37] a Canadian corporation which has a wholly owned subsidiary called Agnew Lake Mines, Ltd., which in turn owns a 90% Interest in a uranium-producing mine in Ontario, Canada. Kerr-Addison's shares are publicly traded on the Toronto Stock Exchange and are owned by more than 11,000 shareholders. While a minority of the directors of Kerr-Addison are also officers of Noranda, Kerr-Addison keeps its own books and records and holds its own corporate meetings separate and apart from any other company. Noranda also has wholly owned subsidiaries that own uranium prospects located in Canada, Australia and the United States. One of these is Noranda Australia, Ltd., which has an interest in undeveloped uranium deposits in Australia. In addition, personnel of Noranda Sales Corporation, Ltd., a wholly owned Canadian subsidiary, have consulted with purchasers or prospective purchasers of uranium at various times in an effort to sell uranium to be produced in the future. These facts, as disclosed by affidavits in support of Noranda's motion to dismiss, reveal that Noranda has control over responsive documents of Noranda Australia and Noranda Sales, but not over those of Kerr-Addison.

The situation [**38] with Rio Algom Corporation (Rio U.S.) is much more complex than either Noranda or Engelhard. Rio U.S. is a Delaware corporation with its principal place of business in Moab, Utah, where it owns and operates a uranium mining and milling facility. Rio U.S. is the wholly owned subsidiary of Atlas Alloys, Inc., an Ohio corporation, which in turn is the wholly owned subsidiary of Rio Algom, Ltd. (Rio Canada), a Canadian corporation which mines and sells uranium produced from its Elliott Lake mine in Canada. Rio U.S. has appeared in this action and defended itself, but Rio Canada has defaulted.

Rio U.S. states that it has withheld no documents in its possession, custody and control, including documents from files located in Canada, on the ground that they are affected by foreign law. However, it has declined to produce certain other documents located in Canada because those documents are in the possession, custody and control of its parent once removed, Rio Canada, and because production of those documents would violate Canadian law. Westinghouse has sought to define an overlap or gray area of documents falling between these two statements. Westinghouse argues that Rio U.S. has unjustifiably [**39] refused to produce responsive documents concerning its uranium mining, marketing and exploration activities, because even though those documents are located in Canada in the files of Rio Canada's directors, officers and employees, those persons at all pertinent times acted in behalf of Rio U.S. and had responsibility for those uranium activities.

In support of this contention, Westinghouse has submitted extensive evidence that Rio U.S. and Rio Canada have operated as a single functional unit in all aspects of their uranium business. These two corporations have shared an interlocking structure of corporate directors, officers, and executive and administrative personnel who have managed the uranium-related activities of both

corporations. The intervening ownership interest of Atlas Alloys is wholly collateral to the managerial unity of the two companies. Numerous officers of Rio U.S. have held dual positions with Rio Canada, enabling them to perform identical uranium-related functions for each corporation. For example, George Albino, in his capacity as principal operating officer of both corporations from 1971 to 1977, exercised direct managerial control over the daily uranium operations [**40] of both companies. Nine of Rio U.S.'s current officers and directors have offices at the corporate headquarters of Rio Canada in Toronto, Ontario. In January, 1976, A. G. Lowell, who is a Rio Canada Vice-President, stated that "Rio Algom Corporation is wholly owned by Rio Algom Ltd., and all marketing matters related to [*1153] uranium and other mineral products are handled from our Toronto office." Other evidence demonstrates that Rio U.S. and Rio Canada have been treated as a single uranium business not only by themselves, but by other members of the uranium industry and by their ultimate parent, Rio Tinto Zinc Corporation, Ltd.

From the available evidence of coordinated uranium-related activities, we conclude that there is a strong likelihood that Rio U.S. is withholding responsive documents in the files of Rio Canada personnel who have had and/or continue to have responsibility for Rio U.S.'s mining and marketing of uranium. To defend this withholding, Rio U.S. relies on cases involving a corporation's liability for a related corporation's actions. However, there is a crucial distinction between ability to compel production of documents and liability for a subsidiary's [**41] acts. The latter may require Rio U.S. to actually control or manage Rio Canada's business, but the former does not. W. Fugate, Foreign Commerce and the Antitrust Laws, supra at 116. It is sufficient that Rio U.S. has, or once had, control over its directors, officers and employees who managed the uranium-related activities of Rio U.S. alone or of both corporations. Rio U.S. must produce all responsive documents held by those employees or former employees, even if those documents have found their way into Rio Canada files. The formalities separating the two corporations cannot be used as a screen to disguise the coordinated nature of their uranium enterprise.

