# GROUP EXHIBIT F

Not Reported in A.2d                                   Page 1
Not Reported in A.2d, 1995 WL 411795 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
Hoechst Celanese Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.
Del.Super.,1995.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware, New Castle County.
HOECHST CELANESE CORPORATION, et al.,
v.
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, et al.
**Civ. A. No. 89C-SE-35.**

Submitted: Dec. 15, 1994.
Decided: March 31, 1995.

Upon plaintiffs motion for reconsideration of this Court's Order of November 22, 1994 denying plaintiff's request for the production of other policyholder information relating to all Crum & Forster affiliate companies in North River Insurance Company's possession, custody or control. Motion for reconsideration of the Court's November 22, 1994 order is DENIED.

Richard E. Poole, David J. Baldwin, W. Harding Drane and William R. Denny of Potter, Anderson & Corroon, Wilmington, for plaintiffs.
Joel R. Brown of Tybout, Redfearn & Pell, Wilmington, defense liaison counsel.
James W. Semple and Neal C. Belgam of Morris, James, Hitchens & Williams, Wilmington, for North River Ins. Co.

*MEMORANDUM OPINION AND ORDER*
GEBELEIN, Judge.
**\*1** This is the Court's decision on plaintiff Hoechst Celanese Corporation and Celanese Engineering Resins, Inc.'s (HCC) motion for reconsideration of this Court's Order of November 22, 1994 denying plaintiff's request for the production of other policyholder information relating to all Crum & Forster affiliate companies in North River Insurance

Company's (North River) possession, custody or control. For the following reasons, HCC's motion for reconsideration is DENIED.

1. Given HCC's arguments in its papers and before the Court at the status hearing of November 14, 1994, the Court does not agree that it applied an incorrect theory of law. The court in *Gerling International Insurance Co. v. Commissioner of Internal Revenue,* 839 F.2d 131, 140 (3d Cir.1988), held that in situations where documents are in the possession of the corporate parent but are sought from the litigating subsidiary, ... control has been found to exist where the alter ego doctrine warranted piercing the corporate veil, ... and where the subsidiary was an agent of the parent in the transaction giving rise to the suit and in litigating the suit on the parent's behalf. In this vein, HCC sought documents relating to and held by Crum & Forster, the parent company, by establishing North River's control over those documents. Specifically, HCC argues that North River is no more than a mere conduit of Crum & Forster and that the two corporations are but one entity.

2. Nevertheless, the Court will consider what HCC argues is the applicable legal standard in this matter. HCC claims that the correct legal theory is whether a party exercises the requisite control over the documents sought. In determining whether a subsidiary has control over documents held by its parent, the focus of the inquiry is on the closeness of the relationship between the entities. *Flavel v. Equal Employment Opportunity Commission,* 63 Fair Empl.Prac.Cas. (BNA) 1199, 1993 U.S.Dist. LEXIS 18730, at \*10 (E.D.Wis.1993); *Afros S.P.A. v. Krauss-Maffei Corp.,* 113 F.R.D. 127, 129 (D.Del.1986). The Court finds that even under this less burdensome test, HCC has failed to establish the corporate closeness between North River and Crum & Forster.

While HCC argues the legal theory that permits discovery of information in these circumstances, it fails to complete the analysis by arguing relevant



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 411795 (Del.Super.)
(Cite as: Not Reported in A.2d)

facts. Under the case law provided by HCC, the test of control involves a consideration of the following factors: 1) adequate ownership share in the subsidiary by the parent; 2) interlocking management structures; 3) sufficient control exercised by the parent corporation over the subsidiary's directors, officers and employees; and/or 4) a connection to the transaction at issue. *Flavel,* at *13; *Afros,* 113 F.R.D. at 129. However, an examination of the facts of these cases cited by HCC reveals a far more extensive degree of corporate closeness that is not present here.

**\*2** For example, in *Flavel,* two American subsidiaries were wholly owned by its Swedish parent company through a holding company; two of the three board members of the American subsidiaries were Swedish officers of the parent and served as directors of the subsidiaries; the parent had the final say on key management personnel decisions, including performance reviews of general managers of the subsidiaries' operating facilities who were alleged to have an active role in at least several terminations of employees and set the tone for employment practices throughout the American subsidiaries. *Flavel,* at *14. Similarly, in *Afros,* the subsidiary was wholly owned by the foreign parent company and operated as the exclusive seller of the parent's products in the United States; all product inquiries received by the parent from potential American clients are directed to the subsidiary which is the parent's acting arm in the United States. 113 F.R.D. at 131. In addition, the subsidiary's board consisted of four directors who are also employees of the parent; three of the subsidiary's directors, Messrs. Wiehenbrauk, Hingst and Dr. Nill, headed the parent's operating divisions, while the fourth was also a member of the parent's board of directors; two of the four directors played prominent roles in the subsidiary's management; Mr. Hingst served as president of the subsidiary as well as chief executive of the parent's plastic machinery division and his entire salary was paid by the parent; Mr. Wiehenbrauk as head of the parent's finance department oversaw the subsidiary's financial affairs; and generally, an employee of the parent's finance department does the reporting based on figures provided by the subsidiary. *Id.* at 131-132. Moreover, recent board meetings of the subsidiary occurred at the parent's offices; an assignment of the parent's certain patent rights entailed a nominal payment of one dollar to the subsidiary; this decision to transfer the rights was made by a general manager of the parent's plastic division and the subsidiary's board of directors were not informed of or approved the division. *Id.* at 132.

In this case, however, HCC attempts to establish control by pointing out that North River is a wholly owned subsidiary of Crum & Forster; many of the documents produced by North River are on Crum & Forster letterhead and refer to Crum & Forster Insurance rather than to North River; that Crum & Forster handled the plumbing system claims filed against North River's insured and North River has no separate employees; and a memorandum states that *[w]e* issued policies for this insured [Plast-A-Matic] for a period of seven years (emphasis added) and these policies are collectively referred to as Crum & Forster Commercial Insurance. North River has produced Crum & Forster documents relating to other insureds of North River. What is now sought are Crum & Forster documents relating to other insureds of other Crum & Forster subsidiaries. Under case law provided by HCC, the Court finds that the facts as alleged by HCC do not rise to that level necessary to establish corporate closeness between North River, Crum & Forster, and other Crum & Forster subsidiaries. Thus, the Court concludes that HCC has not shown that North River has the requisite level of control over the documents the former now seeks; nor that they are relevant to these proceedings.

**\*3** Based upon the foregoing, HCC's motion for reconsideration of the Court's November 22, 1994 Order is DENIED.

IT IS SO ORDERED.

Del.Super.,1995.
Hoechst Celanese Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.
Not Reported in A.2d, 1995 WL 411795

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



(Del.Super.)

END OF DOCUMENT



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 1
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas.(BNA) 1199, 64 Empl. Prac. Dec. P
43,027
(Cite as: Not Reported in F.Supp.)

Flavel v. Svedala Industries, Inc.
E.D.Wis.,1993.

United States District Court, E.D. Wisconsin.
Malcolm D. FLAVEL, individually and on behalf
of all other persons similarly situated, Representat-
ive Plaintiff,
andRobert F. Cnare, James R. Conradt, Major Cox-
hill, Robert K. Elbel, Malcolm D. Flavel, Russell
H. Graf, Robert L. Isferding, Robert E. Jones,
Chalasani C. Rayan, Richard Spoonamore and Ron-
ald J. Weiss, Plaintiffs,
andEqual Employment Opportunity Commission,
Plaintiff-Intervenor,
v.
SVEDALA INDUSTRIES, INC., f/k/a Boliden Al-
lis, Inc.; Svedala, Inc.; Allis Mineral Systems; and
Mineral Processing Systems, Inc.; Defendants.
**No. 92-C-1095.**

Dec. 13, 1993.

