**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| IN RE: SUBPOENA TO HOSIDEN AMERICA | ) | Case Number 07-cv-6458 |
| CORPORATION | ) | |
| | ) | Judge Ruben Castillo |
| HONEYWELL INTERNATIONAL, INC., et al., | ) | |
| | ) | Magistrate Judge Schenkier |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| APPLE COMPUTER, et al., | ) | |
| | ) | |
| Defendants | ) | |

**COPIES OF UNPUBLISHED OPINIONS CITED IN**

**FUJIFILM CORPORATION'S REPLY MEMORANDUM**

**RICHARD BIEDRZYCKI Plaintiff, v. TOWN OF CICERO, JASON STROUD; RICHARD RAMIREZ; JAMES KOSENESKY; RHONDA GROSS; METRO PARAMEDIC SERVICES, INC.; ANTHONY GEIGER; JOSEPH WINKLER; AND JOHN/JANE DOES 1-10 Defendants.**

**04 C 3277**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2005 U.S. Dist. LEXIS 16423*

**August 8, 2005, Decided**
**August 8, 2005, Filed**

**COUNSEL:** [*1] For Richard Biedrzycki, Plaintiff: Terence J Moran, Joshua Karsh, Peter C McLeod, Gessler Hughes Socol Piers Resnick & Dym Ltd., Chicago, IL.

For Town of Cicero, Defendant: Nicholas Geanopoulos, The Vrdolyak Law Group LLC, Chicago, IL.

For Jason Stroud, Richard Ramirez, James Kosenesky, Defendants: John B. Murphey, Rosenthal, Murphey, Coblentz & Janega, Chicago, IL.

For Metro Paramedic Services, Inc, Defendant: Jeffrey H. Lipe, Alexander R Thiersch, Summer E Heil, Williams, Montgomery & John, Ltd., Chicago, IL.

For Anthony Geiger, Joseph Winkler, Defendants: Michael Raymond LaBarge, Deborah Jennifer Spector, LaBarge, Campbell & Lyon, LLC, Chicago, IL.

**JUDGES:** Magistrate Judge Maria Valdez.

**OPINION BY:** MARIA VALDEZ

**OPINION**

**MEMORANDUM OPINION AND ORDER**

This matter is now before the court for ruling on four discrete but interrelated discovery motions. The four motions are intertwined to the extent they all deal with the discovery of ambulance reports and other documents, many of which likely disclose non-party medical information and treatment histories. [1]

1 The Court has not undertaken an *in camera* review of the documents in dispute, and finds the document descriptions provided by parties sufficient to reach the decisions on the legal issues raised.

[*2] The four motions before this Court are as follows. First, defendant paramedics, Anthony Geiger and Joseph Winkler ("Geiger and Winkler"), move to quash plaintiff's subpoena to non-party Loyola Medical Services ("Loyola") [45] (Defs. Geiger & Winkler's Mot. to Quash at 1), a regional medical resource center with supervisory powers and authority over defendant paramedics and their employer Metro Paramedic Services, Inc. ("Metro"). Similarly, defendant Metro, the town's contracted provider of ambulance/paramedic services, moves to quash plaintiff's subpoena to Loyola and to quash plaintiff's production request of the defendant Town of Cicero ("Cicero") [48] (Def. Metro's Mot. to Quash at 1). Third, plaintiff moves for the entry of a protective order for the handling and disposition of ambulance reports and financial information sought in discovery [52] (Pl.'s Mot. for HIPPA Qualified Protective Order at 1). Finally, plaintiff moves to compel production of select ambulance reports by defendant Metro [54] (Pl.'s Mot. to Compel Produc. at 1).

For the reasons the Court sets out below, the defendants' motions to quash are DENIED, the plaintiff's motion for the entry of a protective [*3] order is GRANTED, and the plaintiff's motion to compel production is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

This lawsuit arises from a July 7, 2003 incident in which defendant paramedics and police responded to a

911 call from the apartment of the plaintiff, Richard Biedrzycki. Plaintiff alleges, in part, that the paramedics failed to provide appropriate medical care and that the officers and paramedics battered him. Plaintiff also alleges that the defendants, exclusive of defendant Metro, engaged in a conspiracy to deprive him of his constitutional rights and engaged in a malicious prosecution.

Plaintiff brings this action under *42 U.S.C. § 1983*, *42 U.S.C. § 12132*, *29 U.S.C. § 794(a)*, and state law. (Compl. at 2.) There are mixed federal and state claims pending against four named police officers, Cicero, and paramedics Geiger and Winkler. Metro is the only defendant the plaintiff sues solely under state law.

## DISCUSSION

### A. Defendants' Motions to Quash

On March 2, 2005, plaintiff issued a subpoena *duces tecum,* pursuant to *Federal Rule of Civil Procedure 45* [*4]  ("*Rule 45* subpoena"), to the keeper of records for Loyola seeking a number of ambulance reports and other documents with a return date of March 15, 2005. Thereafter plaintiff served document requests, pursuant to *Federal Rule of Civil Procedure 34* ("*Rule 34* production request"), on Cicero and Metro for a number of similar documents.

On March 28, 2005, well after the standing return date for Loyola, defendant paramedics moved to quash the *Rule 45* subpoena served on Loyola on two grounds: (1) that the discovery requested would disclose privileged medical information and (2) that the discovery requested would result in an undue burden on Loyola. (Defs. Geiger & Winkler's Mot. to Quash at 1.) Two days later, defendant Metro moved to quash on the same grounds, plus it objected to the *Rule 34* production request served on Cicero on grounds of undue burden and privilege. (Def. Metro's Mot. to Quash at 1.) On April 26, 2005, defendant paramedics joined defendant Metro's effort to oppose the *Rule 34* production request served on defendant Cicero. (Defs. Geiger & Winkler's Reply at 1.)

### 1. Subpoena Served on Non-Party Loyola

Loyola, the subject [*5]  of the *Rule 45* subpoena, complied and produced documents to plaintiff before defendants filed their motion to quash. Today, plaintiff has most of the Loyola-disclosed records, and defendants have declined receipt of these documents until the time that this Court rules on pending motions. (Pl.'s Mem. in Opp'n at 2, 9.)

Plaintiff's original subpoena to Loyola sought production in 10 areas, specified in an attached rider. Defendants assert that they do not raise arguments against production "regarding emergency medical services provided to the Plaintiff." (Def. Metro's Reply at 3; Defs. Geiger & Winkler's Reply at 1 (consisting of rider PP 1.a, 1.b, and 2).) Defendants, moreover, state that they have no objections to Loyola's compliance with rider PP 9 and 10 and portions of P 3. (Def. Metro's Reply at 3, 7; Defs. Geiger & Winkler's Reply at 1 (no objection as to rider PP 9, 10 and the "EMT licenses and continuing education transcripts" requested under rider P 3).) Plaintiff states that Loyola has no documents responsive to rider PP 1.e, 1.g, 4, 5, 6, 7, and 8, thereby making moot ceratin of defendants' joint objections. (Pl.'s Mem. in Opp'n at 6, 8.) In sum, only defendants' objections [*6] to rider PP 1.c, 1.d, and 1.f and the remaining portion of P 3 remain for this Court to address.

### a. Local Rule 37.2

Plaintiff draws the Court's attention to the fact that defendants' motions fail to comply with *Rule 37.2* of the Local Rules of the Northern District of Illinois ("*Local Rule 37.2*"). (Pl.'s Mem. in Opp'n at 2.) In pertinent part, *Local Rule 37.2* provides that:

> [the] court *shall* hereafter refuse to hear any and all motions for discovery and production of documents under *Rule 26 through 37 of the Federal Rules of Civil Procedure*, unless a motion includes a statement (1) that after consultation in person or by telephone and good faith attempts to resolve differences they are unable to reach an accord, or (2) counsel's attempts to engage in such consultation were unsuccessful due to no fault of counsel's.

*Local Rule 37.2* (emphasis added).

*Local Rule 37.2*'s consultation requirement encourages resolution of discovery disputes without judicial involvement. Yet, defendants concede that they did not comply and, in fact, attempt to minimize the importance of the meet-and-confer requirement by chastising plaintiff [*7]  for his "insistence on a conference that would have been fruitless. . . ." (Def. Metro's Reply at 2-3; Defs. Geiger & Winkler's Reply at 1.) *Local Rule 37.2* is not a *suggestion* to the parties, rather it is a mandate. Defendants Metro, Geiger, and Winkler do not get to make a unilateral decision to disregard a Local Rule because they find the subject matter to be "a distraction from the real issues." (Def. Metro's Reply at 2; Defs. Geiger & Winkler's Reply at 1.) Defendants flippantly ask this Court to "not allow plaintiff's reliance on a technicality" to overshadow their arguments. (Def. Metro's Reply at 3; Defs. Geiger & Winkler's Reply at 1.) However, "failure to comply with the local rules is not merely

a 'harmless technicality,' but can be a 'fatal' mistake." *Ridge Chrysler Jeep L.L.C. v. Daimler Chrysler Servs. N. Am., L.L.C., 2004 U.S. Dist. LEXIS 26861, 2004 WL 3021842 at *4 (N.D. Ill. 2004).*

Given the apparent mandatory language of *Local Rule 37.2*, this Court could strictly enforce the import of the rule and deny the motions to quash in their entirety as plaintiff requests. *See, e.g., Sondker v. Philips Elecs. N. Am., 2004 U.S. Dist. LEXIS 14477, 2004 WL 1687016 at *2 (N.D. Ill. 2004)* (striking [*8] moving party's motion for failure to comply with *Local Rule 37.2*'s consultation statement requirement). However, out of deference to the important issues of physician-patient and medical record privilege defendants raise, this Court will not exercise its discretion to deny the motions to quash for failure to abide by *Local Rule 37.2*. Plaintiff's request to deny the motions on this basis, while well-grounded, is denied.

### b. Standing

Plaintiff asserts that defendants lack of standing to challenge the subpoena to non-party Loyola. "Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action unless the party claims some personal right or privilege with regard to the documents sought." *Kessel v. Cook County, 2002 U.S. Dist. LEXIS 4185, 2002 WL 398506 at *2 (N.D. Ill. 2002)* (citation omitted). However, "[a] party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's *legitimate interests." United States v. Raineri, 670 F.2d 702, 712 (7th Cir. 1982)* (emphasis added), *cert. denied, 459 U.S. 1035, 74 L. Ed. 2d 601, 103 S. Ct. 446 (1982). See also United States v. Segal, 276 F. Supp. 2d 896, 900 (N.D. Ill. 2003).* [*9] "Legitimate interests" have included claims of privilege. *See United States v. Bodkins, 2004 U.S. Dist. LEXIS 22406, 2004 WL 2491615 at *3 (W.D. Va. 2004).* As such, plaintiff's request for the denial of the defendants' motions to quash for lack of standing is denied in part. The Court finds defendants have a legitimate interest in protecting the physician-patient and medical record privileges held by non-parties, which secures their standing to raise such claims.