A similar situation may exist with respect to defendant Denison Mines, Inc. (Denison U.S.), but Westinghouse has provided insufficient documentation for us to conclude that Denison U.S. controls withheld documents in the files of its parent defendant Denison Mines, Ltd. (Denison Canada). Denison Canada is a Canadian corporation with its principal place of business in Toronto and engages in the mining, milling and sale of uranium. Denison U.S. is a Delaware corporation with its principal place of business in Denver, Colorado [**42] and is a wholly owned subsidiary of Denison Canada. Denison U.S. is and has been engaged in exploration for uranium and other minerals in the United States. Answer, PP 17, 18. Both corporations have appeared in this action.

Like Rio U.S., Denison U.S. states that it has raised no objections based on foreign law and has produced all documents within its control. Indeed, Denison U.S. allowed plaintiffs to walk through their entire files and select documents without regard to relevancy standards, with the exception of documents covered by the attorney-client privilege or work product immunity. However, Denison U.S. has been silent on the question of whether some of its documents were generated in Canada and have been kept there. Westinghouse suggests that these documents have been and are now held by Denison Canada and that the close managerial connections between the two corporations justify the issuance of an order directing the production of all such documents reflecting management decisions of Denison U.S. But Westinghouse's exhibits on this issue (Nos. 61 and 62) are too scanty to support this inference. Consequently, Westinghouse's motion to compel Denison U.S. to produce [**43] documents from the files of its parent Denison Canada must be denied.

Uranerz raises a control issue of a completely different character. Its documents are located primarily in its corporate offices in Canada and West Germany, and Uranerz raises no control objections as to them. But an undisclosed volume of Uranerz documents is currently located in the offices of the Ministry of Energy, Mines and Resources of the Canadian government in Ottawa. Those documents were transferred in November, 1976, after the Canadian government directed Uranerz and other companies to deposit with the Ministry all documents covered by the Canadian nondisclosure laws which had been enacted in September of that year. When Uranerz's American counsel, Mr. Levitt, later asked the Ministry if he could review the documents, he was advised that no American counsel for any company has been permitted [*1154] to inspect any documents in the Ottawa depository. Levitt was informed that his request would not even be considered unless he could furnish a written opinion that he could not be compelled by any American court to disclose what he had seen. In his view, American law did not provide such an airtight [**44] safeguard against disclosure that he could give such assurances. Therefore Mr. Levitt abandoned his efforts to seek access to these documents. Because these documents are in the actual possession of government officials, and because those officials have demonstrated that access is strictly limited and is to be granted on a discretionary basis, we agree with Uranerz that it has no control over those documents. Compare *Societe Internationale, supra*, 357 U.S. at 204, 78 S. Ct. 1087.

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

We have now determined that, with certain exceptions regarding Denison U.S. and Uranerz, we have the power to issue a production order under Rule 37(a) against the eleven resisting defendants that are the subjects of plaintiffs' motions. The remaining question is whether we should exercise our discretionary power to issue those orders, after weighing the three factors described earlier in this memorandum. We conclude that we should.

The first consideration is the strength of the Congressional policies underlying the statute which forms the basis for plaintiffs' action. Plaintiffs' complaint challenges activities by the defendants which, if true, would constitute massive violations of this nation's antitrust [**45] laws. "These laws have long been considered cornerstones of this nation's economic policies, have been vigorously enforced and the subject of frequent interpretation by our Supreme Court." *United States v. First National City Bank, 396 F.2d 897, 903 (2d Cir. 1968).* "They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Associates, Inc., 405 U.S. 596, 610, 92 S. Ct. 1126, 1135, 31 L. Ed. 2d 515 (1972).* More specifically, Congressional concern with the very practices at issue here, and with the antitrust implications of those practices, is evidenced by extensive subcommittee investigations into the alleged international uranium cartel. See Hearings Before the Subcommittee on Oversight and Investigation of the House Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess. (1977). Governmental concern with this issue achieved choate form when the Justice Department convened a grand jury which eventually charged Gulf with criminal antitrust violations arising out of the same transactions identified by Westinghouse. United States v. [**46] Gulf Oil Corp., Cr. No. 78-123 (W.D.Pa.1978). The existence of this public enforcement action does not supplant plaintiffs' private civil action. Indeed, Congress specifically intended to encourage civil antitrust actions by allowing private litigants to gain certain estoppel advantages from government antitrust actions. *Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 85 S. Ct. 1473, 14 L. Ed. 2d 405 (1965).* From these indicators, it is clear that the policies supporting an inquiry into corporate activities and structure are at least as weighty, and probably stronger, with the antitrust statutes here than they were with the Trading with the Enemy Act in Societe Internationale. See W. Fugate, Supra at 122.

The second consideration is whether the requested documents are crucial to the determination of a key issue in the litigation. Plaintiffs' showing on this factor is simply overwhelming. All of the discovery requests now at issue are directly relevant to a number of fundamental issues in the complaint, answers, affirmative defenses and counterclaims in this litigation. Plaintiffs seek vital information relating to, among other things, the time period [**47] when the alleged conspiracy of uranium producers was carrying out its activities, defendants' alleged efforts to conceal their conspiracy, the impact of that alleged conspiracy on United States interstate and foreign commerce, the defendants' defenses of sovereign compulsion, and information on uranium sales and market conditions. Plaintiffs have submitted voluminous exhibits [*1155] which give a sketchy picture strongly supporting their allegations in these areas but also suggesting that there are larger gaps in defendants' document production.