Stephen Snyder, Laurie A Knocke, Winthrop &
Weinstine, P.A., St. Paul, MN, for plaintiffs.
Brian C. Tyndall, Lloyd B. Zimmerman, U.S.
E.E.O.C., Milwaukee, WI, for plaintiff-intervenor.
David Loeffler, Marty R. Howard, Krukowski &
Costello, S.C., Milwaukee, WI, for defendants.

*MEMORANDUM AND ORDER*
WARREN, Senior District Judge.
**\*1** Before the Court is the plaintiffs' Motion to
Compel the Discovery of Documents Within the
Physical Possession of Svedala Industry, A.B. and/
or Svedala International in the above-captioned
matter. For the following reasons, this motion is
granted.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

On January 1, 1988, Boliden AB, a Swedish com-
pany owned by Trelleborg AB, another Swedish
company, assumed ownership of several units of
Allis-Chalmers Corp., a U.S. company, including
its crushing and screening production facility in

Appleton, Wisconsin, and its pyroprocessing and
grinding mill production facility in Milwaukee,
Wisconsin. (Plaintiff's July 2, 1993 Letter Brief at
2-3.) These units, along with related businesses
owned or controlled by Boliden AB, were renamed
Boliden-Allis, Inc., and were included in the com-
pany's newly-formed Minerals Processing Busi-
ness Area in 1989. *Id.* at 3. In January, 1990, Trel-
leborg AB changed the company's corporate struc-
ture, (1) transforming the Minerals Processing
Business Area into Svedala Industry AB
(SIAB), a Swedish company; (2) renaming Bol-
iden-Allis' remaining operations Allis Mineral
Systems, which became a wholly-owned business
unit of SIAB; (3) forming Svedala Industries
(Svedala), a U.S. company, as a special unit of
SIAB, and (4) creating Svedala, Inc. (SI), a U.S.
company, as a holding company for Svedala Indus-
tries. *Id.* at 6. Svedala International (MINCO)
FN1, a Swedish company formerly known as
MINCO International, is also a subsidiary of SIAB.
*Id.* at 1-2.

Malcolm D. Flavel was hired by Allis-Chalmers in
1961 as a factory representative, and was promoted
to the level of Consultant-Comminution Systems in
1983. (Complaint ¶ 17.) On October 17, 1990, at
the age of 54, Mr. Flavel was terminated from em-
ployment at the Appleton plant. *Id.* at ¶ 18-19.
Robert E. Jones was hired by Allis-Chalmers in
1955 as an Application Specialist, and was pro-
moted to the level of Senior Project Application
Engineer in 1979. *Id.* at ¶ 21. On May 31, 1991, at
the age of 60, Mr. Jones resigned from employment
at the Appleton plant. *Id.* at ¶ 23-24. Mr. Flavel and
Mr. Jones both filed timely complaints with the
Equal Employment Opportunity Commission
(EEOC), alleging that Svedala discriminated
against them on the basis of age. *Id.* at ¶ 11-12. On
September 30, 1992, the EEOC issued a Letter of
Violation, finding (1) that Svedala discriminated
against [Mr. Flavel] and a class of protected age
group employees on the basis of age with respect to
evaluations, terms and conditions of employment,
demotion, and termination; and (2) that Mr. Jones



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2

Not Reported in F.Supp., 1993 WL 380831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P
43,027

(Cite as: Not Reported in F.Supp.)

was subjected to harassment by his manager with considerable frequency, that [Mr. Jones] complained to others about this, and that others complained to the manager about his abusive behavior; [that] younger co-workers were not harassed with the same degree and frequency, [and that witnesses observed] connections between the manager's behavior towards his employees and the employee's age, [with] preference being extended to younger staff members. *Id.* at ¶ 14, 22.

**\*2** On October 16, 1992, the plaintiffs brought the above-captioned matter as a representative action, claiming violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621*et. seq.,* and seeking declaratory relief and damages under state common law; thus far, eleven (11) private plaintiffs have joined this suit.FN2 After an extension was granted by the Court, the defendants filed an Answer on November 25, 1992, which was amended on December 4, 1992. On July 13, 1993, this Court issued an Order allowing the EEOC to intervene as a plaintiff in this action.

Regrettably, discovery in this case has been punctuated by numerous disputes, requiring several dispositive rulings by this Court. In the instant motion, which was originally brought on February 22, 1993, the plaintiffs seek from the defendants the production of documents which are held by foreign entities SIAB and MINCO. At a June 21, 1993 hearing resolving other discovery disputes, which was memorialized in a July 22, 1993 Order, we directed the parties to submit to the Court letter briefs regarding the instant motion. The plaintiffs submitted their letter brief on July 2, 1993, with an addendum on September 10, 1993; the defendants submitted their letter brief on July 9, 1993, with an addendum on July 12, 1993.

## II. *DISCUSSION*

### A. *PARTIES' ARGUMENTS*

The plaintiffs argue that, at all times subsequent to the Allis-Chalmers buyout, Swedish managers at SIAB and its predecessors maintained direct and primary management authority over [the] U.S. busi-

nesses. (Plaintiffs' July 2, 1993 Letter Brief at 3-4.) They emphasize that these managers were, and continue to be, actively involved in making decisions directly affecting the operations and personnel in the Appleton and Milwaukee facilities ... [including] directly participating in key hiring and employment decisions for the U.S. operations ... reviewing the performance of U.S. employees of Svedala ... [and making] decisions concerning the restructuring or reorganization of the Appleton and Milwaukee businesses. *Id.* at 4-5, 7. The plaintiffs note that two of the three board members for [Svedala and SI] are Swedish officers of the parent company [SIAB] ... [while] only one member of the board of Svedala and SI is an American, and that MINCO, who employed one of the plaintiffs at the time of his termination, circulated a blatantly ageist notice of a job opening at the Appleton facility. *Id.* at 6-7. The plaintiffs argue that such facts prove that Svedala and SI have the requisite control pursuant to Rule 34(a) over the requested documents held by SIAB and MINCO because (1) a close corporate relationship exists between the foreign parents and American subsidiaries because they have close managerial connections, interlocking management structures, and the parent company has a significant ownership share of the subsidiary; or (2) the consolidated enterprise or integrated enterprise doctrine under Title VII and the ADEA is met because the foreign parents and American subsidiaries share an interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control. *Id.* at 8-12.

**\*3** The defendants, in turn, claim that, because SIAB and MINCO are not named as defendants in this suit, Svedala and SI are obliged to produce documents now sitting in Sweden only if all the corporations are *alter egos* under the corporate model enacted into law in Section 4(h)(3)(A) through (D) of the ADEA, which requires that corporations share (1) an interrelation of operations; (2) common management, (3) centralized control of labor relations; *and* (4) common ownership or financial control. (Defendants' July 9, 1993 Letter Brief at 3-5.) While acknowledging that this provi-



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 3

Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027

**(Cite as: Not Reported in F.Supp.)**

sion only governs liability under the ADEA, and not discovery, the defendants argue that it creates a substantive right within the meaning of 28 U.S.C. § 2072(b), which cannot be abridged or modified through the application of any of the discovery rules. *Id.* at 5. They argue that the American and Swedish corporations are not *alter egos* however, because [Svedala] and [SI] pursue labor relations' or employment policies without any centralized direction or control from [SIAB] or [MINCO] ... the managements of the Swedish and American companies are not common ... and the production and sales operations of the American and Swedish companies are largely independent of one another and not integrated in a continuous flow. *Id.* at 5-6. Specifically, at the level of employment relevant to this litigation-managers below the level of facility General Manager and professional/technical support staff-the employment decisions of Svedala are not central[ly] controlled from Sweden. (Defendants' July 12, 1993 Addendum to Letter Brief at 2.) Thus, the defendants claim that the companies have totally different senior management ... [and] Svedala runs its own employment regime independent of any direction from SIAB, except a broad directive to conform to U.S. law. (Defendants' July 9, 1993 Letter Brief at 8-10.)