However, defendants do not have standing to argue against Loyola's compliance on grounds of undue burden. Defendants urge an "undue burden" argument on behalf of third-party Loyola -- which did not raise this objection and has already produced documents on time. *See Kessel, 2002 U.S. Dist. LEXIS 4185, 2002 WL 398506 at *2 (N.D. Ill. 2002)* ("Given that subpoenaed parties have produced documents, they obviously have not asserted that the requested production was burdensome or inconvenient, or that the subpoenas sought documents so far removed from relevant issues in the case that the non-parties should be put to the task of pro-

ducing them.") Like *Kessel,* this Court declines to find the burden of production a "legitimate interest" to support standing [*10] for movants to quash discovery subpoenas of another where the third-party fully complied with production, without objection, and within their allotted time. This Court rejects defendants' undue burden objections, and will instead review each of the remaining portions of the subpoena rider called into question by privilege. [2]

> 2  The Court notes that the parties jointly raise one fact-related issue that calls into question the sufficiency of Loyola's position to object to the subpoena on grounds of privilege. Defendants raise a concern that the advisory affixed to the subpoena was misleading and left Loyola with the (mis)impression that attorneys for all nonparty individuals had been provided enough information to permit them to raise such objections on their own. (Defs. Geiger & Winkler's Mot. to Quash at 2; Def. Metro's Mot. to Quash at 2.) Plaintiff concurs and clarifies that the misleading notices were affixed by Record Copy Services, the process agent of the plaintiff. (Pl.'s Resp. at 6-7 n.5.) This Court has concerns that the advisory placed on the subpoena by plaintiff's agent could have been misleading and served to weaken Loyola's footing to object properly, had it chose to do so. As such, defendants were and are the next best suited parties to subrogate Loyola's potential objection on privilege grounds, which further strengthens their claims of standing to argue privilege. Defendants have standing to object to the subpoena based on privilege, but not undue burden.

### [*11]  c. Timeliness of Objections

Plaintiff served his subpoena on Loyola on March 2, 2005 with a return date of March 15, 2005. (Pl.'s Mem. in Opp'n at 2.) Loyola raised no objections and complied with production on time. Defendant paramedics moved to quash plaintiff's subpoena, in part on grounds of privilege, on March 28, 2005, and then defendant Metro moved to quash on March 30, 2005, roughly two weeks after the window for Loyola to comply or object closed. Plaintiff contends defendants' motions to quash are thereby untimely and should be denied on that basis.

*Federal Rule of Civil Procedure 26(b)(1)* limits the scope of discovery to "any matter, not privileged, which is relevant to the subject matter involved in the pending action." This limit "is not self-executing." *Ritacca v. Abbott Laboratories, 203 F.R.D. 332, 334-35 (N.D. Ill. 2001)* (citations omitted); *Applied Systems, Inc. v. Northern Insurance Co. of New York, 1997 U.S. Dist. LEXIS 16014, 1997 WL 639235 at *1 (N.D. Ill. 1997)* (citation

omitted). Instead, a party objecting to a discovery request on grounds of privilege must present the objection in a timely and proper [*12] manner as defined by the Federal Rules of Civil Procedure or risk waiver of the objection entirely. *See Hobley v. Burge, 226 F.R.D. 312, 319-20, 2005 U.S. Dist. LEXIS 3904 (N.D. Ill. 2005)* (citing *Ritacca, 203 F.R.D. at 335*); *Applied Systems, Inc., 1997 U.S. Dist. LEXIS 16014, 1997 WL 639235 at *1. Federal Rule of Civil Procedure 45(c)(2)(B)* dictates what is "a timely and proper manner" for one to object to a discovery subpoena: within 14 days after service.

The "waiver of privilege" sanction is a fact-specific inquiry and has been reserved to extreme cases. *See Ritacca, 203 F.R.D. at 335* (citation omitted) (noting foot-dragging in responding to discovery as grounds to impose a waiver sanction); *Applied Systems, Inc., 1997 U.S. Dist. LEXIS 16014, 1997 WL 639235 at *2* (noting sanction is "reserved for cases of unjustified delay, inexcusable conduct, bad faith, or other flagrant violations"). "Minor procedural violations, good faith attempts at compliance, and . . . mitigating circumstances militate against finding waiver." *Ritacca, 203 F.R.D. at 335* (citation omitted). Plaintiff would have this Court believe that defendants' actions [*13] rise to level of foot-dragging. However, this court respectfully declines plaintiff's invitation to shuffle down that path.

Plaintiff argues that defendants' delay caused him prejudice, "by making it impossible to resolve the motions before the . . . depositions of Geiger and Winkler" (Pl.'s Mem. in Opp'n at 3) and that defendants have engaged in a "pattern" of disobeying discovery dates (Pl.'s Reply Mem in Supp. of Mot. to Compel Produc. at 1). Defendants offer that there was no prejudice to the plaintiff as deposition dates were continued. (Metro's Reply at 3; Def. Geiger & Winkler's Reply at 1.) As plaintiff has not responded to this factual statement, the Court is left to assume any prejudice, if any, caused by defendants' untimeliness was cured by the deposition continuances. The Court finds that the plaintiff did not suffer any prejudice from the defendants' untimely objections. Moreover, the misleading notice affixed to the Loyola subpoena serves as another mitigating factor arguing against a finding of waiver. For these reasons, plaintiff's objection to defendants' motions to quash the *Rule 45* subpoena for untimeliness is denied.

This Court next addresses the remaining portions [*14] of the subpoena rider that defendants allege run counter to *Federal Rule of Civil Procedure 45(c)(3)(A)(iii)* (disclosure of privilege).

### d. Disclosure of Privilege

A review of defendants' pleadings, in light of the mooted claims, reveals a substantial similarity in defendants' objections to rider PP 1.c and 1.d, so this Court addresses them together. Rider P 1.c asks for "all documents relating to EMS services provided by EMT Anthony Geiger on July 7, 2003." (Defs. Geiger & Winkler's Mot. to Quash at Exhibit B.) Rider P 1.d requests the same but with regard to Geiger's co-defendant, Winkler: "All documents relating to EMS services provided by EMT Joseph Winkler on July 7, 2003." (Defs. Geiger & Winkler's Mot. to Quash at Exhibit B.)

Defendant paramedics and defendant Metro raise two sources of applicable privilege: (1) HIPAA and (2) state law. First, defendants both construe the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") to ground a cognizable federal physician-patient or medical record privilege. (Defs. Geiger & Wikler's Mot. to Quash at 2-3; Def. Metro's Mot. to Quash at 2-3.) Second, defendants also raises [*15] a violation of "the more stringent provisions of Illinois state law governing patient privacy records" (Def. Metro Mot. to Quash at 2; Defs. Geiger & Winkler's Reply at 1), in other words "the physician-patient privilege under Illinois state law" or state medical records privilege (Def. Metro Mot. to Quash at 3; Defs. Geiger & Winkler's Reply at 1). The Court addresses each in turn.

### i. HIPAA as Source of Applicable Privilege

Defendants' pleadings fashioning a violation of HIPAA's regulations, specifically *45 C.F.R. § 164.512(e)*, are off the mark. Whether or not HIPAA was violated in this case [3] does little to help defendants clear the threshold inquiry -- whether HIPAA provides an applicable federal privilege for quashing a subpoena request under *Federal Rule of Civil Procedure 45(c)(3)(A)(iii)*. The Seventh Circuit has recently provided a clear answer: HIPAA regulations' procedure for obtaining authority to use medical records in litigation, *45 C.F.R. § 164.512(e)*, is purely procedural in nature and does not create a federal physician-patient or hospital-patient privilege. *Northwestern Mem'l Hosp. v. Ashcroft, 362 F.3d 923, 925-26 (7th Cir. 2004).* [*16] Thus, defendants' reliance on HIPAA as a source of privilege is unfounded.

> 3   As defendants point out, HIPAA's regulations, specifically *45 C.F.R. § 164.512(e)*, authorize a "covered entity" to disclose private health information injudicial proceedings, in part, under either an order of a court or "in response to a subpoena, discovery request, or other lawful process" if the party seeking the information either notifies the patient or makes a "reasonable effort" to secure a qualified protective order. *See Northwestern Mem'l Hosp. v. Ashcroft, 362 F.3d 923, 925-26 (7th Cir. 2004).* Whether or not Loyola is a "covered entity" for HIPAA purposes is not a determination this Court need reach. However, the one fact-specific issue seems clear: plaintiff

sought a protective order, albeit late and well af-ter the fact of Loyola's compliance with the sub-poena, when HIPAA appears to require plaintiffs seeking disclosure under *45 C.F.R. § 164.512(e)(1)(ii)(B)* to notify the subject of the subpoena that "reasonable efforts *have been made* by such party to secure a qualified protective or-der" prior to the time of the disclosure request. *See 45 C.F.R. § 164.512(e)(1)(ii)(B)* (emphasis added). This potential lack of compliance with HIPAA, while related to these events, is not rele-vant to the Court's inquiry as to the applicable source of privilege.

[*17] ii. State Law as Source of Applicable Privi-lege

Defendants rely, in the alternative, on state physi-cian-patient/medical records privilege as the source of the applicable privilege on which they frame their mo-tions to quash. (Def. Metro's Mot. to Quash at 3; Defs. Geiger & Winkler's Reply at 1.) According to defendant Metro, any response to the subpoena's ambulance records request would necessarily disclose medical information of the patients treated by defendant paramedics. (Def. Metro's Resp. to Mot. for Protective Order at 2.) Under defendants' argument, state law governs privilege in this matter and removes from discovery the ambulance re-cords that Loyola turned over. (Def. Metro's Mot. to Quash at 3; Defs. Geiger & Winkler's Reply at 1.)

Plaintiff, on the other hand, argues that state law is wholly inapplicable, (Pl.'s Mem. in Opp'n at 7-8), and that the ambulance records are relevant to both the fed-eral and state claims paving the way for the application of the federal privilege standard over a state standard (Pl.'s Mem. in Opp'n at 12-13). While Illinois does rec-ognize the privilege, "federal common law does not rec-ognize a physician-patient privilege." *Patterson v. Cat-erpillar, Inc., 70 F.3d 503, 506-07 (7th Cir. 1995)* [*18] (citing *Whalen v. Roe, 429 U.S. 589, 602 n.28, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977)*).

Although the mere pendency of litigation in federal court does not justify applying federal privilege law at the expense of state privilege law, *Rule 501 of the Fed-eral Rules of Evidence* guides the determination on whether material sought in discovery is privileged and by which standard. *See Mem'l Hosp. for McHenry County v. Shadur, 664 F.2d 1058, 1061 (7th Cir. 1981)* (per cu-riam). *Rule 501* reads:

Except as otherwise required by the Constitution of the United States or pro-vided by Act of Congress or in rules pre-scribed by the Supreme Court pursuant to statutory authority, . . . privilege . . . shall

be governed by the principles of common law as they may be interpreted by the courts of the United States in light of rea-son and experience. However, in civil ac-tions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege . . . shall be determined in ac-cordance with State law.