The strength of plaintiffs' need for these documents is perhaps best demonstrated by these facts. First, Gulf has admitted the "establishment of an international uranium cartel under which price controls and market allocations were established" for at least some sales of uranium. (Gulf Brief, p. 18). Second, the information which plaintiffs seek is of such exceptional significance that three foreign governments have sought to authorize defendants to withhold that information for the express purpose of frustrating United States judicial inquiries into the activities of this cartel. Third, ten defendants have withheld documents under [**48] their control which are said to be within the scope of the secrecy legislation. The inevitable inference is that the withheld information is likely to be the heart and soul of plaintiffs' case.

Several defendants counter that the unproduced documents are merely cumulative of presently available discovery (Gulf, pp. 56-57) or that their own examination of the documents has convinced them that they have little significance to the case (Federal, pp. 14-15). These arguments were persuasively rejected by the district court in the Societe Internationale litigation:

> Under the rules of United States Courts a party is not required to accept the assurance of opposing counsel as to what has been made available. He is entitled to draw his own conclusions on examination of the papers. *111 F. Supp. at 442.*

Other defendants argue that they are equally prejudiced by the nondisclosure laws, since they may be prevented from using exculpatory documents which are covered by those laws. (See, e.g. Noranda, pp. 24-25). However, the solution to this "problem" lies in the fullest possible disclosure, not in a mutual limitation on relevant information.

480 F. Supp. 1138, *; 1979 U.S. Dist. LEXIS 8686, **;
29 Fed. R. Serv. 2d (Callaghan) 414; 1980-1 Trade Cas. (CCH) P63,124

Finally, we recognize that, as one [**49] commentator has put it, "the heart of any American antitrust case is the discovery of business documents. Without them, there is virtually no case." Note, Discovery of Documents Located Abroad in U.S. Antitrust Litigation: Recent Developments in the Law Concerning the Foreign Illegality Excuse for Non-Production, *14 Va.J.Int'l. L. 747 (1974).* That is especially true when plaintiffs allege an antitrust conspiracy which has taken deliberate and elaborate steps to cloak its activities. "If true, the nature of the activities must be ferreted out of dark and obscure corners." *Societe Internationale, supra, 111 F. Supp. at 443.* The documents at issue here are crucial to plaintiffs' proof.

The third consideration involves an appraisal of the chances for flexibility in a country's application of its nondisclosure laws. The degree of leniency in the application of the nondisclosure laws varies from country to country. South Africa has taken the most flexible position. It has allowed Westinghouse to inspect Utah's uranium-related documents in that country, and is currently considering a request from Engelhard to allow a similar inspection of its documents. Australia has rejected all past [**50] requests for a waiver of its regulations, but interprets its laws as authorizing the Attorney General to grant such waivers. The Attorney General is presently considering requests for waivers from Engelhard, Getty and Utah. Canada has taken a completely inflexible position. It has consistently rejected all requests for waivers, stating that its government officials have no authority to grant them. It has opposed Westinghouse's unsuccessful efforts to secure letters rogatory from a Canadian court for production of uranium-related documents. It has rejected all requests to modify or amend the regulations and has refused to give any assurances of nonprosecution for any violations. Canada has also sent numerous diplomatic notes to the U.S. State Department in which it has expressed a firm position that any disclosure of documents covered by its regulations would be inimical to its national interests. Canada's position has not been relaxed by its amicus submission.

[*1156] On balance, we have concluded the issuance of Rule 37(a) orders is required. The entry of such orders may lead to a further narrowing of the defendants' foreign law objections. That process has already [**51] been evidenced by the increased disclosures which have occurred since Westinghouse filed the present motions. Even if some defendants subsequently conclude, as they now suggest, that they have already done everything within their powers to comply with such an order, we do not think an order at this time would be a futile gesture. The order will serve to declare Westinghouse's right to the discovery it seeks, thereby framing the competing interests of the United States and the foreign governments on a plane where the potential moderation of the exercise of their conflicting enforcement jurisdictions can be meaningfully considered. We do not seek to force any defendant to violate foreign law. But we do seek to make each defendant feel the full measure of each sovereign's conflicting commands, so that, in the words of Chief Judge Kaufman of the Second Circuit, it now

> "must confront . . . the need to "surrender to one sovereign or the other the privileges received therefrom' or, alternatively a willingness to accept the consequences."