### B. *LEGAL STANDARD*

Document production in discovery is governed by Rule 34(a), which reads as follows:

Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents, ... or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) *and which are in the possession, custody or control of the party upon whom the request is served...*

By using the word or, Rule 34(a) makes a clear distinction among the meanings of possession, custody, and control. In determining whether or not a party exercises control, courts ask whether a party has a legal right to obtain the documents

requested upon demand; actual physical possession is not required. *Burton Mechanical Contractors, Inc., v. Foreman,* 148 F.R.D. 230, 236 (N.D.Ind.1992); *Henderson v. Zurn Indus., Inc.,* 131 F.R.D. 560, 567 (S.D.Ind.1990) (*citing Searock v. Stripling,* 736 F.2d 650, 653 (11th Cir.1984)); *In re Folding Carton Antitrust Litigation,* 76 F.R.D. 420, 423 (N.D.Ill.1977). The party seeking document production bears the burden of establishing the opposing party's control over such documents. *Burton,* 148 F.R.D. at 236.

**\*4** The plaintiffs properly note that, in determining whether a U.S.-domestic corporation must produce documents in possession of a foreign parent or affiliate, courts have focused on whether the U.S. corporation has the requisite degree of control over the documents sought. *See, e.g., Afros S.P.A. v. Krauss-Maffei Corp.,* 113 F.R.D. 127, 129 (D.Del.1986); *In re Uranium Antitrust Litigation,* 480 F.Supp. 1138, 1145-53 (N.D.Ill.1979). In deciding whether a subsidiary has control over documents held by its parent corporation, courts focus on the closeness of the relationship between the entities. *See, e.g., Johnson v. Cloos Int'l., Inc.,* 1990 WL 106560, at *1-2 (N.D.Ill.1990); *Afros,* 113 F.R.D. at 129-31; *Cooper Indus., Inc. v. British Aerospace, Inc.,* 102 F.R.D. 918, 919 (S.D.N.Y.1984). If the requisite degree of closeness is found, domestic corporations may be required to produce documents in the possession of foreign parents or affiliates, even though the latter are not subject to the personal jurisdiction of the court. *Cloos,* 1990 WL 106560, at 1-2; *Afros,* 113 F.R.D. at 131; *In re Uranium,* 480 F.Supp. at 1145-53.

### C. *ANALYSIS*

In their letter brief, the defendants mistakingly assume that the *alter ego* doctrine [FN3] embodied in Section 4(h)(3) of the ADEA dictates resolution of the control issue under Rule 34(a). Section 4(h)(3), however, is a *liability* provision, and it is clear that a party may exercise the requisite degree of control over documents held by a related entity under the discovery rules without exhibiting the degree of interrelationship necessary to project liabil-



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ity upon such entity pursuant to the ADEA. The degree of relationship between a domestic subsidiary and a foreign parent required to subject the latter to liability under the ADEA is certainly greater than that needed to subject the latter to document production through the former. This does not, as the defendants assert, violate 28 U.S.C. § 2072(b),[FN4] because the substantive right created under Sections 4(h)(1-3) of the ADEA, the inclusion or exclusion of liability for SIAB and MINCO,[FN5] is not implicated simply because such entities may be required to produce documents through Svedala and SI pursuant to Rule 34(a). A domestic subsidiary, then, may be required to produce documents held by a foreign parent, even though that parent is not covered by the provisions of the ADEA, so long as that subsidiary controls such documents as defined under Rule 34(a).[FN6]

The Court is satisfied that the defendants so control the requested documents held by SIAB and, derivatively, MINCO. As previously noted, in spirit with the current policy of permissive discovery, a party is generally considered to have control over documents under Rule 34(a) if it can likely obtain such documents upon demand. Thus, under the Rule 34(a) control analysis employed in *Afros S.P.A.* and its progeny, a sufficiently close corporate relationship exists between a domestic subsidiary and a foreign parent to compel the former to produce documents held by the latter if their degree of interrelation is evidenced by (1) adequate ownership share in the subsidiary by the parent; (2) interlocking management structures; (3) sufficient control exercised by the foreign parent over the subsidiary's directors, officers, and employees; and/or (4) a connection to the transaction at issue. Consideration of such factors promotes the policies underlying Rule 34(a) and ensures that a corporation cannot hide incriminating documents overseas; and, because none of these factors acts as an exclusive test, each factor need not be satisfied to prove the existence of Rule 34(a) control.

*5 Nobody disputes that SIAB owns 100% of Svedala through its holding company, SI. Nor can it

be seriously disputed that SIAB has traditionally maintained interlocking management structures with SI and Svedala. As noted by the plaintiffs, and as indicated in the defendants' exhibits, Thomas Older, the President, CEO, and Board member of SIAB, and Jan Knutsson, an Executive Vice President of SIAB, are currently acting as two of the three directors of Svedala, and Mr. Knutsson is also the Manager of Allis Mineral Systems. In addition, Mr. Older and Sven Ek, another Executive Vice President of SIAB, are currently acting as two of the three directors of SI. Clearly, this degree of interrelationship between directors of domestic subsidiaries and officers of a foreign parent sufficiently demonstrates the requisite corporate closeness required under this branch of the Rule 34(a) control analysis. In light of this, the defendants argument that SIAB lacks interlocking management with SI and Svedala simply because they do not share common directors or common officers is clearly disingenuous.

It also appears that SIAB exercised the requisite degree of control over the management of Svedala and SI regarding employment policies and decisions to justify the plaintiffs' document production request. The defendants concede that officers of SIAB have the final say on key management personnel decisions, including performance reviews, down to the level of General Managers of operating facilities. The plaintiffs, in turn, charge that several of these handpicked managers had an active role in at least several of their terminations, and set the tone for employment practices throughout Svedala and SI. This Court is satisfied that SIAB exhibited sufficient control over the hiring and review of upper and mid-level managers to bring the requested documents within the control of SI and Svedala pursuant to Rule 34(a). The plaintiffs have demonstrated that the motives behind employment decisions by SI and Svedala may be exhibited in documents held by SIAB, and have shown that, given the corporations' close relationship, such documents are available to the domestic corporations upon request. In addition, as previously noted, it is clear that our decision has no bearing on the *liability* of SIAB or MINCO for any



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 580851 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027
(Cite as: Not Reported in F.Supp.)

Page 5

allegedly unlawful acts;[FN7] therefore, the defendants' concerns as to our flaunting conventional notions of unlimited liability through incorporation are unwarranted. As a result, SI and Svedala will be required to produce the documents requested by the plaintiff which are held by SIAB pursuant to Rule 34(a).

Finally, because MINCO falls within the penumbra of the domestic subsidiaries' close relationship with SIAB, documents held by it are also discoverable by the plaintiffs. As previously noted, MINCO is a foreign, wholly-owned subsidiary of SIAB; and because, *inter alia*, MINCO's manager, Peter Kohle, is an Executive Vice President of SIAB, it appears that these corporations have interlocking management. In addition, the defendants have not challenged the plaintiff's assertion that MINCO directly employed at least one of the plaintiffs. Finally, based on the letter briefs submitted by the parties, the Court reasonably intimates that SIAB manages the operations of MINCO in the same manner as it does SI and Svedala; thus, SIAB clearly controls documents held by MINCO as defined under Rule 34(a). As a result, such documents, if relevant, are discoverable by the plaintiffs through Rule 34(a) as accessible through SIAB.FN8

### III. SUMMARY

*6 For the foregoing reasons, the Court hereby ORDERS that the plaintiffs' motion to compel documents in the above-referenced matter be GRANTED.

SO ORDERED.

FN1. For the sake of clarity, Svedala International will be referred to by its previous name, MINCO.