*FED. R. EVID. 501.*

From the express language of the above Rule, [*19] two conclusions are clear. First, when a plaintiff asserts only federal claims, federal privilege law governs. *See Northwestern Mem'l Hosp., 362 F.3d 923, 926 (7th Cir. 2004)* (noting federal common law the source of privi-lege in federal-question suits). Second, when the case is before a federal court under diversity jurisdiction, state privilege law applies. *Fed. R. Evid. 501.* What is unclear under *Rule 501*, however, is the proper resolution of a case like this, where the plaintiff asserts commingled federal and state claims and relevant evidence may be privileged under one but not the other. *See Jaffee v. Redmond, 518 U.S. 1, 17 n.15, 135 L. Ed. 2d 337, 116 S. Ct. 1923 (1996)* (noting the lack of clarity but finding resolution unnecessary to decide that case); Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 5434 at 861-64 (1980 ed. & Supp. 2005) (noting uncertain legislative history on point).

The Seventh Circuit follows the "usual solution by the courts " in cases where federal and state privilege law collide -- "a preference for federal privilege law when it conflicts with state privilege law." 3 Jack B. Weinstein & Margaret [*20] A. Berger, *Weinstein's Federal Evidence § 501.02[2][c]* at 501-14 (2d ed. 2005 & Supp. Feb. 2005) (noting at least seven federal circuits courts, in-cluding the Seventh Circuit, opt for the application of a federal privilege over a competing state privilege when evidence is relevant to both federal and state claims).

The appellate and trial courts of the Seventh Circuit have sided with this majority trend. *See Northwestern Mem'l Hosp. v. Ashcroft, 362 F.3d 923, 925 (7th Cir. 2004)* ("The enforcement of federal law might be ham-strung if state-law privileges more stringent than any federal privilege regarding medical records were appli-cable to all federal cases."); *Equal Employment Oppor-tunity Comm'n v. Illinois Dep't of Employment Sec., 995 F.2d 106, 107 (7th Cir. 1993)* ("When state and federal statutes clash, the *Supremacy Clause of the Constitution* gives the federal statute controlling force. *Rule 501 of the Federal Rules of Evidence* reinforces this message in the domain of evidentiary privileges."); *Mem'l Hosp. for McHenry County, 664 F.2d at 1061 n.3 (7th Cir. 1981)*

[*21] (per curiam) (applying federal privilege law in a federal action notwithstanding the presence of a supplemental state claim); *Hugley v. The Art Inst. of Chicago, 981 F. Supp. 1123, 1126 (N.D. Ill. 1997)* (court is not required to recognize state-law privilege in a case with "the principle claims" being federal despite one supplemental state claim).

While the state standards for privilege are most often not followed in a case with mixed federal and state claims, they are not completely disregarded either. *See Mem'l Hosp. for McHenry County, 664 F.2d at 1061.* "A strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at *no substantial cost* to federal substantive and procedural policy." *Id.* (citation omitted) (emphasis added). One occasion where a state privilege standard can apply in a mixed federal question with a supplemental state law claim case is when the contested evidence is only relevant to the state claim. *See Freeman v. Fairman, 917 F. Supp. 586, 588 (N.D. Ill. 1981).* Yet, the contested documents in this matter are not only relevant [*22] to the state claims.

Plaintiff alleges that the ambulance reports are relevant to his establishing the elements of Count IV (*§ 1983* malicious prosecution) and Count V (*§ 1983* conspiracy), as well as serving possible impeachment purposes or evidence to prove motive, intent, and/or *modus operandi.* (Pl.'s Reply Mem in Supp. of Protective Order at 8 n.6, 12-14.) We need not resolve the admissibility of ambulance reports for such purposes at such an early stage in the litigation. However, relevance in discovery is a far broader concept than under the Federal Rules of Evidence. It is well settled that relevance for discovery purposes, is to be interpreted broadly. *See Goldman v. Checker Taxi Co., 325 F.2d 853, 855 (7th Cir. 1963)* (citing *Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947)).* And, relevant material for discovery purposes may encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case. *Minch v. City of Chicago, 213 F.R.D. 526, 527 (N.D. Ill. 2003)* (internal quotations omitted) (citing *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 57 L. Ed. 2d 253, 98 S. Ct. 2380 (1978)).* [*23] Plaintiff's assertion that the Loyola-disclosed material is relevant to his federal claims seems reasonable, as it may prove to bear directly on or lead to other matters that may bear on his causes of action rooted in federal law. The above, taken together, supports the application of the federal law on privilege regarding physician-patient and medical record privilege over the corresponding state standards. There being no such privilege under federal law, the disputed documents are discoverable. Defendants' motions to quash the sub-

poena to Loyola with respect to rider PP 1.c and 1.d are denied. [4]

> 4  The result is the same for defendants' motions to quash rider P 1.f (covering documents pertaining to a specific ambulance run, incident # C307-283) and the remaining portion of rider P 3 (covering letters of commendation). Similar to their grounds of objection to rider PP 1.c and 1.d, defendants base their objection to rider PP 1.f and 3 by asserting that the Illinois physician-patient privilege and the state privilege contained in the Medical Studies Act, *735 ILCS 5/8-2101* and *2102,* are the applicable sources of privilege. (Defs. Geiger & Winkler's Mot. to Quash at 3-4; Def. Metro's Mot. to Quash at 4-5.)
>
> As stated previously, this Court need not delve into the scope of state case law or statute, as neither inquiry furthers the threshold question: whether federal or state privilege law applies to the case at hand. In a non-diversity case such as this, the existence of a privilege must be determined by reference to federal common law, even where, as here, the action includes supplemental claims under state law. *Mem'l Hosp. for McHenry County v. Shadur, 664 F.2d at 1061.* There being no federal physician-patient or medical record privilege and recognition of either state standard would stand in direct conflict, defendants' motions to quash portions of subpoena rider P 1.f and 3 are accordingly denied.

[*24]  ***iii. Applicability of State Law Privilege to Metro Alone***

Defendant Metro invites this Court to apply the state law privilege standards to it alone. (Def. Metro's Mot. to Quash at 5-6.) Defendant Metro argues "it is sued . . . only on state law claims, and it cannot be disputed that state law privileges apply to state law claims." (Def. Metro's Reply at 6). Simply put, defendant Metro has misread the applicable case law in this area. Defendant Metro cites *Freeman v. Fairman, 917 F. Supp. 586 (N.D. Ill. 1996),* in support of a blanket application of state law privilege standards to all state claims. However, the proper application of *Freeman* is not that broad. In *Freeman,* the Court's allowance of a state standard on privilege was limited to situations where the discoverable item in question is only relevant to the state claim(s). *Freeman, 917 F. Supp. at 588.* "State law privileges do not automatically bind federal courts in federal cases." *United States v. Wilson, 960 F.2d 48, 50 (7th Cir. 1992).* Unlike the scenario laid out in *Freeman,* here the discovery sought by plaintiff appears to be relevant to both his state [*25] supplemental claims and his federal claims. The distinction proposed by defendant Metro -- applying

a competing state privilege to one defendant -- finds no support in case law.

Moreover, common sense seems to foreclose this possibility as well. If federal courts are reluctant to apply two different privilege standards to different claims before the same trier of fact, why would a court add an extra layer of complexity -- limiting instructions on whether certain items can be used as to certain defendants and not the others on only certain claims. *See, e.g., WM. T. Thompson Co. v. General Nutrition Corp., Inc., 671 F.2d 100, 103-04 (3d Cir. 1982)*("Obviously applying two separate disclosure rules with respect to different claims tried to the same jury would be unworkable. . . . One rule or the other must govern."). Defendant Metro's request to apply a state privilege to itself alone, for the above stated reasons, is hereby denied.

### B. Production Request Served on Defendant Cicero

On February 18, 2005, plaintiff served identical *Rule 34* production requests on defendant Metro and defendant Cicero. (Pl.'s Mem. in Opp'n at 10.) Neither defendant Metro nor [*26] defendant Cicero have complied, instead each has filed objections. (Pl.'s Mem. in Opp'n at 10.) Interestingly, defendants Metro, Geiger, and Winkler move to "quash" the production request on Cicero and not the one served on Metro. (Def. Metro's Mot. to Quash at 6; Defs. Geiger & Winkler's Reply at 1; Pl's Mem. in Opp'n at 10.) This Court also believes defendants' motion to "quash" the production request propounded to Cicero is best construed as an objection to discovery and proceeds accordingly.

At the heart of the objection are three months of ambulance reports prepared by defendant paramedics. The February 18 request calls for the production of:

> All ambulance reports, incident reports, run reports and other writings -- prepared or signed by defendant Winkler or defendant Geiger -- regarding EMS calls to which one or both of them responded and/or medical services one or both of them provided between April 7, 2003 and July 7, 2003.

(Pl.'s Mem. in Opp'n at Exhibit C-D.) [5] Defendants argue that the ambulance reports sought impose an undue burden on defendant Cicero and that the ambulance reports are privileged, and thereby not discoverable. [6]

5  On February 25, 2005, plaintiff served a similar *Rule 34* request on defendant Metro albeit broader in scope. (Pl.'s Mot. to Compel at 1.) The February 25 production request calls for docu-

ments pertaining to medical services provided by defendant paramedics at two specific addresses through July 7, 2003. The February 25 request is the subject of plaintiff's motion to compel and is discussed below in a separate portion of this opinion.

[*27]

6  Plaintiff does not set forth any objection to the standing of defendants Metro or paramedics to assert discovery objections to written discovery propounded to defendant Cicero. Although this Court has previously address such standing problems, *supra at 7*, the Court will address the timeliness of defendants' objection nonetheless.

### 1. Timeliness of Objections

Plaintiff filed his document request on defendant Cicero on February 18, 2005. Cicero responded with their objections on April 1, 2005, well after the time allowed under the *Federal Rules of Civil Procedure. Rule 34(b)* requires "the party upon whom the request is served shall serve a written response within 30 days after the service of the request." Defendants fail to address defendant Cicero's untimely response. (Def. Metro's Reply at 7 (no mention of untimeliness); Def. Geiger & Winkler's Reply at 1.) "The failure to object to a discovery request in a timely fashion may constitute a waiver of the objection, including objections based on privilege." *Applied Systems, Inc., 1997 U.S. Dist. LEXIS 16014, 1997 WL 639235 [*28] at *2 (N.D. Ill. 1997)*(citations omitted). However, the rules of discovery do not automatically require waiver in such a situation. *Id.* "Rather, waiver . . . is a serious sanction reserved for cases of unjustified delay, inexcusable conduct, bad faith, or other flagrant violations." *Id.*

Courts have reserved the waiver sanction to extreme cases. *See Ritacca, 203 F.R.D. at 335* (noting unjustified delay in responding to discovery as grounds to impose a waiver sanction). On more than one occasion, defendants fail to justify their untimely response to the February 18, 2005 requests, including those served on defendant Cicero and defendant Metro. Moreover, defendant Metro fails to respond to plaintiff's timeliness objection in their written reply. Accordingly, this Court believes Cicero's late response and defendants' non-responsive pleadings constitute the type of occasion whereby *Rule 34(b)'s* 30 day requirement should be strictly construed. Defendant Metro's and defendant paramedics' motions to "quash" plaintiff's production request propounded to defendant Cicero is hereby denied.