*United States v. First National City Bank, 396 F.2d 897, 905 (2d Cir. 1968).*

Accordingly, plaintiffs' motions to compel Utah, Gulf, GMCL, [**52] Noranda, Denison Canada, Engelhard, Getty, Federal, and Rio U.S. to produce foreign documents are granted in their entirety and are granted in part and denied in part as to Uranerz and are denied as to Denison U.S. Defendants' alternative objections to production of foreign documents on grounds such as attorney-client privilege and overbroad definitions are reserved for ruling at such time as defendants announce their ability to comply with this order. Production hereunder to be made on or before January 2, 1980.

The motions of defendants Getty, Gulf and Utah to compel Westinghouse to comply with Pretrial Order No. 5 are granted in part and Westinghouse is directed to provide defendants with a list identifying the foreign documents which it has produced from its domestic files.



155 F.R.D. 626
155 F.R.D. 626, 145 A.L.R. Fed. 749
**(Cite as: 155 F.R.D. 626)**

Page 1

**H**
Japan Halon Co., Ltd. v. Great Lakes Chemical Corp.
N.D.Ind.,1993.

United States District Court,N.D. Indiana,Hammond
Division.
JAPAN HALON CO., LTD., Plaintiff,
v.
GREAT LAKES CHEMICAL CORPORATION and
Yuichi Iikubo, Defendants.
**No. 4:90cv37AS.**

May 28, 1993.

Defendants in action by Japanese company for
misappropriation of trade secrets filed motion to
compel discovery of unprivileged documents from
plaintiff's parent companies.    The District Court,
Allen Sharp, Chief Judge, held that relationship
between parent corporations and plaintiff was
sufficiently close to justify enforcing discovery
request.

Motion granted.
West Headnotes

**[1] Federal Civil Procedure 170A**  1574

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(E) Discovery and Production of
Documents and Other Tangible Things
         170AX(E)2 Subject Matter in General
            170Ak1574 k. Existence, Possession,
Custody, Control and Location. Most Cited Cases
Plaintiff in action for misappropriation of trade
secrets had sufficiently close relationship with its
parent corporations to justify enforcing discovery
request as to documents in possession of parent
companies.    Fed.Rules Civ.Proc.Rule 34, 28
U.S.C.A.

**[2] Federal Civil Procedure 170A**  1312

170A Federal Civil Procedure

      170AX Depositions and Discovery
         170AX(C) Depositions of Parties and Others
Pending Action
            170AX(C)1 In General
               170Ak1312 k. Letters Rogatory from
Without the United States. Most Cited Cases
Defendants in action for misappropriation of trade
secrets brought by Japanese company would not be
required to pursue request for discovery of
documents in possession of plaintiff's parent
companies through letters rogatory procedures
prescribed by Japan's Reciprocal Judicial Assistance
Act through consular channels.    Fed.Rules
Civ.Proc.Rule 34, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A**  1551

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(E) Discovery and Production of
Documents and Other Tangible Things
         170AX(E)1 In General
            170Ak1551 k. In General. Most Cited
Cases
Analysis of document production under Federal
Rules of Civil Procedure is subject to broad
approach, as rule is to be liberally, rather than
narrowly, construed. Fed.Rules Civ.Proc.Rule 34, 28
U.S.C.A.

**[4] Federal Civil Procedure 170A**  1551

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(E) Discovery and Production of
Documents and Other Tangible Things
         170AX(E)1 In General
            170Ak1551 k. In General. Most Cited
Cases
Japanese company which brought action for
misappropriation of trade secrets would not be
permitted to use Japanese practice of "secondment"
to prevent discovery of documents in possession of
its parent companies.   Fed.Rules Civ.Proc.Rule 34,
28 U.S.C.A.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

155 F.R.D. 626                                                                                                    Page 2
155 F.R.D. 626, 145 A.L.R. Fed. 749
**(Cite as: 155 F.R.D. 626)**

**\*626** John R. VanWinkle, Bingham Summers Welsh and Spilman, Indianapolis, IN, Matthew D. Powers, Jared Bobrow, Weil Gotshal and Manges, Menlo Park, CA, for Japan Halon Co., Ltd.
John C. Duffey, James V. McGlone, Stuart and Branigin, Lafayette, IN, for Great Lakes Chemical Corp.

### MEMORANDUM AND ORDER
ALLEN SHARP, Chief Judge.
Japan Halon filed its complaint for misappropriation of trade secrets against Great Lakes in the Central District of California on February 22, 1990. Following a transfer of venue to the Northern District of Indiana, Great Lakes filed its answer and counterclaim.    Japan Halon has amended its complaint to include Yuichi Iikubo as a defendant. Great Lakes has filed a motion to compel discovery of unprivileged documents from Onoda Cement and Tosoh, Japan Halon's parent companies.