FN2. On February 25, 1993, the Court signed a stipulated order that consolidated *Weiss v. Boliden-Allis, Inc.,* Case No. 91-C-493, with the instant case. Normally, pursuant to Local Rule 4.03, [i]f the motion is granted, the judge to whom the low-

est numbered case is assigned shall handle all future proceedings covered by the consolidation order. When two or more cases are consolidated, all documents relevant to the purposes for which consolidation was granted will thenceforth be docketed only on the docket sheet for the lowest numbered of the consolidated cases.

In this case, however, while the cases were consolidated into the lower-numbered case on the docket sheet, they were consolidated into the higher-numbered case in the court file. Because both cases were originally assigned to this Court, this oversight has not caused any significant administrative difficulties; it did, however, precipitate a filing error which resulted in a significant delay in processing the instant motion. To eliminate any further confusion, the Court hereby requests that, despite Local Rule 4.03, the parties use the higher-case number, 91-C-1095, in the caption of any subsequent filings in this case.

FN3. In their letter brief, the plaintiffs term this the consolidated enterprise or integrated enterprise liability doctrine under the ADEA.

FN4. 28 U.S.C. § 2072(b) reads as follows: Such rules [the Federal Rules of Civil Procedure] shall not abridge, enlarge or modify any substantive right.

FN5. Clearly, Section 4(h)(3) of the ADEA does not grant the defendants any substantive right to be free from the rules of discovery.

FN6. The Court expresses no opinion as to whether SIAB or MINCO are sufficiently interrelated with SI and Svedala to implicate the liability provisions of the ADEA.

FN7. *See supra* pages 9-10.

FN8. The Court notes, however, that documents held by MINCO are generally less



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

likely to be relevant to the instant matter than those held by SIAB, a more proximate relative to the plaintiffs than MINCO.

E.D.Wis.,1993.

Flavel v. Svedala Industries, Inc.

Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027

END OF DOCUMENT



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 1
Not Reported in F.Supp., 1990 WL 106560 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Ⱶ
Johnson v. Cloos Intern., Inc.
N.D.Ill.,1990.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Elton D. JOHNSON, Plaintiff,
v.
CLOOS INTERNATIONAL, INC., Defendant.
**No. 89 C 8483.**

July 11, 1990.

*MEMORANDUM OPINION AND ORDER*
ANN C. WILLIAMS, District Judge.
*1 Plaintiff, Elton D. Johnson, filed suit against his
former employer, Cloos International, Inc. (Cloos
USA), alleging that Cloos USA's termination of
plaintiff's employment was motivated by racial dis-
crimination, in violation of Title VII of the Civil
Rights Act of 1964. Defendant filed a motion to
dismiss plaintiff's complaint, claiming that Cloos
USA is not an employer within the meaning of Title
VII because it employed less than fifteen persons
during the year of the alleged violation and the pre-
ceding year. On March 21, 1990, plaintiff served
defendant with his first set of interrogatories and
request for documents, requesting information re-
lating to ownership, operations and employment
practices of Cloos USA, its parent corporation in
Germany and its sister corporations in England,
Switzerland and Austria. This information is neces-
sary to respond to defendant's motion to dismiss be-
cause if Cloos USA alone does not have the requis-
ite number of employees, plaintiff may be able to
show that Cloos USA and its parent and sister cor-
porations are an integrated enterprise and that the
combined number of employees of these companies
exceeds fifteen.

Cloos USA responded to plaintiff's interrogatories
and document requests regarding Cloos USA but
failed to provide any information regarding its par-
ent company, Cloos GMBH, or any of its sister
companies. In a letter dated May 24, 1990, counsel

for defendant stated that information regarding
companies other than Cloos International, Inc.
[Cloos USA] ... is overseas and not within the pos-
session of my client, and on those grounds it is my
client's position that we are unable to produce and
under no obligation to produce such information or
documentation. Plaintiff's Motion to Compel, Ex-
hibit C. Plaintiff then filed a motion to compel de-
fendant to fully answer the interrogatories and to
produce the requested documents.

Defendant, in its response to plaintiff's motion to
compel, for the first time objects to plaintiff's re-
quests for information on the ground of relevancy.
Although this objection is not timely and therefore
technically should be considered waived, the court
will address it briefly. Defendant claims that
plaintiff's discovery request is legally irrelevant be-
cause a 1966 EEOC opinion letter stated that for-
eign employers are covered by Title VII of the
Civil Rights Act of 1964 ... only when they have
the requisite number of employees ... within the
United States. *See* Defendant's Memorandum, Ex-
hibit A. However, there is more recent case author-
ity which provides that subsidiaries and their par-
ents can be considered single entities for Title VII
purposes. *See e.g., Smith v. Jones Warehouse, Inc.,*
590 F.Supp. 1206 (N.D.Ill.1984). Thus, plaintiff's
discovery requests are quite relevant to defendant's
motion to dismiss.[FN1]

The only question remaining is the whether the re-
quested information is within Cloos USA's posses-
sion and control such that the court can compel its
production pursuant to the Federal Rules of Civil
Procedure. There is precedent for compelling a U.S.
subsidiary to produce information held by its for-
eign parent corporation. *See, e.g., Afros S.P.A. v.
Krauss-Maffei Corp.,* 113 F.R.D. 127 (D.Del.1986).
The *Afros* court stated that the key factual issues
in determining control [such that discovery could
be compelled] were: the parent's ownership share in
the subsidiary or affiliated corporation; whether the
corporations had interlocking management struc-
tures; the degree of control exercised by the parent


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 106560 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 2

Case 1:07-cv-06458    Document 25-7    Filed 12/11/2007    Page 12 of 22

over the subsidiary's directors, officers, and employees. *Id.* at 129, *citing, In Re Uranium Antitrust Litigation,* 480 F.Supp. 1138, 1151-53 (N.D.Ill.1979). The court went on to emphasize that [t]he control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them. *Id.*

**\*2** In the case at bar, the plaintiff has shown the requisite close coordination between defendant and its parent corporation to require defendant to produce the requested information regarding Cloos GMBH. Cloos USA is a wholly owned subsidiary of Cloos GMBH. Walter Cloos is the president of Cloos USA as well as the president of Cloos GMBH. Walter, Erwin and Helmut Cloos are on the board of directors of both Cloos USA and Cloos GMBH. This interlocking managerial scheme is sufficient to show the close coordination necessary in order to compel a domestic subsidiary to obtain information for discovery from a foreign parent. Therefore, the court grants the motion to compel with respect to Cloos GMBH in Germany.

The court denies the motion to compel as it relates to Cloos USA's sister corporations in Austria, Switzerland and England. Plaintiff offers no information regarding the managerial structure of these companies other than the affidavit of Petra Davis Johnson. The affidavit states that, based on information and belief, Walter, Helmut and Erwin Cloos act as officers and directors of all Cloos subsidiaries. *See* Davis Johnson Affidavit at ¶ 11. The affiant's belief, in and of itself, is not enough to show the close coordination necessary to imply control over information. The court realizes that the very information the plaintiff seeks to compel could substantiate its claim that Cloos USA should provide the information. However, at this point, the court must suggest plaintiff issue a subpoena duces tecum, pursuant to Fed.R.Civ.P. 45, to these sister corporations to obtain the information it needs to counter defendant's motion to dismiss.

  FN1. Defendant goes on to state that because plaintiff's discovery requests were,

in its view, irrelevant, [t]he only apparent purpose for which plaintiff has propounded this discovery is to harass and burden defendant CII. In fact, defendant wastes an entire page discussing how abusive plaintiff's discovery requests were. The court rejects this entire argument as unfounded and cautions that further attempts by defendants to put forth unsupported arguments will result in the court assessing sanctions.

N.D.Ill.,1990.

Johnson v. Cloos Intern., Inc.

Not Reported in F.Supp., 1990 WL 106560 (N.D.Ill.)

END OF DOCUMENT



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

H

U.S. v. Amerigroup Illinois, Inc.
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois.
UNITED STATES of America, State of Illinois, ex
rel., and Cleveland Tyson, Plaintiffs,
v.
AMERIGROUP ILLINOIS, INC., and Amerigroup
Corporation, Defendants.
No. 02 C 6074.