### C. Plaintiff's Motion for a Protective Order

Plaintiff files a motion [*29] for the entry of a HIPAA qualified protective order that would serve to re-

2005 U.S. Dist. LEXIS 16423, *

strict the handling of and order the destruction of ambulance reports and a number of limited documents related to finances disclosed or to be disclosed in discovery. (Pl.'s Mot. for Prot. Order at 1.) The plaintiff's proposed order would cover, in part, the documents plaintiff requested from Loyola and defendant Cicero. (Def. Metro's Resp at 1-2.) A plain meaning review of the plaintiff's proposed order indicates it would also cover the ambulance reports plaintiff seeks from defendant Metro. Defendant Metro opposes the entry of the protective order on grounds of privilege, again citing to state law privileges. For the reasons set out above, state law of privileges do not govern the privilege determination in the matter at hand. As the federal privilege standard applies, there is no applicable physician-patient or medical records privilege that removes the ambulance reports from the reach of discovery.

Defendant Metro, arguing in the alternative, asserts that HIPAA mandates "very stringent standards for the de-identification of medical records," which Metro asserts would be violated should records be turned [*30] over in compliance with plaintiff's protective order, as proposed. (Def. Metro's Resp. at 3-4.) Metro's read on HIPAA's de-identification standards is misguided. HIPAA does not mandate de-identification, instead it offers multiple standards and means to guide covered entities in properly disclosing protected health information. *Compare 45 C.F.R. § 164.514* (standard for de-identification) *with §§ 164.512(a)* (standard for disclosure required by law); *164.512(b)* (standard for disclosure for public health activities); *164.512(e)* (standard for disclosures for judicial and administrative proceedings); *164.512(f)* (standard for disclosure for law enforcement purposes); *164.512(j)* (standard for disclosure to avert serious threat to health or safety). As HIPAA's de-identification regulations are but one means of compliance, the Court denies defendant Metro's request that the protective order be denied for failure to comply with HIPAA's de-identification option. Moreover, entry of plaintiff's proposed order would also obviate the need for HIPAA de-identification.

Next, the Court turns to plaintiff's proposed order. The Seventh Circuit concluded in *Northwestern* [*31] *Memorial Hospital* that HIPAA's standards for disclosure of protected health information in judicial proceedings, *45 C.F.R. § 164.512(e)*, "should [only] be understood . . . to create a procedure for obtaining authority to use medical records in litigation." *362 F.3d at 925-26*. Plaintiff seeks a protective order that meets HIPAA's "qualified protective order" standard. For purposes of HIPAA's standards for disclosure in judicial proceedings, a "qualified protective order" means, with respect to protected health information, an order of a court that "(A) prohibits the parties from using or disclosing the protected health

information for any purpose other than the litigation . . . for which such information was requested; and (B) requires the return to the covered entity or destruction of protected health information (including all copies made) at the end of the litigation . . . .." *45 C.F.R. § 164.512(e)(1)(v)*. Review of plaintiff's proposed protective order reveals it would limit the parties to use of ambulance reports to the litigation at hand and order their destruction at the conclusion of all trial and appellate [*32] proceedings. (Pl.'s Proposed Protective Order at 1-2.) The Court finds the plaintiff's protective order meets HIPAA's two-prong definition of a "qualified protective order." Moreover, there are no arguments before this Court that defendants object to the non-HIPAA provisions of the plaintiff's proposed order. (Pl.'s Reply Mem. in Support of Protective Order at 10.)

Finally, defendant Metro asks for additional language in the proposed protective order should it be granted. (Def. Metro's Resp. to Protective Order at 4.) Defendant Metro seeks a clear statement that the proposed protective order would not govern admissibility for any information produced pursuant to the order. As plaintiff does not object to defendant Metro's clarifying language (Pl.'s Reply Mem. in Support of Protective Order at 10), the Court grants Metro's request for modification. Accordingly, the Court grants the plaintiff's motion for a HIPAA qualified protective order provided that parties meet and confer to craft a new proposed order that is consistent with this opinion within five business days.

### D. Plaintiff's Motion to Compel Production of Documents by Defendant Metro

On February 25, 2005, through [*33] his third document request to defendant Metro, plaintiff sought all documents, including ambulance reports, related to two particular addresses in which defendants Geiger and/or Winkler were involved prior to the date plaintiff alleges he was battered and provided substandard medical services. (Pl.'s Mot. to Compel at 1.) On March 29, 2005, defendant Metro responded to the plaintiff's document request by raising objections on four grounds. (Pl.'s Mot. to Compel at Exhibit A.) Defendant Metro argues that the request is (1) "not calculated to lead to admissible evidence," (2) unduly burdensome, (3) overbroad, and (4) in violation of HIPAA. (Pl.'s Mot. to Compel at Exhibit A.)

In April 2005, plaintiff filed a motion to compel the production of aforementioned documents by defendant Metro. (Pl.'s Mot. to Compel at 1.) In addition to countering each of the four grounds of objection that defendant Metro raises, plaintiff argues that Metro is time barred from raising their objection. The Court begins with the procedural argument.

2005 U.S. Dist. LEXIS 16423, *

### 1. Timeliness of Objections

Plaintiff argues that defendant Metro's objection to production is outside of the time allowed by *Federal Rule of Civil Procedure 34(b)* [*34]   . (Pl.'s Mot. to Compel at 1-2.) Defendant Metro cites "an inadvertent clerical error" that accounted for the untimely service of their response to the plaintiff's production request and argues no prejudice to the plaintiff resulted. (Def's Resp. to Mot. to Compel at 2.)

In the absence of a court order or party agreement, *Rule 34(b)* allows only 30 days for a party upon whom a request for production is served to serve their written response. The Court notes that *Rule 34(b)* is cast in the mandatory. As such, the clear import of the Rule cannot be easily escaped. The Court also notes the delayed response time by defendant Metro appears to be a recurrent pattern. Plaintiff asserts that not only was defendant Metro late in responding to the plaintiff's motion to compel, they were late in filing their motion to quash and responding to plaintiff's first discovery request. (Pl.'s Reply Mem. at 1.) Metro has not contested this assertion. Moreover, whereas the Court credited the clerical error of the plaintiff's agent to the advantage of defendant Metro in their motion to quash, the defendant's own "inadvertent clerical error" here will be credited to the advantage of the opposing party. Taken [*35]  together, these three factors lead the Court to conclude that Metro's failure to serve their objection to the production request in a timely manner is fatal. As such, the Court grants plaintiff's motion to compel.

Even if this Court were to agree with defendant Metro on the timeliness of service, the Court would still grant plaintiff's motion to compel on the independent bases articulated below.

### 2. Relevance

Defendant Metro's first basis for objection to the plaintiff's request is relevance. Defendant Metro asserts that the plaintiff's request is "not calculated to lead to admissible evidence." (Pl.'s Mot. to Compel at Exhibit A.) Plaintiff seeks documents relating to any earlier visit by Metro's employees, co-defendants paramedics, to the apartment where plaintiff lives and/or the adjoining three-flat. (Pl.'s Mot. to Compel at 2; Pl's Reply at 2 n.1.) *Federal Rule of Civil Procedure 26(b)(1)* permits discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party." Discoverable information is not limited to that which would be admissible at trial. Information is relevant under *Rule 26(b)(1)* [*36]  "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Relevant material, for discovery purposes, may encompass any

matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case. *Minch, 213 F.R.D. at 527.*

Plaintiff argues that the ambulance reports sought through his third discovery request are likely relevant to his establishing motive (Pl.'s Mot. to Compel at 2) and to impeach defendants' denial of prior runs to the addresses (Pl.'s Reply Mem. at 2). Defendant, on the other hand, resorts to the fishing expedition defense and argues that given the limited weight such ambulance reports would have in establishing motive, the motion should be denied. (Def's Response to Mot. to Compel at 3.)

Defendant Metro's arguments lack substance. First, arguments as to the sufficiency or weight of such evidence are premature at this stage. Relevant matters for discovery purposes only need to be "reasonably calculated" to lead to discovery of admissible evidence. Thus, the Court finds that the request for documents related to the neighboring address is reasonably calculated [*37]  to lead plaintiff to admissible evidence about ambulance visits to the plaintiff's home. Finally, with regard to defendant Metro's claim of fishing expedition, the Court notes that the Supreme Court, in a famous passages, has spoken of the proper scope of discovery rules, inclusive of *Rule 26*. It said, "We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case." *Hickman v. Taylor, 329 U.S. 495, 507-08, 91 L. Ed. 451, 67 S. Ct. 385 (1947).* Defendant Metro has failed to establish that the discovery requested is irrelevant to any claim.

### 3. Burden of Production

Defendant Metro's second objection to the plaintiff's request is that it is unduly burdensome. (Pl.'s Mot. to Compel at Exhibit A.) Plaintiff asserts defendant Metro's grounds for making this claim is unsubstantiated and "made without factual inquiry." (Pl.'s Mot. to Compel at 3.) Counsel for plaintiff reports a "meet-and-confer" conversation with counsel for defendant Metro as to the nature of the burden wherein Metro acknowledged that they [*38]  had no information as to the number of documents responsive to plaintiff's request or how they were organized. (Pl.'s Reply Mem. at 3.) Defendant Metro has not offered any contrary fact on this point. The Court finds Metro's objection of "undue burden" simply lacking in support.

### 4. Overbreadth of Request

Defendant Metro's third ground for objecting to plaintiff's request is that it is overly broad. (Pl.'s Mot. to

Compel at Exhibit A.) Specifically, defendant Metro points to the limitless time frame of plaintiff's request. (Def.'s Resp. to Mot. to Compel at 6.) However, this argument is disingenuous. Defendant Metro's assertion belies logic and reasoning. Plaintiff draws the Court's attention to a concession he made before Magistrate Judge Nolan on April 12, 2005. In open court, plaintiff "agreed to limit the request to documents to a period of several months." (Pl.'s Reply Mem. at 3). Defendant fails to articulate why a time factor of several months is overly broad. Accordingly, defendant's objection rooted in overbreadth is denied.