### Analysis

[1] The issue before the court is whether Japan Halon has "possession, custody or control" over the documents in question.    Fed.R.Civ.P. 34 delineates the scope of production of documents between parties.FN1    In this **\*627** case, the defendants have requested that documents be produced, or at least their existence or nonexistence be confirmed, by nonparties, Onoda Cement and Tosoh.    Rule 34 only applies to discovery between parties, but it "does not prevent discovery of the kind permitted by the rule against one who is not a party" (Charles A. Wright & Arthur R. Miller, 8 Federal Practice and Procedure § 2208 (1970).    Great Lakes bases its argument for production on Japan Halon's alleged custody or control over documents in the possession of its parent companies, which would give the plaintiff the legal right to copies of documents.    Japan Halon, however, has declared that it does not have the requisite control over the documents because "Japanese law makes clear that Japan Halon has no right to broadly demand internal documents from Onoda and Tosoh" (Memorandum of Japan Halon in Opposition to Great Lakes' Motion ["Japan Halon Memorandum"] at 2). Thus, Japan Halon has argued that international interpretation of its corporate structure and the Japanese discovery law result in the conclusion that its does not have the requisite control over documents in possession of its parent companies.    In response to Japan Halon's declaration that Japanese law does not

permit compliance with Great Lakes' discovery request, the defendants have argued that "[h]aving chosen to bring its lawsuit in the U.S. federal courts, Japan Halon is required to conduct discovery within the letter and the spirit of the Federal Rules of Civil Procedure" (Defendant's Memorandum in Support of Motion to Compel Discovery ["Defendants' Memorandum"] at 3).

> FN1. (a) Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents ... which are in the possession, custody or control of the party upon whom the request is served ...Fed.R.Civ.P. 34(a).

[2] Conversely, Japan Halon has argued that the Federal Rules of Civil Procedure cannot be applied in this case until Great Lakes has pursued its discovery request through the "traditional letters rogatory procedures prescribed by Japan's Reciprocal Judicial Assistance Act" through consular channels (Japan Halon's Memorandum at 3).    The defendants claim that this course of action would be futile, and that Rule 34 is applicable:
"It is generally understood that a Japanese court, acting as a commissioned or assigned judge as defined by the Code of Civil Procedure, *cannot issue an order to produce documents or other tangible* evidence in executing *letters rogatory* from a foreign court.    Thus, the only assistance generally given by Japanese courts is the taking of testimony of witnesses, expert witnesses and the parties."

Defendants' Memorandum at 18, quoting 7 Kitagawa, *Doing Business is Japan* §    5.05[5][d] (M.B.1992 ed.) (emphasis added).    This court finds that the defendants are not required to take the path of letters rogatory prior to filing their motion to compel discovery pursuant to Fed.R.Civ.P. 34.    The court also agrees with the defendants that because Japan is not a signatory to the Hague Convention on Evidence, any analysis of case law on that point is rendered moot (Defendant's Reply in Support of Motion to Compel ["Defendant's Reply"] at 2).

[3] The analysis of document production under the Federal Rules of Civil Procedure is subject to a broad approach, as the "rule is to be liberally, rather than narrowly, construed, and its provisions have the force and effect of a statute"8 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2202

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1970). Great Lakes bases its discovery request on the relationship between Japan Halon and its parent corporations:

Defendants believe-and Japan Halon does not deny-that its "parent companies" namely Onoda Cement Co., Ltd. and Tosoh are in physical possession of documents which are 1) reasonably calculated to lead to the discovery of admissible evidence, and 2) responsive to one or more of the Defendants' requests for discovery.

Defendants' Memorandum in Support at 4. Further, Great Lakes argues that the close nature of the three corporate entities supports the conclusions that the documents are within the "possession, custody and control" *628 meaning of Fed.R.Civ.P. 34(a), even though they are in the possession of nonparties:"A party may be required to produce documents and things that he possesses even though they belong to a third person who is not a party to the action. And if a party has possession, custody or control, he must produce documents and things even though the documents and things are themselves beyond the jurisdiction of the court."

Defendants' Memorandum in Support at 4-5, quoting 8 Charles A. Wright & Arthur R. Miller, 8Federal Practice and Procedure § 2210 (1970).

The defendants also cite Afros S.P.A. v. Krauss-Maffei Corp., 113 F.R.D. 127, 129 (D.Del.1986), which defines control: "The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them." Afros S.P.A. based its analysis on the test applied in In Re Uranium Antitrust Litigation, 480 F.Supp. 1138 (N.D.Ill.1979), in which the court held that:

It is sufficient that Rio U.S. has, or once had, control over its directors, officers and employees who managed the uranium-related activities of Rio U.S. alone or of both corporations. Rio U.S. must produce all responsive documents held by those employees or former employees, even if those documents have found their way into Rio Canada files. The formalities separating the two corporations cannot be used as a screen to disguise the coordinated nature of their uranium enterprise.

In Re Uranium, 480 F.Supp. at 1153.