Oct. 21, 2005.

Michael I. Behn, Behn & Wyetzner, Michael
Charles Rosenblat, Michael E. Rosenblat, P.C.,
Paul Joseph Gaynor, Chaka M. Patterson, David
Jamison Adams, Tyree L. Givens, Illinois Attorney
General's Office, Paul Joseph Gaynor, Chaka M.
Patterson, Illinois Attorney General, Joan Matlack,
Putterman & Howard, Marla Helene Swartz, Mi-
chael Keyes Hendershot, Frederick H. Cohen, Chad
A. Blumenfield, David Joel Chizewer, Hillary
Levitt Dunn, Goldberg, Kohn, Bell, Black, Rosen-
bloom & Moritz, Ltd, Michele Marion Fox, United
States Attorney's Office, NDIL, William W.
Thomas, Futterman & Howard, Chtd ., Chicago, IL,
for Plaintiffs.
Daniel John Voelker, Andrew C. Nordahl, Cather-
ine A. Miller, Daniel Charles Curth, Hillard M.
Sterling, Jeffrey Lawrence Dorman, Freeborn &
Peters, Kellye L. Fabian, Kirkland & Ellis LLP
(Chicago), Michele Marion Fox, United States At-
torney's Office, NDIL, Robert A Barba, Illinois At-
torney General's Office, Chicago, IL, for Defend-
ants.

***MEMORANDUM OPINION AND ORDER***
Jeffrey Cole, United States Magistrate Judge.
*1 The Illinois Department of Healthcare and Fam-
ily Services (HFS),  has moved to quash a sub-
poena *duces tecum* served on it by the defendants
calling for production of emails of three named
HFS employees on the ground that compliance with
the subpoena would be unduly burdensome-espe-

cially given the fact that HFS is not a party to the
case.

I

**BACKGROUND**

A

**The Underlying Complaint**

Relator, Cleveland Tyson, filed this *qui tam* suit un-
der the False Claims Act (FCA),   31 U.S.C. §§
3729*et seq.* and Illinois Whistleblower Reward and
Protection Act (Illinois  Whistleblower Act). 740
ILCS §§ 175/1*et seq.*[FN1] The FCA establishes civil
penalties for any person who files a  false or fraud-
ulent claim for payment or approval  by the United
States government. 31 U.S.C. § 3729(a)(1). The
provisions of the IWRPA are similar. 740 ILCS §
175/3. The State of Illinois intervened in the suit on
March 2, 2005; the United States was just granted
leave to intervene on October 17, 2005.

> FN1. The term, *qui tam,* comes from the
> Latin expression, *qui tam pro domino rege
> quam pro se ipso in hac parte sequitur*
> (Who  brings the action for the King as
> well as for himself). *United States ex rel.
> Mathews v. Bank of Farmington,* 166 F.3d
> 853, 857 (7th Cir.1999). In a *qui tam* ac-
> tion, a private party, the relator,  brings
> an action to redress fraud upon the govern-
> ment. *Id.* If the claim is proven, the relator
> receives a percentage of the recovery ran-
> ging, under the current statute, from 10%
> to 30%. *Id.* at 857-58 (*citing*31 U.S.C. §
> 3730(d)).*See Vermont Agency of Natural
> Resources v. United States ex rel. Stevens,*
> 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d
> 836 (2000). The history of the False
> Claims Act is detailed in *United States ex
> rel. S. Prawer and Co. v. Fleet Bank of
> Maine,* 24 F.3d 320, 324 (1st Cir.1994).*See
> also United States ex rel. Williams v. NAC*



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Corp.,* 931 F.2d 1493, 1496-98 (11th Cir.1991).

The second amended complaint alleged that under its contract with the Illinois Department of Public Aid-now known as HFS-Amerigroup Illinois (AMG-IL) was required to submit quarterly statements certifying that, to its knowledge, there had been no fraud, abuse, or misconduct on the part of its employees, providers, or representatives. The contract defined abuse as a manner of operation that results in excessive or unreasonable costs to the Federal and/or State health care programs.( *Second Amended Complaint,* Ex. A, at 2). The Second Amended Complaint alleges that AMG-IL did not report its limited enrollment practices in its quarterly certifications, which were a precondition to its receiving payment from the federal and state programs involved. This omission allegedly resulted in and constituted false or fraudulent claims for payment in violation of the applicable statutes.

### B

### The Present Discovery Dispute

On July 29, 2005, defendants served a subpoena on HFS, calling for the production of twelve categories of materials. It was the third in a series of substantially similar subpoenas, the first two having been the subject of successful motions to quash by HFS.FN2 On August 11, 2005, HFS moved to quash the subpoena as to all but two of the categories-Nos. 5 and 11-on three grounds: that service was defective under the plain language of Fed.R.Civ.P. 45(b)(1); that the documents sought were not relevant; and that the subpoena was unduly burdensome to a non-party under Fed.R.Civ.P. 45(c)(3)(A)(iv). In the alternative, HFS sought a protective order that no discovery be had aside from discovery bearing on the calculation of damages. Defendants filed their response to HFS's motion on August 18, 2005.

> FN2. The defendants have filed objections to those two prior rulings under Fed.R.Civ.P. 72(a), which are currently pending before Judge Leinenweber.

I convened a hearing on this matter on August 23rd and 24th of 2005. In those two sessions, lengthy conferences were conducted in open court, and many of the disputed issues relating to the instant motion, as well as to another discovery dispute, were resolved. In the end, the parties were able to reach a voluntary agreement as to all but two of the document categories, Nos. 6 and 7. The resolution of their dispute as to category No. 6 was held in abeyance at my request. Document category No. 7, which relates to the production of emails of HFS personnel, remains in dispute, and it is the category that is presently the subject of HFS's motion to quash.

*2 The defendants have agreed to limit their request to the emails of Lucille Rendok and Kelly Carter, who are currently HFS employees, and Nelly Ryan, a former employee. In addition, the defendants have agreed that HFS may limit the search terms to be used in retrieving the desired emails to: (1) adverse select*, cherry, pregnan*, trimester, discriminate*, and/or continuity of care; combined with (2) some reference to Amerigroup, such as Amerigroup or AMG. HFS-still unhappy with the request-filed its reply brief on September 14, 2005.

HFS maintains that the current version of the subpoena must still be quashed under Rule 45(c)(3)(A)(iv) because the defendants' request is unduly burdensome, and the emails are irrelevant and unlikely to lead to the discovery of admissible evidence. The defendants' position consists largely of the unadorned conclusion that the burden is not undue and that the emails are critical to proving that HFS had knowledge of the claimed illegality, which HFS insists is at least a *pro tanto* defense to the claimed fraud.

### II

### ANALYSIS

### A

### Undue Burden Within The Meaning Of Rule 45(c)(3)(A)(iv) And The Protections Accorded Non-Parties



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-06458    Document 25-7    Filed 12/11/2007    Page 15 of 22

Rule 45(c)(3)(A)(iv) mandates that a court shall quash or modify a subpoena if it subjects a person to undue burden. The Advisory Committee's Notes to the 1991 amendments to Rule 45 make clear that the amendments have enlarge[d] the protections afforded persons who are required to assist the court by giving information or evidence. The rule requires the court to protect all persons from undue burden imposed by the use of the subpoena power. *Id.* This is not the discretionary language of Rule 26(c), under which a court may make any order which justice requires to protect a party or person from ... undue burden.... It is a command[ ]. *Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.,* 333 F.3d 38, 41 (1st Cir.2003).

HFS submits that its system and attendant backup system do not even allow the retrieval of emails for the entire five-year period-2000 through 2004-specified in the subpoena. All that is available, according to HFS, is a year's worth of emails. But even that, HFS argues, would constitute an undue burden on it.