### 5. HIPAA De-Identification Standards Violation

Defendant Metro's final basis for objection is that the plaintiff's request violates [*39] HIPAA's de-identification procedure. (Pl.'s Mot. to Compel at Exhibit A). The Court, however, agrees with plaintiff's construction of HIPAA. HIPAA does not shield documents in discovery, it only minimizes the disclosure of certain "protected health information" injudicial proceedings. Nor does HIPAA mandate de-identification. Absent court order, parties may comply with HIPAA by either de-identifying or submitting records with "protected health information" to a protective order.

Defendant Metro's objections are without proper support. Plaintiff's motion to compel is hereby granted in part and denied in part. The plaintiff's motion to compel is denied to the extent it seeks records beyond the "sev-

eral months" concession that plaintiff agreed to in open court. This Court construes the "several months" concession to be five months. Thus, the Court orders defendant Metro to comply with the plaintiff's February 25, 2005 production request related to documents generated by either defendant paramedic covering the two addresses in question from February 7, 2003 through July 7, 2003.

### CONCLUSION

Based on the foregoing, this Court DENIES the defendants' motions to quash, GRANTS the [*40] plaintiff's motion for a protective order, and GRANTS IN PART and DENIES IN PART the plaintiff's motion to compel production. Parties must comply by submitting a revised protective order to this Court within five business days of the entry of this order. Defendants must comply with the motion to compel within 14 days of the entry of this order. Finally, plaintiff is ordered to disclose all records Loyola produced under subpoena that are not in defendants' possession.

**SO ORDERED.**

**Dated:** August 8, 2005

**ENTERED:**

**HON. MARIA VALDEZ**

**United States Magistrate Judge**

LEXSEE 1991 U.S. DIST. LEXIS 4269

**DANIEL DUNCAN, et al., Plaintiffs, v. NORTHERN ALASKA CARPENTERS RETIREMENT FUND, et al., Defendants**

**No. MS90-273**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON**

*1991 U.S. Dist. LEXIS 4269; 13 Employee Benefits Cas. (BNA) 1399*

**January 10, 1991, Decided
January 10, 1991, Filed**

**COUNSEL:** Richard J. Birmingham, Howard David Stambor, D. Bruce Lamka, DAVIS, WRIGHT, TREMAINE, Seattle, Washington.

Michael Alexander Patterson, LEE, SMART, COOK, MARTIN & PATTERSON, Seattle, Washington.

**JUDGES:** [*1] Barbara J. Rothstein, Chief United States District Judge.

**OPINION BY:** ROTHSTEIN

**OPINION**

ORDER ENFORCING FOREIGN SUBPOENA

THIS MOTION comes before the court on plaintiffs' motion to enforce a foreign subpoena. Having reviewed the matter, together with all documents filed in support and in opposition, and being fully advised, the court finds and rules as follows:

*I. FACTUAL BACKGROUND*

Plaintiffs are a group of carpenters who worked on the Trans-Alaska Oil pipeline in the mid-1970s. Defendants are retirement funds to which plaintiffs contributed while working on the pipeline. Upon completion of the pipeline, a majority of the carpenters were laid off, and trustees of the defendant pension plans forfeited plaintiffs' interest in pension benefits, contending that plaintiffs had not worked for the ten-year vesting period set forth in the plan. Plaintiffs' Motion to Enforce Subpoena at 4.

Plaintiffs filed a class action lawsuit in U.S. District Court in the District of Oregon, claiming that a partial termination of the pension plan, entitling plaintiffs to the vesting of their benefits, occurred upon completion of the

pipeline and subsequent termination of workers from 1976-80, [1] and that the pension plan [*2] trustees violated their fiduciary obligations under the Employee Retirement Income Security Act (ERISA) and the Labor Management Retirement Act by, among other things, failing to adopt an accelerated vesting schedule to accommodate the substantial but temporary increase in contributions caused by construction of the pipeline.

> 1   The Internal Revenue Code (IRC) requires that in order to be a qualified trust, a pension plan must vest all workers in their accrued benefits upon "partial termination" of the plan. *IRC § 411(d)(3)*. Partial termination occurs when there is a significant decline in the number or percentage of workers participating in a pension plan. *Treas. Reg. § 1.411(d)-2(b)(1)*. The plan documents at issue in this case provide for vesting upon partial termination. Plaintiffs' Motion to Enforce Subpoena at 4.

Through earlier discovery, plaintiffs learned that in 1980 the Internal Revenue Service (IRS) began to investigate various pension plans that covered Alaska pipeline workers, including the plan at issue [*3] here. Affidavit of Richard Birmingham, para. 3. The purposes of the IRS investigation were to determine whether a partial termination of the plans had occurred because of the large number of layoffs upon completion of the pipeline, whether plan participants were therefore entitled to benefits and whether the trustees' refusal to pay accrued benefits would result in tax liability for the various plans. Plaintiffs' Motion to Enforce Subpoena at 5.

In response to the IRS investigation, the trustees of several of the plans appealed to Congress to change the partial termination provisions of the code in a manner that would save them from liability and protect their tax

1991 U.S. Dist. LEXIS 4269, *; 13 Employee Benefits Cas. (BNA) 1399

exempt status. As part of the Deficit Reduction Act of 1984, Congress included an amendment to the Internal Revenue Code (IRC) that eliminated the possible tax liability that would arise from a "partial termination" of the plans covering former pipeline workers. Pub. L. No. 98-369, § 552, 98 Stat. 896, 896-97 (1984). This action by Congress prompted the IRS to abandon its investigation of whether the plans covering Alaska pipeline workers had been partially terminated. The termination of the IRS investigation did not render [*4] moot the question of whether there was a partial termination for the purposes of determining whether plaintiffs' are entitled to benefits.

To support their claim that partial termination occurred, thereby entitling them to benefits pursuant to their pension plan, plaintiffs requested information from the IRS related to its investigation of the plans. On April 24, 1990, plaintiffs obtained from the District of Oregon a foreign subpoena directing Seattle IRS officials to appear at a deposition and to bring with them

Copies of any records, notes, reports, memoranda, and documents regarding any investigations, audits, analyses, reviews, determinations or other studies with respect to the possible partial termination of any employee benefit pension plans occurring as a result of a decline in plan participation due to the completion of the Trans-Alaska Oil Pipeline construction project. . . .

Plaintiffs' Motion to Enforce Foreign Subpoena, Exhibit A. Stephen H. Flesner, disclosure officer for the IRS Seattle District Office, responded to the subpoena by stating that such materials were not subject to disclosure pursuant to *26 U.S.C. § 6103(a)*. Subsequent attempts by plaintiffs to receive [*5] clarification from the IRS as to which documents specifically were covered by *26 U.S.C. § 6103(a)* were unproductive, and plaintiffs' counsel's attempts to engage counsel for the IRS in a Local Rule 37(g) discovery dispute conference were unproductive. Plaintiffs now move this court to enforce the foreign subpoena issued by the District of Oregon by compelling the IRS to appear at a deposition and to produce the documents specified in the subpoena.

## II. DISCUSSION

Disclosure of the subpoenaed documents is governed by *26 U.S.C. §§ 6103 and 6104(a)(1)(B)*. *Section 6103(a)* states the general rule of confidentiality for materials classified as returns and return information. However, the rest of *§ 6103* includes a number of exceptions to the nondisclosure rule. Of particular relevance to this case is *§ 6103(e)(1)(F)*, which provides for disclosure of returns and return information in the case of the return of a trust or a beneficiary of the trust if that beneficiary has a material interest and if disclosure would not seriously impair federal tax administration. *26 U.S.C. §§ 6103(e)(1)(F), 6103(e)(7)*. *Section 6104(a)(1)(B)* provides for disclosure of information related to pension plans.

Plaintiffs [*6] contend that the information they request is subject to disclosure under either *§ 6103(e)*(1(F) or *§ 6104(a)(1)(B)*. The IRS, however, contends that *§ 6103(e)(1)(F)* does not apply to pension trusts and that, even if it does, most of the information requested is not subject to disclosure under either provision. [2]

> 2  The IRS also states that it is willing to provide to plaintiffs a number of documents subject to disclosure under *§ 6104(a)(1)(B)*: (1) the annual returns/reports of the benefit plan; (2) Forms 5500 with related documents for years 1977-83; (3) Form 5303-application of plan for determination of collective bargaining plan; and (4) the technical advice memorandum issued by the IRS to the plan.

Thus, this court must determine whether *§ 6103(e)(1)(F)* applies to pension plan trusts and whether the subpoenaed documents are subject to disclosure under either *§ 6103(e)(1)(F) or § 6104(a)(1)(B)*.

### A. Defendants' Opposition to Motion to Enforce

The court notes initially that defendants also have filed an opposition [*7] to plaintiffs' motion to enforce the foreign subpoena. However, defendants do not have standing to contest the compulsory process of the district court since they are not in possession of the materials subpoenaed and because they have not alleged any personal right with respect to the materials subpoenaed. *Brown v. Braddick, 595 F.2d 961, 967 (5th Cir. 1979)*; *Clayton Brokerage Co. v. Clement, 87 F.R.D. 569, 571 (D. Md. 1980)*.

### B. Application of 6103(e)(1)(F) to Pension Trusts

The IRS contends that the legislative history of *§ 6104* indicates that it was meant to be the exclusive code provision for disclosure of information about pension plans. Thus, the IRS concludes that *§ 6103(e)(1)(F)* is not applicable to pension plans that happen to take the form of trusts. The IRS supports its contention of *§ 6104's* exclusivity primarily through reference to a House report stating that the information made available under *§ 6104* will give pension plan participants "enough information to enforce their plan rights. " H.R. Rep. No. 93-807, 93rd Cong. 2d Sess., 1974 U.S. Code Cong. & Ad. News 4827.

Although courts ordinarily give deference to the interpretation [*8] of a statute by an agency charged with administering that statute, *Howe v. Smith, 452 U.S. 473,*

1991 U.S. Dist. LEXIS 4269, *; 13 Employee Benefits Cas. (BNA) 1399

*484 (1981)*, the IRS' reading of *§§ 6103(e)(1)(F)* and *6104(a)(1)(B)* contradicts the unambiguous language of those provisions. See *id. at 483*. *Section 6103(e)(1)(F)* does not place any limitation on the kind of trust about which a materially interested person can retain information. In addition, *§ 6104(a)(1)(B)* does not state that it is the exclusive provision governing disclosure of information about pension plans. Furthermore, the legislative history cited by the IRS does not "clearly express" a legislative intent either that *§ 6103(e)(1)(F)* does not apply to pension plan trusts or that *§ 6104(a)(1)(B)* was meant to govern exclusively disclosure of pension plan information. See *Pyramid Lake Paiute Tribe of Indians v. United States Dept. of Navy, 898 F.2d 1410, 1417 (9th Cir. 1990)*.

Thus, this court concludes that determination of whether disclosure of the information specified in the foreign subpoena is appropriate is governed by both *§ 6103(e)(1)(F)* and *§ 6104(a)(1)(B)*.