[4] The same analysis applies to this case. As an alternative to its position that Great Lakes should be forced to pursue international letters rogatory through consular routes with a dim chance of success, Japan Halon advances the argument that the Japanese practice of "secondment" should prevent discovery from its parent companies:

Japan Halon's board of directors includes four full-time directors and four part-time directors. See Haga Decl. § 5. The four full-time directors are charged with primary responsibility for conducting and directing the business activities of Japan Halon. Id. Each of these directors is seconded from Onoda or Tosoh and, during the period of the secondment, performs no duties or responsibilities for Tosoh or Onoda. Id. § § 6-7. The effect of these secondments is that each of Japan Halon's full-time directors is subject to the command and control of Japan Halon, not Tosoh or Onoda. This is because Tosoh and Onoda gave up their right to command and control the seconded employees during the period of the secondment. Bobrow Decl., Exh. C. Thus, Japan Halon's full-time directors do not "overlap" with Tosoh or Onoda because the full-time directors are subject only to the command and control of Japan Halon.

Secondment makes Japan Halon's board of directors structure completely distinguishable from the structure at issue in Afros S.P.A., the case relied on by Great Lakes.

Japan Halon Memorandum at 9. This hypertechnical argument is precisely the type that is considered obstructionist in violation of the letter and of the spirit of Fed.R.Civ.P. 34. The defendants have cited, for five pages, deposition testimony that evidences extreme closeness of Japan Halon and its parent corporations (Defendants' Memorandum in Support at 7-12). Despite what its connection is called in Japan, the relationship between the parent corporations and Japan Halon is sufficiently close to justify enforcing a discovery request. In keeping with the test for control in In Re Uranium Antitrust litigation, 480 F.Supp. 1138, 1153, the term "secondment" "cannot be used as a screen to disguise the coordinated nature" of the companies, in an attempt to evade discovery relevant to the lawsuit brought by Japan Halon.

Japan Halon further advances the position that the parent companies do not stand to benefit from this lawsuit, although the two corporations hold all the stock in Japan Halon (Japan Halon Memorandum at 12-14). This court does not agree that because neither parent corporation owns a majority of the shares, neither will benefit. The court is also not convinced that because any award *629 would go to Japan Halon, its parent corporations would not

155 F.R.D. 626
155 F.R.D. 626, 145 A.L.R. Fed. 749
**(Cite as: 155 F.R.D. 626)**

Page 4

benefit directly enough to warrant any production of documents on their behalf.

The tactics of some counsel in this case have the distinct odor of an effort to prolong the discovery disputes so as to undermine the trial date in this case. Such will not be tolerated and the trial date is firm. The Civil Justice Reform Act, 28 U.S.C. § 1471 et seq., and this district's plan thereunder places heavy burdens on the judges of this court to give prompt attention to civil cases. This court has every intention of doing precisely what the Congress has demanded of the Federal trial judiciary and will tolerate no effort to improperly undermine same.

Counsel in this case must understand that it is the practice of this court to require during the period of discovery all witnesses including expert witnesses who are to be called at trial to be disclosed. Failure to disclose such witnesses so that they may be deposed during the discovery period will generally foreclose those witnesses testifying at trial. This court also encourages the presentation of expert testimony on video tape deposition, understanding that a written transcript must accompany the same. Those depositions also must be completed during the open discovery period.

In terms of worldwide macroeconomics, it may well be argued that there are many characteristics of the current Japanese economy which are admirable and which should be adopted in this nation. One may well argue, for example, that the excessive number of lawyers in the United States represent a drain on its economy. Japan currently has very few lawyers in its society. However, it is unlikely that the legal system in the United States in this regard is likely to change in any significant way in the immediate future given the social and political values of those who currently hold the levers of power in this nation. Whatever the faults of the legal system of the United States may be, and there are many, foreign corporations who do business in this nation must be bound by our laws and legal system. It is not the primary responsibility of this court to bring about social and economic change in the nation. It is the obligation of this court to fairly and evenhandedly enforce the laws of this nation to all concerned including, where appropriate, foreign corporations. This court does not conceive that it here has an obligation to wade deeply into Japanese domestic law and any invitation to do so is now most respectfully declined. The corporate entities before this court are doing business in this nation and the jurisdictional basis of this court is based on that fact under 28

U.S.C. § 1332. In fact, a Japanese corporation has invoked that jurisdiction of this court, and therefore is subject to the appropriate laws that apply here.

In looking through the elaborate discovery paper chase present in this record, there is every appearance that this plaintiff who chose to invoke the jurisdiction of the United States courts is engaged in a species of international hide and seek. Such a game is unwise and can become very expensive under the sanction provisions of both Fed.R.Civ.P. 16 and Fed.R.Civ.P. 37, aside from any reference to Fed.R.Civ.P. 11. Further, the Supreme Court of the United States has now submitted to the Congress a far-reaching amendment to Fed.R.Civ.P. 26 which would greatly expand the scope of discovery. It also provides for voluntary disclosures by parties and sanctions for failure to comply. Under the Civil Justice Reform Act, 28 U.S.C. 1471 et seq., and the plans and orders thereunder this court has provided for expansive discovery in civil cases. The direction of the law is clear and the rule is for expansive discovery and those who oppose same carry heavy burdens and risk heavy sanctions. The new legal order requires a change in attitudes and practices born in an earlier era. The opposition to discovery in this case smacks of an earlier now outdated mentality.