As the party objecting to the document request, HFS must demonstrate that the burden of producing the one year's worth of emails is undue. There must be affirmative and compelling proof. *Ipse dixits* will not suffice. *See Trading Technologies Intern., Inc. v. eSpeed, Inc.,* No. 04 C 5312, 2005 WL 1300778, *1 (N.D.Ill. April 28, 2005)(Moran, J.); *Semien v. Life Insurance. Co. of North America,* No. 03 C 4795, 2004 WL 1151608, *1 (N.D.Ill. April 21, 2004)(Kocoras, J.); *In re Sulfuric Acid Antitrust Litigation,* No. 03 C 4576, 2005 WL 2403328, *9 (N.D.Ill. Sept.27, 2005)(collecting cases). HFS has provided such evidence in the form of the affidavit of a testimonially competent HFS employee. *See* Rule 602, Federal Rules of Evidence.

## B

### The Evidence In Support Of HFS's Motion Suffices To Carry Its Burden Of Proving That Production Of The One Year's Worth Of Emails Should Not Be Required

**\*3** In support of its contention that the document request is unduly burdensome, HFS has submitted the affidavit of Donald Perry, the chief of its bureau of information systems. (*Motion of Non-Party HFS to Quash a Subpoena for Documents,* Ex. H). Mr. Perry is familiar with HFS's email systems, as well as procedures for backing up email files and restoring old files. (*Id.,* Ex. H, at ¶ 2). The HFS email system comprises 23 post offices residing on specified servers. Each HFS employee is provided with an individual email account in the post office that is appropriate to their location. (*Id.,* Ex. H, at ¶ 3). The post offices are backed up incrementally on a daily basis, while a full back up of all the post offices is performed over the weekend. (*Id.,* Ex. H, at ¶ 4). The daily, incremental backup files are retained for one month; the weekly backup files are retained for one year. (*Id.,* Ex. H, at ¶ 5).

Mr. Perry's affidavit explains what would be involved in retrieving the old email files the defendants have requested. In order to restore an employee's email account, one begins with the data range and the employee's post office. The data range is limited to one year from the current date. Once provided with a data range and post office, HFS's central management service can retrieve the appropriate back up tapes from an off-site storage facility and restore that entire post office to a dedicated server with restricted access. (*Id.,* Ex. H, at ¶ 6). At that point, the individual employee's email messages can be retrieved and analyzed to determine relevance. (*Id.,* Ex. H, at ¶ 7). According to Mr. Perry, however, a post office may only be restored one week at a time; if there are multiple weeks in the data range, the restoration process must be performed in stages. (*Id.,* Ex. H, at ¶ 8). During such a staged retrieval process, a post office is restored for a period, analyzed, and then deleted to allow the next post office to be restored and analyzed. (*Id.,* Ex. H, at ¶ 9). This stored retrieval process is costly, in terms of expense, equipment, and manpower. (*Id.,* Ex. H, at ¶ 10). For example, a review of one year's worth of an employee's emails would take approximately six weeks.(*Id.,* Ex. H, at ¶ 10).

Significantly, the defendants do not challenge any of Mr. Perry's assertions. This omission, they



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claimed at oral argument, was the inevitable result of having no familiarity with the internal systems used at HFS. The argument is unpersuasive. The defendants could have sought leave to depose Mr. Perry, and, of course, they could have retained an expert of their own to opine on the validity of Mr. Perry's statements-at least in a general sense. Moreover, Mr. Perry's assessment is confirmed, in the main, by the cases, which have recognized that the task of restoring emails through the use of backup tapes is a unique burden:

Backup tapes record a snapshot of the contents of the computer system at the moment the backup is run. The data on a backup tape are not organized for retrieval of individual documents or files, but for wholesale, emergency uploading onto a computer system.In case the system crashes, and all the information created since the previous backup is lost, the contents of the tape can be loaded onto the system, restoring the lost information. Since crashes presumably occur infrequently, backup tapes need not be as convenient to access as, say, a CD-ROM. At the same time, backup tapes must have the capacity to store large amounts of information since they are relied upon to replace all the information contained on a computer system after a crash. It is understandable, then, that backup tapes sacrifice accessibility for storage capacity, since to have both would be impractical and costly.

**\*4** *Hagemeyer North America, Inc. v. Gateway Data Sciences Corp.,* 222 F.R.D. 594, 600 (E.D.Wis.2004) (Citations omitted).

This is not to say that undue burden may be presumed simply because electronic evidence is involved. *Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309, 318 (S.D.N.Y.2003). But, in the hierarchy of accessibility, it is clear that electronic data stored on media such as the backup tapes involved here is near the bottom. *Id.* at 319.One of the reasons for the difficulty involved in searching backup tapes is that they store infinitely more information than most other storage media. For example, a CD-ROM's storage capacity is 650 megabytes, the equivalent of 325,000 typewritten pages. Computer networks, on the other hand, create backup data meas-

ured in terabytes-1,000,000 megabytes-which is the equivalent of 500 billion typewritten pages. Manual for Complex Litigation (Fourth) § 11.446 (2004) (*cited in Hagemeyer,* 222 F.R.D. at 601).

It is not a decisive answer to say that the defendants have offered pay the costs that might be incurred in retrieving the emails. Expense is but a part of the burden. As Mr. Petty's uncontested affidavit indicates, the process of retrieving the emails also entails the extensive use of equipment and internal manpower. It will take six weeks to restore and review the data of just one of the three individual's email accounts. The entire project, then, will entail eighteen weeks of effort. To be sure, one can imagine the use of three dedicated servers to perform each of the six weeks of restoration work concurrently, but the end result is still eighteen weeks of manpower and eighteen weeks of use of the necessary equipment. That burden, which is undeniably substantial, exists independently of the monetary costs entailed.

The defendants have dealt with the question of undue burden by essentially ignoring its existence. This mode of dealing with potentially dispositive argument is as pointless as is ignoring potentially dispositive authority that is contrary to a party's position. *Hill v. Norfolk & Western Ry. Co.,* 814 F.2d 1192, 1198 (7th Cir.1987); *Fred A. Smith Lumber Company v. Edidin,* 845 F.2d 750, 753 (7th Cir.1988). While ignoring the question of burdens, the defendants have not cited not a single case in which a non-party was subjected to the significant burden of restoring electronic data from backup tapes.

### C

### The Significance Of HFS's Non-Party Status

In keeping with the text and purpose of Rule 45(c)(3)(A), it has been consistently held that non-party status is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue. *See North Carolina Right to Life, Inc. v. Leake,* -F.R.D.-, 231 F.R.D. 49, 2005 WL 2456982 (D.D.C. Oct.6, 2005); *Wyoming v.*



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-06458    Document 25-7    Filed 12/11/2007    Page 17 of 22

*U.S. Dept. of Agriculture,* 208 F.R.D. 449, 452 (D.D.C.2002); *In re Automotive Refinishing Paint,* 229 F.R.D. 482, 495 (E.D.Pa.2005). As the First Circuit has explained:

**\*5** Although discovery is by definition invasive, parties to a law suit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to *special weight* in evaluating the balance of competing needs.

*Cusumano v. Microsoft Corp.,* 162 F.3d 708, 717 (1st Cir.1998)(Emphasis added). Here, the unique burden of restoring the email records and the special weight to be accorded HFS's non-party status combine to require that the defendants' subpoena be quashed under Rule 45(c)(3)(A)(iv).

Instead of focusing on the pivotal question of undue burden, the defendants attempt to demonstrate how relevant-i.e., how important-the emails are to HFS's possible knowledge and approval of the defendants' alleged fraud under the False Claims Act. According to the defendants, HFS was aware of adverse selection and has allowed it to be a general part of the Medicaid program that it was charged with administering. (*Defendants' Response to Motion of Non-Party HFS,* at 13.) As such, the defendants argue that their request for the emails is critical to a government knowledge defense under *United States ex rel. Durcholz v. FKW, Inc.,* 189 F.3d 542 (7th Cir.1999).