C. Disclosure of Subpoenaed Documents Under *§ 6103(e)(1)(F)*

[*9] In order for documents to be disclosed pursuant to *§ 6103(e)(1)(F)*, the documents must fall within the definition of returns or return information, the party requesting the documents must be a trustee or a beneficiary of a trust and must have a material interest in the information, and disclosure of the information must not impair federal tax administration.

The IRS does not contest the classification of this material as return information, plaintiffs' material interest in the information or the absence of impairment of federal tax administration through disclosure of the information. However, the IRS does contend that plaintiffs are not beneficiaries within the meaning of *§ 6103(e)(1)(F)*. The IRS further argues that the precise question at issue in this lawsuit is whether plaintiffs are in fact beneficiaries of the defendant pension plans and that plaintiffs here are improperly trying to litigate the issue of whether they are beneficiaries against the government in this court rather than against defendants in the District of Oregon. The IRS, however, confuses the term beneficiary with the vesting of benefits. ERISA provisions governing employer disclosure of pension plan information [*10] define participants and beneficiaries as those who may become entitled to benefits as well as those who are entitled to benefits.

A beneficiary "is a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to benefit thereunder." *29 U.S.C. § 1002(8)*. A participant

is any employee or former employee or an employer, or any member or former member of any employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan . . . or whose beneficiaries may be eligible to receive any such benefit.

*29 U.S.C. 1002(7)*. Furthermore, the qualifying language "may become" includes those with a colorable claim to vested benefits. *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117 (1989)*; *Kuntz v. Reese, 785 F.2d 1410, 1411 (9th Cir. 1986)*, cert. denied, *479 U.S. 916 (1986)*; *Saladino v. I.L.G.W.U. Nat. Retirement Fund, 754 F.2d 473, 476 (2d Cir. 1985)*.

For purposes of class certification, the District of Oregon already has determined that name plaintiff Daniel Duncan is a participant within the meaning [*11] of ERISA, *29 U.S.C. §§ 1002(7), 1132*, because he has a colorable claim to vested benefits. Affidavit of Richard J. Birmingham, Exhibit B, at 23-24 (Findings and Recommendations of Magistrate William Dale); Plaintiffs' Reply Memorandum on Motion to Enforce Subpoena, Exhibit B (Order of U.S. District Judge James Redden adopting the Findings and Recommendations of Magistrate William Dale).

The reasoning behind Magistrate Dale's finding that plaintiffs are participants under *29 U.S.C. § 1002(7)* is also persuasive in a determination that plaintiffs are beneficiaries under *29 U.S.C. § 1002(8)*. A beneficiary is one who "is or may become entitled" to a benefit under an employee benefit plan just as a participant is an employee or former employee who "is or may become eligible." [3] To obtain disclosure information, a beneficiary is one who has a colorable claim to vested benefits. The District of Oregon already has determined that plaintiffs have such a colorable claim.

> 3 There are, of course, differences between a beneficiary and a participant. The major differences are that a beneficiary receives the benefit from the participant's contributions to the plan and that a beneficiary may be but need not be an employee contributing to the pension plan.

[*12] Thus, plaintiffs are beneficiaries of a trust within the meaning of *§ 6103(e)(1)(F)* and are entitled to disclosure of the return information designated in the foreign subpoena.

D. Disclosure of Subpoenaed Documents Under *§ 6104(a)(1)(B)*

As the court has determined that the subpoenaed documents are subject to disclosure under *§ 6103(e)(1)(F)*, it need not determine whether they are subject to disclosure under *§ 6104(a)(1)(B)*.

1991 U.S. Dist. LEXIS 4269, *; 13 Employee Benefits Cas. (BNA) 1399

III. CONCLUSION

It is hereby ORDERED, ADJUDGED and DE-CREED that:

(1) plaintiffs' motion to enforce subpoena is GRANTED; and

(2) the IRS is directed to produce the specified documents at a deposition scheduled by the parties.

DATED at Seattle, Washington this 10th day of January, 1991.



Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P
43,027
**(Cite as: 1993 WL 580831 (E.D.Wis.))**

**H**
United States District Court, E.D. Wisconsin.
Malcolm D. FLAVEL, individually and on behalf of
all other persons similarly
situated, Representative Plaintiff,
and
Robert F. Cnare, James R. Conradt, Major Coxhill,
Robert K. Elbel, Malcolm D.
Flavel, Russell H. Graf, Robert L. Isferding, Robert
E. Jones, Chalasani C.
Rayan, Richard Spoonamore and Ronald J. Weiss,
Plaintiffs,
and
Equal Employment Opportunity Commission,
Plaintiff-Intervenor,
v.
SVEDALA INDUSTRIES, INC., f/k/a Boliden Allis,
Inc.; Svedala, Inc.; Allis
Mineral Systems; and Mineral Processing Systems,
Inc.; Defendants.
No. 92-C-1095.

Dec. 13, 1993.
Stephen Snyder, Laurie A Knocke, Winthrop &
Weinstine, P.A., St. Paul, MN, for plaintiffs.

Brian C. Tyndall, Lloyd B. Zimmerman, U.S.
E.E.O.C., Milwaukee, WI, for plaintiff-intervenor.

David Loeffler, Marty R. Howard, Krukowski &
Costello, S.C., Milwaukee, WI, for defendants.

*MEMORANDUM AND ORDER*

WARREN, Senior District Judge.

*1 Before the Court is the plaintiffs' Motion to
Compel the Discovery of Documents Within the
Physical Possession of Svedala Industry, A.B. and/or
Svedala International in the above-captioned matter.
For the following reasons, this motion is granted.

I. *FACTUAL AND PROCEDURAL BACKGROUND*
On January 1, 1988, Boliden AB, a Swedish
company owned by Trelleborg AB, another Swedish
company, assumed ownership of several units of

Allis-Chalmers Corp., a U.S. company, including its
crushing and screening production facility in
Appleton, Wisconsin, and its "pyroprocessing" and
grinding mill production facility in Milwaukee,
Wisconsin. (Plaintiff's July 2, 1993 Letter Brief at 2-
3.) These units, along with related businesses owned
or controlled by Boliden AB, were renamed Boliden-
Allis, Inc., and were included in the company's
newly-formed "Minerals Processing Business Area"
in 1989. *Id.* at 3. In January, 1990, Trelleborg AB
changed the company's corporate structure, (1)
transforming the "Minerals Processing Business
Area" into Svedala Industry AB ("SIAB"), a Swedish
company; (2) renaming Boliden-Allis' remaining
operations "Allis Mineral Systems," which became a
wholly-owned business unit of SIAB; (3) forming
Svedala Industries ("Svedala"), a U.S. company, as a
"special unit" of SIAB, and (4) creating Svedala, Inc.
("SI"), a U.S. company, as a holding company for
Svedala Industries. *Id.* at 6. Svedala International
("MINCO") [FN1] , a Swedish company formerly
known as MINCO International, is also a subsidiary
of SIAB. *Id.* at 1-2.

Malcolm D. Flavel was hired by Allis-Chalmers in
1961 as a factory representative, and was promoted to
the level of Consultant-Comminution Systems in
1983. (Complaint ¶ 17.) On October 17, 1990, at
the age of 54, Mr. Flavel was terminated from
employment at the Appleton plant. *Id.* at ¶ 18-19.
Robert E. Jones was hired by Allis-Chalmers in 1955
as an Application Specialist, and was promoted to the
level of Senior Project Application Engineer in 1979.
*Id.* at ¶ 21. On May 31, 1991, at the age of 60, Mr.
Jones resigned from employment at the Appleton
plant. *Id.* at ¶ 23-24. Mr. Flavel and Mr. Jones both
filed timely complaints with the Equal Employment
Opportunity Commission ("EEOC"), alleging that
Svedala discriminated against them on the basis of
age. *Id.* at ¶ 11-12. On September 30, 1992, the
EEOC issued a Letter of Violation, finding (1) that
Svedala "discriminated against [Mr. Flavel] and a
class of protected age group employees on the basis
of age with respect to evaluations, terms and
conditions of employment, demotion, and
termination;" and (2) that Mr. Jones "was subjected

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.

Page 2

Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027

**(Cite as: 1993 WL 580831 (E.D.Wis.))**

to harassment by his manager with considerable frequency, that [Mr. Jones] complained to others about this, and that others complained to the manager about his abusive behavior;    [that] younger co-workers were not harassed with the same degree and frequency, [and that witnesses observed] connections between the manager's behavior towards his employees and the employee's age, [with] preference being extended to younger staff members." *Id.* at ¶ 14, 22.

**\*2** On October 16, 1992, the plaintiffs brought the above-captioned matter as a representative action, claiming violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.,* and seeking declaratory relief and damages under state common law;    thus far, eleven (11) private plaintiffs have joined this suit. [FN2] After an extension was granted by the Court, the defendants filed an Answer on November 25, 1992, which was amended on December 4, 1992. On July 13, 1993, this Court issued an Order allowing the EEOC to intervene as a plaintiff in this action.

Regrettably, discovery in this case has been punctuated by numerous disputes, requiring several dispositive rulings by this Court.    In the instant motion, which was originally brought on February 22, 1993, the plaintiffs seek from the defendants the production of documents which are held by foreign entities SIAB and MINCO.    At a June 21, 1993 hearing resolving other discovery disputes, which was memorialized in a July 22, 1993 Order, we directed the parties to submit to the Court letter briefs regarding the instant motion.    The plaintiffs submitted their letter brief on July 2, 1993, with an addendum on September 10, 1993;    the defendants submitted their letter brief on July 9, 1993, with an addendum on July 12, 1993.

## II. *DISCUSSION*
### A. *PARTIES' ARGUMENTS*

The plaintiffs argue that, at all times subsequent to the Allis-Chalmers buyout, Swedish managers at SIAB and its predecessors maintained "direct and primary management authority over [the] U.S. businesses." (Plaintiffs' July 2, 1993 Letter Brief at 3-4.) They emphasize that these managers "were, and continue to be, actively involved in making decisions directly affecting the operations and personnel in the Appleton and Milwaukee facilities ... [including] directly participating in key hiring and employment decisions for the U.S. operations ...

reviewing the performance of U.S. employees of Svedala ... [and making] decisions concerning the restructuring or reorganization of the Appleton and Milwaukee businesses." *Id.* at 4-5, 7. The plaintiffs note that "two of the three board members for [Svedala and SI] are Swedish officers of the parent company [SIAB] ... [while] only one member of the board of Svedala and SI is an American," and that MINCO, who employed one of the plaintiffs at the time of his termination, circulated a "blatantly ageist notice of a job opening" at the Appleton facility. *Id.* at 6-7. The plaintiffs argue that such facts prove that Svedala and SI have the requisite "control" pursuant to Rule 34(a) over the requested documents held by SIAB and MINCO because (1) a "close corporate relationship" exists between the foreign parents and American subsidiaries because they have close managerial connections, interlocking management structures, and the parent company has a significant ownership share of the subsidiary;    or (2) the "consolidated enterprise" or "integrated enterprise" doctrine under Title VII and the ADEA is met because the foreign parents and American subsidiaries share an interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control. *Id.* at 8-12.