The defendants' motion to compel discovery is **GRANTED. IT IS SO ORDERED.**

N.D.Ind.,1993.
Japan Halon Co., Ltd. v. Great Lakes Chemical Corp.
155 F.R.D. 626, 145 A.L.R. Fed. 749

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Profile

Page 1 of 1



# Profile

(as of the end on June, 2007)

| Company Name | Hosiden Corporation |
|---|---|
| Address | Head Office<br>4-33, Kitakyuhoji 1-Chome, Yao-City, Osaka 581-0071, JAPAN<br>Phone +81-72-993-1010 |
| Business | 1.Manufacturing and selling of electronic, electrical appliances, related parts, and auto parts<br><br>2.Manufacturing and selling information telecommunications equipment, office machines, and medical equipment and related parts<br><br>3.All businesses which accompany former title |
| Established | September 14, 1950 |
| Capital | 13,660,279,000 yen<br>A total of 72,710,000 stocks (as of the end on June, 2007) have been issued. |
| Closing of Accounts | March 31 |
| Trademark | HOSIDEN |
| Board of Directors | President          Kenji Furuhashi<br>Vice-president     Haremi Kitatani<br>Managing director  Yasuhiro Shigeno<br>Managing director  Eiichi Ino<br>Director           Shinji Hombo<br>Full time Auditor  Shigetoshi Kashiwaya<br>Auditor            Akira Nakanishi<br>Auditor            Kenichi Takahashi |
| No. of Employees | 1,000 people (as of the end on June, 2007). |
| Stock Listings | Tokyo and Osaka Securities Exchange (Primary Market) |



Copyright(C)2007 Hosiden Corporation. All Rights Reserved.

Search - 5 Results - 69-053-9184          Page 1 of 2

Source: Public Records > Find a Business > Dun & Bradstreet > § D&B Duns Market Identifiers Plus (US) ⓘ
Terms: **69-053-9184**  (Edit Search | Suggest Terms for My Search)

↰Select for FOCUS™ or Delivery
☐

*Worldbase, 02/19/2007, HOSIDEN AMERICA CORPORATION*

Copyright 2007 Dun & Bradstreet, Inc
Worldbase
RETURN

Check availability of a D&B Business Information Report (Credit Report)

February 19, 2007

HOSIDEN AMERICA CORPORATION

120 E STATE PKWY
SCHAUMBURG, IL 601735335
USA

**COUNTY:** COOK
**REGION:** NORTH AMERICA

* * * * * * * * * **COMMUNICATIONS** * * * * * * * * *
**TELEPHONE:** 8478858870

**COUNTRY CODE:** 0001

* * * * * * * * * **COMPANY IDENTIFIERS** * * * * * * * * *
**DUNS:** 08-981-3281

* * * * * * * * * **COMPANY INFORMATION** * * * * * * * * *
**FOUNDED:** 1978
**LEGAL STATUS:** Corporation

**EMPLOYEES HERE:** 22 - Actual
**EMPLOYEES TOTAL:** 31 - Actual

* * * * * * * * * **CORPORATE STRUCTURE** * * * * * * * * *

**GLOBAL ULTIMATE COMPANY:**
DUNS NUMBER: **69-053-9184**
COMPANY NAME: HOSIDEN CORPORATION
ADDRESS: 1-4-33, KITAKYUHOJIYAOOSAKA581-0071JAPAN

* * * * * * * * * **EXECUTIVES** * * * * * * * * *

CEO:                     KENJI FURUHASHI, PRESIDENT
TREASURER:        KATSUMI KASHIWAI
SECRETARY:        COLIN HARA
MANAGING DIRECTOR:    TOMIO HARAKI

* * * * * * * * * **DESCRIPTION** * * * * * * * * *
ELECTRICAL APPARATUS AND EQUIPMENT, NSK

Search - 5 Results - 69-053-9184

**\* \* \* \* \* \* \* \* \* MARKET AND INDUSTRY \* \* \* \* \* \* \* \* \* \***
**PRIMARY SIC:**
5063 - Whol electrical equipment
**SECONDARY SIC:**
5065 - Whol electronic parts/equipment


**\* \* \* \* \* \* \* \* \* OTHER FINANCIALS \* \* \* \* \* \* \* \* \* \***


**FINANCIAL FIGURE DATE (not available)**

|  | **US DOLLARS** | |
|---|---|---|
| ANNUAL SALES | $6,500,000 | 6,500,000 |


**LOAD-DATE:** June 4, 2007



Source: Public Records > Find a Business > Dun & Bradstreet > $ D&B Duns Market Identifiers Plus (US) [i]
Terms: **69-053-9184**   (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Friday, September 7, 2007 - 12:10 PM EDT