There, the Seventh Circuit explained that, in order to prove an FCA violation, a relator must produce evidence that [the defendant] knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval. *Id.* at 544 (*citing*31 U.S.C. § 3729(a)(1)). The court described the *mens rea* element as requiring that the defendant have actual knowledge of (or deliberately ignore or act in reckless disregard of) the truth or falsity of the information presented; no specific intent to defraud is required. 189 F.3d at 544 (Emphasis in original). While the court noted that [i]nnocent mistakes or negligence are not actionable, it also cautioned

that [w]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either fraudulent or simply false. *Id.*

As for the government knowledge defense, the court held that: [i]f the government knows *and approves of* the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. *Id.* at 545 (Emphasis added). Despite the seeming clarity of the court's opinion, HFS and the defendants have very different interpretations of the opinion and of the elements of the defense. (*Defendants' Response to Motion of Non-Party HFS,* at 13-14; *Reply Brief of the Non-Party HFS to Defendants' Response,* at 3-5). For the defendants, knowledge, *simpliciter,* is enough. Not surprisingly, HFS contends that there must have been approval by employees who had approval authority, not merely knowledge of what was going on. (*HFS Reply Brief* at 6). For the defendants, this sort of proof is irrelevant since they ignore the approval prong of the Seventh Circuit's opinion.

**\*6** Of course, it would be improper for me to make a determination about the ultimate merits of the controversy regarding the scope of the government knowledge defense since that issue is before Judge Leinenweber in the context of defendant's motion for summary judgment. But that does not mean that some cursory review is inappropriate for limited purposes. Compare *Von Drake v. National Broadcasting Co., Inc.,* No. 04-CV-0652, 2004 WL 1144142, \*2 (N.D.Tex. Mar. 29, 2004)(cursory review to determine whether defendants have substantial arguments for dismissal); *Pacific Lumber Co. v. National Union Fire Insurance. Co. of Pittsburgh, PA,* 220 F.R.D. 349, 352 (N.D.Cal.2003)(cursory review to determine whether motion will potentially dispose of entire case and whether pending motion can be decided absent additional discovery); *Chrysler Capital Corp. v. Century Power Corp.,* 137 F.R.D. 209, 209-10 (S.D.N.Y.1991)(cursory review to determine whether motion appears to have substantial grounds or does not appear to be without foundation in law); *Aura Lamp & Lighting, Inc. v. International Trad-*



Case 1:07-cv-06458    Document 25-7    Filed 12/11/2007    Page 18 of 22

*ing Corp.,* 325 F.3d 903 (7th Cir.2003); *Price v.Code-Alarm,* 73 Fed.Appx. 159, 161, 2003 WL 21750812 (7th Cir.2003); (Although a court of appeals lacked jurisdiction to decide the merits of a case over which there was no jurisdiction, it could nevertheless take a peek to see whether to transfer the case to the Federal Circuit or dismiss the appeal); *Philips v. Seiter,* 173 F.3d 609, 611 (7th Cir.1999).

Judge Cudahy was the author of the opinion in *Durcholz.* On the panel were Judges Posner and Rovner. The Court of Appeals' conjunctive phrasing-if the government knows *and* approves-would appear to have been purposeful and intended to signal that mere knowledge alone of illegality would not enable those who defraud the government from being able to draw a conjurer's circle around their illegality and insulate themselves from condign punishment. Any other reading would make the conjunctive phrasing superfluous. The defendants have not paused to analyze the matter in any depth; they have merely quoted the text of the opinion. HFS, relying on the identical language quoted by the defendants, stressed the conjunctive phrasing and, in addition, adverted to the doctrine that prohibits, in most cases, estoppel against the government.

The inappropriateness of my deciding the issue presently before Judge Leinenweber is further underscored by the fact that the Relator and the State of Illinois have not briefed the government knowledge issue in connection with the present motion, involving as it does, a non-party. Consequently, any expression of ultimate opinion on the government knowledge defense would not only be unfair, but would necessarily be uninformed, as parties with a significant interest in the proper resolution of the question have not had an opportunity to express themselves. *Cf. Adamson v. California,* 332 U.S. 45, 59 (1946) (Frankfurter, J., concurring) (the judicial process [is] at its best only when there are comprehensive briefs and powerful arguments on both sides....); Brandeis, The Living Law, 10 Ill. L.Rev. 461, 470 (1916)(A judge rarely performs his functions adequately unless the case before him

is adequately presented.).

**\*7** On the state of the present record, the following seems beyond debate: the burden on HFS to produce the requested emails is substantial and undue, while the claimed criticality of the emails is anything but certain, given the polar positions on the question by HFS and the defendants and the unresolved nature of the issue of the contours of the government knowledge defense. But even if it be conceded that the emails are potentially germane to the that defense, the significant and undue burden on HFS precludes production. *See Heidelberg Americas,* 333 F.3d at 41. In *Heidelberg,* for example, the First Circuit upheld the district court's quashing of a subpoena to a non-party and, in so doing, noted that:

some considerable question exists as to how discovery of the materials would lead to admissible evidence. In other words, the documents are not obviously, and perhaps not even reasonably, calculated to lead to other discoverable materials ... The burden on the non-party ..., by contrast, appears to be significant.

333 F.3d at 41.

Here, too, the subpoena is significantly burdensome, and there is a question as to the claimed criticality of the emails: When the defendants filed their motion for summary judgment in December 2004, they were obviously satisfied that the evidentiary record they had compiled was sufficiently comprehensive and compelling that there were no disputed issues of material fact on the question of the government knowledge defense. In the intervening eleven months, the defendants have been content to rely on the record submitted to the district court. Yet, in this court, they now insist that the emails are indispensable to the defense that they thought was so straightforward and uncompromising in their favor that they were entitled to judgment as a matter of law under Rule 56. The tension between the current claim in this court that the evidence is so critical that any burden that the non-party HFS must endure is outweighed by the need for the evidence and the position taken in the sum-



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-06458   Document 25-7   Filed 12/11/2007   Page 19 of 22

mary judgment motion is as irreconcilable as it is obvious. In short, while the evidence sought may be relevant, on the present record, the efforts required for its production would be unduly burdensome, especially given HFS's non-party status, and the unresolved issue of the scope of the government knowledge defense.

For the foregoing reasons, the motion of non-party Illinois Department of Healthcare and Family Services to quash the defendants' subpoena [267] as to document category No. 7 is GRANTED.

N.D.Ill.,2005.
U.S. v. Amerigroup Illinois, Inc.
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)

END OF DOCUMENT



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 1
Not Reported in F.Supp.2d, 2006 WL 559288 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d)

c

Morrow v. Air Ride Technologies, Inc.

S.D.Ind.,2006.

Only the Westlaw citation is currently available.

United States District Court,S.D. Indiana, Indiana-
polis Division.

Joe MORROW and American, Innovative Manu-
facturing Industries, Inc., Plaintiffs,

v.

AIR RIDE TECHNOLOGIES, INC. Defendant.

No. IP-05-113.

March 6, 2006.

ENTRY ON PLAINTIFFS' MOTION TO COM-
PEL RESPONSE TO NON-PARTY SUBPOENA

BAKER, Magistrate J.