**\*3** The defendants, in turn, claim that, because SIAB and MINCO are not named as defendants in this suit, Svedala and SI "are obliged to produce documents now sitting in Sweden only if all the corporations are *alter egos* under the corporate model enacted into law in Section 4(h)(3)(A) through (D) of the ADEA," which requires that corporations share (1) an interrelation of operations;    (2) common management, (3) centralized control of labor relations;    *and* (4) common ownership or financial control. (Defendants' July 9, 1993 Letter Brief at 3-5.) While acknowledging that this provision only governs liability under the ADEA, and not discovery, the defendants argue that it creates a " 'substantive right' within the meaning of 28 U.S.C. § 2072(b), which cannot be abridged or modified through the application of any of the discovery rules." *Id.* at 5. They argue that "the American and Swedish corporations are not *alter egos* however, because [Svedala] and [SI] pursue 'labor relations' or employment policies without any 'centralized' direction or control from [SIAB] or [MINCO] ... the managements of the Swedish and American companies are not 'common' ... and the production and sales operations of the American and Swedish companies are largely independent of one another

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027
(Cite as: 1993 WL 580831 (E.D.Wis.))

Page 3

and not integrated in a continuous flow. *Id.* at 5-6. Specifically, "at the level of employment relevant to this litigation--managers below the level of facility General Manager and professional/technical support staff--the employment decisions of Svedala are not central[ly] controlled from Sweden." (Defendants' July 12, 1993 Addendum to Letter Brief at 2.) Thus, the defendants claim that the companies "have totally different senior management ... [and] Svedala runs its own employment regime independent of any direction from SIAB, except a broad directive to conform to U.S. law." (Defendants' July 9, 1993 Letter Brief at 8-10.)

B. *LEGAL STANDARD*

Document production in discovery is governed by Rule 34(a), which reads as follows:

"Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents, ... or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) *and which are in the possession, custody or control of the party upon whom the request is served ...*"

By using the word "or," Rule 34(a) makes a clear distinction among the meanings of "possession," "custody," and "control." In determining whether or not a party exercises "control," courts ask whether a party has a legal right to obtain the documents requested upon demand; actual physical possession is not required. *Burton Mechanical Contractors, Inc., v. Foreman*, 148 F.R.D. 230, 236 (N.D.Ind.1992); *Henderson v. Zurn Indus., Inc.*, 131 F.R.D. 560, 567 (S.D.Ind.1990) (*citing Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir.1984)); *In re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 423 (N.D.Ill.1977). The party seeking document production bears the burden of establishing the opposing party's control over such documents. *Burton*, 148 F.R.D. at 236.

**\*4** The plaintiffs properly note that, in determining whether a U.S.- domestic corporation must produce documents in possession of a foreign parent or affiliate, courts have focused on whether the U.S. corporation has the requisite degree of control over the documents sought. *See, e.g., Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127, 129 (D.Del.1986); *In re Uranium Antitrust Litigation*, 480 F.Supp. 1138, 1145-53 (N.D.Ill.1979). In deciding whether a subsidiary has "control" over

documents held by its parent corporation, courts focus on the closeness of the relationship between the entities. *See, e.g., Johnson v. Cloos Int'l., Inc.*, 1990 WL 106560, at \*1- 2 (N.D.Ill.1990); *Afros*, 113 **F.R.D. at 129-31**; *Cooper Indus., Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 919 (S.D.N.Y.1984). If the requisite degree of closeness is found, domestic corporations may be required to produce documents in the possession of foreign parents or affiliates, even though the latter are not subject to the personal jurisdiction of the court. *Cloos*, 1990 WL 106560, at 1-2; *Afros*, **113 F.R.D. at 131**; *In re Uranium*, 480 F.Supp. at 1145-53.

C. *ANALYSIS*

In their letter brief, the defendants mistakenly assume that the "*alter ego* " doctrine [FN3] embodied in Section 4(h)(3) of the ADEA dictates resolution of the "control" issue under Rule 34(a). Section 4(h)(3), however, is a *liability* provision, and it is clear that a party may exercise the requisite degree of "control" over documents held by a related entity under the discovery rules without exhibiting the degree of interrelationship necessary to project liability upon such entity pursuant to the ADEA. The degree of relationship between a domestic subsidiary and a foreign parent required to subject the latter to liability under the ADEA is certainly greater than that needed to subject the latter to document production through the former. This does not, as the defendants assert, violate 28 U.S.C. § 2072(b), [FN4] because the "substantive right" created under Sections 4(h)(1-3) of the ADEA, the inclusion or exclusion of liability for SIAB and MINCO, [FN5] is not implicated simply because such entities may be required to produce documents through Svedala and SI pursuant to Rule 34(a). A domestic subsidiary, then, may be required to produce documents held by a foreign parent, even though that parent is not covered by the provisions of the ADEA, so long as that subsidiary "controls" such documents as defined under Rule 34(a). [FN6]

The Court is satisfied that the defendants so "control" the requested documents held by SIAB and, derivatively, MINCO. As previously noted, in spirit with the current policy of permissive discovery, a party is generally considered to have "control" over documents under Rule 34(a) if it can likely obtain such documents upon demand. Thus, under the Rule 34(a) control analysis employed in *Afros S.P.A.* and its progeny, a sufficiently close corporate relationship exists between a domestic subsidiary and a foreign

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027
(Cite as: 1993 WL 580831 (E.D.Wis.))

Page 4

parent to compel the former to produce documents held by the latter if their degree of interrelation is evidenced by (1) adequate ownership share in the subsidiary by the parent; (2) interlocking management structures; (3) sufficient control exercised by the foreign parent over the subsidiary's directors, officers, and employees; and/or (4) a "connection to the transaction" at issue. Consideration of such factors promotes the policies underlying Rule 34(a) and ensures that a corporation cannot "hide" incriminating documents overseas; and, because none of these factors acts as an exclusive test, each factor need not be satisfied to prove the existence of Rule 34(a) "control."

*5 Nobody disputes that SIAB owns 100% of Svedala through its holding company, SI. Nor can it be seriously disputed that SIAB has traditionally maintained interlocking management structures with SI and Svedala. As noted by the plaintiffs, and as indicated in the defendants' exhibits, Thomas Older, the President, CEO, and Board member of SIAB, and Jan Knutsson, an Executive Vice President of SIAB, are currently acting as two of the three directors of Svedala, and Mr. Knutsson is also the Manager of Allis Mineral Systems. In addition, Mr. Older and Sven Ek, another Executive Vice President of SI, are currently acting as two of the three directors of SI. Clearly, this degree of interrelationship between directors of domestic subsidiaries and officers of a foreign parent sufficiently demonstrates the requisite "corporate closeness" required under this branch of the Rule 34(a) control analysis. In light of this, the defendants argument that SIAB lacks "interlocking management" with SI and Svedala simply because they do not share common directors or common officers is clearly disingenuous.

It also appears that SIAB exercised the requisite degree of control over the management of Svedala and SI regarding employment policies and decisions to justify the plaintiffs' document production request. The defendants concede that officers of SIAB "have the final say" on "key management personnel" decisions, including performance reviews, down to the level of General Managers of operating facilities. The plaintiffs, in turn, charge that several of these handpicked managers "had an active role" in at least several of their terminations, and "set the tone" for employment practices throughout Svedala and SI. This Court is satisfied that SIAB exhibited sufficient control over the hiring and review of upper and mid-level managers to bring the requested documents within the control of SI and Svedala pursuant to Rule

34(a). The plaintiffs have demonstrated that the motives behind employment decisions by SI and Svedala may be exhibited in documents held by SIAB, and have shown that, given the corporations' close relationship, such documents are available to the domestic corporations upon request. In addition, as previously noted, it is clear that our decision has no bearing on the *liability* of SIAB or MINCO for any allegedly unlawful acts; [FN7] therefore, the defendants' concerns as to our flaunting conventional notions of unlimited liability through incorporation are unwarranted. As a result, SI and Svedala will be required to produce the documents requested by the plaintiff which are held by SIAB pursuant to Rule 34(a).

Finally, because MINCO falls within the penumbra of the domestic subsidiaries' "close relationship" with SIAB, documents held by it are also discoverable by the plaintiffs. As previously noted, MINCO is a foreign, wholly-owned subsidiary of SIAB; and because, *inter alia*, MINCO's manager, Peter Kohle, is an Executive Vice President of SIAB, it appears that these corporations have interlocking management. In addition, the defendants have not challenged the plaintiff's assertion that MINCO directly employed at least one of the plaintiffs. Finally, based on the letter briefs submitted by the parties, the Court reasonably intimates that SIAB manages the operations of MINCO in the same manner as it does SI and Svedala; thus, SIAB clearly controls documents held by MINCO as defined under Rule 34(a). As a result, such documents, if relevant, are discoverable by the plaintiffs through Rule 34(a) as accessible through SIAB. [FN8]

### III. *SUMMARY*
*6 For the foregoing reasons, the Court hereby ORDERS that the plaintiffs' motion to compel documents in the above-referenced matter be GRANTED.

SO ORDERED.

> FN1. For the sake of clarity, Svedala International will be referred to by its previous name, MINCO.

> FN2. On February 25, 1993, the Court signed a stipulated order that consolidated *Weiss v. Boliden-Allis, Inc.*, Case No. 91-C-493, with the instant case. Normally, pursuant to Local Rule 4.03, "[i]f the motion is granted, the judge to whom the lowest

Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64 Empl. Prac. Dec. P 43,027
(Cite as: 1993 WL 580831 (E.D.Wis.))

numbered case is assigned shall handle all future proceedings covered by the consolidation order. When two or more cases are consolidated, all documents relevant to the purposes for which consolidation was granted will thenceforth be docketed only on the docket sheet for the lowest numbered of the consolidated cases." In this case, however, while the cases were consolidated into the lower-numbered case on the docket sheet, they were consolidated into the higher-numbered case in the court file. Because both cases were originally assigned to this Court, this oversight has not caused any significant administrative difficulties; it did, however, precipitate a filing error which resulted in a significant delay in processing the instant motion. To eliminate any further confusion, the Court hereby requests that, despite Local Rule 4.03, the parties use the higher-case number, 91-C-1095, in the caption of any subsequent filings in this case.

FN3. In their letter brief, the plaintiffs term this the "consolidated enterprise" or "integrated enterprise" liability doctrine under the ADEA.

FN4. 28 U.S.C. § 2072(b) reads as follows: "Such rules [the Federal Rules of Civil Procedure] shall not abridge, enlarge or modify any substantive right."