● LexisNexis®  About LexisNexis  | Terms & Conditions
Copyright ©  2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# **<u>Exhibit I</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| IN RE: SUBPOENA TO HOSIDEN AMERICA | ) Case No.: 07 C 6458 |
| CORPORATION | ) |
| | ) Judge Ruben Castillo |
| HONEYWELL INTERNATIONAL, INC., et al., | ) |
| | ) Magistrate Judge Schenkier |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| APPLE COMPUTER, et al., | ) |
| | ) |
| Defendants. | ) |

Case 1:07-cv-06458    Document 19    Filed 11/27/2007    Page 1 of 3

## DECLARATION OF SOICHIRO RAI

I, Soichiro Rai, declare under penalty of perjury as follows:

1.    I am the Treasurer of Hosiden America Corporation (hereinafter referred to as "Hosiden America"), which has its principal place of business located at 120 East State Parkway Schaumburg, IL 60173.

2.    I am one of the individuals responsible for supervising responses to subpoenas served on Hosiden America.

3.    I have reviewed the subpoena duces tecum served by Fujifilm Corporation on Hosiden America in the above-captioned cause (the "Subpoena"). As a custodian of records for Hosiden America, I am familiar with the categories of documents sought in the Subpoena.

4.     Of the categories of documents requested in the Subpoena, Hosiden America does not retain such documents that are more than seven (7) years old.  Consequently, Hosiden America does not have within its ownership or control any documents responsive to Fujifilm's Subpoena, which were limited to the years 1988-1994 (and subsequently further limited to the years 1988-1992 by agreement of Fujifilm's legal counsel).

Case 1:07-cv-06458    Document 19    Filed 11/27/2007    Page 2 of 3

5.     In addition, as reported through Hosiden America's legal counsel to Fujifilm's legal counsel, upon a diligent search of Hosiden America's files, no responsive documents to Fujifilm's Subpoena have been discovered.

6.     Hosiden America does not control or have access to documents belonging to Hosiden Corporation, the Japanese parent corporation of Hosiden America (referred to hereafter as "Hosiden Japan").

7.     Notwithstanding the foregoing lack of control by Hosiden America over Hosiden Japan's documents, Hosiden Japan has voluntarily advised Hosiden America that Hosiden Japan does not have any documents that are responsive to Fujifilm's Subpoena.

8.     Consequently, as previously reported to Fujifilm, Hosiden America does not have any responsive documents to Fujifilm's Subpoena, and in addition, upon information from Hosiden Japan, there are no documents possessed by Hosiden Japan that are responsive to Fujifilm's Subpoena.

I declare under penalty of perjury that the foregoing is true and correct.

Soichiro Rai

N:\SYS02\2665\Lit\0240 - Declaration of Rai.doc

3

# Exhibit J

# STROOCK

Via Facsimile/ Confirmation Via Mail

November 28, 2007

Ian G. DiBernardo
Direct Dial  212-806-5867
Fax  212-806-6006
idibernardo@stroock.com

Matthew Woods, Esq.
Robins, Kaplan, Miller & Ciresi
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015

Re:  *Honeywell International Inc. et al. v. Apple Computer Inc. et al.*
     USDC/DDE Case No. 04-1338-***
     Our Client/Matter No. 208801/0921

Dear Matt:

As you know in connection with FUJIFILM Corporation's enforcement of the subpoena duces tecum served on Hosiden America, Hosiden America has filed a declaration (a copy of which is attached) indicating that neither Hosiden America nor Hosiden Corporation, its Japanese parent, has any responsive documents.

In an effort to resolve the matter with the least burden on Hosiden and in a form admissible in the Delaware action, we request that Honeywell agree to a stipulation that FUJIFILM Corporation served the subpoena seeking documents in Hosiden America's and Hosiden Corporation's possession and that neither entity has any responsive documents.

Please let us know at your earliest convenience if Honeywell is agreeable to such a stipulation.  Once you indicate your agreement, we will circulate a draft stipulation. Because initial briefing in the enforcement matter is scheduled for December 4, 2007, we would appreciate hearing from you by the end of this week.

Very truly yours,

Ian G. DiBernardo

NY 71101445v1

Matthew Woods, Esq.
November 28, 2007
Page 2


Cc:     Rein F. Krammer, Esq. (w/o encl.)
        Jason Metnick, Esq. (w/o encl.)
        Richard James Lofgren, Esq. (w/o encl.)
        Thomas Bernard Keegan, Esq. (w/o encl.)
        George H. Gerstman, Esq. (w/o encl.)
        Lawrence Rosenthal, Esq. (w/o encl.)

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212 806 5400