I. Background.

**\*1** On November 12, 2004 Plaintiffs Joe Morrow
and American Manufacturing Industries, Inc., filed
a patent infringement suit against competitor De-
fendant Air Ride Technologies, Inc., in the United
States District Court of Arizona. [JAMS Docket
No. 2, pp. 1-2 .] Through Defendant's discovery re-
sponses, Plaintiffs learned that Defendant used
products from Firestone Industrial Products Com-
pany (Firestone)  in manufacturing the products at
issue in the Arizona patent suit. [*Id.,* p. 2.] Fire-
stone, too, is one of Plaintiffs' direct competitors.
[JAMS Docket No. 2, p. 3.] In subsequent discov-
ery requests to Defendant, Plaintiffs sought all
documents showing what components [Firestone]
provided to Defendant  for use in the allegedly in-
fringing products. [*Id.*]

When Defendant allegedly failed to produce any
documents, Plaintiffs served Firestone, a non-party,
with a subpoena duces tecum on November 10,
2005 requesting all documents showing  or touch-
ing upon any communications between and/or busi-
ness transacted between Firestone Ind. Prod. Co.
and/or any affiliated entities and Air Ride Techno-
logies and/or any affiliated entities, from January 1,
1997 to the present date.[JAMS  Docket Nos. 3, 5.]

Consistent with Fed.R.Civ.P. 45(c)(2)(B), Firestone
served written objections on all parties on Novem-
ber 22.[FN1][JAMS Docket No. 4.] Firestone objects
to the subpoena on the dual bases that it subjects
Firestone to undue burden and contemplates the
production of privileged and other protected matter.
[JAMS Docket No. 11.]

> FN1. Firestone initially did not file its ob-
> jections and proposed motion to quash sub-
> poena with any court. Subsequent to
> Plaintiffs' motion to compel, Firestone ob-
> tained leave from this Court to respond to
> Plaintiffs' motion to compel. [JAMS Dock-
> et No. 10.] Although the response filed by
> Firestone is titled Non-Party  Firestone In-
> dustrial Products Company's Motion to
> Quash Subpoena Duces Tecum and Re-
> sponse to Plaintiffs' motion to compel,  the
> only matter properly before this Court is
> Plaintiffs' motion to compel, and the Court
> treats this filing as a response.

On December 9, Plaintiffs moved to compel Fire-
stone's response to the subpoena.[FN2][JAMS Dock-
et No. 1.] Plaintiffs contend that Firestone's objec-
tions are largely unsupported bare  assertions.
[JAMS Docket No. 2, pp. 4-7.] Plaintiffs also assert
that they are entitled to the requested discovery be-
cause it is relevant to establish when the alleged in-
fringement commenced, whether and to what extent
it was knowing and willful, whether Firestone en-
gaged in contributory negligence, and to determine
if any additional claims exist against Firestone.

> FN2. Plaintiffs failed to submit a separate
> statement certifying that Plaintiffs' counsel
> made a reasonable effort to reach agree-
> ment with Firestone on this matter as re-
> quired by Local Rule 37.1. While it would
> be well within the Court's discretion to re-
> quire strict compliance with the local rules,
> the Court opts instead to assess the merits
> of this issue rather than dispose of this
> matter on procedural grounds. *See Fisher*



*v. National Railroad Passenger Corporation, 152 F.R.D. 145, 149 (S.D.Ind.1993) ([W]here a previous error is the result of negligence or other nonculpable conduct ... the dispute is better decided on the merits than on procedural grounds.).*

## II. Discussion.

Plaintiffs move to compel responses to their non-party subpoena under Federal Rule 45(c)(2)(B), which provides that if objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Rule 45 mandates that such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded. Fed.R.Civ.P. 45(c)(2)(B). A district court may limit the scope of discovery if the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive. Fed.R.Civ.P. 26(b)(2); *see also Cook, Inc. v. Boston Scientific Corp.,* 2002 WL 406977, at *1 (N.D.Ill.2002) (Discovery may be limited if the court determines it is unreasonably cumulative or duplicative, or if the burden or expense of the proposed discovery outweighs its likely benefit.) (internal quotations omitted).It has consistently been held that non-party status' is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue. *United States v. Amerigroup Illinois, Inc.,* 2005 WL 3111972, at *4 (N.D.Ill. Oct. 21, 2005).

**\*2** Plaintiffs' chief contention-that Firestone's objections are not appropriately substantiated-could easily be levied against Plaintiffs' arguments as well. In this case, the request is unduly burdensome on its face and the Plaintiffs' statements in support of their motion actually undermine any assertion that the discovery is relevant to the instant litigation.FN3

FN3. Based on the paucity of information concerning the requested documents, the Court does not endeavor to assess whether this request implicates trade secrets or other confidential materials. Instead, the Court bases its decision on the undue burden to the non-party in this matter and Plaintiffs' lack of verification that the information is unavailable through any other source. Nonetheless, it is not difficult to imagine that this request could reach trade secrets and confidential information for which Plaintiffs have not demonstrated the requisite relevance and specific need. *See Pioneer Hi-Bred International Inc., v. Holden's Foundation Seeds, Inc.,* 105 F.R.D. 76, 82 (N.D.Ind.1985).

To determine whether a Rule 45 subpoena is unduly burdensome, a court may weigh a number of factors including relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are requested, and the burden imposed. *The Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Servicenter of Haverstraw, Inc.,* 211 F.R.D. 658, 662-63 (D.Kan.2003). In this case, Plaintiffs subpoena casts a wide net encompassing any and all documents in any form concerning communication or business transactions between non-party Firestone, Defendant, and any of their respective affiliates over a seven-year period. In both of their briefs, Plaintiffs advocate that their offer to pay all reasonable costs of compliance with the subpoena nullifies any possible burden to Firestone. [JAMS Docket Nos. 2, 13.] Plaintiffs' offer misses its legal mark because expense is but a part of the burden. *Amerigroup Illinois,* 2005 WL 3111972 at *4.

Plaintiffs fail to adequately explain exactly how this information is reasonably calculated to lead to discovery of admissible evidence. Plaintiffs' statements to the Court that they seek the information to support a claim of contributory negligence and other potential amended claims against Firestone [JAMS Docket No. 2, p. 6] belie any contention that the request was designed to reap relevant evid-



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ence for use in the pending litigation as presently postured. As such, Plaintiffs' request cannot stand.

Plaintiffs vastly understate the obvious burden their subpoena imposes on Firestone. For instance, Plaintiffs state, Plaintiffs have requested documents showing Firestone's business dealings with a small, family owned company, that has one location and buys a limited number of components, going back only to the late 1990's.[JAMS Docket No. 13, p. 3.] Such statements do nothing to demonstrate the lack of burden on Firestone. If anything, these statements suggest that Plaintiffs should seek alternative means of discovery. Given its breadth and lack of specificity or relevance to any claims pending in the underlying lawsuit, this subpoena facially poses an undue burden on Firestone. *See Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, LTD,* 333 F.3d 38, 42 (1st Cir.2003) (subpoena requesting any and all documents relating to business between plaintiff and a non-party over a ten-year span of time was unduly burdensome).

Plaintiffs' reasoning foreshadows another basis for denying their motion. Plaintiffs seem to concede, implicitly at least, that the information they seek may be available from Defendant. While Plaintiffs represent that they served discovery requests and followed up in writing when no response was received, they do not state that they moved to compel the production of this information from the adversarial party Defendant. Absent such assurance of unavailability of this information from this less burdensome source, this Court is reluctant to allow the Plaintiffs to jettison the burden of production on a non-party, however potentially adversarial that non-party may ultimately prove to be to Plaintiffs. *See Bada Company v. Montgomery Ward & Co.,* 32 F.R.D. 208, 209-10 (S.D.Ca.1963) (non-parties to the action should not be burdened with the annoyance and expense of producing the documents sought unless the plaintiff is unable to discover them from the defendant).

### III. Conclusion.

**\*3** Plaintiffs' expansive subpoena poses an undue burden on a non-party and seeks information that may be obtainable from some other source that is more convenient, less burdensome, or less expensive. Accordingly, the Court DENIES Plaintiffs' motion to compel [JAMS Docket No. 1] Firestone's response to Plaintiffs' November 10, 2005, subpoena.

So ordered.

S.D.Ind.,2006.
Morrow v. Air Ride Technologies, Inc.
Not Reported in F.Supp.2d, 2006 WL 559288 (S.D.Ind.)

END OF DOCUMENT



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.