FN5. Clearly, Section 4(h)(3) of the ADEA does not grant the defendants any substantive right to be free from the rules of discovery.

FN6. The Court expresses no opinion as to whether SIAB or MINCO are sufficiently interrelated with SI and Svedala to implicate the liability provisions of the ADEA.

FN7. See supra pages 9-10.

FN8. The Court notes, however, that documents held by MINCO are generally less likely to be relevant to the instant matter than those held by SIAB, a more proximate relative to the plaintiffs than MINCO.

Not Reported in F.Supp., 1993 WL 580831 (E.D.Wis.), 63 Fair Empl.Prac.Cas. (BNA) 1199, 64

Empl. Prac. Dec. P 43,027

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

SARAH GRIPPER, Plaintiff, vs. CITY OF SPRINGFIELD, ILLINOIS, a Municipal Corporation, Defendant.

No. 04-3215

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF IL-LINOIS, SPRINGFIELD DIVISION

*2006 U.S. Dist. LEXIS 29058*

May 12, 2006, Decided
May 12, 2006, Filed

**SUBSEQUENT HISTORY:** Summary judgment granted by *Gripper v. City of Springfield, 2007 U.S. Dist. LEXIS 17811 (C.D. Ill., Mar. 14, 2007)*

**PRIOR HISTORY:** *Gripper v. City of Springfield, 2006 U.S. Dist. LEXIS 19205 (C.D. Ill., Apr. 13, 2006)*

**COUNSEL:** [*1]  For Sarah Gripper, Plaintiff: A Courtney Cox, HART & HART, Benton, IL.

For City of Springfield, Illinois, a Municipal Corporation, Defendant: Frank S Martinez, James A Lang, CITY OF SPRINGFIELD, Springfield, IL.

For City of Springfield, Illinois, a Municipal Corporation, Counter Claimant: James A Lang, CITY OF SPRINGFIELD, Springfield, IL.

For Sarah Gripper, Counter Defendant: A Courtney Cox, HART & HART, Benton, IL.

**JUDGES:** Richard Mills, United States District Judge.

**OPINION BY:** Richard Mills

**OPINION**

*OPINION*

RICHARD MILLS, U.S. District Judge:

This case is before the Court on the Defendant's motion to quash the subpoena.

Defendant City of Springfield, Illinois has moved to quash a subpoena to National City Bank. In support of the motion, the City states that on April 24, 2006, National City Bank was served by fax with a document purporting to be a subpoena. The City claims that the "subpoena" is not in the form prescribed by *Federal Rule of Civil Procedure 45*. The City notes that the cut-off date for discovery in this case was April 24, 2006. The return date for the subpoena was April 28, 2006. The City asserts that its counsel requested [*2] that the Plaintiff voluntarily recall the "improper" subpoena. The Plaintiff did not recall the subpoena. The City then moved to quash the subpoena directed at National City Bank.

In her response, the Plaintiff first states that a subpoena was sent on Aril 20, 2006 to Illinois National Bank, Matt Hitzemann's former employer, requesting the production of documents on April 24, 2006, the last day of the discovery period. On April 24, an Illinois National Bank representative notified the Plaintiff's counsel that because of various mergers, the requested documents could instead be obtained from National City Bank. The subpoena directed to National City Bank was served on April 24, 2006 and requested production on April 28, 2006.

The Plaintiff next alleges that on April 25, 2006, the City's counsel faxed a letter to Plaintiff's counsel regarding the subpoena, wherein he stated, "I will file a Motion to Quash tomorrow morning if you have not voluntarily complied." Because he had already left for the day, the Plaintiff's counsel saw the fax when he arrived at his office on the morning of April 26. The Plaintiff claims that counsel immediately emailed counsel for the City asking why he thought [*3] the subpoena was untimely and whether he had any authority for that statement. Counsel for the City then filed this motion to quash and answered Plaintiff's counsel by stating, "I assume you are able to read the case management order that sets the cut-off date as April 24."

Next, the Plaintiff notes that the subpoena is directed to National City Bank, and that the City therefore lacks

2006 U.S. Dist. LEXIS 29058, *

standing to quash the subpoena. "Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action unless the party claims some right or privilege with regard to the documents sought." 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2459 (2d ed. 1995). The Plaintiff's counsel states that he has received no complaint from National City Bank regarding compliance with the subpoena. Moreover, the City has not pointed to any "right or privilege" implicated by the requested documents.

As for the City's other arguments, the Plaintiff alleges that it has not specified what defect it believes exists with the subpoena in violation of *Rule 45*. Moreover, while maintaining that the subpoena was sent to National City Bank during the discovery [*4] period, the Plaintiff contends that even if the request was made after the discovery deadline, there is no legitimate reason to prevent her from obtaining information from a third party by subpoena. The Plaintiff asserts that the requested information can be used for reasons that do not involve discovery.

Although the City claims that the subpoena is not in the proper form prescribed by *Rule 45*, its motion to quash appears to be based primarily on its assertion that the subpoena is untimely. Given that the City has not alleged that it has some right or privilege with regard to the requested documents, however, the Court concludes that the City lacks standing to move to quash the subpoena issued to the non-party bank.

Ergo, the Defendant's motion to quash the subpoena [d/e 64] is DENIED.

ENTER: May 12, 2006

FOR THE COURT:

s/ Richard Mills

United States District Judge

Not Reported in F.Supp.                                                     Page 1
Not Reported in F.Supp., 1990 WL 106560 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

**H**

Johnson v. Cloos Intern., Inc.
N.D.Ill.,1990.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Elton D. JOHNSON, Plaintiff,
v.
CLOOS INTERNATIONAL, INC., Defendant.
**No. 89 C 8483.**

July 11, 1990.

*MEMORANDUM OPINION AND ORDER*

ANN C. WILLIAMS, District Judge.

*1 Plaintiff, Elton D. Johnson, filed suit against his former employer, Cloos International, Inc. ("Cloos USA"), alleging that Cloos USA's termination of plaintiff's employment was motivated by racial discrimination, in violation of Title VII of the Civil Rights Act of 1964. Defendant filed a motion to dismiss plaintiff's complaint, claiming that Cloos USA is not an employer within the meaning of Title VII because it employed less than fifteen persons during the year of the alleged violation and the preceding year. On March 21, 1990, plaintiff served defendant with his first set of interrogatories and request for documents, requesting information relating to ownership, operations and employment practices of Cloos USA, its parent corporation in Germany and its sister corporations in England, Switzerland and Austria. This information is necessary to respond to defendant's motion to dismiss because if Cloos USA alone does not have the requisite number of employees, plaintiff may be able to show that Cloos USA and its parent and sister corporations are an "integrated enterprise" and that the combined number of employees of these companies exceeds fifteen.

Cloos USA responded to plaintiff's interrogatories and document requests regarding Cloos USA but failed to provide any information regarding its parent company, Cloos GMBH, or any of its sister companies. In a letter dated May 24, 1990, counsel

for defendant stated that "information regarding companies other than Cloos International, Inc. [Cloos USA] ... is overseas and not within the possession of my client, and on those grounds it is my client's position that we are unable to produce and under no obligation to produce such information or documentation." Plaintiff's Motion to Compel, Exhibit C. Plaintiff then filed a motion to compel defendant to fully answer the interrogatories and to produce the requested documents.

Defendant, in its response to plaintiff's motion to compel, for the first time objects to plaintiff's requests for information on the ground of relevancy. Although this objection is not timely and therefore technically should be considered waived, the court will address it briefly. Defendant claims that plaintiff's discovery request is legally irrelevant because a 1966 EEOC opinion letter stated that foreign employers are "covered by Title VII of the Civil Rights Act of 1964 ... only when they have the requisite number of employees ... within the United States." *See* Defendant's Memorandum, Exhibit A. However, there is more recent case authority which provides that subsidiaries and their parents can be considered single entities for Title VII purposes. *See e.g.,* Smith v. Jones Warehouse, Inc., 590 F.Supp. 1206 (N.D.Ill.1984). Thus, plaintiff's discovery requests are quite relevant to defendant's motion to dismiss. FN1

The only question remaining is the whether the requested information is within Cloos USA's possession and control such that the court can compel its production pursuant to the Federal Rules of Civil Procedure. There is precedent for compelling a U.S. subsidiary to produce information held by its foreign parent corporation. *See, e.g.,* Afros S.P.A. v. Krauss-Maffei Corp., 113 F.R.D. 127 (D.Del.1986). The *Afros* court stated that the "key factual issues in determining control [such that discovery could be compelled] were: the parent's ownership share in the subsidiary or affiliated corporation; whether the corporations had interlocking management structures; the degree of control exercised by the parent

Not Reported in F.Supp., 1990 WL 106560 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

over the subsidiary's directors, officers, and employees." *Id.* at 129, *citing, In Re Uranium Antitrust Litigation,* 480 F.Supp. 1138, 1151-53 (N.D.Ill.1979). The court went on to emphasize that "[t]he control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them." *Id.*

**\*2** In the case at bar, the plaintiff has shown the requisite "close coordination" between defendant and its parent corporation to require defendant to produce the requested information regarding Cloos GMBH. Cloos USA is a wholly owned subsidiary of Cloos GMBH. Walter Cloos is the president of Cloos USA as well as the president of Cloos GMBH. Walter, Erwin and Helmut Cloos are on the board of directors of both Cloos USA and Cloos GMBH. This interlocking managerial scheme is sufficient to show the "close coordination" necessary in order to compel a domestic subsidiary to obtain information for discovery from a foreign parent. Therefore, the court grants the motion to compel with respect to Cloos GMBH in Germany.

The court denies the motion to compel as it relates to Cloos USA's sister corporations in Austria, Switzerland and England. Plaintiff offers no information regarding the managerial structure of these companies other than the affidavit of Petra Davis Johnson. The affidavit states that, based on information and belief, Walter, Helmut and Erwin Cloos act as officers and directors of all Cloos subsidiaries. *See* Davis Johnson Affidavit at ¶ 11. The affiant's belief, in and of itself, is not enough to show the "close coordination" necessary to imply control over information. The court realizes that the very information the plaintiff seeks to compel could substantiate its claim that Cloos USA should provide the information. However, at this point, the court must suggest plaintiff issue a subpoena duces tecum, pursuant to Fed.R.Civ.P. 45, to these sister corporations to obtain the information it needs to counter defendant's motion to dismiss.

FN1. Defendant goes on to state that because plaintiff's discovery requests were,

in its view, irrelevant, "[t]he only apparent purpose for which plaintiff has propounded this discovery is to harass and burden defendant CII." In fact, defendant wastes an entire page discussing how "abusive" plaintiff's discovery requests were. The court rejects this entire argument as unfounded and cautions that further attempts by defendants to put forth unsupported arguments will result in the court assessing sanctions.

N.D.Ill.,1990.
Johnson v. Cloos Intern., Inc.
Not Reported in F.Supp., 1990 WL 106560 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.